EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:13-CV-00649-FL

Amy Sparks,                    )
individually, and Robert )
D. Sparks, as Personal    )
Representative of the     )
Estate of Jarred B.       )
Sparks,                        )
                               )
   Plaintiffs,             )
                               )
vs.                            )
                               )
Oxy-Health, LLC and       )
Oxy-Health Corporation,   )
                               )
   Defendants.             )
_____/

VIDEOTAPED DEPOSITION OF STEVEN R. ARNDT, PH.D., CHFP
(Taken by the Plaintiffs)
Raleigh, North Carolina
Thursday, October 30, 2014

Reported in Stenotype by
Sophie Brock, RPR, CRR
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

MAGNA
LEGAL SERVICES

How does physiology relate to human factors?

A. Well, generally, human factors is the study of the capabilities and limitations of people as they interact with their environment, tools, technology, organizations, and other individuals.

So when we want to know about how people can perform or how they will be affected by certain elements within those areas, physiology plays a part in that.

Q. Do you consider yourself to be an expert in physiology?

A. No. I'm an expert in human factors; and there is physiological aspects of the human that do play a part in my expertise.

Q. Okay. Fair to say you're not an expert in hyperbaric technology?

A. Only in the things that are associated with human factors.

Q. Okay. Have you ever designed a hyperbaric chamber?

A. No.

Q. Have you ever tested a hyperbaric chamber?

A. Define "tested."

Q. Let me ask it this way.

Prior to being retained as an expert in this

MAGNA
LEGAL SERVICES

litigation, had you ever used a hyperbaric chamber?

A. No.

Q. Okay. Prior to being retained as an expert in this case, had you ever with your own two eyes ever seen a hyperbaric chamber?

A. I don't recall seeing one specifically, no. In person.

Q. I take it from your testimony, then, that you are unable, as you sit here today, to provide us information about a specific recollection of seeing with your own two eyes a hyperbaric chamber prior to being retained as an expert in this litigation --

A. My --

Q. -- is that correct?

A. Yeah. I'm sorry.

I've seen hyperbaric chambers in the literature, in documentaries, in television shows, in training materials I've seen. I'm a scuba diver, so I'm aware of hyperbaric technology. But I've never been, in person, that I can recall, with a hyperbaric chamber prior to this matter.

Q. Okay. And certainly I appreciate that explanation about seeing a documentary, or something appearing on television, or an article appearing in either a popular journal or a peer-reviewed journal,

MAGNA
LEGAL SERVICES

factors in terms of whether it can or cannot.

Q. What are those other factors, Doctor?

A. Explicitness. Size. Location. Social pressure. Peer pressure. Benign experience. Perception of risk. Risk-taking behavior. Personal responsibilities. Fear of compliance or non-compliance. Comprehension. Legibility.

I'm sure there's a few others, but I think I've covered the main areas.

Q. You mentioned perception of risk. Do you agree with the statement that perceived -- let me start over.

You mentioned perception of risk. Do you agree with the statement that the data in the human factors literature shows that warning effectiveness increases with the perceived hazardousness of the product?

A. No. I would say that self-comp -- self-reported likelihood of compliance, in some cases, has been shown to be linked to perception of risk. But it depends on the context; it depends on the individuals; it depends on the measure of effectiveness that you're discussing.

Q. What about the statement that users who believe that they are personally susceptible to

MAGNA
LEGAL SERVICES

serious injury while using a particular product should 09:45:48 be more likely to look for, attend to, and comply with 09:45:51 warnings information? 09:45:55

A. Well, that, again, would be context specific 09:45:55 and individual specific. As soon as you say "should 09:45:58 be," that's indicative of the distribution of human 09:46:01 responses, and you can't isolate any one factor that 09:46:05 way. 09:46:10

Q. What about the statement that severity of 09:46:24 injury is the principal predictor of hazard 09:46:26 perception? Do you agree with that statement? 09:46:29

A. No. That would depend, again, on the 09:46:32 individual's knowledge; it would depend on their 09:46:34 experience. 09:46:37

The understood level of severity may have an 09:46:40 impact, but there are certainly contexts and 09:46:42 situations where it may have no impact. 09:46:46

Q. You mentioned benign experiences a minute 09:47:04 ago? 09:47:08

A. Yes. 09:47:08

Q. Okay. What do you mean by that? What's your 09:47:09 understanding of that term? 09:47:11

A. Well, my use of that term is meant to 09:47:13 describe a situation where an individual has a history 09:47:17 of experience with a product or an environment or a 09:47:21

MAGNA
LEGAL SERVICES

A. I don't think so. I'd have to look it up and look through it again. But we've cited it in support for opinions in this matter.

Q. Fair to say you typically don't cite reference materials to support a position you're taking if you disagree with the methodology of that given reference?

A. It depends. Sometimes there are papers that have difficulties with methodologies, and some of the information can be gleaned from the data that's collected.

I can't universally say that I've never had a paper that we've thought could have been done better or could have been done differently that still doesn't have useful information in it.

Q. Is useful information the same as reliable information?

A. Well, it would depend on the context and the information. Reliability has a very specific definition. Useful can help you define information; it can expand your knowledge. Reliability is, you know, is it repeatable? Is it -- are the methods accepted? Is it something that someone could recreate?

Q. Do you agree with the statement that

MAGNA
LEGAL SERVICES

including a warning is better than not providing    09:53:10

warning information at all?    09:53:12

    A.  As it stands alone, no.    09:53:15

    Q.  Okay.  Do you know a gentleman with the last    09:53:17
name of Wogalter?    09:53:41

    A.  Mike Wogalter, yes.    09:53:44

    Q.  Do you know where in the world -- I'll call    09:53:48
him Mike -- where he lives?    09:53:52

    A.  I think Dr. Wogalter is now living in    09:53:54
Florida.  I think he's retired.    09:53:57

    Q.  Have you ever cited any articles or chapters    09:54:19
or peer-reviewed literature offered by Mike Wogalter?    09:54:22

    A.  I have, yes.    09:54:29

    Q.  Same question with respect to the Handbook of    09:54:30
Human Factors and Ergonomics, edited by Dr. Salvendy.    09:54:32

    A.  Yes, I believe I've cited that before.    09:54:37

    Q.  Okay.    09:54:41

      With respect to Dr. Salvendy's Handbook of    09:55:03
Human Factors and Ergonomics, is this a book that you    09:55:05
own?    09:55:10

    A.  I believe it's in my library.  But we should    09:55:11
be careful because Dr. Salvendy was the compiler and    09:55:15
ultimate editor, but it's a series of chapters by many    09:55:19
different authors on numerous different topics.    09:55:25

    Q.  Okay.  Including Dr. DeJoy and the    09:55:28

MAGNA
LEGAL SERVICES

Q.   Okay.

A.   I am certain that during my 18 years there have been aspects of issues involving certain litigation matters that someone would find adverse. From an engineering or scientific or human factors standpoint, I can't point to a specific recollection of any one event, but when you say "adverse," I don't know who is making the judgment.

Q.   Okay.  You mentioned an engineering perspective.  Do you hold yourself out as an engineer?

A.   Well, I have two advanced degrees in industrial engineering, but I am not a licensed professional engineer.  There is no PE for human factors.

Q.   Right.  In fact, you are ineligible, based on your education, to sit for the professional engineering exam in this state of North Carolina; correct?

A.   I haven't looked at what the requirements are in North Carolina.

Q.   Okay.  Do you hold an -- strike that.

Do either of your degrees -- any of the three degrees that you hold qualify you to sit for a professional engineering exam in any state in this country?

MAGNA
LEGAL SERVICES

courts as an expert in human factors; is that fair?  10:12:56

A. I don't know what you understand, but yes, 10:12:59
I have.  10:13:01

Q. Okay. That's a fair point, Doctor.  10:13:02

What other fields besides human factors, if 10:13:06
any, have you been qualified by a court as an expert? 10:13:08

A. I think all of my testimony has been under 10:13:11
the umbrella of human factors. I've had various 10:13:14
testimony involving subcategories of it: Safety; 10:13:19
warnings and instructions; anthropometry. All of the 10:13:22
areas we've covered before certainly have come up in 10:13:26
the breadth of the work I've done. But I have always 10:13:29
held that my experience, training and knowledge is in 10:13:31
the area of human factors.  10:13:34

Q. And do you plan on stating anything 10:13:37
differently when you're called to testify at the trial 10:13:39
of this action?  10:13:42

A. No.  10:13:43

Q. Okay. I think I know the answer to this, but 10:13:44
do you hold any patents?  10:13:48

A. No.  10:13:50

Q. Okay. Have you ever taught any college 10:13:50
courses?  10:13:55

A. Yes.  10:13:56

Q. Tell me about those.  10:13:56

MAGNA
LEGAL SERVICES

Q. Let me ask it this way: Has Exponent, Incorporated, done any testing to determine the deflation rate of this exemplar chamber under conditions substantially similar to those believed to have been involved in the death of Jarred Sparks?

A. Well, if you'd notice in this case, in this exemplar, we did not have an oxygen concentrator pass through. So this was just to document the deflation rate of this exemplar chamber.

As far as I know, and under my -- we've never done a documented -- well, I've never done or know of any documented deflation rate estimate for a similarly-configured chamber.

Q. Okay. Fair to say, then, that if I were to ask you to tell us here today, as a retained expert, what the deflation rate was under -- for the chambers at issue in this litigation, under conditions substantially similar to the evening in which Jarred Sparks passed away, you'd be unable to provide that information?

A. That's correct. We haven't done any type of an accident reconstruction for the incident chamber --

Q. Okay.

A. -- and the conditions that existed on the night of the incident.

MAGNA
LEGAL SERVICES

total sum of chambers over their history, to examine whether or not -- or to demonstrate the effect of an estimate of one use per week per chamber up to -- I believe the highest we go is five uses per week per chamber, and how that affects the overall rate of usage, and estimates that are used in our report.

Q. And where did those estimates come from, one through five?

A. Well, we have testimony in the record of chambers being used as much as five days a week, multiple times per day. We have testimony of individuals using it every day per week.

We started with one, which would be a very much more conservative number than anything I've seen in the record, and went up to as high as five. It was just a range of numbers based on the lowest number we could find in the record.

Q. Okay. You could have somebody who used the chamber twice a month; correct?

A. On average, for the totality of the chambers, this is our best estimate based on the record.

Q. Okay.

A. But yes, you could.

Q. Okay. Someone could go out and purchase a chamber and use it twice per month; correct?

MAGNA
LEGAL SERVICES

A. Yes.

Q. Okay. And then if you were to use basic arithmetic, that would give you a number of 0.5; correct?

A. 0.5 what?

Q. 0.5 uses per week.

A. Yes.

Q. Okay. Similarly, you could have someone use the chamber once a month?

A. You certainly could.

Q. Okay. And that would give you, through basic arithmetic, a number of 0.25; correct?

A. That's correct.

Q. Okay. With respect to any number of uses per week less than one, did you or Dr. Alper, or anyone else at Exponent, consider such a number?

A. Well, certainly it's considered. Based on the record, the information that we have is that, in the clinical setting, these were used a lot more frequently than the numbers we used. And in the home setting, at least as far as the Sparks and the Pressons discussed, their number was much higher than the number we used also.

So, on average, we use this as an estimate. It's not meant to indicate that this is the population

MAGNA
LEGAL SERVICES

actual value. It's our best estimate based on the record.

Q. And that would be a sample size of testimony of the Pressons and the Sparkses; correct?

A. And the physicians who treat.

Q. In a clinical setting?

A. Correct.

Q. Okay. But with respect to home use, it's based on a sample size of --

MR. HOYLE: How many? Three? Four depos?

Q. -- five depositions?

A. For home use, yes.

Q. Okay. And your own document that I've marked as Exhibit 145 shows that calendar year 2011, 8,576 of these devices were sold?

A. I will assume you read that correctly.

Q. Okay. You told us earlier about how human factors encompasses some specialized education, training and experience in the field of statistics; correct?

A. Yes.

Q. Okay. Is five out of 8,576 a representative sample size?

A. It would depend on what you're looking for.

MAGNA
LEGAL SERVICES

As it relates to the issues and the facts in this case, the only one that's important in terms of the application is the family's use of it.

In terms of estimating a population value, no, I would say that five data points is not likely to be a representative sample without some additional analysis.

Q. What about additional data? Would you need additional data, Doctor?

A. You could take additional data.

Q. You could. My question's a little bit different. Should you take additional data?

A. Well, it would depend on what you're trying to define.

Q. Okay.

If there was testimony in this litigation that the Sparkses went for months without using the chamber at all, would that change your values of one through five --

MR. AMMER: Objection to the form.

BY MR. HOYLE:

Q. -- that you've used for purposes of this estimation?

MR. AMMER: Objection to form.

MR. HOYLE: The witness can answer.

MAGNA
LEGAL SERVICES

THE WITNESS: I'm sorry, are you asking about specific testimony about their use of a chamber while they had it in their house? Or that the time and period when they didn't have any treatments?

BY MR. HOYLE:

Q. Let me ask it this way: Is the sole purpose of the data contained in the document I've marked as Exhibit 145 to show us with what frequency the Sparks family used a home-based hyperbaric chamber?

A. No. It extends many years beyond their use.

It's meant to demonstrate that, with the cumulative lifespan of the chambers, and the number of chambers out there, if the estimates are correct for applications and uses per week, this would be the magnitude of uses that could be expected for this population of chambers.

Q. So this population of chambers would go beyond the Sparks's home in Cumberland County, North Carolina; correct?

A. Correct.

Q. It would extend to all 100 counties in the state of North Carolina; correct?

A. Wherever there's a chamber.

These are the list -- or the number of chambers that have been produced by Oxy -- or that

MAGNA
LEGAL SERVICES

have been sold by Oxy-Health and produced by HTI that

we're aware of based on the record.

Q. And that's true from the west coast to the east coast, from the north to the south, throughout the United States of America; correct?

A. Wherever they've sold or manufactured, this is the total number of chambers that we're aware of.

Q. Okay. But, again, to use your words earlier, this is not a population-based estimate?

A. No, I said that, depending on what you're attempting to do, if you needed a better estimate for the population, if you wanted additional data to further reduce variability, you could take additional sample data to better describe the exposure or the number of uses per year or over the lifespan of the product.

Q. But, again, I want to make sure I understand the point and purpose of the documents I've marked as Exhibit 145. These are to show the frequency and ultimately the cumulative number of uses of home-based hyperbaric chambers throughout the entire country?

A. No.

Q. Okay. How is that statement I've said wrong?

A. Because it's not limited to home-based, and it's not -- it's not a description of frequency.

MAGNA
LEGAL SERVICES

It's a documentation demonstration of how cumulative chambers with the lifespan that we've gleaned over this period demonstrate how many times they could have been used over the time span without a history of an event like this occurring.

Q. Okay. But the sample size from which you took this data was less than five depositions; correct?

A. Well, no. The sample size where we collected the number of chambers came from documents produced in this case. The estimates for weekly usage were based on the record in this case. And we've made an assumption, for the purposes of this demonstration, that that would apply, within this range, across the products that are out there.

Q. Whether they be in the clinical setting or the home setting; correct?

A. That's correct. We've included both.

Q. Okay. You've included both, and you, again, are basing -- in order to come up with a cumulative number, this involves multiplication; right?

A. Yes.

Q. Okay. So one of the numbers we're going to use to multiply to get to our big number is the number of uses per week; correct?

MAGNA
LEGAL SERVICES

applicable to the design and fabrication of the 01:01:57

chamber at issue in this litigation?" what would your 01:02:02

answer be? 01:02:05

    A.   It would be that the -- according to what 01:02:06

I demonstrated earlier and showed you in the 01:02:09

highlighted section, the -- there was no intent to 01:02:11

design to that standard, so it wouldn't be applicable. 01:02:15

    Q.   Had you ever reviewed the ASME PVHO-1 01:02:19

standard prior to being retained as an expert in this 01:02:24

case? 01:02:26

    A.   Not that I can recall. 01:02:29

    Q.   You don't have a specific recollection, as 01:02:31

you sit here today, of sitting down with the ASME 01:02:32

PVHO-1 standard and reading it prior to being retained 01:02:38

in this case; is that fair? 01:02:40

    A.   That's fair. 01:02:42

    Q.   Okay.  And, certainly, since you didn't 01:02:43

review it prior to being retained in this case, you 01:02:45

had no role in authoring it; correct? 01:02:47

    A.   That's correct. 01:02:50

    Q.   The ASME, what is that? 01:02:51

    A.   American Society for Mechanical Engineers, 01:02:54

I believe. 01:02:57

    Q.   Okay.  Are you a member of that organization? 01:02:58

    A.   I am not. 01:03:00

MAGNA
LEGAL SERVICES

Q. Do you hold yourself out to be a mechanical engineer?    01:03:01 01:03:03

A. No.    01:03:03

Q. Have you ever been a member of any ASME committee?    01:03:04 01:03:06

A. No.    01:03:06

Q. Is the sole basis for the opinion that you just gave me about the applicability of this ASME PVHO-1 standard based upon your reading of it?    01:03:13 01:03:15 01:03:19

A. As well as the testimony of others in this case.    01:03:22 01:03:24

Q. All right. So, one, you read it; and then, two, you reviewed testimony from others; correct?    01:03:26 01:03:28

A. Yes.    01:03:31

Q. Okay. And, specifically, whose testimony are you relying on?    01:03:31 01:03:33

A. Peter Lewis.    01:03:34

Q. Okay. Who else?    01:03:36

A. As the designer of the product, he's the only one that I'm relying upon for that basis.    01:03:37 01:03:40

Q. Okay. So you're relying on the testimony of Mr. Lewis, and you read the standard; correct?    01:03:44 01:03:47

A. Yes.    01:03:49

Q. Anything else you've done in order to formulate that opinion, belief, and/or statement?    01:03:50 01:03:51

MAGNA
LEGAL SERVICES

A. Like I said before, it's not an opinion that I hold. It's not described in my report as one of the -- one of my opinions. You asked me a question about what would my answer to that question be.

Q. Okay. And that's what I'm trying to get a sense of, because, I'll be honest with you, I read your report, and I thought it was a very fine report, and I really don't take issue with how things were worded in there, but I found a few things to be a little ambiguous, and this is one of them.

I just want to get a sense, as this is the only time I get to talk to you -- and I am paying $475 for your time here today -- to understand whether or not you're going to show up at the trial of this action with a big sign you hold up saying ASME PVHO does or does not apply. That's what I'm trying to get a sense of; okay?

MR. HOYLE: And you can object if you want to.

MR. AMMER: Object to form.

BY MR. HOYLE:

Q. Does that make sense?

A. Well, as I said, my opinions are listed in my report. The bases for my opinions are listed in my report. If there's additional things that are said at

MAGNA
LEGAL SERVICES

had unintended consequences to it as far as creating a

hazard that presented an unreasonable risk from a

safety standpoint or from a human factors standpoint.

Q. Okay. Do you intend to offer an opinion at the trial of this action whether Oxy-Health is a manufacturer of the 320 hyperbaric chamber pursuant to applicable federal regulations?

A. Well, the only applicable federal regulation I'm aware of in this case is the FDA; and from what I've reviewed, the 510(k) indicates that HTI is the manufacturer of the product.

As we've discussed, all of my opinions are based on human factors, and my actual opinions are listed in my report. So beyond that, I would not have any other opinions on that aspect.

Q. Okay. And with respect to that, reading Dr. Peter Lewis --

MR. HOYLE: Is he a doctor? He's a mister. Okay. Strike that.

BY MR. HOYLE:

Q. I think we've already established that -- other than reviewing those written records yourself, and reading the testimony of Mr. Lewis and Mr. Patel, is there anything else that you rely on to make that statement?

MAGNA
LEGAL SERVICES

A. Well, I've read the 510(k)'s. I've read the -- all of the other production documents that are in my files that indicate how the devices were designed; who conducted the analysis of the devices; who tested the devices.

So it's not limited to those elements you described; it's the entirety of my file that goes into that description or statement.

Q. Okay. Explain to me how, if at all, human factors as a discipline would help your average person off the street -- let's say New Bern, North Carolina -- understand whether Oxy-Health Corporation was or was not a manufacturer of this hyperbaric chamber at issue?

A. Well, human factors is the -- is the study of the interaction between people, their organizations, products, their environment. We often do organizational socio-technical system design review. We deal with organizational issues like supervision, change, management, as it affects safety and decision-making.

But as far as if you're asking how does human factors apply to what's written on a 510(k) application, there isn't anything. That's just a factual component of what's written there.

MAGNA
LEGAL SERVICES

As far as what the FDA has ruled as to who the manufacturer is, again, that's factual. That wouldn't be a human factors opinion.

Q. Okay. And that's what I'm trying to understand, because -- will you agree with -- well, maybe you won't agree with me.

Let me ask you this: Do you consider human factors would be a scientific discipline?

A. I do.

Q. Okay. We teach human factors in schools of engineering; correct?

A. As well as schools of psychology.

Q. Okay. And at Wisconsin, where you got your doctor of philosophy degree, it was in the school of engineering; correct?

A. That's correct.

Q. In some other places, it might be lumped in with the psychology folks?

A. Yes.

Q. Okay. If it's a scientific discipline, it'd have to follow the scientific method; correct?

A. Well, it depends on what you're doing. I mean, if you're testing, then, yes, we typically try to follow the scientific method.

But there's many aspects of human factors

MAGNA
LEGAL SERVICES

that don't require you to follow a scientific method of formulating hypotheses, testing with data collection, and rejecting or accepting a theory.

So, no, you can't say that all human factors has to follow the scientific method.

Q. Okay. Give me an example of something that you do, as a human factors expert, that does not require you to follow the scientific method in order to form your opinion.

A. If I am asked to design a label to meet compliance with the Federal Hazardous Substance Act, I use my knowledge of visual acuity, my knowledge of contrast sensitivity, my knowledge of comprehension and language, my knowledge of risk and hazard assessment, to create text that's compliant with the standard, with the hazards associated with the product.

I don't need to go out and do testing and statistical analysis to determine whether or not the labeling is compliant with that regulation.

Q. Now, with respect to your -- we'll use your hypothetical concerning the Federal Hazardous Substances Act.

In determining whether or not a product's label complies with the FHSA, what objective

MAGNA
LEGAL SERVICES

verifiable steps would you take in that process? 01:28:19

A. Well, the FHA -- FHSA has specific 01:28:25 requirements for signal word size, signal word use, 01:28:30 color, measurement of the presentary -- primary 01:28:36 display panel, hazard assessment based on the hazards 01:28:41 identified for the component parts. We can measure 01:28:45 the height of the font of the product. We can measure 01:28:50 the label itself. We can verify the colors that are 01:28:52 used in the -- in the label itself. 01:28:57

Q. Okay. I'm glad you got to the font size. 01:29:02 That's the only thing I seem to know about the Federal 01:29:07 Hazardous Substances Act. I think it's got to be, 01:29:09 what, at least 11-point, or some nonsense? 01:29:13

A. No, it's not based on the point size. 01:29:16

Q. Okay. We'll talk about that later. 01:29:18

So there are objective things, though, that 01:29:20 you can do to make that determination? 01:29:22

A. Yes. 01:29:24

Q. Okay. Are there situations in your work as a 01:29:25 human factors expert where you're making a 01:29:32 determination, or rendering an opinion, in which you 01:29:37 are, one, not following the scientific method, and, 01:29:43 two, unable to follow an objective-based methodology? 01:29:47

A. Yes. 01:29:54

Q. Okay. What are some examples of that? 01:29:55

MAGNA
LEGAL SERVICES

A.  If I'm asked to render an expert opinion    01:29:58
based on my experience, training and knowledge in    01:30:00
human factors on things like likelihood of warnings    01:30:03
compliance, based on the body of literature in the    01:30:08
field, based --    01:30:10

Q.  Doctor, can I ask you to slow down just a    01:30:11
little bit?  I apologize --    01:30:13

A.  Sure.    01:30:14

Q.  -- I'm from South Carolina.  It's hard to    01:30:14
hear sometimes.    01:30:16

Likelihood of?    01:30:19

A.  You keep saying, "I'm from South Carolina."    01:30:20
I'm aware of no differences, generically [verbatim],    01:30:22
of people from South Carolina to hear or speak    01:30:24
differently than others, so ...    01:30:27

I will speak slower so that you can write    01:30:29
down what I'm saying.    01:30:31

Q.  I appreciate that, Doctor.  I appreciate your    01:30:32
accommodations.    01:30:34

Likelihood of?    01:30:35

A.  Likelihood of compliance with warnings or    01:30:35
labeling, based on issues associated -- or reported in    01:30:36
the body of literature in the field; based on factual    01:30:40
information in a case for the specific individuals who    01:30:44
are involved and exposed to a product label.    01:30:49

MAGNA
LEGAL SERVICES

Those are elements that I can do based on my training and knowledge, based on my review of the scientific literature, based on my experience; and they don't follow specifically the scientific method of formulating a hypothesis, testing the data, and accepting or rejecting a hypothesis.

Q. And in those scenarios, there'd be a -- no objective methodology with which someone else could come back and check your work?

A. In some cases.

You can always go back to the literature and evaluate the applicability of the literature, the methods that are used in the literature, whether the criteria used for the basis of the opinion are generally accepted in the field. But you're asking me a difference between a legal determination as opposed to a scientific determination.

Q. With respect to a scientific determination when the scientific method's not being followed; correct?

MR. AMMER: Objection to form. Vague.

THE WITNESS: I don't understand your question.

BY MR. HOYLE:

Q. Certainly. You took issue and said that

MAGNA
LEGAL SERVICES

I was asking you questions from a legal context when we were talking about whether or not something was accepted scientifically.

A. No, no. I was saying that there are differences between potential criteria for acceptance from a legal perspective than there are from a scientific perspective.

I can make informed judgments based on my knowledge of the literature, based on my experience, education and training, to create labels, or to evaluate labels and likelihood of compliance, to assist clients in creating labels, evaluating sufficiency of labels.

If we're talking about a legal setting, it may be a different set of criteria based on the facts of the case, based on the information that's available.

Q. Okay.

Now, going back to this likelihood of compliance. Okay. You are aware that there are articles in the human factors literature where testing has been done by some of the gentlemen we've talked about today to try and determine, through actual testing, what the likelihood of compliance would be with a given warning. Is that true?

MAGNA
LEGAL SERVICES

A. I'm very familiar with that literature.

Q. Okay. So there are some folks out there who do testing to determine likelihood of compliance?

A. I have done testing to determine likelihood of compliance also.

Q. Okay. Not a strange concept, then?

A. That's correct.

Q. Okay. Have you done any testing, with respect to this case, concerning issues relating to compliance involving the Sparks family?

A. No, not specifically related to the facts in this case.

Q. What about generically related to the facts in this case?

A. No. I haven't used the facts in this case to do any testing of warnings compliance.

Q. Dr. Arndt, you've never been to the Sparks's home in Cumberland County, North Carolina; correct?

A. Correct.

Q. Do you know what the square footage of this house is?

A. No.

Q. Have any idea?

A. I've seen photographs of the house, but I haven't attempted to make any estimate of the square

MAGNA
LEGAL SERVICES

connection wasn't made, if, when the pumps were turned on, the noise that Dylan heard was the air escaping from the hose and not from the foot of the chamber, then there is no mechanical analysis. It becomes an issue of his perception of where the noise is coming from.

So there hasn't been any analysis done that would rule out any one of these three proposed time periods.

Q. You used the word "perception" there. I'll come back to that in a minute.

I just want to be clear. You have not done an accident reconstruction in this case; correct?

A. That's correct.

Q. Okay. Not aware of any person doing an accident reconstruction in this case?

A. That's correct.

Q. Okay. If asked at trial, based on your education, training and experience, about whether or not you believe that Dylan's perception was different from the actual events taking place in that room, would you have an answer to that?

MR. AMMER: Objection to form.

THE WITNESS: Well, his perception would be of the events taking place in the room.

MAGNA
LEGAL SERVICES

full pressure.                                        03:04:28

Q.   Do you think one has to be an expert in human   03:04:30
factors to identify what you just told us, that      03:04:32
there's three periods of time:  Either prior, during, 03:04:36
or after?                                             03:04:39

A.   No.  And that's not my opinion in the case.     03:04:39
The -- this is just used to describe the             03:04:43
potential time periods, and how one would identify a 03:04:46
failure during these modes, or what factors would    03:04:50
mitigate or lead to a detection of a failure in each 03:04:54
of these time periods, because it's different in each 03:04:58
one.                                                 03:05:00

Q.   Okay.                                           03:05:02

A.   And then you would need a human factors         03:05:05
background to be able to describe that.              03:05:07

Q.   Okay.  But, again, at that point, would you     03:05:11
be following the scientific method?                  03:05:19

A.   For what?                                        03:05:22

Q.   I'll withdraw the question.                     03:05:24
You reference chapter 8 of the manual, about         03:05:39
setting a clock or a timer; correct?                 03:05:42

A.   Yes.                                             03:05:45

Q.   Okay.  You can't offer an opinion in this       03:05:45
case whether the setting of a clock or a timer would 03:05:48
have prevented this incident, can you?               03:05:50

Case 5:13-cv-00649-FL   Document 36-5   Filed 11/24/14   Page 32 of 71

MAGNA
LEGAL SERVICES

A.   In what sense?  In terms of, it might going to determine at what point Jarred asphyxiated?  No, I'm not offering any medical opinions about the timing of when he actually expired.

The use of a timer in my references in this are an indication of the Sparks family's not following information in the manual.  And information about previous behaviors, or failure to follow instructions and warnings, is useful in a human factors analysis of whether or not additional or alternative language would cause a change in behavior.

Q.   And what's the basis for that statement?

A.   Based on the literature in human factors.

Q.   Can you identify for me a specific article or --

A.   We've cited it -- we've cited it in the report.

Q.   Okay.  Help me understand that.  What citation is that, Doctor?

A.   There's a paper that we cite by Ayres called "What is a warning, and when will it work?" that talks about the characteristics of an individual who is likely, if at all, to be affected by warnings.  And one of the factors is willingness to change behavior or seeking information.  And there's no indication

MAGNA
LEGAL SERVICES

information like that in the manual.  03:15:20

Q.  There's nothing in there that says somebody  03:15:23
might suffocate to death?  03:15:26

A.  No, that language is not in the manual.  03:15:28

Q.  In addition to that language, that particular  03:15:31
adverse reaction is not reflected within the manual;  03:15:39
correct?  03:15:44

A.  That's correct.  03:15:45

Q.  Okay.  03:15:46

Look at this language:  03:15:48

"Reassure the person inside that  03:15:53

the attendant will remain with  03:15:55

them during the entire treatment  03:15:57

and will be regularly checking on  03:15:58

them."  03:16:00

Is there anything within that sentence that  03:16:00
indicates where in relation to the chamber the person  03:16:04
who will be regularly checking on them is going to be?  03:16:13

A.  No.  03:16:18

Q.  Nothing on there that says that the person  03:16:20
who is classified as the attendant should not traverse  03:16:24
more than 10 feet away from the chamber, is there?  03:16:28

A.  No, because that would be dependent on the  03:16:30
conditions of the individual, the conditions of the  03:16:33
environment.  03:16:34

MAGNA
LEGAL SERVICES

As we've said earlier, the context of the application of the product, the patient being treated, their history, their capabilities and limitations, all play a part in what's an appropriate monitoring situation. And it would be incumbent upon the individual doing the treatment to assess those hazards and to appropriately monitor the individual.

Q. Based on what you just told me, can you identify for me any objective factors, or criteria -- let's use that word instead -- any objective criteria that we should use to determine whether or not the monitoring was appropriate?

A. Well, given that no one checked in on him, period, I would say that the monitoring was insufficient.

Q. I appreciate that answer, Doctor.

Based on your answer to two questions ago, where I was asking you how far away the attendant could be from the chamber, and you gave me a long list of factors that we had to consider in order to formulate an answer to that question, will you agree with me that all of those criteria that you listed for us are subjective, as opposed to objective?

MR. AMMER: Objection to form.

THE WITNESS: No. I would say the fact

MAGNA
LEGAL SERVICES

that Dylan, at two points, as I recall, mentioned by Mrs. Sparks and -- or Jarred, I'm sorry -- mentioned by both Dylan and Mrs. Sparks, had attempted to open the chamber while inside, those are two objective data points. And previous experiences that the Sparks had which indicate that Jarred may be at risk for rapid decompression based on his behaviors.

The fact that the door is closed means that they can't see him in the chamber. The lights are off; they can't see the chamber. That's objective. The illumination levels prevent them -- the door being closed, prevent them from seeing his behaviors. They cannot monitor the pressure on the gauge because there's no line of sight to the pressure gauge. Those are objective, physical, physics-based parameters that are really undisputed.

BY MR. HOYLE:

Q. Okay. But with respect to looking to the context of where the attendant is in relation to the chamber, you identified for us that, based on the data point of prior efforts to get out of the chamber, that there could be rapid decompression of the chamber. Will you agree with me that the hazards associated with that is different than suffocating to death?

A. Absolutely.

MAGNA
LEGAL SERVICES

Q. Okay.

I understand you've never been in the house in Cumberland County where the Sparks family live, but let's assume for a minute that, instead of grading papers downstairs, that the room where this chamber had been set up was a little bit bigger, and there was a nice comfortable easy chair in there, and that Mrs. Sparks was sitting in that nice comfortable easy chair grading her papers, and that she fell asleep there, within the same room as the hyperbaric chamber.

In that scenario, do you have an opinion as to whether or not Mrs. Sparks would have recognized that the air supply hose had become disconnected?

MR. AMMER: Objection to form.

THE WITNESS: It would depend on when she fell asleep, when the hose became disconnected.

Based on my experience with the product, there is a detectable difference between the sound the chamber makes when it's exhausting through the two vent ports versus when air is coming out of the supply chamber; and there is an absolute spatial separation between the sources of the sound.

So if you were in that room, I would -- based on my experience with the two incident products -- or two exemplar products and the incident

MAGNA
LEGAL SERVICES

product, it is a marked change in sound, both in sound 03:21:50

quality, sound volume, and sound location, when the 03:21:55

hose becomes disconnected. 03:21:59

If the hose became disconnected before she 03:22:01

fell asleep, absolutely, you would be able to 03:22:05

determine where and when that took place. 03:22:07

If she is already asleep when the hose 03:22:11

becomes disconnected, I don't know that there's been 03:22:17

any demonstration of how that could occur. If you 03:22:19

want to describe that, then I can offer an opinion on 03:22:22

that; whether or not she could possibly detect that 03:22:25

based on the feedback she would get. 03:22:27

BY MR. HOYLE: 03:22:30

Q. All right. I appreciate your answer. 03:22:32

Have you done -- strike that. 03:22:34

Have you recorded, with any type of 03:22:36

instrument or device, the sounds that are emitted from 03:22:41

this chamber and its component parts? 03:22:49

A. No, I've not. 03:22:52

Q. Okay. You've just used your own two ears; is 03:22:53

that correct? 03:22:56

A. That's correct. 03:22:57

Q. Okay. 03:22:57

I asked you earlier about the sheriff's 03:22:57

report, and I think you told me you read it; correct? 03:23:00

MAGNA
LEGAL SERVICES

A.  I did.                                                          03:23:03

Q.  Okay.  Do you recall reading that one of the                   03:23:04
investigators wrote in the report, quote:                          03:23:06

"I notice that, although the                                       03:23:09

hissing sound now emitted from the                                 03:23:09

opposite side of the chamber, it                                   03:23:12

did not sound substantially                                        03:23:14

different from the hissing sound                                   03:23:15

it had been emitting."                                             03:23:17

Do you recall reading that?                                        03:23:19

A.  I do.                                                          03:23:20

MR. AMMER:  Objection to form.                                     03:23:21

BY MR. HOYLE:                                                       03:23:22

Q.  You think your ears are better than that of                    03:23:34
that sheriff's detective?                                          03:23:36

A.  There's a --                                                   03:23:38

MR. AMMER:  Objection to form.                                     03:23:39

THE WITNESS:  -- couple of problems with          03:23:39
your question, and with the qualification of my                    03:23:41
answer.                                                            03:23:42

BY MR. HOYLE:                                                       03:23:43

Q.  Sure.                                                          03:23:43

A.  First, the officer clearly indicates that he                   03:23:44
can determine the spatial separation between the two               03:23:47
different sounds, which is what I described in my                   03:23:50

MAGNA
LEGAL SERVICES

Sparks family would have heard or perceived.                03:27:53

It's the same if you ask an expert in auto               03:27:55
mechanics "What sound is my car making?" they can          03:27:58
perceive certain things that are wrong with the engine     03:28:02
more than a layperson can.                                 03:28:04

Everybody's getting the same sound waves to              03:28:07
their ears, but through their experience and training      03:28:09
they have a different perception of what those sounds      03:28:12
mean.                                                      03:28:14

BY MR. HOYLE:                                              03:28:17

Q.  But, Doctor, until this litigation, you had           03:28:19
no experience with hyperbaric chambers; correct?           03:28:25

A.  That's correct.                                        03:28:28

Q.  Never designed them?                                   03:28:28

A.  That's correct.                                        03:28:29

Q.  Okay.  Never manufactured them?                        03:28:30

A.  That's correct.                                        03:28:31

Q.  Never even climbed in one until one got               03:28:32
shipped to you up in Illinois; correct?                    03:28:34

A.  That's correct.                                        03:28:37

Q.  Okay.  How -- strike that.                             03:28:37

How many different days, okay --                         03:28:53

You know what day is?  Midnight to midnight;             03:28:57
right?  Okay.                                              03:29:00

How many different days did you actually                 03:29:01

MAGNA
LEGAL SERVICES

observe the chamber -- the exemplar chamber you had up in Illinois -- inflate and deflate?  Was it all on one day?  Or was it over the course of two days?  Three days?  A month?  A year?

A.  I think all my exposure to the chamber occurred in one day.

Q.  One day.  Okay.

A.  To the exemplar chamber we have in our Illinois office.

Q.  Okay.  And again, I'm not quarreling with you, but when you tell me that your perception is different than that of an investigator from the Sheriff's Office, you cannot point me to any instrument or device or -- that could verify that; correct?

A.  It's not something that's verifiable through a device.  It's based on the context of your exposure and your experience with the product.

I have more experience than the sheriff's officer did, and the Sparks family has much more experience than I do.

I can determine a difference based on my limited hours of experience with the device -- standing in different places, operating it in different modes, disconnecting the hose, listening to

MAGNA
LEGAL SERVICES

frequency response, separation of the microphones, the 03:32:37
playback device that's being used. 03:32:40

It's very critical, if you're trying to 03:32:42
represent sounds, that you use appropriate technology. 03:32:44
Using a digital tape recorder with a single 03:32:48
microphone, or even a stereo microphone, with a 03:32:51
one-inch separation, cannot replicate what the human 03:32:54
ears can hear. 03:33:00

Q. Let me ask you this: If we go to trial on 03:33:12
this case and we strike a jury, and we put people from 03:33:15
Eastern North Carolina in that jury, do you believe it 03:33:20
would be proper or improper for them to use their own 03:33:25
two ears to listen to what sound this chamber makes 03:33:29
when the hose becomes disconnected from the chamber? 03:33:35

A. It would depend on what you're trying to 03:33:39
represent. 03:33:41

If you're trying to represent what is 03:33:41
audible, in terms of the sound levels, the differences 03:33:43
in the frequency content, the spatial separation of 03:33:48
the hose location from the exhaust vent, I think that 03:33:50
a juror would be able to use their own ears to 03:33:54
determine if they can detect a spatial separation 03:33:58
between the two elements. I think that a juror would 03:34:01
be able to hear the differences in frequency content 03:34:04
and volume between the different sources of sound. 03:34:07

MAGNA
LEGAL SERVICES

What a jury wouldn't be able to do is make a determination of what it sounded like in the Sparks' room, or have the specific knowledge of what their experience has led them to understand about the various sounds.

I think with interaction with the device, I think with being in the device and around the device and setting it up, I think the jury could develop knowledge of the relationship of the different sounds and their functions, but it would depend on how much time they were given with the device, and what you were asking them to do in relationship to the sound.

Q. You mentioned that -- gave me an idea, which is always dangerous. We might have to have a field trip when we try this case.

You mentioned that the jurors would not necessarily be in the room that Jarred Sparks died in; correct?

A. I don't think that they are. You were asking me about the courtroom.

Q. Okay. But you yourself have never been in that room; correct?

A. That's correct.

Q. You don't know -- well, maybe you do know; I don't know.

Case 5:13-cv-00649-FL Document 36-5 Filed 11/24/14 Page 43 of 71

MAGNA
LEGAL SERVICES

Do you know what it would have sounded like 03:35:20 in that room that you've never been in? 03:35:23

A. I could never know exactly what it sounded 03:35:27 like. But the issues that I'm dealing with, in terms 03:35:29 of physical separation, haven't changed. The issues 03:35:34 of volume and frequency content of the two different 03:35:37 elements doesn't change, in effect, with the room that 03:35:41 it's in, unless you're talking about an anechoic 03:35:46 chamber or some other concert venue setting. So 03:35:49 I didn't need that for the conclusions I've offered. 03:35:55

Q. All right, let's continue in your report, 03:36:00 Doctor. 03:36:01

There is an indented paragraph on page 7 03:36:03 that says: 03:36:07

"Caution: We recommend that an 03:36:09 attendant be present during the 03:36:12 entire time someone is inside the 03:36:13 chamber due to any unforeseen 03:36:15 emergency involving the patient's 03:36:18 condition that is unrelated to the 03:36:19 hyperbaric chamber treatment." 03:36:22

Q. Did I read that correctly? 03:36:24

A. You did. 03:36:25

Q. Is that sentence I just read a warning? 03:36:26

A. Yes. 03:36:33

MAGNA
LEGAL SERVICES

Q. Okay. What hazard or hazards does it identify?

A. It says, "unforeseen emergency involving the patient's condition."

Q. Okay.

We were talking earlier about the asteroid hitting this building; you recall that?

A. Yes.

Q. Okay. And you told us that there's a low frequency that an asteroid might hit this building, but it would be real bad if it did; correct?

A. Yes.

Q. Okay. Is there anything that tells us whether or not this unforeseen emergency is talking about what you told us about earlier, the paper cut, or something real bad like an asteroid hitting the building?

A. No, because that would depend on the specific patient: Their history, their ailment, what was being treated, their familiarity with the chamber, their experience, and the assessment that was made of them by the treating individual.

Q. Okay. Nothing within that warning that encompasses the quick-disconnect valve becoming separated from the chamber?

MAGNA
LEGAL SERVICES

A. No. The quick-disconnect is not mentioned in that paragraph. 03:37:43 03:37:46

Q. That's not encompassed in that warning; correct? 03:37:47 03:37:49

A. It's not mentioned there. 03:37:50

Q. If one read that warning, that you felt the need to put in bold letters and indent in your report, there's nothing in that sentence that provides one the information about the particular hazard of a quick-disconnect valve becoming separated from the chamber; correct? 03:37:56 03:37:59 03:38:08 03:38:11 03:38:13 03:38:16

A. That's correct. 03:38:17

Q. Okay. You'll agree with me that there's no mention of the consequences, in that sentence, if an attendant is not present during the entire time; correct? 03:38:18 03:38:27 03:38:29 03:38:32

A. You couldn't mention the consequences because we haven't identified a specific hazard, because that would be dependent on the patient's specific condition and response. 03:38:32 03:38:34 03:38:37 03:38:40

Q. Okay. 03:38:42

Do you agree that warnings should be designed so as to attract attention? 03:38:42 03:38:44

A. It would depend. It depends on the context. It depends on the individual. It depends on the 03:38:47 03:38:49

MAGNA
LEGAL SERVICES

familiarity with the product.            03:38:52

If information is intended to reach the   03:38:55
user, you would like them to be able to see it and   03:38:58
read it.  And if there is a likelihood that they are   03:39:02
not going to see the label because of its placement or   03:39:07
because of its size, then increasing certain   03:39:10
parameters may introduce a higher likelihood of   03:39:15
detection.            03:39:18

Q.  But your answer to my question was, it   03:39:22
depends?            03:39:24

A.  Yes.            03:39:25

Q.  Okay.  Would that also be true with respect   03:39:26
to the statement "Warnings should contain information   03:39:28
about the nature of the hazard"?            03:39:30

A.  Well, I think we already described the fact   03:39:33
that in order for it to be a warning you would need to   03:39:35
describe some form of a hazard.            03:39:38

Q.  Oh.  Okay.  Well, I'll ask my question a   03:39:40
different way, then.            03:39:43

Will you agree with the statement that   03:39:44
warnings should contain information about the nature   03:39:46
of the hazard?            03:39:47

A.  If you're using the ANSI Z535 definition,   03:39:49
which it sounds like you're quoting from, they define   03:39:53
a warning under that standard as having a statement of 03:39:56

MAGNA
LEGAL SERVICES

the hazard, a means to avoid the hazard, consequences of the events, and the likelihood of the consequence if the instructions aren't followed.

Q. Okay. Those elements are not present with respect to the text that you pulled out and indented on page 7 of your report; correct?

A. That's correct.

Q. Okay.

You'll agree with me that both Mrs. Sparks and her son Dylan were present within the home on the night that Jarred suffocated to death in the hyperbaric chamber; correct?

A. Yes.

Q. Okay. They hadn't gone somewhere else; correct?

A. No.

Q. We get to turn to Opinion 2 now.

Opinion 2. The opinion states, quote:

"There was sufficient information
in the form of verbal instructions
available to the plaintiffs that,
if complied with, the incident
would not have occurred."

Did I read that correctly?

A. Yes.

MAGNA

LEGAL SERVICES

Q.  Okay.  What assumptions do you rely on for that opinion?

A.  I have reviewed the testimony of the various individuals who have testified that they have provided verbal instructions to the Sparks family, or that they would typically provide a set of instructions to the family involved in this type of treatment.

Q.  Okay.  Is it your understanding that Dr. Bradstreet testified that Creation Zone had an employee that would provide training to families that rented chambers from Creation Zone?

A.  I think that's correct.

Q.  He testified her name was Patty Hawkins; do you recall that?

A.  I don't recall her name.

Q.  Okay.  Do you recall that Dr. Bradstreet testified that Ms. Hawkins would not provide training to people who would treat at Dr. Bradstreet's clinic on how to use a hyperbaric chamber?

A.  No, I don't recall that specific testimony. I'd have to look back at it.

Q.  Okay.  Do you recall that Dr. Bradstreet testified that he had no knowledge one way or the other whether Ms. Hawkins provided instructions or training to the Sparks's family with respect to

MAGNA LEGAL SERVICES

hyperbaric chambers?

A. I think that's generally correct.

Q. Generally correct. Okay.

A. I don't recall his specific answer to a question like that. I'd have to go back and refer to his testimony.

Q. Okay.

MR. AMMER: And I'll object to the form. If you do have a specific statement that you're referring to, if you'd give it to the witness.

MR. HOYLE: Your objection's noted.

BY MR. HOYLE:

Q. The Sparks did not rent a hyperbaric chamber from Dr. Bradstreet or Creation Zone; correct?

A. I think that's correct.

Q. Okay. Dr. Bradstreet did not -- strike that. Dr. Bradstreet did not have a specific recollection of training members of the Sparks family with how to use the hyperbaric chamber; correct?

A. I believe that's correct, yes.

Q. Okay. Similarly, Dr. Bradstreet did not specifically testify that he warned the Sparks that there is a suffocation hazard associated with this hyperbaric chamber; correct?

A. I think that's correct too.

MAGNA
LEGAL SERVICES

No one deposed in this case so far -- and I've got good news: You're the last person to be deposed in this case. But no one deposed in this case so far has testified that they verbally instructed the Sparks family that someone should remain in the room while Jarred used the hyperbaric chamber; correct?

A. To the best of my recollection, the testimony has been they didn't give that specific instruction, but had they known how he was being monitored, they would have advised against that.

Q. No one deposed in this case so far has testified that they verbally instructed the Sparks family that someone should regularly check on Jarred during hyperbaric treatment; correct?

A. Specific to Jarred --

Q. Yes, sir.

A. -- and specific to testimony, I think the answer's the same. I don't recall testimony where anyone had indicated any specific instructions as they relate to Jarred and the hyperbaric oxygen treatments.

There is record information about constant monitoring of Jarred based on his impairment. There is, obviously, a record in the manual about monitoring, but -- and the testimony is that, had they known how the Sparks family was monitoring, they would

MAGNA
LEGAL SERVICES

have advised against it. But I don't think I recall 03:53:54

any testimony saying that someone should stay with 03:53:56

Jarred all the time. 03:54:00

Q. No one deposed in this case so far has 03:54:04

testified that they warned the Sparks family that the 03:54:06

quick-disconnect valve could inadvertently disconnect 03:54:08

from the chamber; correct? 03:54:12

MR. AMMER: Objection to form. 03:54:14

THE WITNESS: You mean verbally? 03:54:17

BY MR. HOYLE: 03:54:18

Q. Yes, sir. 03:54:18

A. That's correct. 03:54:19

Q. And just so we're all clear, we're on the 03:54:20

section of your opinions dealing with verbal 03:54:24

instructions; correct? 03:54:26

A. I don't know where your questions are -- 03:54:27

Q. Okay. 03:54:29

A. I know we were talking about that before. 03:54:29

I don't know if you're deviating from that section. 03:54:31

Q. Okay. Just so we're all on the same sheet of 03:54:33

music, I'm still asking questions concerning Opinion 03:54:36

No. 2. Okay? All right. So that's why my questions 03:54:39

are about verbal instructions. 03:54:42

No one deposed in this case so far has 03:54:44

testified that they warned the Sparks family that 03:54:46

Case 5:13-cv-00649-FL   Document 36-5   Filed 11/24/14   Page 52 of 71

MAGNA
LEGAL SERVICES

there was an asphyxiation risk associated with use of the hyperbaric chamber; correct?

A. I don't recall that language in any of the testimony I've reviewed.

Q. Okay. No one deposed in this case so far has testified that they instructed the Sparks family to remain in the room until the hyperbaric chamber fully inflated; correct?

A. I don't recall that testimony either.

Q. No one deposed in this case so far has testified that they instructed the Sparks family to set a clock or timer for the duration of Jarred's hyperbaric treatment; correct?

A. I think that's correct.

Q. Okay. No one deposed in this case so far has testified that they instructed the Sparks family that users should not sleep in the hyperbaric chamber; correct?

MR. AMMER: Objection to form. Are we still talking about verbally? I --

MR. HOYLE: Yes.

MR. AMMER: Okay. The last couple of questions I wasn't sure if you were inserting it or not. I want to make sure that this is all verbal.

MR. HOYLE: It's all verbal.

MAGNA
LEGAL SERVICES

MR. AMMER:  Okay.                    03:56:09

THE WITNESS:  Not that I recall.     03:56:10

BY MR. HOYLE:                         03:56:10

Q.  Okay.  Doctor, have you seen pictures of  03:56:11
this -- strike that.                 03:56:14

Doctor, have you reviewed written marketing  03:56:16
materials for this chamber?          03:56:17

A.  I have.                          03:56:19

Q.  Okay.  Seen any pictures of people sleeping  03:56:19
in them?                             03:56:21

A.  Not that I recall, no.           03:56:30

Q.  Let's turn to Opinion 3.         03:56:39

There is a method to the madness, I can  03:56:41
assure you.                          03:56:44

And Opinion No. 3 is:                03:56:46

"If the air hose becomes             03:56:50
disconnected, sufficient cues are    03:56:52
available to alert an attendant,     03:56:55
or to alert a reasonably             03:56:57
attentive, non-autistic,             03:57:00
self-treating individual."           03:57:02

Did I read that correctly?           03:57:03

A.  You did.                         03:57:05

Q.  That's your opinion?             03:57:06

A.  Yes.                             03:57:07

MAGNA
LEGAL SERVICES

Q. Okay. Why do you say "non-autistic, self-treating individual"?

A. I would never expect Jarred to -- based on my understanding of his impairment level, based on my understanding of the record, this is not meant to indicate that when the hose came off, he should have been able to identify the failure and respond appropriately to it.

Q. You go back over the three time periods with respect to Opinion 3; correct?

A. They are listed there, yes.

Q. You state -- I'm now turning the page to page 11, Doctor --

"If the air supply hose disconnected from the chamber during Time Period 2, and a reasonably attentive operator was present in the room, the disconnection of the hose would be marked with a discrete and detectable change in sound quality; there would be a sudden hissing sound as air was forced through the disconnected air supply hose."

MAGNA
LEGAL SERVICES

Did I read that correctly? 03:58:33

A. Yes. 03:58:35

Q. Is there any additional information that 03:58:43 we've not talked about already concerning the 03:58:46 perception, sound, and all that, that forms the basis 03:58:50 of that opinion? 03:58:53

A. You mean besides what's in the report? 03:58:54

MR. AMMER: Object to form. 03:58:56

BY MR. HOYLE: 03:58:59

Q. Yes, sir. 03:58:59

A. No. I think, including what's in the 03:58:59 reports, and what we've discussed, that would likely 03:59:01 cover it all. 03:59:03

Q. Okay. And thank you for helping me with my 03:59:04 question. I needed that. 03:59:08

What if someone does not remain in the room 03:59:30 during treatment for a couple of hours? What cues 03:59:32 would be available to alert that person that the 03:59:36 chamber was not operating as intended? 03:59:38

A. You mean at the time that they are not in the 03:59:42 room? 03:59:43

Q. Yes, sir. 03:59:44

A. Depends on where they are, what they can 03:59:45 hear, what their experience is. 03:59:47

You'd have to give me a little bit more 03:59:50

MAGNA
LEGAL SERVICES

information.

Q. Okay. Now, we've already established, quite painfully, I believe, that you've never been to the Sparks's house in Cumberland County, North Carolina; correct?

A. That's correct.

Q. Don't know how far away, in any form of measurable distance, Mrs. Sparks was from the chamber at the time that the quick-disconnect valve separated from the chamber; correct?

A. That's correct.

Q. Will you agree with me that there's no doubt that an audible alarm would have alerted an individual that the chamber was not operating as intended?

A. What kind of audible alarm? Based on what type of sensor? Placed in what location? At what level? What individual? What level of false alarm rate?

You'd have to give me a lot more information before I could answer that question.

Q. All right. False alarm rate. What would be the consequence of a high false alarm rate?

A. You would turn it off.

We all are aware of people whose smoke detectors go off in their kitchen when they cook, and

MAGNA
LEGAL SERVICES

they take the batteries out because they don't want to keep dealing with the false alarms.

False alarm rate in any alarm will lead to either ignoring the alarm, as we all see happen with car alarms going off -- it becomes an annoyance rather than a signal. So determining the appropriate sensitivity threshold for detection, false alarm rate, hit rate, miss rate, for any type of alarm or detection system is critical if you're going to design a system like that.

THE VIDEOGRAPHER: Two minutes, counsel.

MR. HOYLE: Let's go off the videotape record.

THE VIDEOGRAPHER: Off the record at 4:02.

(RECESS TAKEN FROM 4:02 P.M. TO 4:23 P.M.)

THE VIDEOGRAPHER: On the record at 4:23.

BY MR. HOYLE:

Q. All right. Good afternoon, Doctor.

A. Good afternoon.

Q. We're still not yet at that point in the day where I get to say good evening; and I think, if we both endeavor to work hard, we won't be saying that to each other in a few hours.

MAGNA
LEGAL SERVICES

If, at any point in time, though, you want a break to finish your cold cup of coffee or get something else to eat, or you need to take a break for any reason, don't let that be an impediment; okay?

A. Okay.

Q. We've so far talked about Opinions 1, 2 and 3 of your report; correct?

A. Yes.

Q. That takes us to Opinion No. 4. Can you turn to page 12 of your report, please, sir.

A. Yes.

Q. This Opinion 4 is really in response to opinions expressed by one of the plaintiff's retained experts, Dr. Grugle; correct?

A. Well, that's part of it.

Q. Okay.

A. It's also given -- there's -- we cite Mr. Workmans in -- Mr. Workman in the basis that it's also dealing with issues associated with any issue of additional or alternative language or warnings.

Q. Is it your opinion that this incident still would have occurred regardless of what specific warning was placed on the product itself?

A. Yes.

Q. Let's turn to Opinion 5. We're making

MAGNA
LEGAL SERVICES

BY MR. HOYLE:                                              04:52:52

Q.   Would any of your opinions as set forth in         04:52:53
Opinion 5 of your report change if that information        04:52:56
that I just relayed to you -- that being, that the        04:52:59
quick-disconnect valve that resulted -- that was          04:53:03
incorporated into this specific product was               04:53:06
incorporated into the design of the Vitaeris 320          04:53:09
hyperbaric chamber at the specific request of             04:53:14
Oxy-Health -- turned out to be true?                      04:53:16

A.   Well, you'd have --                                 04:53:18

MR. AMMER:   Object to form.                    04:53:19

THE WITNESS:   You'd have to show me what        04:53:20
you meant by a request, and you'd have to show me what    04:53:22
HTI did in terms of evaluating a request, or              04:53:24
evaluating a design, before I could comment on that.      04:53:28

And then it would -- really, the choice of a         04:53:31
valve, and the design of the product, is now getting a    04:53:34
little bit beyond the realm of human factors, when        04:53:39
you're talking about the actual component selection.      04:53:42

BY MR. HOYLE:                                              04:53:45

Q.   Component selection is within the discipline       04:53:46
of human factors?                                          04:53:48

A.   Well, it can be.  But it seems like what           04:53:49
you're asking me is to make a determination as to who     04:53:51
is responsible for the design, and the choices that       04:53:54

MAGNA
LEGAL SERVICES

that follows the words "Excessive Carbon Dioxide Exposure" to be a warning?

A.  No.  It's an instruction.

MR. HOYLE:  How much time do we have, Mr. Videographer?

THE VIDEOGRAPHER:  Four minutes.

MR. HOYLE:  All right.  I'm going to -- I'm going to talk fast.

BY MR. HOYLE:

Q.  Do you agree that instructions are distinguished from warnings on the grounds that they are not intended or designed to alert a user to the possibility of negative consequences?

A.  I would disagree.  You can't make that global of a statement.

Q.  Do you know -- are you familiar with the publication entitled "What is a warning, and when will it work?"

A.  Yes.  It's a publication I referred to earlier as a basis of one of my opinions, written by Tom Ayres, that we've cited in our report.

Q.  Okay.  It's authored by folks who -- at the time, all the authors of that paper were employed by Exponent, Incorporated's predecessor; correct?

A.  Well, same company.  Not a predecessor --

MAGNA
LEGAL SERVICES

Would any of the opinions set forth in Opinion No. 5 change if Oxy-Health is determined by a competent authority to be a manufacturer of the Vitaeris 320 hyperbaric chamber?

A. Not that I can foresee.

Q. Okay.

Let's turn to Opinion 6, Doctor. Opinion 6 says:

"The training provided to Dylan Sparks was insufficient to allow him to operate the chamber in a proficient manner."

Did I read that correctly?

A. You did.

Q. That's your opinion?

A. It is.

Q. Okay.

Prior to this litigation, what experience did you have with appropriate training needed to operate a hyperbaric chamber?

A. As I have said multiple times, I've never operated a chamber prior to this -- this case.

Q. Fair to say that prior to this case you had never trained any person or persons in how to operate a hyperbaric chamber?

MAGNA
LEGAL SERVICES

A. That's correct.

Q. Okay. What about since you became retained by the attorneys sitting on the other side of this table, have you trained any person or persons in how to operate a hyperbaric chamber?

A. No.

Q. Will you agree with me that this manual for this product states that no specialized training is required to operate the portable mild hyperbaric chamber?

A. Yes, that is what it says.

Q. Now, I got an education a little while ago about the impact human factors training and experience is going to have on one's hearing. So I suspect that there might be a corollary to where human factors training and experience can have an impact on one's reading.

But with respect to that sentence from the manual, that "no specialized training is required to operate the portable mild hyperbaric chamber," based on those words, is any training required, Doctor?

A. Certainly, training is required. There isn't any specialized training, but I would expect you to read the manual, to comply with the instructions in the manual, to comply with the information that's on

MAGNA
LEGAL SERVICES

A.  I have read it multiple times in the context of this case.

Q.  Had you ever read it prior to this case?

A.  No.  I think I've answered that before today.

Q.  Okay.

Turn with me to page 22 in your report. There is a -- I'm in the paragraph that begins "Despite Mr. Workman's opinion ..."

A.  Yes.

Q.  Okay.  And the second full sentence says, "FDA approved ..."  Do you see that sentence?

A.  Yes.

Q.  Okay.

"FDA approved Oxy-Health's hyperbaric chambers for marketing without compliance to these standards."

Did I read that correctly?

A.  Yes.

Q.  Is there a difference, in your mind, between approval and clearance?

A.  Well, I think the FDA approves for marketing a device.  I don't know that there's a difference. I -- that's beyond my scope.

Q.  Okay.  Will you agree with me that the FDA

MAGNA
LEGAL SERVICES

A.   No.

Q.   Do you consider the work that you have done in this case to be decipherable by the average layperson?

MR. AMMER:   Objection to form.

THE WITNESS:   With my explanation and testimony, yes.

BY MR. HOYLE:

Q.   I'm just going to go through a little bit of housekeeping.  I beg your indulgence.

Do you agree that an effective warning message consists of four message components, each of which serves a different purpose:  One, signal word to attract attention; two, identification of a hazard; three, explanation of consequences if exposed to hazard; and four, directives for avoiding the hazard?

A.   No, I can't agree with that statement in its entirety.

Q.   What portions of that statement can you agree with?

A.   That simply supplying those bits of information that you've described doesn't make a warning effective.

Effectiveness is the ability of the warning to change safety-critical behavior for those

MAGNA
LEGAL SERVICES

individuals who are likely to be exposed to the 06:05:50
hazard, who would have acted differently without the 06:05:52
information. 06:05:55

Q. The four components that I just listed, do 06:06:02
you believe that those are components that all 06:06:05
warnings should contain? 06:06:09

A. No, not necessarily. There are times when 06:06:10
you can provide warning information that doesn't have 06:06:12
any of that, that's sufficient. A stop sign is a 06:06:15
great example. I don't provide consequence 06:06:19
information; I don't provide likelihood; and people 06:06:22
may or may not comply, but it's understood what the 06:06:25
warning means. 06:06:27

So you have to look at the context again, 06:06:28
you have to look at the application, you have to look 06:06:31
at the individual's experience and training and 06:06:34
knowledge about particular hazards, before you can say 06:06:36
any one design of a warning is required. 06:06:39

Q. Do you agree that the content of a warning 06:06:49
must be unambiguous in conveying the relevant 06:06:51
information, must contain words which are understood, 06:06:54
and must be relatively brief? 06:06:57

A. Again, no. You can't in all cases say that a 06:06:59
warning must be brief. Certain types of warnings 06:07:03
require lengthy descriptions. 06:07:06

MAGNA
LEGAL SERVICES

A.   That injury may be caused.

Q.   And how does one avoid that hazard?

A.   By not using any other compressor or pump.

Q.   Okay.  What other warnings do you see, Doctor?

A.   On page 14, there's a statement that says:

"Turn the compressor 'on' and keep
'on' for the duration of the
Initial Setup.

"Note:  The compressor must be
'on' and hooked up to the chamber
before human occupancy in the
chamber; it must remain on until
the person completely exits the
chamber."

Q.   And that text that you just read, that's a warning, not an instruction?

A.   Yes.

Q.   Okay.  What hazard is identified in that warning?

A.   There is no hazard identified in that warning.

Q.   Okay.  I take it, then -- I just want to make sure I understand the testimony.

A warning, from your point of view, does not

MAGNA
LEGAL SERVICES

require identification of a hazard?

A. It depends on the context. In a manual, where you have all of the previous information that the user has read and understands, and then you provide information about proper set-up and use, you can expect the user to understand the information previously provided and use the new information in the context of the manual.

To take this and provide it on its own, no, that would not be sufficient information by itself; but in the context of the product manual, it is.

Q. Okay.

A. Again, right after that, it says:

"Do not attempt to use any other pump to pressurize these chambers."

We've discussed that already.

Typically, notice messages are also covered in warnings standards. So at the bottom of page 14, it says:

"Note: Failure to close both zippers will completely --"

I'm sorry.

"Failure to close both zippers completely will decrease the

MAGNA
LEGAL SERVICES

effectiveness of the chamber by

not allowing it to attain or

maintain full pressure."

On page 18, where they're talking about preparing a person for hyperbaric therapy, if the person has pressure or difficulty equalizing, there's a statement that says:

"If they are aware of any prior

problems, pay close attention as

the chamber starts to pressurize."

And this is in the context of preventing discomfort to the user.

Q. And that's a warning, Doctor?

A. It is.

Q. Okay.

A. At the bottom of page 18, it states:

"If the patient experiences

excruciating pain, it may be a

sign of other existing medical

problems, and the patient's

physician should be consulted.

Hyperbaric treatment may be

resumed upon the advice of the

medical counselor."

Q. And that's a warning, not an instruction,

MAGNA
LEGAL SERVICES

Doctor?

A. It is. It's talking about the consequences of using the chamber; it's talking about an adverse or unintended or undesirable outcome; and it's telling you what you should do about it.

Q. Doctor, with your permission, given the late hour of the day, can I stop you at that particular page?

A. You can stop me wherever you want, but I haven't completed my review of the manual.

Q. All right. And that's fair. I'll acknowledge, stipulate, and sign in blood to that effect.

We've looked at a whole bunch of examples in the past -- I don't know -- 10, 15 minutes of text that you've identified for us as warnings as opposed to instructions.

Is there any set of objective criteria that you can set forth for me to help me understand the difference between a warning and an instruction?

A. I have told you: That warning information typically provides information about an adverse or undesirable outcome; whether that be product damage, discomfort, dislike of the product. Any adverse outcome or undesirable effect can be deemed a warning,

MAGNA
LEGAL SERVICES

depending on how it's provided.

It's different when you're talking about warning label design. So if you're referring to Z535.4, and the list of things that they say can be included in a warning label, that's different than how you would phrase and write an instruction manual.

Q. Okay. Taking Z535.4 or .6 out of this equation, okay, can you direct me to any specific text, whether it be a treatise, an article, presentation, that substantiates what you just told me about objective criteria that differentiates a warning from an instruction?

A. I don't think I gave you any objective criteria.

You asked me for examples of warning information in the manual, and I have provided you with examples, based on my expertise, training and knowledge, of information in the manual that provides information about undesirable consequences or outcomes associated with the use or misuse of the product.

Q. What about a reference -- whether it be a treatise, article, or presentation -- for your definition of "warning"?

A. No, I can't point to a specific paper that would give you the same definition that I did, as I

Case 5:13-cv-00649-FL    Document 36-5    Filed 11/24/14    Page 71 of 71