EXHIBIT F



*Human Factors*

**Sparks v. Oxy-Health**

**Project No.**
**1403520.000**

**Report of**
**Steven R. Arndt, Ph.D., CHFP**

**August 29, 2014**



# Sparks v. Oxy-Health

# Project No.
# 1403520.000

Prepared for

Kevin L. Chignell
Parker Poe Adams & Bernstein LLP
Wells Fargo Capitol Center
150 Fayetteville Street, Suite 1400
Raleigh, North Carolina  27601


Prepared by

Steven R. Arndt, Ph.D., CHFP
Exponent Failure Analysis Associates
525 West Monroe Street, Suite 1050
Chicago, Illinois 60661


August 29, 2014


© Exponent, Inc.

# Contents

Page

**Executive Summary**     iii

**Incident Description and Background**     1

**Opinions and Bases**     6

    Opinion 1     6

    Opinion 2     8

    Opinion 3     10

    Opinion 4     12

    Opinion 5     16
       Risk Assessment     16
       Sequence of Events Not Reasonably Foreseeable     18

    Opinion 6     19

    Opinion 7     21
       Voluntary vs. Mandatory     21
       Gas Sensor Requirements     22
       Fittings for Life Critical Breathing Devices – "Inadvertent Disengagement Neither Defined Nor Demonstrated"     23

    Opinion 8     23

**Documents Reviewed**     24

**Demonstrative Exhibits for Deposition and Trial**     25

**References**     26

Appendix A     List of Materials Reviewed
Appendix B     Curriculum Vitae of Steven R. Arndt, Ph.D.
Appendix C     Testimony List of Steven R. Arndt, Ph.D.

# Executive Summary

I, Steven R. Arndt, Ph.D., hold the following opinions to a reasonable degree of scientific certainty at the time of the issuance of this report. These opinions are based on my review of the supplied materials, examination of an exemplar Vitaeris-320 hyperbaric chamber, my review of relevant standards and literature, and my education, training, and experience. The basis for each opinion is described in detail in the body of the report. In many cases, direct citations are provided in footnotes in the text; however, these footnotes are not necessarily my sole basis for the associated statements.

1. There was sufficient information in the form of warnings and instructions available to the Plaintiffs that, if read and followed, the incident would not have occurred.

2. There was sufficient information in the form of verbal instructions available to the Plaintiffs that, if complied with, the incident would not have occurred.

3. If the air hose becomes disconnected, sufficient cues are available to alert an attendant or to alert a reasonably attentive, non-autistic, self-treating individual.

4. An ANSI Z535-compliant warning at the head of the chamber related to the potential for the quick disconnect valve to disconnect, as proposed by Plaintiffs' expert, Dr. Grugle, would not have prevented this incident. Additional information, as suggested by Plaintiffs' experts, would not have prevented this incident.

5. There was no scientific basis for Hyperbaric Technologies or for Oxy-Health to change their design.

6. The training provided to Dylan Sparks was insufficient to allow him to operate the chamber in a proficient manner.

7. The ASME PVHO-1 and NFPA 99 standards identified by Plaintiffs' experts were voluntary standards. These standards did not require redesign of the quick disconnect or inclusion of oxygen or carbon dioxide monitoring.

8. The CO2 sensor proposed by Plaintiffs' experts would not function in the chamber environment. Plaintiffs' experts have not identified a CO2 sensor that would have prevented this incident.

I reserve the right to amend or supplement these opinions if additional work is requested and/or additional discovery materials are provided.

Sincerely,

Steven R. Arndt, Ph.D., CHFP
Principal

# Incident Description and Background

Hyperbaric Technologies, Inc. (HTI) obtained 510(k) marketing clearance for the incident chamber in 2000 and did report that they met the NFPA 99 or ASME PVHO-1 standards.[1]  In subsequent Certificate to Foreign Government documents, HTI was recognized as the manufacturer of Vitaeris hyperbaric chambers, Oxy-Health was recognized as the distributor of Vitaeris hyperbaric chambers, and HTI continued to have clearance to market the product in the United States.[2]

Oxy-Health obtained the incident hyperbaric chamber from HTI and subsequently sold it in 2005.[3]  The incident chamber is serial number 3398, and is dated October 7, 2005.[4]  Mrs. Presson testified that she purchased the incident chamber from Vita O2.[5]

The Sparks family consists of Mr. Robert Sparks (Mr. Sparks), Mrs. Amy Sparks (Mrs. Sparks), and their children, Ms. Kelsey Sparks (Kelsey), Mr. Jarred Sparks (Jarred), and Mr. Dylan Sparks (Dylan).[6]

Jarred was diagnosed with autism when he was two and a half years old.[7]  Mrs. Sparks testified that Jarred always had to have supervision and that she never left Jarred in the house alone from the time Jarred was young up to the time of the subject incident.[8]

Mrs. Sparks testified that she learned of hyperbaric treatment in a workshop[9] and that Dr. Kartzinel, Jarred's primary physician,[10] had mentioned hyperbaric treatment as an option for Jarred[11] and was "all for it."[12]  In addition, Mrs. Sparks testified that she would speak to her friend, Mrs. Presson, about things that were new.[13]

Jarred started with hyperbaric treatment when he was about twelve years old.[14]  Mrs. Sparks testified that the first hyperbaric treatment Jarred had was with Dr. Bradstreet in Dr. Bradstreet's office[15] in Melbourne, Florida.[16]  During the treatments in Florida, there was always someone in the

---

[1] HTI 510(k) K001409

[2] 2003 Certificate to Foreign Government; 2005 Certificate to Foreign Government; 2013 Certificate to Foreign Government

[3] BATES OXY 121-122

[4] Photos of Incident Scene from Sheriff, Disc 1, DSC_7101

[5] Janet Presson, pp. 50-51

[6] Amy Sparks, pp. 17-18, 35

[7] Amy Sparks, p. 35

[8] Amy Sparks, pp. 67-69

[9] Amy Sparks, p. 69

[10] Amy Sparks, pp. 59-61

[11] Amy Sparks, p. 69

[12] Amy Sparks, p. 76

[13] Amy Sparks, pp. 69-70

[14] Amy Sparks, pp. 74-75

[15] Amy Sparks, p. 75

[16] Amy Sparks, p. 61

chamber with Jarred;[17] Mr. Sparks, Kelsey, and Dylan would accompany Jarred in the chamber.[18] Jarred had a treatment every few months from the time of his first treatment until the Sparks got the first hyperbaric chamber in their house.[19] Mrs. Sparks testified that when Jarred received treatments in the soft-sided chamber in Florida, the staff would not stay in the treatment room; they would leave occasionally, going back and forth.[20] Dr. Bradstreet testified that there was always somebody in the room when individuals were in the chamber[21] and that there was never a child with autism unattended by a parent or therapist while inside a chamber.[22] Dr. Kartzinel testified that at his clinic there was a technician for every one or two chambers and that the technician stays in the room for the entire treatment and never leaves.[23]

Around 2006, Dr. Bradstreet allowed Mrs. Sparks to borrow a chamber for around ten months.[24] Mrs. Sparks testified that she did not have a prescription when she received the chamber from Dr. Bradstreet.[25] Mrs. Sparks testified that when they received the chamber, they were shown how to use it, had been around it in Dr. Kartzinel's office, and that she made sure she knew how to use it before she put her son into it.[26] Mrs. Sparks testified that the chamber used in 2006-2007 was set up the same way as the incident chamber,[27] but did not have an oxygen concentrator.[28] Mrs. Sparks testified that during the 2006-2007 time frame, Jarred was taking treatment in the chamber pretty much every day.[29] Mrs. Sparks testified that she did not receive a copy of the manual with the chamber she borrowed from Dr. Bradstreet.[30] There is no indication in the record that I have reviewed that a manual was ever requested by Mrs. Sparks.

Mrs. Sparks testified that after returning the borrowed chamber to Dr. Bradstreet, Jarred started treatments at A Small Miracle between 2007 and 2009.[31] Mrs. Janet Presson (Mrs. Presson) is owner and president of A Small Miracle and Mr. Robert Presson (Mr. Presson) was Vice President and Treasurer.[32] Mrs. Presson also started a company called Hyperbaric Advantage to provide hyperbaric treatments.[33] Mrs. Sparks testified that the person monitoring the therapy at A Small

---

[17] Amy Sparks, p. 96

[18] Amy Sparks, p. 95

[19] Amy Sparks, pp. 77, 90

[20] Amy Sparks, pp. 93-94

[21] Jeff Bradstreet, p. 37

[22] Jeff Bradstreet, p. 43

[23] Jerry Kartzinel, p. 57

[24] Amy Sparks, pp. 77-78

[25] Amy Sparks, p. 132

[26] Amy Sparks, pp. 88-89

[27] Amy Sparks, p. 82

[28] Amy Sparks, pp. 82-83

[29] Amy Sparks, p. 85

[30] Amy Sparks, p. 155

[31] Amy Sparks, p. 92

[32] Janet Presson, p. 22

[33] Janet Presson, pp. 64-65

Miracle would come and go from the treatment room.[34]  Mrs. Presson testified that the Hyperbaric Advantage employees sat in the room and there would always be an employee monitoring what was going on inside of the chamber during treatments.[35]

After returning the chamber, Mrs. Sparks asked Mrs. Presson, of A Small Miracle, not to sell the hyperbaric chamber because she wanted to purchase it.[36]  Mrs. Sparks obtained a prescription for hyperbaric oxygen therapy (HBOT) for Jarred.[37]  The prescription stated, "HBOT home chamber. Use as directed."[38]  Mrs. Sparks testified that Dr. Kartzinel did not tell her how to monitor Jarred inside the chamber when the chamber was being used.[39]

Mr. and Mrs. Sparks purchased the incident hyperbaric chamber and Mr. and Mrs. Presson delivered the incident chamber to the Sparks' house on February 5, 2011.[40]  When Mr. and Mrs. Presson delivered the chamber, they set it up and tested it to ensure it was in good working order.[41] The chamber was set up in Kelsey's room.[42]  The Pressons provided information to the Sparks family regarding how to use the chamber and how to use the oxygen concentrator.[43]  Mrs. Sparks testified that, from the time the chamber was set up by the Pressons, she did not disconnect anything and does not know of anyone else doing so.[44]  She testified that there were occasions, such as when someone was spending the night, when the chamber was moved and then put back into place.[45]

Mrs. Sparks flipped through the manual, but did not read it.[46]  Mrs. Sparks testified that Kelsey and Dylan knew how to use the chamber, and that Kelsey and Dylan had been trained by "us" (Mr. and Mrs. Sparks).[47]  Dylan did not read the manual.[48]

Mrs. Sparks testified that Jarred attempted to unzip the chamber that was acquired from Mr. and Mrs. Presson and that they (the Sparks) knew they had to be cautious because they were afraid Jarred would try to unzip out.[49]  She further testified that her husband would get into the chamber borrowed from Dr. Bradstreet with Jarred because it was not at bedtime and they were worried about Jarred unzipping the chamber.[50]  Mrs. Sparks testified that if the chamber were unzipped from

---

[34] Amy Sparks, p. 127

[35] Janet Presson, p. 71

[36] Amy Sparks, p. 144

[37] Exhibit 2; Amy Sparks, p. 130

[38] Exhibit 2

[39] Amy Sparks, p. 133

[40] Exhibit 3

[41] Amy Sparks, p. 152

[42] Amy Sparks, p. 153

[43] Amy Sparks, p. 138

[44] Amy Sparks, p. 172

[45] Amy Sparks, p. 192

[46] Amy Sparks, p. 159

[47] Amy Sparks, p. 106

[48] Dylan Sparks, p. 64

[49] Amy Sparks, pp. 97-98

[50] Amy Sparks, pp. 102-103

the inside, it could injure the person and damage the chamber;[51] she was worried about Jarred's lungs and the possibility of bursting an eardrum.[52]  Mrs. Sparks testified that no one other than Jarred took treatments inside the incident chamber.[53]

Jarred's treatments were 2-3 hours, "whatever Jarred could tolerate."[54]  Mrs. Sparks testified that Dr. Kartzinel told her not to do treatments more than two or three hours.[55]

Mrs. Sparks testified that they would normally put Jarred to bed around 8:30, let him sleep for 30-45 minutes, have him go to the bathroom, and then put him into the chamber.[56]  Mrs. Sparks testified that she and her family would always use the oxygen concentrator and the pumps.[57]  The oxygen concentrator mask would be laid next to Jarred's face because Jarred would not wear it.[58]  Mrs. Sparks testified that she would stay in the room until the chamber was pressurized,[59] and she would always listen for the whistling sound which indicated to her that the chamber was working properly.[60]  She testified that she would leave the door to the room open[61] and that she would always be in and out of the room,[62] and that sometimes she did not check as frequently and she might come back 30 minutes later.[63]

Dylan testified that he would not always wait for the chamber to get up to pressure before leaving the room.[64]  He testified that he did not use the oxygen concentrator because Jarred would not wear it.[65]  Dylan testified that he usually left the door closed or cracked.[66]

Jarred had a treatment the Tuesday prior to the incident, did not have a treatment on Wednesday,[67] and the incident treatment began on the evening of Thursday, June 9, 2011, and ended Friday, June 10, 2011.[68]

The night of the incident, Mrs. Sparks asked Dylan to put Jarred into the chamber.[69]  Jarred went to the bathroom and then got into the chamber.[70]  Dylan turned on the pumps, zipped up the

---

[51] Amy Sparks, p. 103

[52] Amy Sparks, p. 98

[53] Amy Sparks, p. 105

[54] Amy Sparks, pp. 117-118

[55] Amy Sparks, p. 133

[56] Amy Sparks, p. 116

[57] Amy Sparks, p. 187

[58] Amy Sparks, pp. 129-130

[59] Amy Sparks, pp. 181-182

[60] Amy Sparks, p. 182

[61] Amy Sparks, pp. 128-129

[62] Amy Sparks, p. 114

[63] Amy Sparks, p. 115

[64] Dylan Sparks, pp. 74-75

[65] Dylan Sparks, p. 65

[66] Dylan Sparks, p. 85

[67] Amy Sparks, p. 117

[68] Amy Sparks, pp. 149, 200-201

[69] Amy Sparks, p. 210; Dylan Sparks, p. 98

chamber,[71] saw the chamber begin to inflate,[72] and left the room and shut the door without waiting for the chamber to fully inflate.[73] Dylan then spent 20-30 minutes on a computer 4-5 feet away from the door.[74] He testified that he could hear the discharge of air through the overpressure valves[75] and that the air discharge started about 10 minutes after he left the room.[76]

Dylan then went downstairs and watched television for around 30 minutes, told his mom he was going to bed, and went to bed around 10:30 to 11:30.[77] Mrs. Sparks testified that Dylan was on the computer for around one-and-a-half hours and that he then went downstairs and told her that he was going to bed.[78] Dylan did not check on Jarred prior to going to bed.[79]

Mrs. Sparks testified that she fell asleep.[80] When she woke up, she was worried that Jarred had gone to the bathroom in the chamber.[81] She went upstairs and, upon checking on Jarred, found him unresponsive.[82]

First responders were called at 3:40 a.m. on the morning of June 10, 2011.[83] The Cumberland County Sheriff's Office report indicates that the police found the hose that pumped air into the chamber had fallen to the floor and caused the chamber to deflate.[84]

---

[70] Dylan Sparks, pp. 99-100

[71] Dylan Sparks, p. 100

[72] Dylan Sparks, p. 104

[73] Dylan Sparks, pp. 91-92, 99

[74] Dylan Sparks, pp. 80, 91

[75] Dylan Sparks, p. 92

[76] Dylan Sparks, p. 109

[77] Dylan Sparks, pp. 92, 111

[78] Amy Sparks, p. 215

[79] Dylan Sparks, p. 105

[80] Amy Sparks, p. 202

[81] Amy Sparks, p. 203

[82] Amy Sparks, pp. 202-203

[83] BATES MR_Sparks 7

[84] Cumberland Co. Sheriff's Office Investigation Report, p. 1

# Opinions and Bases

I hold the following opinions to a reasonable degree of scientific certainty based on my review and analysis of the supplied materials, examination of an exemplar Vitaeris 320 hyperbaric chamber, my review of relevant standards and literature, and my education, training, and experience:

## Opinion 1

**There was sufficient information in the form of warnings and instructions available to the Plaintiffs that, if read and followed, the incident would not have occurred.**

There exist three distinct time periods during which the air supply hose may have become disconnected from the hyperbaric chamber:

**Time Period 1.** Prior to Dylan putting Jarred into the chamber and starting the air pumps,

**Time Period 2.** After Dylan put Jarred into the chamber and started the air pumps, but before the chamber reached a full inflation pressure of around 4 pounds per square inch (PSI), or

**Time Period 3.** After the chamber reached a full inflation pressure of around 4 PSI during the course of the treatment.

In the Operating and Reference Manual, revision 4, dated January 2005,[85] the eighth chapter is entitled, "Operating the Chamber."[86]  The first step in chapter eight is to "Prepare Equipment." This step includes an instruction to, "Securely push in the 'QUICK-DISCONNECT VALVES' to their respective attachment sites …" and goes on to state, "There should be no air leak from the QUICK DISCONNECT VALVES."[87]  If the air supply hose became disconnected from the chamber during Time Period 1, compliance with these instructions to attach the quick disconnect valves and to ensure there was no air leak from the quick disconnect valves would have identified the disconnection and ensured that the quick disconnect valves were attached prior to chamber operation.  This would have prevented the incident.

The sixth step in chapter eight is, "Chamber Manipulation."[88]  This stage describes actions to take until the chamber reaches ½ to 1 PSI.  It further includes an instruction to, "Watch the PRESSURE GAUGE on top of the chamber to assure the indicator reaches 3-4 PSI and remains at or near 3-4 PSI…"[89]  If the air supply hose became disconnected from the chamber during Time Period 1 or Time Period 2, compliance with these instructions to assure that the chamber reached 3-4 PSI would have led to identification of the chamber failing to reach full pressure.  Failure of the chamber to reach full pressure would have indicated that the chamber was not functioning properly, and would

---

[85] BATES OXY 40-41

[86] BATES OXY 64

[87] BATES OXY 64

[88] BATES OXY 66

[89] BATES OXY 66

have led a reasonably attentive operator to take additional action to either troubleshoot the cause of the chamber failing to inflate or to end the treatment. Steps to troubleshoot the chamber not inflating properly are provided in chapter twelve, entitled, "Troubleshooting and Chamber Operation."[90] The first step described to troubleshoot this problem is to, "Move your hand close to (not touching) all connections and along the zipper, to detect any areas from which air escapes."[91] Had this step been taken, as described in the Operating and Reference Manual, the disconnection of the air supply hose would have been identified and corrected and this incident would not have occurred.

The seventh and final step in the eighth chapter is entitled, "Observe."[92] In this step, the operator is instructed to:

> Set a clock or timer for the prescribed treatment period. Reassure the person inside that the attendant will remain with them during the entire treatment and will be regularly checking on them.[93]

Had a clock or timer been set for the treatment period, Mrs. Sparks would have woken sooner to check on Jarred and to end his treatment. However, given that Jarred's treatments were intended to be two to three hours in length, or whatever Jarred could tolerate,[94] whether a clock or timer would have prevented this incident is not clear and would be based on factors such as when the air supply hose became disconnected from the chamber, how well the chamber was sealed, and whether the oxygen concentrator was in use.

The step also instructs the operator to tell the person inside that the attendant will remain with them during the entire treatment and will regularly check on them. The instruction to remain with the person inside the chamber and check on them regularly implies that the attendant will be in the room and will look in on the person inside the chamber. Had these actions been taken, Mrs. Sparks or Dylan would have been presented with sufficient information to recognize that the air supply hose had become disconnected, as described in Opinion 3.

In chapter seven, "Treatments," a warning statement is provided:

> **Caution: We recommend that an attendant be present during the entire time someone is inside the chamber due to any unforeseen emergency involving the patient's condition that is unrelated to the hyperbaric chamber treatment.[95]**

Although this warning statement does not identify the specific hazard related to this incident, had it been read and followed, it would have been sufficient to prevent this incident in that an individual present during the entire treatment would have been able to identify the disconnection of the chamber at Time Period 1, 2, or 3 and take action to troubleshoot or to end Jarred's treatment.

---

[90] BATES OXY 41, 73

[91] BATES OXY 74

[92] BATES OXY 66

[93] BATES OXY 66

[94] Amy Sparks, pp. 117-118

[95] BATES OXY 63

Also in chapter seven, "Treatments," there is an instruction to "Consult with the prescribing doctor for individual protocols."[96] Thus, Oxy-Health and HTI recognize that a physician may be involved in determining the procedures and protocols to be followed for an individual patient.

In chapter eleven, entitled, "Safety Considerations: Precautions and Contraindications,"[97] potential dangers related to the chamber and their likelihoods are discussed, including otic barotrauma, decompression sickness, pulmonary hyper-expansion, and excessive carbon dioxide exposure.[98] Excessive carbon dioxide exposure is defined as, "A disorder caused by excessive carbon dioxide inhalation,"[99] and the description of the condition states:

> The person inside of the mild hyperbaric chamber is in an enclosed structure and is expiring carbon dioxide. This carbon dioxide is concentrated to a level that is determined by the rate at which fresh air is pumped into the chamber and released through the two air release valves.

This statement would indicate to a reader of the Operating and Reference Manual that introduction of fresh air into the chamber is important with regard to carbon dioxide exposure.

Had the instructions and warning statements in the Operating and Reference Manual been complied with during Jarred's treatment on June 9-10, 2011, the disconnection of the air supply hose would have been identified and corrected and Jarred would not have asphyxiated.

## Opinion 2

**There was sufficient information in the form of verbal instructions available to the plaintiffs that, if complied with, the incident would not have occurred.**

The Sparks family received instructions on use of the chamber from Dr. Bradstreet's clinic in association with their renting a chamber, from Dr. Kartzinel in association with his providing them a prescription to purchase a chamber, and from Mr. and Mrs. Presson when they delivered the incident chamber.

Dr. Bradstreet testified that when he provides a prescription for hyperbaric therapy, he tells the patient how often and how long to use the chamber.[100] Extensive instructions and training in the clinic were provided to families that rented chambers through his clinic related to operation and safety.[101] He testified that parents may not have been instructed to stay inside the room during the entire time of treatment, but that they were instructed to have close supervision;[102] they would not have trained families to operate a chamber where a child was left unattended in the chamber.[103] Dr. Bradstreet testified that the instructions would have had information about the importance of

---

[96] BATES OXY 63

[97] BATES OXY 69

[98] BATES OXY 69-71

[99] BATES OXY 71

[100] Jeff Bradstreet, p. 18

[101] Jeff Bradstreet, p. 54

[102] Jeff Bradstreet, p. 95

[103] Jeff Bradstreet, pp. 103-104

monitoring the person inside the chamber.[104]  Further, Dr. Bradstreet testified that he warned people there is a suffocation hazard and that the only source of air flow is through the compressor.[105]  Dr. Bradstreet testified that he is not aware of any chambers being prescribed without instructions being provided.[106]  As a result, the Sparks would have been trained on how to use the chamber.[107]

Dr. Kartzinel testified that his instructions to Mrs. Sparks were to re-start where she left off with treatments, with the same length of time, frequency, pressure, and use of oxygen.[108]  He testified there was no further discussion about whether there would be a dive partner, or monitoring, because she had already been using a chamber in the home.[109]  There were no oral instructions he would have provided to Mrs. Sparks at that point.[110]

Mr. and Mrs. Presson testified that they set up the chamber and made sure that it all worked properly.[111]  Mr. Presson testified that he told Mr. Sparks how to get the chamber in the house, set it up, turn it on, and turn it off.[112]  Mr. Presson gave the Sparks "the standard issue warnings and cautions: 'Don't unzip it when it's pressurized.'"[113]  Mr. Presson testified that he did not discuss monitoring of the chamber with the Sparks.[114]  However, Mrs. Presson testified that she clearly remembers Mrs. Sparks telling her she was going to sit in the room and grade papers.[115]  Both Mr. and Mrs. Presson recognized that the Sparks had prior knowledge related to use of the chamber;[116] Mrs. Presson testified that they did not start the training "from scratch" like they would have with a beginner.[117]  Mr. and Mrs. Presson testified that they did not train Dylan to use the chamber.[118]

Mr. and Mrs. Sparks, through the training that would have been provided when they borrowed a chamber from Dr. Bradstreet, received sufficient information to understand the hazard of suffocation related to the chamber and to understand the importance of monitoring Jarred while Jarred was receiving a treatment in the chamber.  Had the Sparks used the chamber in a manner consistent with the instructions they received, this incident would not have occurred.

Plaintiffs' expert Dr. Nancy Grugle, testified that the doctor's instructions have no impact on her opinions in the case: "Instructions from the doctor are not product warnings."[119]  Dr. Grugle fails to

---

[104] Jeff Bradstreet, p. 122

[105] Jeff Bradstreet, pp. 96-98

[106] Jeff Bradstreet, p. 59

[107] Jeff Bradstreet, pp. 80-81

[108] Jerry Kartzinel, pp. 103-104

[109] Jerry Kartzinel, pp. 104-105

[110] Jerry Kartzinel, p. 105

[111] Janet Presson, p. 103

[112] Jack Presson, pp. 77-78

[113] Jack Presson, p. 82

[114] Jack Presson, p. 90

[115] Janet Presson, p. 123

[116] Janet Presson, p. 121; Jack Presson p. 77

[117] Janet Presson, p. 110

[118] Jack Presson, p. 66; Janet Presson, p. 145

[119] Nancy Grugle, pp. 162-163

account for the role that instructions from physicians may have regarding appropriate use of a prescription medical device. Within the communications and human-factors domains, source credibility is known to exert strong influence on a person's behavior. When a behavior is encouraged, taught, or demonstrated by somebody perceived to be holding a superior position to the observer, that behavior is reinforced (Hovland & Weiss, 1951; Craig & McCann, 1978).

By failing to consider training and information provided by Jarred's treating physicians in her application of the hierarchy of hazard control,[120] Dr. Grugle failed to consider the full system that was available to provide information to the Sparks family. While the hierarchy of hazard control can serve as a useful reference point in accident analysis, it fails to account for outside influences, such as those provided by Jarred's treating physicians (Krauss et al., 2008). Dr. Grugle's use of the hierarchy of hazard control fits with Hall et al.'s (2010, p. 1064) description of how,

> … "*the* safety hierarchy" is virtually always applied to a single hazard that is at issue without regard to other hazards, unintended consequences, or considerations other than simply minimizing risk. This narrow, retrospective view contrasts with the way safety is examined prospectively. Focusing only on one hazard may not produce the same conclusions as looking at safety more broadly, and generally wouldn't be expected to result in well-founded conclusions.

Given that Dr. Bradstreet's clinic provided training directly to the Sparks family, the training and information provided directly to the Sparks by the individual who trained them had a greater likelihood of being effective than information in the Operating and Reference Manual, due to the information being provided directly to the Sparks and due to the credibility of the source and Mrs. Sparks' and Dylan's failure to adequately familiarize themselves with the manual.

## Opinion 3

**If the air hose becomes disconnected, sufficient cues are available to alert an attendant or to alert a reasonably attentive, non-autistic, self-treating individual.**

In Opinion 1, three distinct time periods were discussed during which the air supply hose may have become disconnected from the hyperbaric chamber:

**Time Period 1.** Prior to Dylan putting Jarred into the chamber and starting the air pumps,

**Time Period 2.** After Dylan put Jarred into the chamber and started the air pumps, but before the chamber reached a full inflation pressure of around 4 pounds per square inch (PSI), or

**Time Period 3.** After the chamber reached a full inflation pressure of around 4 PSI during the course of the treatment.

If the air supply hose was disconnected from the chamber during Time Period 1, a hissing sound would have been evident at start-up of the pumps. At initial start-up, a hissing sound would not be expected because the hissing sound through the relief valves associated with normal use of the chamber occurs when the chamber is fully, or nearly fully, pressurized. This sound would provide

---

[120] Nancy Grugle, e.g. pp. 39, 41, 71

an immediate cue to a reasonably attentive operator that the chamber was not functioning properly. In addition, with the air supply hose disconnected, the chamber would not begin to inflate and the reading of the pressure gauge would not increase. For a reasonably attentive operator complying with the instructions in the user manual to observe the chamber until it reached 3-4 PSI, the failure of the chamber to reach these pressures would serve as an additional indicator that the chamber was not functioning properly.

If the air supply hose disconnected from the chamber during Time Period 2 and a reasonably attentive operator was present in the room, the disconnection of the hose would be marked with a discrete and detectable change in sound quality; there would be a sudden hissing sound as air was forced through the disconnected air supply hose. In addition, with the air supply hose disconnected, the chamber would cease to inflate and the reading of the pressure gauge would not increase. For a reasonably attentive operator complying with the instructions in the user manual to observe the chamber until it reached 3-4 PSI, the failure of the chamber to reach these pressures would serve as an additional indicator that the chamber was not functioning properly.

If the air supply hose was disconnected from the chamber during Time Period 3 and a reasonably attentive operator was present in the room, the disconnection of the hose would be marked with a discrete and detectable change in sound quality; there would be a sudden hissing sound as air was forced through the disconnected air supply hose. This sound would be in addition to the hissing sound produced by air escaping through the pressure relief valves. Within several minutes, the hissing sound produced by air escaping through the pressure relief valves would cease, and only the hissing of air forced through the disconnected air supply hose would remain. While the chamber would likely maintain its shape, the pressure gauge would read less than 4 PSI. These signals would be sufficient to alert a reasonably attentive operator that the chamber was not operating as intended.

Even if an operator were not in the room at the time the air supply hose disconnected from the chamber, sufficient cues were available to alert a reasonably attentive operator that the chamber was not operating as intended if the operator entered the room to check on the individual within the chamber. Based on my observations, a reasonably attentive operator would be able to identify the difference between air escaping from the pressure relief valves at the foot of the chamber and air escaping through the air supply hose at the head of the chamber. Further, the pressure gauge would read less than 4 PSI. These cues would be sufficient to alert a reasonably attentive operator that the chamber was not operating as intended.

If an individual were to engage in self-treatment, it would be possible to recognize the air supply hose becoming disconnected from the chamber while receiving treatment within the chamber. Based on my own experience within the chamber, there is a noticeable pressure drop when the air supply hose becomes disconnected. In addition, when used without a diffuser, the sound pressure level inside the chamber dropped significantly and noticeably when the air supply hose was disconnected. However, I would not anticipate an individual with autism self-treating in the chamber.

# Opinion 4

**An ANSI Z535-compliant warning at the head of the chamber related to the potential for the quick disconnect valve to disconnect, as proposed by Plaintiffs' expert, Dr. Grugle, would not have prevented this incident. Additional information, as suggested by Plaintiffs' experts, would not have prevented this incident.**

Dr. Nancy Grugle, wrote that:

> The purpose of a warning is to improve safety or to eliminate or reduce incidents that result in injury, illness or property damage by influencing people's behavior in ways that will improve safety.[121]

I agree with Dr. Grugle that this is the purpose of a warning. Dr. Grugle fails to define what it means for a warning to be effective and instead notes that effective warnings should be: available at the time and location needed; conspicuous; and explicit, comprehensible, practicable, and meet other criteria.[122] Based on Dr. Grugle's definition of the purpose of a warning, to be effective, a warning must change behavior "in a way that results in a net reduction in the relevant negative consequences" (Ayres et al., 1989, p. 1).

Dr. Grugle opined that Oxy-Health, "failed to provide effective warnings that were available at the time and location needed, conspicuous, and explicit."[123]

Dr. Grugle testified that the on-product labels should conform to ANSI Z535.4.[124] In addition, Dr. Grugle opined that the Operating and Reference Manual should comply with ANSI Z535.6.[125] She testified that 2006 was not the first date of the ANSI Z535.6 standard.[126] Her testimony was incorrect (ANSI Z535.6-2006, p. vi). The ANSI Z535.6 standard did not exist at the time the chamber was sold, in 2005.[127] Further, neither ANSI Z535.4 nor ANSI Z535.6 is a mandatory standard.

Dr. Grugle testified that a label is not defective if it meets the ANSI Z535 standard and the person does not read or follow the information, and that complying with the ANSI Z535 standard maximizes the likelihood that the standard will be seen, read, and followed.[128] Dr. Grugle opined that if a warning is missing a signal word, missing hazard identification, or missing consequences, then it is not adequate.[129] Dr. Grugle is mistaken in her testimony. An informative appendix in ANSI Z535.4-2002, "B3.1 The Content of the word message," provides instruction related to the omission of hazard type, avoidance, or consequence information:

---

[121] Robson Forensic Report, p. 12

[122] Robson Forensic Report, p. 13, Nancy Grugle, p. 67

[123] Robson Forensic Report, p. 13

[124] Nancy Grugle, p. 248

[125] Nancy Grugle, p. 247

[126] Nancy Grugle, p. 247

[127] BATES OXY 121-122

[128] Nancy Grugle, p. 251

[129] Nancy Grugle, pp. 243-244

> The word message on a product safety sign typically communicates information to an observer on the type of hazard, the consequence of not avoiding the hazard and how to avoid the hazard. Many factors must be considered when determining whether to omit consequence, avoidance or type of hazard information in the word message. Factors to consider include whether the message can be inferred from a symbol, other text messages, user training or the context in which the safety sign is used.

Further, research has demonstrated that designing a warning to comply with ANSI Z535 may not increase compliance with warnings (Young et al., 2002).

Contrary to Dr. Grugle's testimony, warnings and instructions provided with a product are adequate if they provide sufficient information, if read and followed, to prevent an incident. Research on the effectiveness of warnings has shown that certain criteria must be met before information presented can affect and change user behavior (Ayres et al., 1989). The most basic premise of whether a warning will be effective necessitates that the user seek such information, and the warning is noticed, read, and followed. This requires an attentive user who is interested and willing to change his/her behavior (Ayres et al., 1989).

Mr. W.T. Workman, Plaintiffs' expert, testified that it is reasonable for a product manufacturer to expect that someone who purchases the product will read the manual.[130] He further testified that, without reading the user manual, the user could put themselves or others at risk in the operation of the product.[131] In this case, Mrs. Sparks flipped through the manual, but did not ever read it[132] and Dylan did not read the Operating and Reference Manual.[133]

Dr. Grugle provided an example on-product warning related to the quick disconnect valve in the area of the quick disconnect valve, as depicted in Figure 1. This label is in close proximity to the quick disconnect valve near the head of the chamber. The labeling recommended by Dr. Grugle would not have been effective in preventing this incident.

---

[130] W.T. Workman, p. 22

[131] W.T. Workman, p. 23

[132] Amy Sparks, p. 154

[133] Dylan Sparks, p. 127



Example On-Product Quick Disconnect Valve Warning from Dr. Grugle, BATES MR_Sparks 666

Figure 1.        Example warning proposed by Dr. Grugle

The incident chamber was set up in Kelsey's room with the assistance of Mr. and Mrs. Presson. Mr. Presson testified that a chest of drawers, or some piece of furniture had to be moved to make space for the chamber.[134]  Dylan testified that there was not a lot of space between the head of the chamber and the bookcase; there was probably 2-3 inches of clearance.[135]  Dylan further testified that the way the chamber was put into the room was the only way it would fit so that you could open the door and not block everything else.[136]  Mr. Presson testified that once the chamber was set up, inflation was demonstrated.[137]  Mrs. Presson testified that they were comfortable with the clearance around the chamber once they had set it up.[138]  Once the chamber was set up and had been successfully tested, the Pressons and the Sparks were not likely to have moved the bookcase farther away from the head of the chamber.  People only comply with warnings or instructions if the cost (in terms of money, convenience, time, energy, etc.) is low enough for the individual to believe compliance is worthwhile (Dingus et al., 1991).  Data show that when the "cost" increases, even if only slightly, the rate of compliance drops significantly.

Based on testimony, Dylan had put Jarred into the chamber two days prior to the incident for a treatment.[139]  Mrs. Sparks testified that she did not have any trouble operating the unit from the time the chamber was delivered until the time of the incident and that there were no malfunctions of any

---

[134] Jack Presson, p. 64

[135] Dylan Sparks, pp. 86-87

[136] Dylan Sparks, p. 89

[137] Jack Presson, pp. 72-73

[138] Janet Presson, pp. 111-112

[139] Amy Sparks, pp. 117, 308

pieces or parts related to the chamber.[140]  Similarly, Dylan testified that he does not recall having problems with the chamber prior to the incident.[141]

Further, Dylan testified that he did not ever inspect the quick disconnect valve or the valves that connect to the pumps before using the chamber, and he did not do so the night of the incident.[142] Dylan would not have seen or read the warning Dr. Grugle proposed on the night of the incident and it would not have influenced his behavior.

No one checked on Jarred from the time he was put into the chamber until Mrs. Sparks removed him from the chamber.[143]  The treatment procedure the night of the incident differs from the procedures used when the Sparks first began using hyperbaric chambers, when Dylan would enter the chamber with Jarred for treatments,[144] and from Mrs. Sparks' testimony regarding how frequently she would check on Jarred.[145]  Mrs. Sparks testified that she did not check on Jarred prior to Dylan going to bed because Dylan was "up there with Jarred."[146]

Both Mrs. Sparks and Dylan were aware that injury or product damage could occur if Jarred were to unzip the chamber[147] and both had had experience with Jarred attempting to unzip the chamber while pressurized.[148]  In addition, A Person-Centered Profile for Jarred,[149] which describes his capabilities, limitations, and the level of care he requires, states that:

> Jarred needs constant assistance to complete tasks, stay on track, and constant supervision.  Jarred can not [sic] be left alone, he will do whatever he wants even if it is not safe.  Jarred has no concept of right from wrong.[150]

The care plan also states that, "Jarred is to be closely supervised at all times to ensure his medical, physical, and emotional health are not compromised."[151]  Mrs. Sparks signed the plan document on April 27, 2011, indicating that she agrees "with the services/supports to be provided."[152]

In spite of this knowledge and these experiences, neither Mrs. Sparks nor Dylan believed it was necessary to stay in the room with Jarred during treatments.[153]

Benign experiences with a product without any negative consequences can cause an individual to become complacent in his or her safety awareness (Karnes et al., 1986).  A false sense of safety can

---

[140] Amy Sparks, p. 180

[141] Dylan Sparks, p. 75

[142] Dylan Sparks, pp. 77, 102

[143] Amy Sparks, p. 221

[144] Dylan Sparks, pp. 52-55

[145] Amy Sparks, pp. 114, 312

[146] Amy Sparks, p. 221

[147] Amy Sparks, p. 98; Dylan Sparks, p. 71

[148] Amy Sparks, p. 97; Dylan Sparks, pp. 46-47

[149] BATES ASM 339

[150] BATES ASM 339

[151] BATES ASM 362

[152] BATES ASM 364

[153] Amy Sparks, pp. 112, 182; Dylan Sparks, pp. 58, 68

develop over time which can provide the impetus for the user to seek out methods that increase production or increase comfort with the product, at the cost of creating or magnifying hazards. In addition, research describes that users who are more familiar with a product are less likely to notice, look for, read, and comply with warnings (Dorris & Purswell, 1977; Zeitlin, 1994; Otsubo, 1988; Godfrey et al., 1983; Goldhaber & deTurck, 1988) because they presumably already know, or think they know, the hazards and rules for use. As people become more familiar with a product, they perceive it as less hazardous and may be less likely to seek information on safe behavior (DeJoy, 1999, p. 227).

Given that Mrs. Sparks and Dylan did not believe it was necessary to monitor Jarred in the chamber during treatments, were not seeking information regarding safe use of the product, and that they were aware of hazards that could lead to injury or product damage resulting from Jarred's actions, no additional or alternative information in the Operating and Reference Manual or on the product itself would have prevented this incident.

## Opinion 5

**There was no scientific basis for Hyperbaric Technologies or for Oxy-Health to change their design.**

Mr. Samir Patel, President and CEO of Oxy-Health since 2007,[154] testified that HTI manufactures the chamber.[155] HTI conducted risk analyses for the product.[156] Oxy-Health did not participate in the selection of components to be incorporated into a Vitaeris 320 hyperbaric chamber.[157]

Dr. Grugle testified that safety and human factors practitioners rely on the engineers who designed a product to provide information about the hazards associated with the product unless it is a readily identifiable, open and obvious hazard.[158] Given Oxy-Health's and HTI's respective roles related to the incident chamber, it was reasonable for Oxy-Health to rely on HTI to provide information about the hazards associated with use and foreseeable misuse of the chamber.

### Risk Assessment

Hyperbaric Chambers are identified in 21 CFR 868.5470, and have a product code of "CBF." A search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database for product code "CBF" for the 10 years prior to the incident, 2001-2010, identified 22 records. Of those, two were for the manufacturer Oxy-Health, one of which was submitted by Plaintiffs' expert

---

[154] Samir Patel, p. 8

[155] Samir Patel, p. 17

[156] BATES HT 263-264; BATES HT 910-913

[157] Samir Patel, pp. 15-16

[158] Nancy Grugle, p. 49

W.T. Workman.[159]  Neither of the records identified an injury.  The records related to Oxy-Health have been produced in this case.[160]

A single MAUDE record was related to a disconnected valve on a chamber manufactured by HTI.  The event description states, "… Rptr presumes that the valve was not connected properly and the popping sound heard was the valve as it disconnected after initial pressurization."[161]  No injury or harm to any individual was reported.  This incident was reported by Plaintiffs' expert Mr. Workman.[162]  However, based on Mr. Patel's testimony, the incident that was reported did not have to do with a valve becoming detached from the chamber while the chamber was in operation.[163]

In the other MAUDE record related to Oxy-Health, the reporter alleges violations related to the design and use of Oxy-Health soft hyperbaric chambers.  No injury or harm to any individual is reported.[164]

Apart from the subject incident, I have seen no record of any instances of air supply hoses unintentionally becoming detached from the chamber prior to the incident.  In addition, a competitor company, Summit to Sea, also uses a quick disconnect connection for the air supply line to their hyperbaric chambers (Summit to Sea, 2014).  Summit to Sea's website indicates that their product has been around for more than six years and that they have more than 1,000 units installed worldwide.[165]

As of December 2010, Oxy-Health had sold approximately 6,624 hyperbaric chambers with this type of connection.[166]  Mrs. Sparks testified that the chamber they had in 2006-2007 was used every day,[167] and testified that it was used three to four times per week.[168]  From April 28 to June 6, the Sparks used the incident chamber an average of three to four times per week.[169]  Mr. Presson testified that they use their chamber three to four times per week.[170]  Dr. Bradstreet testified that in the clinic, the Fortius chambers were used 6-7 times per day and the Vitaeris chambers were used 8-10 times per day.[171]  Table 1 provides an estimation of the number of uses of chambers with this type of connection sold by Oxy-Health up to December 2010, assuming an average usage rate for all chambers between 1 use per week and 5 uses per week.  Thus, the likelihood of an inadvertent disconnection occurring and leading to death was very low.

---

[159] BATES MR_Sparks 296

[160] BATES OXY 125-126; BATES MR_Sparks 98-100

[161] MDR Report Key 420970, p .1

[162] W.T. Workman, p. 79

[163] Samir Patel, pp. 60-63

[164] MDR Report Key 726092, p. 1

[165] Obtained from http://www.hyperbaric-dives.com/faq.htm on August 13, 2014

[166] BATES OXY 259, 274

[167] Amy Sparks, p. 85

[168] Amy Sparks, p. 101

[169] Photos of Incident Scene from Sheriff, Disc 1, DSC_7063

[170] Jack Presson, p. 34

[171] Jeff Bradstreet, pp. 28-29

**Table 1.  Cumulative number of uses by number of uses per week**

| Number of Uses Per Week | Cumulative Uses |
|:---:|:---:|
| 1 | 1,728,636 |
| 2 | 3,457,272 |
| 3 | 5,185,908 |
| 4 | 6,914,544 |
| 5 | 8,643,180 |

## Sequence of Events Not Reasonably Foreseeable

Ms. Grugle opined that "Warnings should be provided when a significant hazard exists from foreseeable use of a product"[172] and states that Oxy-Health had a duty to warn users about the asphyxiation hazard related to the product.  She testified that manufacturers are required to provide warnings or instructions for foreseeable misuse, which she defines as, "errors in using the product that have been identified and that are known to the manufacturer."[173]  The sequence of events that led to this incident was not reasonably foreseeable to Oxy-Health.  As described above, there exist numerous instructions and cues to instruct users to use the chamber safely and to alert users if the air supply hose becomes disconnected.

To foresee this incident, Oxy-Health would have had to recognize some or all of the below points, in combination:

- Failure of Mrs. Sparks and of Dylan to review Operating and Reference Manual.
- Failure of Dylan to check the connections prior to starting the chamber.
- Failure of Dylan to wait in the room after starting the chamber to ensure the chamber reached the appropriate pressure.
- Failure to identify through differences in sound that the air supply hose had become disconnected.
- Failure to identify through monitoring of the pressure gauge that the air supply hose had become disconnected.
- Either:
  - The pumps turned on with the air supply hose disconnected and the disconnection not detected.
  - The connection between the pumps and the chamber becoming disconnected due to interaction with objects on a shelf near the head of the chamber; or
  - The connection between the pumps and the chamber becoming disconnected due to Jarred's movements in the chamber.
- The chamber to be run with the connection between the pumps and the chamber disconnected.
- Mrs. Sparks to fall asleep.
- Failure of Mrs. Sparks and Dylan to remain with Jarred and regularly check on him during the treatment.

---

[172] Robson Forensic report, p. 12

[173] Nancy Grugle, p. 95

- Failure to set a clock or timer for the prescribed treatment period.
- Failure of Mrs. Sparks and of Dylan to check on Jarred for 4-5 hours.

While identification of an interruption of the air supply to the chamber was identified by HTI as a potential hazard,[174] it was not recognized that this would lead to asphyxiation. Failure to recognize that an inadvertent disconnection on the quick disconnect could lead to asphyxiation is similar to Dr. Grugle's opinion that a trip and fall over the cords of the chamber would not be likely to cause a serious injury or death.[175] While a trip and fall is not likely to cause serious injury or death in most cases, it is a possibility. Similarly, while serious injury or death is a possible outcome related to an inadvertent disconnection of the air supply hose, it is unlikely due to the feedback available to individuals providing treatment and to individuals receiving treatment. As described above, numerous conditions must be present simultaneously to create a situation in which an inadvertent disconnection of the air supply hose leads to death.

## Opinion 6

**The training provided to Dylan Sparks was insufficient to allow him to operate the chamber in a proficient manner.**

There were a number of resources available to the Sparks family to obtain information regarding how to properly utilize the hyperbaric chamber. These included:

- the Operating and Reference Manual,
- Dr. Kartzinel, their prescribing physician,
- Dr. Bradstreet, who had previously prescribed a hyperbaric chamber for them and lent them a hyperbaric chamber,
- Mr. and Mrs. Presson, who sold them the chamber, utilized a similar chamber in their own home, and had run a business supervising others in the chamber's use.

In addition, Dylan could have utilized his mother, Mrs. Sparks, as a resource to determine how to provide treatment to Jarred.

The night of the incident, the procedures taken by Dylan were not consistent with the instructions that were available in the product manual, with procedures described by the physicians who had prescribed the chamber, or with the procedures utilized by his mother, Mrs. Sparks. This demonstrates that insufficient training was provided to Dylan, a 16 year old minor[176] who was expected to provide a prescription medical treatment to his brother.

---

[174] BATES HT 263-264; BATES HT 910-913

[175] Nancy Grugle, pp. 115-116

[176] Amy Sparks, p. 207

1403520.000 – 2435

Specifically, the following actions demonstrate the failure of Mr. and Mrs. Sparks training of Dylan:

- Did not ensure there was no air leak near the quick disconnect valves or ensure the quick disconnect valves were attached;[177]
    - This action is inconsistent with the instructions in the Operating and Reference Manual,[178] which instructs to securely push the quick disconnect valves to their respective attachment sites and states that there should be no air leak from the quick disconnect valves;
- Did not stay in the room to verify the chamber was completely inflated and pressurized and did not look at the pressure gauge before leaving the room;[179]
    - This action is inconsistent with the instructions in the Operating and Reference Manual,[180] which instructs to watch the pressure gauge to assure it reaches 3-4 PSI and remains at 3-4 PSI and instructs to reassure the person in the chamber that the attendant will remain with them and regularly check on them;
    - This action is inconsistent with Mrs. Sparks' use of the chamber; she testified that she would stay to make sure everything was going properly and would leave the room after she saw the chamber was pressurized;[181]
- Turned off the lights and shut the door;[182]
    - Mrs. Sparks testified that she left the door open during treatments[183] and that she always told Dylan to leave the door open.[184] She referred to Dylan's closing of the door saying, "Typical high schooler;"[185]
- Did not go into the room to check on Jarred at any time after putting Jarred into the chamber;[186]
    - This action is inconsistent with the instructions in the Operating and Reference Manual,[187] which instructs the attendant to reassure the person in the chamber that he or she will remain with them and regularly check on them;
    - Mrs. Sparks testified that she would check on Jarred two or three times in a one to two and a half hour treatment;[188]
    - Dr. Bradstreet testified that parents were not instructed to be in the room the entire time, but were instructed to have close supervision.[189] He further testified that

---

[177] Dylan Sparks, pp. 129-130

[178] BATES OXY 64

[179] Dylan Sparks, pp. 106-107

[180] BATES OXY 66

[181] Amy Sparks, pp. 181-182

[182] Dylan Sparks, pp. 91-92

[183] Amy Sparks, p. 223

[184] Amy Sparks, p. 222

[185] Amy Sparks, pp. 222-223

[186] Dylan Sparks, p. 105

[187] BATES OXY 66

[188] Amy Sparks, p. 312

[189] Jeff Bradstreet, p. 95

- instructions were given to families using hyperbaric chambers including the importance of monitoring the person inside the chamber;[190]
  - o Mrs. Presson testified that she clearly remembers talking to Mrs. Sparks regarding that Mrs. Sparks was going to sit in the room and grade papers;[191]
- Did not use O2 concentrator;[192]
  - o Mrs. Sparks testified that she would put the O2 concentrator mask next to Jarred's face so that it would blow on him while he slept[193] and that her other family members always used the O2 concentrator as well;[194] Mrs. Sparks testified that she thought Dylan used the O2 concentrator the night of the incident;[195]
  - o Dr. Bradstreet testified that the prescription for the hyperbaric oxygen therapy always specified oxygen;[196]
- Did not set a clock or timer for prescribed period;[197]
  - o This action is inconsistent with the instructions in the Operating and Reference Manual,[198] which instructs to set a clock or timer for the prescribed treatment period.

# Opinion 7

**The ASME PVHO-1 and NFPA 99 standards identified by Plaintiffs' experts were voluntary standards. These standards did not require redesign of the quick disconnect or inclusion of oxygen or carbon dioxide monitoring.**

## Voluntary vs. Mandatory

ASME PVHO-1and NFPA 99 were adopted as recognized consensus standards by the Food and Drug Administration (FDA) October 16, 1998 (63 FR 55619-55620). In a 2001 FDA Guidance (FDA, 2001), in a section related to procedures for use of consensus standards, it states:

> Conformance is voluntary: Reviewers should recognize that conformance with recognized consensus standards is strictly voluntary for a medical device manufacturer. A manufacturer may choose to conform to applicable recognized standards or may choose to address relevant issues in another manner.

Similarly, in a 2007 FDA Guidance (FDA, 2007), under a section titled "Voluntary Conformance," it states:

---

[190] Jeff Bradstreet, p. 122

[191] Janet Presson, p. 123

[192] Dylan Sparks, p. 103

[193] Amy Sparks, pp. 129-130

[194] Amy Sparks, p. 187

[195] Amy Sparks, p. 221

[196] Jeff Bradstreet, p. 49

[197] Dylan Sparks, p. 134

[198] BATES OXY 66

> Conformance with recognized consensus standards is strictly voluntary for a medical device manufacturer. A manufacturer may choose to conform to applicable recognized standards or may choose to address relevant issues in another manner.

Despite Mr. Workman's opinion that, "… At the very least, this PVHO should comply with the standards set forth in ASME PVHO-1 and NFPA 99,"[199] compliance with these standards is not required by FDA. FDA approved Oxy-Health's hyperbaric chambers for marketing without compliance to these standards[200] and continued to approve the chambers for marketing in the United States and abroad up to and through the time the chamber was manufactured.[201]

Mr. Workman testified that the ASME PVHO-1 standard is mandated in the NFPA 99 standard, which is in turn mandated in the NFPA 101 standard.[202] He testified that he is pretty sure North Carolina is an NFPA state and that he would check that by checking with the state fire marshal.[203] A search of references in the North Carolina 2006 Fire Code,[204] which was in effect at the time of the incident,[205] indicated that NFPA 99 was cited in section 3006.4 and that NFPA 101 was cited in section 1024.6.2; ASME PVHO-1 was not cited (North Carolina Fire Code, 2006, Chapter 45). Further, neither NFPA 99 nor NFPA 101 were cited with relation to hyperbaric chambers (North Carolina Fire Code, 2006, Chapters 10, 30).

## Gas Sensor Requirements

The NFPA 99 standard would not have required an oxygen sensor for the subject hyperbaric chamber (NFPA 99-2002, section 20.2.8.4). The section of NFPA 99-2002 related to Carbon Dioxide Monitoring cited by W.T. Workman[206] applies whenever ventilation is not used, and therefore does not apply to the incident chamber. The section of NFPA 99-2002 related to Carbon Monoxide Monitoring cited by W.T. Workman[207] has no bearing on this incident as I have seen no evidence that carbon monoxide was involved in this incident.

The SOS Hyperlite, which Mr. Workman identifies as compliant with ASME PVHO-1,[208] offers an oxygen monitor as an additional feature (SOS Hyperlite, 2009).

---

[199] Report of W.T. Workman, p. 17

[200] K001409, Letter from FDA to HTI date stamped August 2, 2000

[201] 2003 Certificate to Foreign Government; 2005 Certificate to Foreign Government

[202] W.T. Workman, pp. 272-273

[203] W.T. Workman, p. 310

[204] Obtained from http://www2.iccsafe.org/states/2006NorthCarolina/ on August 21, 2014

[205] Obtained from http://www.ncfma.com/nc_codes___laws/ on August 26, 2014

[206] Report of W.T. Workman, p. 7

[207] Report of W.T. Workman, p. 7

[208] BATES MR_Sparks 614

**Fittings for Life Critical Breathing Devices – "Inadvertent Disengagement Neither Defined Nor Demonstrated"**

As noted by Mr. Workman, ASME PVHO-1 2007 section 4-2.4.1(f) states that, "fittings used on life critical breathing devices shall be of types that are resistant to inadvertent disengagement."[209] This standard came into effect after the incident chamber had been manufactured and sold.[210] The 2002 version of this standard under the same section states in section 4-4.5.1(d), "Fitting used on divers' umbilicals shall be types which are resistant to inadvertent disengagement."[211] Contrary to the testimony of Plaintiffs' expert Mr. Natoli,[212] specific reference to "divers' umbilicals" in the standard indicates that the standard applies to divers' umbilicals.

Neither the 2002 nor the 2007 version of the ASME PVHO-1 standard defines "inadvertent disengagement" or provides a means for measuring whether a fitting is resistant to inadvertent disengagement. Plaintiffs' experts have provided no evidence, testing, or measurements to establish that this fitting is not resistant to inadvertent disengagement. As described in Opinion 5, it is likely that this fitting had been used more than 1 million times prior to this incident without any reports of inadvertent disengagement. If this fitting were not resistant to inadvertent disengagement, it is likely that it would have been inadvertently disengaged at a higher rate than 1 per 1 million uses.

## Opinion 8

**The CO2 sensor proposed by Plaintiffs' experts would not function in the chamber environment. Plaintiffs' experts have not identified a CO2 sensor that would have prevented this incident.**

Mr. Natoli testified that the CO2 sensor he identified in his report would not have prevented the subject incident.[213] The sensor proposed by Mr. Natoli functions by detecting the amount of CO2 particles in a given volume at an expected pressure (CO2Meter.com User Manual). While the sensor does allow for adjusting the elevation where the sensor is being used, it does not allow for increasing pressure to adjust for an increased concentration of CO2 in a given volume, which causes the sensor to false alarm.

---

[209] Report of W.T. Workman, p. 6

[210] BATES OXY 121-122

[211] BATES MR_Sparks 387

[212] Ronald Natoli, pp. 128-129

[213] Ronald Natoli, p. 253

1403520.000 – 2435

## Documents Reviewed

As part of my analysis, I have reviewed and relied upon materials provided to me in this case, listed in Appendix A, an exemplar Vitaeris 320 hyperbaric chamber, and on materials cited within this report and listed in the references section. Where depositions or reports were provided with attachments or exhibits, those documents were also reviewed, even if not individually listed.

As discovery is continuing, additional materials may be generated and further analysis may be conducted. If additional opinions or alterations to the opinions stated in this report are generated, those opinions will be communicated to Mr. Kevin Chignell, Esq.

## Demonstrative Exhibits for Deposition and Trial

At this time, I have not completed preparation of final exhibits for deposition or trial. If needed, I expect that the exhibits may include, but not be limited to, my report and the materials listed in the body and/or provided in the attached appendices, excerpted sections from any relevant standards, photographs or blueprints of the product, available manuals, labels and/or instructions, and results from my analysis described above. Additional demonstrative exhibits may be prepared when necessary to adequately illustrate and explain the technical details of the analysis, findings, or opinions to the jury.

In 2014, Exponent charges for my time at a rate of $475 per hour. A copy of my current curriculum vitae is provided in Appendix B. A list of my prior testimony for the prior four years is provided in Appendix C.

Case 5:13-cv-00649-FL     Document 36-6     Filed 11/24/14     Page 30 of 49

# References

21 CFR 868.5470

63 FR 55619-55620

ANSI Z535.4-2002. American National Standard for Product Safety Signs and Labels.

ANSI Z535.6-2006. American National Standard for Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials.

ASME PVHO-1. (2007). Safety Standard for Pressure Vessels for Human Occupancy: An American National Standard. The American Society of Mechanical Engineers.

Ayres, T.J., Gross, M.M., Wood, C.T., Horst, D.P., Beyer, R.R., and Robinson, J.N. (1989). What is a warning and when will it work? Proceedings of the Human Factors Society 33rd Annual Meeting, pp. 426-430.

Craig, C.S. & McCann, J.M. (1978). Assessing Communication Effects on Energy Conservation. *The Journal of Consumer Research, 5(2)*, 82-88.

CO2Meter.com. CO2 mini CO2 Monitor User Manual.

DeJoy, D. (1999). Motivation. In M. Wogalter, D. DeJoy, and K.R. Laughery (Eds.), Warnings and Risk Communication. Philadelphia: Taylor & Francis.

Dingus, T.A., Hathaway, J.A. and Hunn, B.P. (1991). A Most Critical Warning Variable: Two Demonstrations of the Powerful Effects of Cost on Warning Compliance. Proceedings of the Human Factors and Ergonomics Society, pp. 1034-1038.

Dorris, A.L. and Purswell, J.L. (1977). Warnings and human behavior: implications for the design of product warnings. Journal of Products Liability, 1, pp. 207-220.

Food and Drug Administration. (2001). Recognition and Use of Consensus Standards; Final Guidance for Industry and FDA.

Food and Drug Administration. (2007). Guidance for Industry and FDA Staff: Recognition and Use of Consensus Standards.

Godfrey, S.S., Allender, L., Laughery, K.R., and Smith, V.L. (1983). Warning messages: will the consumer bother to look? Proceedings of the Human Factors Society 27th Annual Meeting, pp. 950-954.

Goldhaber, G.M. and deTurck, M.A. (1988). Effectiveness of warning signs: gender and familiarity effects. Journal of Products Liability, 2, 271-284.

Hall, S. M., Young, S. L., Frantz, P., Rhoades, T. P., Burhans, C. G., & Adams, P. S. (2011). Clarifying the Hierarchical Approach to Hazard Control. In W. Karwowski & G. Salvendy (Eds.), *Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries* (pp. 1057-1064). CRC Press.

Hovland, C.J. & Weiss, W. (1951). The Influence of Source Credibility on Communication Effectiveness. *Public Opinion Quarterly, 15*, 635-650.

Karnes, E.W., Leonard, S.D., Rachwal, G. (1986). Effects of Benign Experiences on the Perception of Risk. Proceedings of the Human Factors Society 30th Annual Meeting, pp. 121-125.

Krauss D., Arndt, S.R., Lakhiani, S.D., and Khan, F. (2008). Additional Considerations When Applying the "Safety Engineering Hierarchy" in Industrial Work Settings. Proceedings of the 13th Annual International Conference on Industrial Engineering, pp. 633-638

North Carolina Fire Code. (2006). Chapter 10: Means of Egress.

North Carolina Fire Code. (2006). Chapter 30: Compressed Gases.

North Carolina Fire Code. (2006). Chapter 45: Referenced Standards.

NFPA 99. (2002). Standard for Health Care Facilities.

Otsubo, S.M. (1988). A behavioral study of warning labels for consumer products: perceived danger and use of pictographs. Proceedings of the Human Factors Society 32nd Annual Meeting, pp. 536-540.

SOS Hyperlite. (2011). Technical Specification for Braided Hyperbaric Stretchers SOS Hyperlite March 2011.

Summit to Sea. (2014). Summit to Sea QD Connector Screen Shot, obtained from www.hyperbaric-dives.com on July 31, 2014.

Young, et al., 2002. "Safety Signs and Labels: Does compliance with ANSI Z353 increase compliance with warnings?" Professional Safety, September 2002, pp. 18-23

Zeitlin, L.R. (1994). Failure to follow safety instructions: faulty communication or risky decisions? Human Factors, 36(1), 172-181.

# Appendix A

## List of Materials Reviewed

# List of Materials Reviewed

## CLIENT SUPPLIED MATERIALS

**Pleadings**

- Complaint for Damages
- Answer of Oxy-Health, LLC and Oxy-Health Corporation
- Amended Answer of Oxy-Health, LLC and Oxy-Health Corporation
- Defendants' Responses to Plaintiffs' First Set of Requests for Admission and Second Set of Requests for Production of Documents
- Defendants' Responses to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production of Documents
- Plaintiff Amy Sparks' Answers & Responses to Defendants Oxy-Health, LLC's & Oxy-Health Corporation's First Set of Interrogatories and Requests for Production of Documents
- Plaintiff Robert Sparks' Answers & Responses to Defendants Oxy-Health, LLC's & Oxy-Health Corporation's First Set of Interrogatories and Requests for Production of Documents

**Depositions**

- Bradstreet, Jeff.  July 28, 2014
- Grugle, Nancy.  July 21, 2014
- Kartzinel, Jerry.  August 4, 2014
- Natoli, Jr., Ronald.  July 17, 2014
- Patel, Samir.  July 10, 2014
- Presson, Jack.  February 27, 2014
- Presson, Janet.  February 26, 2014
- Sparks, Amy.  February 17, 2014
- Sparks, Dylan.  February 21, 2014
- Workman, W.T.  July 25, 2014

**Exhibits**

- Exhibits 1 - 19, 61

**Incident Reports**

- Cumberland County Sheriff's Office Investigation Report
- Cumberland County Sheriff's Office Supplemental Reports
- MEDWATCH Report of Incident, BATES HT 297

- Cape Fear Valley – Cumberland County EMS, Dispatch Number: 11061381, BATES MR-Sparks 2
- BATES MR_Sparks 7-14
- Report of Autopsy Examination for Jarred Bryan Sparks, BATES MR_Sparks 15

**Photographs**

- Photos of Incident Scene from Sheriff, Disc 1 (120 photographs)
- Photos of Incident Scene from Sheriff, Disc 2 (105 photographs)
- Screenshots from video deposition of Amy Sparks, Dylan Sparks, Janet Presson, and Jack Presson
- Photographs of warnings on chamber (2 photographs)

**Expert Materials**

- Plaintiffs' Rule 26(a)(2) Expert Disclosure
  - Exhibit 1. Report of W.T. Workman, June 3, 2014
  - Exhibit 1A. CV of W.T. Workman
  - Exhibit 2. Report of Ronald J. Natoli and Nancy Grugle, June 26, 2014
  - Exhibit 2A. CV of Ronald Natoli
  - Exhibit 2B. Retention letter for Ronald Natoli
  - Exhibit 3. CV of Nancy Grugle
  - Exhibit 3A. Retention letter for Nancy Grugle

**Bates Documents**

- ASM 339 – 444
- HT 1 - 1034
- MR_Sparks 2-687
- OXY 1 – 277

**Regulatory Documents**

- 2003 Certificate to Foreign Government
- 2005 Certificate to Foreign Government
- 2013 Certificate to Foreign Government
- HTI 510(k) – K001409
- Hyperbaric Technologies, Inc., Current Good Manufacturing Practices, January 13, 2004, Rev F
- Letter from HTI to Oxy-Health stating HTI has practiced Current Good Manufacturing Practices since 1993, September 25, 2009

**Exemplar Hyperbaric Chamber**

- Exemplar hyperbaric chamber and frame
- Bolsters
- Mattress pad
- Compressors and air filters x 2
- Tubing and valves
- Wireless remote
- Silencer
- Operating and Reference Guide, Revision 7.1-July 2011
- Important Information Page
- Time Sensitive Offer
- Mild Hyperbaric Chamber ASSEMBLY VIDEO
- Tools and fasteners
- Check pattern fabric

# Appendix B

**Curriculum Vitae of Steven R. Arndt, Ph.D.**



Exponent
525 W. Monroe Street
Suite 1050
Chicago, IL 60661

telephone 312-999-4200
facsimile 312-999-4299
www.exponent.com

**Steven R. Arndt, Ph.D., CHFP**
**Principal**

**Professional Profile**

Dr. Steve Arndt is an Industrial Engineer in Exponent's Human Factors practice. Dr. Arndt specializes in human factors, human performance, and ergonomics associated with industrial and occupational safety, driver/operator performance and consumer product design. He provides consultation in the investigation and prevention of accidents and injuries with consumer products in the home and industrial products in occupational environments.

Dr. Arndt has 17 years of experience performing investigations of occupational and industrial incidents involving process safety, machine guarding, fall protection, and materials handling. He has assisted in the selection and development of safety systems for consumer and industrial equipment. He has performed hazard and risk assessments for consumer products, industrial machines and systems including, oil field operations, hydraulic fracturing operations, fall protection and fall prevention systems, presses, conveyors, forklifts, scaffolding, aerial boom lifts, excavation equipment, amusement park attractions, auditory warnings and signals as well as medical devices and many consumer products.

Dr. Arndt has also designed and evaluated warnings, labeling, instructions, manuals, safety data sheets and other collateral materials for consumer and industrial products, medical devices and household and industrial chemicals by applying government and voluntary standards, data gathered from scientific literature, product history data, accident and injury databases, and focus group testing. Dr. Arndt has participated in consumer product recalls by assisting manufacturers in defining the scope of potential recalls, testing, and development of announcements and instructions, and design and evaluation of retrofit parts for compliance with Consumer Product Safety Commission (CPSC) recommendations. He has performed risk, injury, and accident mode assessments of accident patterns associated with consumer products using nationally collected hospital emergency room injury data from the CPSC's National Electronic Injury Surveillance System (NEISS).

He also investigates operator behaviors, decision making, perceptions and response times associated with lines of sight and visibility and conspicuity associated with both automotive and heavy equipment operation including, trucking, forklifts and other construction equipment.

Prior to joining Exponent, Dr. Arndt was employed by the Wisconsin Center for Space Automation and Robotics, Telerobotics and Human Performance Research Laboratory. His research focus included predicting the abilities of persons with disabilities to perform complex tasks using objective tests and assessing telerobotic technologies for space based applications.

08/14

**Academic Credentials and Professional Honors**

Ph.D., Industrial Engineering, University of Wisconsin-Madison, 1996
M.S.I.E., Industrial Engineering, University of Wisconsin-Madison, 1991
B.S., Psychology, University of Wisconsin-Madison, 1988

**Certifications and Training**

Certificant, Board of Certification in Professional Ergonomics, CHFP #1644
OSHA Qualified Team Leader for Process Hazard Analysis (PHA)
OSHA Qualified Forklift Safety Trainer
OSHA Qualified Aerial Device Safety Trainer
Certified Forklift Operator
Qualified Individual for Fall Protection
PADI Certified Open Water Scuba Diver

**Publications**

Perlmutter, S, Cades DM, Heller, MF, Giachetti, RS, Sala JB, Arndt, SA. Effects of mobile technology use on walking. Proceedings, 58th Human Factors and Ergonomics Society Annual Meeting, 2014.

Quartuccio, J, Franz S, Gonzalez, C, Kenner, NM, Cades DM, Sala JB, Arndt, SA, McKnight, PE. Seeing is believing: The use of data visualization to identify trends for cycling safety. Proceedings, 58th Human Factors and Ergonomics Society Annual Meeting, 2014.

Cades DM, Arndt SR, Sala JB, Krauss DA. What you need to know about the distracted driver. Feature Article in The Illinois Association of Defense Trial Counsel Quarterly 2013; 23(4).

Khan FS, Krauss DA, Alper SJ, Droll J, Arndt SR, Lakhiani SD, Cades DM. Do people heed warnings at gas stations? Proceedings, 2nd Annual World Conference of the Society for Industrial and Systems Engineering, pp. 114–117, Las Vegas, NV, November 5–7, 2013. ISBN: 97819384960-1-1.

Tsuji JS, Dahlstrom DL, Arndt SR, Rogers WS, Clark JA. Best uses of experts in producing labels and warnings for products containing engineered nanomaterials. BNA Expert Evidence Reporter, 12 EXER 20, January 9, 2012.

Cades DM, Arndt SR, Kwasniak AM. Driver distraction is more than just taking eyes off the road. Institution of Transportation Engineers Journal 2011; 81(7).

Tsuji JS, Dahlstrom DL, Arndt SR, Rogers WS, Clark JA. Labeling and warning for products containing engineered nanomaterials—Learning from the past or we are doomed to repeat it. Part II. BNA Tort Law Reporter, 26 TXLR 1435, December 8, 2011.



Tsuji J, Dahlstrom DL, Arndt S, Rogers Wm, Clark J.  Labeling and warning for products containing engineered nanomaterials—Learning from the past or we are doomed to repeat it?-Part I, BNA Product Safety & Liability Reporter, Vol.39, PSLR 1283, November 21, 2011.

Tsuji J, Dahlstrom DL, Arndt S, Rogers Wm, Clark J.  Engineered nanomaterials in the workplace:  What to do when the genie is out of the bottle.  BNA Toxic Law Reporter, Vol. 26, No. 27, July 14, 2011.

Weaver B, Ruberte L, Khan F, Arndt, S.  Normal pedal activation in real world situations.  SAE Paper No. 11B-0291/2011-01-0551, SAE World Congress 2011, Detroit, MI, 2011.

Khan FS, Sala JB, Arndt SR.  Considerations in the textless presentation of warning and safety information.  Proceedings, 15th Annual International Conference on Industrial Engineering Theory, Applications and Practice, Mexico City, Mexico, 2010.

Khan F, Sala J, Arndt S.  Reducing subjectivity when attempting auditory scene recreation in accident reconstruction.  Proceedings, Human Factors and Ergonomics Society 54th Annual Meeting, San Francisco, CA, 2010.

Vigilante W, Rhoades T, Arndt SR, Cohen HH.  Forensic human factors/ergonomics practice from the perspective of the forensic consulting firms.  Proceedings, 53rd Annual Meeting of the Human Factors and Ergonomics Society, San Antonio, TX, 2009.

Khan FS, Sala JB, Arndt SR.  Psychoacoustic response to auditory warnings.  Proceedings, 14th Annual International Conference on Industrial Engineering Theory, Applications and Practice, Anaheim, CA, 2009.

Khan FS, Arndt SR, Krauss DA.  Understanding the relationship between safety climate and warning compliance in occupational settings.  Proceedings, 14th Annual International Conference on Industrial Engineering Theory, Applications and Practice, Anaheim, CA, 2009.

Arndt S, Krauss D, Weaver B.  A previously unidentified failure mode for ladder-climbing fall-protection systems.  Proceedings, American Society of Safety Engineers Professional Development Conference and Exposition, Las Vegas, NV, 2008.

Krauss D, Arndt S, Lakhiani S, Khan F.  Additional considerations when applying the "Safety Engineering Hierarchy" in industrial work settings.  Proceedings, 13th Annual International Conference on Industrial Engineering: Theory, Applications and Practice, Las Vegas, NV, 2008.

Arndt S, Young D, Krauss D.  Human factors issues in trucking—What does a qualified expert need to know?  Trucking Law Seminar, Phoenix, AZ, April 17, 2008.

Arndt SR, Wood CT, Delahunt PB, Wall CT, Krauss DA.  Who's in the back seat?  A study of driver inattention.  Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.



Krauss DA, Kuzel MJ, Arndt SR, Delahunt PB.  Validation of digital image representations of low-illumination scenes.  SAE Paper 2006-01-1288, Society for Automotive Engineers, Inc., 2006.

Huntley-Fenner G, Arndt S, Sanders K.  Case study:  Pedestrian behavior at grade crossings.  Proceedings, Int Conf Indust Engin Theory Applic Practice 2005; 10:69–73.

Arndt SR, Hammoud SA, Cargill RS.  Head accelerations experienced during everyday activities and while riding roller coasters.  Proceedings, 48th Annual Meeting of the Human Factors and Ergonomics Society, New Orleans, LA, 2004.

Al-Tarawneh IS, Stevens WJ, Arndt SR.  An analysis of home and hospital medical device incidents in the MAUDE database.  Proceedings, 48th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2003.

Arndt SR, Al-Tarawneh IS.  Fixed-site amusement park injuries:  An examination of two sources of data.  Proceedings, 47th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2003.

Arndt SR, Cargill RS.  Everyday life accelerations.  Injury Insights, Publication of the National Safety Council, p. 6–7, June/July 2003.

Arndt S, Ayres TJ, Li L, Wood CT, Young D.  Human factors in product recall planning.  Proceedings, 6th Annual International Conference on Industrial Engineering, November 2001.

Arndt SR, Hammoud S, Kennett K.  The role of human factors, biomechanics and accident reconstruction in forklift accident investigations.  Proceedings, 6th Annual International Conference on Industrial Engineering—Theory, Applications and Practice, San Francisco, CA, November 18–20, 2001.

Wood CT, Arndt S, Kelkar R.  Children's use of various internal automobile trunk release mechanisms intended to reduce child entrapment risk.  Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp. 912–915, 1999.

Arndt S, Humphrey D, Kelkar R, Kelsh M, McCarthy R, Mrad R.  Repetitive stress injuries:  incidence trends, the regulatory landscape and verdict.  Proceedings, Silicon Valley Ergonomics Conference & Exposition, ErgoCon '99, San Jose, CA, June 1–4, 1999.

Ayres TJ, Wood CT, McCarthy RL, Arndt SR.  Relative rollover risk estimates for pickup trucks.  Proceedings, 7th International Conference on Product Safety Research, Washington, DC, 1999.

Arndt S, Ayres T, McCarthy R, Schmidt R, Wood CT, Young D.  Warning labels and accident data.  Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp. 550–553, Chicago, IL, October 1998.



Ayres TJ, Arndt SR, Young DE.  Product-related risk of falling among the elderly.  Proceedings, Silicon Valley Ergonomics Conference and Exposition, San Jose, CA, 1998.

Wood CT, Arndt SR, McCarthy RL.  Using risk analysis to reduce the hazards on playgrounds.  Proceedings, National Manufacturing Week Conference, Chicago, IL, March 1998.

Wiker SF, Vanderheiden G, Lee S, Arndt SR.  Development of tactile mice for blind access to computers:  Importance of stimulation locus, size, and vibrotactile display resolution.  Proceedings, Human Factors Society 35th Annual Meeting, pp. 708–712, 1991.

**Reports and Presentations**

Investigation of amusement park and roller coaster injury likelihood and severity.  Exponent Failure Analysis Associates Report, prepared for Six Flags, New York, August 2002.

Nanotechnology Products in 2010:  What You Need to Know About Warning, Labeling and Instructions.  Exponent/Day Pitney Webinar, Presented January 2010.

**Project Experience**

Evaluation of the effects of cell phone use and texting leading to distraction during walking and the effects on gait.

Incident investigations, risk and hazard analysis associated with oil and gas production, refining, and transmission.  Investigation of issues including worker safety, MSDS use and development, worker training, use of PPE, and employee supervision.  Applications include process safety human factors, hydraulic fracturing operations, natural gas distribution, CLNG facility construction, and offshore operations.

Evaluation and development of safety and information and collateral materials, including the development of standards, MSDS and on product labeling, with regards to the production, testing and manufacture of nanomaterials.

Tested ladder climbing fall protection systems using Hybrid III test mannequins to examine the performance of systems during simulated fall scenarios.  Testing was done to examine the potential limitations of systems that were built in compliance with existing standards.

Evaluated load and vehicle stability of off-road tele-handler forklift in order to determine the potential for loss of load control and vehicle tip-over.  Testing was conducted to examine operator's ability to detect load and vehicle instability during the lifting of objects that exceeded the rated capacity of the forklift.

Participated in the design review, testing, evaluation, and implementation of the Fire Department City of New York (FDNY) Personal Safety System (PSS), a compact, lightweight escape system intended for use by firefighters for quick escape from burning buildings.  This device was named the best safety invention of 2006 by TIME Magazine.



Developed multiple improved methodologies for taking and presenting low-light photographs to accurately document the visibility, conspicuity, and contrast of objects and features in the scene. This includes normal digital photography and high dynamic range photography.

Developed, and evaluated the readability, comprehensibility, and the accuracy of instructions and warnings involved in consumer product recall corrective action plans.

Conducted risk analysis of amusement park related safety to examine the accident modes and frequency of injuries associated with riding roller coasters and compared forces experienced on rides with activities of daily living.

Conducted testing to assist automobile manufacture in the design, development, and evaluation of trunk release mechanisms that would allow children and adults to escape from vehicle trunks.

**Professional Affiliations**

- Human Factors and Ergonomics Society
- American Society of Safety Engineers
- Society of Automotive Engineers



# Appendix C

**Testimony List of Steven R. Arndt, Ph.D.**



## List of Depositions and Trial Testimony - Last Four Years
## for Steven R. Arndt, Ph.D., CHFP

### Depositions

1. Chesapeake Louisiana, L.P., et al. v. Innovative Wellsite Systems, Inc., et al., August 28, 2014 in the United States District, Court Western District of Louisiana, Shreveport Division, Civil Action No. 5:12-CV-02963.

2. Deanna O'Donnell et al. v. Sunbelt Rentals et al., August 12, 2014 in the Court of Common Pleas of Cuyahoga County, State of Ohio, Case No. CV12773661.

3. Thuong Van Nguyen v. Home Depot U.S.A., Inc. et al., July 18, 2014 in the Circuit Court of St. Louis County, State of Missouri, Cause No. 12SL-CC02809.

4. Kolton Hedden, by his next friend, Jeff Hedden v. The Braun Corporation, Allied Bus Sales, INC., d/b/a Allied Bus Sales, Thayer R-II School District, IC Bus, LLC, Ann Madden, and Joyce Hedden, July 9, 2014 in the Circuit Court of Oregon County, Thirty-Seventh Judicial Circuit, State of Missouri, Case #: 11AM-CC00020.

5. Russell Spaziani and Kathleen Spaziani v. Fedex Corporate Services, Inc., D.W. Nicholson Corporation, and SSOE, Inc., June 27, 2014 in the United States District Court Southern District of Indiana Indianapolis Division, Cause No: 1:12-cv-0810 WTL-MJD.

6. Judith Ann Brandt and Neal Brandt, v. BB Holdings Partners d/b/a TGI Fridays, June 9, 2014 in the Circuit Court of Greene County, Missouri, Case No: 1031-CV02272.

7. Isaiah Arscott, a minor, by and through his parents, legal guardians and next friends, Pierre Arscott and Shanna Arscott, and Pierre Arscott and Shanna Arscott, Individually, v. The Rock Ranch, LLC. February 7, 2014 in the Superior Court of Fulton County, State of Georgia, Civil Action File No.: 2012CV222819.

8. George v. Oldenburg, February 4, 2014 in the Superior Court of Fayette County, State of Georgia, Civil Action File No. 2012 V-1225WFS.

9. Garcia v. H & E Equipment, Genie Industries and C. F. Jordan v. Mid Cities Erectors, January 30, 2014 in the County Court at Law No. Two Dallas County, Texas, Cause No. CC-09-5130.

10. McBurney v. Lesco Design & Manufacturing Company, Inc. November 1, 2013 in the Circuit Court of Clay County, Missouri, Case No. 07CY-CV10927.

11. Montgomery Mutual Insurance A/S/O Vivienne Varndore and Vivienne Varnadore v. W. M. Barr & Company, Inc., Affordable Electric and Home Improvements, LLC, George William Neal, and Lowe's Home Centers, Inc. October 2, 2013 in the Court of Common Pleas Second Judicial Circuit, State of South Carolina, County of Aiken. Civil Action No. 2012-CP-02-02420.

12. Thatcher, et al. v. Brookville Equipment Corp v. Martin County Coal Corp. et al. June 27, 2013 in the United States District Court, Eastern District of Kentucky, Southern Division at Pikeville. Case No. 7:12-CV-00050-ART.

13. FirstBank Southwest, as guardian of the estate of Phillip Caler, a minor, Gary Caler, individually and as parent and guardian of minor Phillip Caler, and Angie Ramsey, individually and as parent of minor, Phillip Caler v. Simon Property Group, Inc., Schindler Elevator Corporation, Montgomery Elevator Company N/K/A Kone Corporation, Circle Center Mall, LLC, Semperit Industrial Products Inc., EHS Global, and Escalator Handrail USA, Inc. May 17, 2013 in the Marion Superior Court Civil Division, County of Marion, State of Indiana. Cause No. 49D11-1105-CT-O17492.

14. Ngan Thi Oliver, as Guardian and next friend of Phat Tan Nguyen v. Lauderdale Marine Center, LLC. May 3, 2013 in the Circuit Court of the 17th Judicial Circuit in and For Broward County, Florida. General Jurisdiction Division. Case No. 10-014063 08.

15. Owens, Pamela and Ronnie, Individually and as Surviving Parents and Personal Representatives of The Estate of Christopher Rondale Owens, deceased; Ryan Montgomery; and Scottie Joseph Thibodaux v. C.W. Matthews Contracting Co., Inc.; Lincoln Trucking Inc.; Garth Barnett; Harrell Hauling, Inc.; Georgia Department of Transportation; and Accident Insurance Company, Inc. January 3, 2013 in the State Court for the County of Fulton, State of Georgia. Civil action file No. 11EV012407C.

16. Patty Profitt, as next friend of Ralph Edward Profitt and Patty Profitt, individually v. Corley Manufacturing Co., D/B/A Corley Sawmill Machinery, et al. November 16, 2012 in the Commonwealth of Kentucky Letcher Circuit Court. Civil Action No: 08-CI-360.

17. Salvatore M. Bombardiere, Sr. v. Schlumberger Technology Corporation, et al. November 13, 2012 in the United States District Court for the Northern District of West Virginia, Clarksburg Division. Case No.: 1:11-cv-00050.

18. Judith Candler, David Matthew, et al. v. Kinder Morgan, Inc., et al. October 18-19, 2012 in the 15th Judicial District, Parish of Vermilion, State of Louisiana. Docket Nos. 92439 "E" and 92472 "D".

19. Melissa Shelton v. Gallagher Materials Corporation et al. September 24, 2012 in the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois. Case No. 07 L 0511.



20. Chad Stephens, Guardian of the Person and the Estate of Stacy S. Stephens & Chad Stephens, Individually v. James K. Melton, FPP Family Investments, Inc. and Perdue Farms Incorporated. August 29, 2012 in the Daviess Circuit Court for the County of Daviess, State of Indiana. Cause No. 14CO1-1106-CT-000259.

21. Alan D. Stackhouse and Thelma S. Stackhouse v. Benjamin J. Woodard and McCutchanville Volunteer Fire Department, Inc. August 24, 2012 in the Vanderburgh Circuit Court for Vanderburgh County, State of Indiana. Cause No. 82C01-1106-CT-332.

22. Ronald E. Nelson, et al. v. American Family Mutual Insurance Company, et al. Case No: 08-CV-114 and Daniel A. Nelson, et al. v. Acuity Insurance Company, et al. June 28, 2012 in the Circuit Court for Bayfield County, State of Wisconsin. Case No: 09-CV-128.

23. Lovitt v. Ecolab. June 26, 2012 in the United States District Court for the Northern District of Illinois Eastern Division, Court File No. 1:10-cv-04078.

24. Bolding v. Clean Earth Sanitation, Inc. May 21, 2012 in the Circuit Court for Williamson County, Tennessee at Franklin, Docket No: 09698.

25. Marheine v. Minergy LLC et al. April 26, 2012 in the Circuit Court of Winnebago County, State of Wisconsin, Case No.: 10-CV-0576.

26. Fuehringer v. Komo Machine, Inc. February 15, 2012 in the United States District Court for the Western District of Wisconsin, Case No. 11CV204.

27. Hernandez and Jeronimo v. Altec Environmental Products, LLC, and Altec Industries, Inc., and Asplundh Tree Expert Co. January 24, 2012 in the United States District Court, Southern District of Florida, Case No. 9:10-CV-80532.

28. Augustin Miramontes, Jr., et al. v. Riverside County Fire Department December 16, 2011 in the Superior Court of the State of California in and for the County of Riverside, Case No. RIC 541335.

29. Bayer v. Panduit Corp. et al. December 6, 2011 in the Circuit Court of Cook County, Illinois, Law Division, Case No. 07 L 009877.

30. Wel Companies, Inc. v. Trifonoff and S P Richards Co. and General Parts Company.  November 8, 2011 in the Court of Common Pleas of Portage County, Ohio, Case No: 2009 CV 00745.

31. Howard v. Cybex International, INC. and St. Louis Workout, INC. October 18, 2011 in the Circuit Court of St. Louis County, State of Missouri, Case No: 08SL-CC00098.

32. Bayer v. Panduit Corp. et al. October 10, 2011 in the Circuit Court of Cook County, Illinois, Law Division, Case No. 07 L 009877.



33. Rago et al. v. Federal Signal Corporation September 30, 2011 in the Circuit Court of Cook County, Illinois, Law Division, Case Nos. 00 L 006486, 00 L 006487, 00 L 006489, 00 L 006490, 00 L 006493, and 00 L 006495.

34. Bayer v. Panduit Corp. et al. August 31, 2011 in the Circuit Court of Cook County, Illinois, Law Division, Case No. 07 L 009877.

35. Armitage v. Apex Control Systems, Inc., d/b/a Apex Automation, Inc., and Swindell Dressler International Company.  August 25, 2011 in the United States District Court, Southern District of Indiana, Terre Haute Division, Case No. 2:08-CV-0045 RLY-WGH.

36. McBurney v. Lesco Design & Manufacturing Company, Inc. July 8, 2011 in the Circuit Court of Clay County, Missouri, Case No. 07CY-CV10927.

37. Meyer/Secura Insurance v. Badger Highways, et al. June 30, 2011 in the Circuit Court of Winnebago County, Wisconsin, Case No. 09-CV-2603.

38. Aker Kvaerner/IHI v. Bay, Ltd. April 20, 2011before the American Arbitration Association, No. 73 158 Y 06771 07.

39. Brown v. McGrath Lexus of Chicago, et al. April 04, 2011 in the Circuit Court of Cook County, Illinois – County Department, Law Division, Case No. 2008 L 011389.

40. Kirkland v. Emhart Glass, et al. March 31, 2011 in the United States District Court, Western District of Washington at Tacoma, Case No. 3:10-cv-05125 BHS.

41. Hale v. The State of West Virginia, et al. March 15, 2011 in the Circuit Court of Logan County, West Virginia, Case No: 07-C-193.

42. Lessard v. Tyco Electronics Corporation v. Hayward Industries, Inc., et al.  March 4, 2011 in the United States District Court, District of Rhode Island, Case No. 09-112.

43. Lessard v. Tyco Electronics Corporation v. Hayward Industries, Inc., et al. January 20, 2011 in the United States District Court, District of Rhode Island, Case No. 09-112.

44. Stoffel v. Waste Management of Illinois, Inc., et al.  January 3, 2011 in the Circuit Court of Cook County, Illinois, County Department – Law Division, Case No. 05L013072.

45. Bickel v. Mud Creek Golf Course, Inc., et al.  September 13, 2010 in the Hamilton Superior Court, Indiana, Case No. 20D01-0803-CT-340.



## Arbitration Testimony

1. Paul Lowers and Nicole Lowers v. Jadaview, LLC. October 17, 2012 in the Court of Common Pleas of Westmoreland County, Pennsylvania Civil Division. Case No. 5839 of 2010.

2. Aker Kvaerner/IHI v. Bay, Ltd. August 8, 2011 before the American Arbitration Association, No. 73 158 Y 06771 07.

## Trial Testimony

1. Montgomery Mutual Insurance A/S/O Vivienne Varndore and Vivienne Varnadore v. W. M. Barr & Company, Inc., Affordable Electric and Home Improvements, LLC, George William Neal, and Lowe's Home Centers, Inc. April 9, 2014 in the Court of Common Pleas Second Judicial Circuit, State of South Carolina, County of Aiken. Civil Action No. 2012-CP-02-02420.

2. Ryan George and Melissa McKinney v. Julie Oldenburg, March 5, 2014 in the Superior Court of Fayette County, State of Georgia. Cilil Action File No. 2012V-1225WFS.

3. Shannon L. Sullivan v. BNSF Railway Company, February 27, 2014 in the District Court, Fourth Judicial District, State of Minnesota, County of Hennepin, Court File No. 27-CV-12-24152.

4. Alan D. Stackhouse and Thelma S. Stackhouse v. Benjamin J. Woodard and McCutchanville Volunteer Fire Department, Inc. October 23, 2013 in the Vanderburgh Circuit Court for Vanderburgh County, State of Indiana. Cause No. 82C01-1106-CT-332.

5. Salvatore M. Bombardiere, Sr. v. Schlumberger Technology Corporation, Consol Energy, Inc., CNX Gas Company, LLC, CNX Gas Corporation, and SOS Staffing Services March 6, 2013 in the United States District Court for the Northern District of West Virginia, Civil Action No. 1:11-cv-00050.

6. Christine Rago, vis a vis John Franco v. Federal Signal Corporation December 14, 2012 in the Circuit Court of Cook County, Illinois, Law Division, Case No. 00 L 6489.

7. Rago et al. v. Federal Signal Corporation November 17, 2011 in the Circuit Court of Cook County, Illinois, Law Division, Case Nos. 00 L 006486, 00 L 006487, 00 L 006489, 00 L 006490, 00 L 006493, and 00 L 006495.

8. Bacon v. DB Industries, Inc., January 10, 2011, in the United States District Court of Douglas County, Nebraska, Doc.1047 No. 091.

