EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.: 5:13-cv-00649-FL


AMY SPARKS, individually, and
ROBERT D. SPARKS, as Personal
Representative of the ESTATE OF
JARRED B. SPARKS,


          Plaintiffs,

vs.

OXY-HEALTH, LLC and
OXY-HEALTH CORPORATION,


          Defendants.

_____/




VIDEOTAPED DEPOSITION OF:     JERRY KARTZINEL, M.D.

DATE TAKEN:                   August 4, 2014

TIME:                         1:00 - 5:20 p.m.

PLACE:                        Akerman, LLP
                              420 South Orange Avenue
                              Suite 1200
                              Orlando, FL


REPORTED BY:                  Helen Bennett, RPR, Ph.D.
                              Notary Public
                              State of Florida at Large

A    -- and do them in the same manner as she was doing them.

Q    As far as length of time?

A    Length of time.

Q    And frequency?

A    That's correct.

Q    And pressure?

A    That's correct.

Q    And with the oxygen?

A    Correct.

Q    Okay.

A    With oxygen.  And I do not know if she was using oxygen with the other one.

Q    Were you aware of whether or not she was going to be using oxygen with this one, the new one?

A    I believe, yes.

Q    Okay.  Do you recall having discussions with her at that point about sort of the difference between using the chamber in the clinic and in the home?

A    Since she had already been using the other chamber in the home, I did not.

Q    Okay.  Would you have had any discussions with her about whether or not there was going to be a dive partner --

Case 5:13-cv-00649-FL    Document 36-10    Filed 11/24/14    Page 3 of 7

A     No.

Q     -- or what about monitoring --

A     No.

Q     -- about who was going to be there in the room with or without the child?

A     No, we did not.

Q     Okay.  And why not?

A     Because she had already done over 100 hours of intervention.  I wrote 400 at one point and -- but she already had a significant amount of time in the chamber, so I figured that she was pretty well versed on how to do this.

Q     And you were expecting her to do it now the way that she had done it the same way before?

A     Correct.

MR. SWETT:  Object to form.

Q     Did you talk to Ms. Sparks at that point about the manual that would have accompanied the chamber, whether to read the manual?

A     No.

Q     Okay.  And other than providing the prescription, were there any oral instructions that you would have given to Amy Sparks at that point?

A     No.

Q     Okay.  Did you provide her any warnings or

Case 5:13-cv-00649-FL    Document 36-10    Filed 11/24/14    Page 4 of 7

cautions related to the hyperbaric treatment?

A    No.

Q    And who would have done -- I guess who would have done that before for the treatment that was provided by the chamber from Creation Zone?

A    You would have to ask them.

Q    Got you.  So that would have all been through Dr. Bradstreet?

A    Correct.

Q    Okay.  Did you advise the Sparks family to keep a log of how often the treatments were given?

A    (Shakes head).

Q    Is that a yes or a no?

A    No, I'm sorry.

Q    Thank you.  Did you ever -- Did you talk to the Sparks family at all about what to do with the chamber between uses?

A    No.

Q    And so what would you typically tell new parents that were using these chambers in-home that haven't previously used it about what to do with the chamber between uses?

A    Well, we would talk about how to clean them.

Q    Okay.  And how would -- what would you

Case 5:13-cv-00649-FL    Document 36-10    Filed 11/24/14    Page 5 of 7

wrote down those three.  Are there any others that you generally would talk to the clients about?

A    No.

Q    Okay.  Are there any other risks -- well, strike that.

At some point in time I guess you testified today that you advise the families that someone should always remain in the room with someone receiving hyperbaric therapy if you are going to perform that therapy in the home setting, is that correct?

A    That's correct.

Q    Amy Sparks gave a deposition in this case previously, and I'll represent to you that her testimony was that no one specifically instructed her that that is the way it had to be done in a home setting.

Do you have any reason to dispute her testimony?

MR. CHIGNELL:  I'll object, but go ahead.

A    No, because I have no idea what was said to her previously.

Q    Okay.  Do you have a specific recollection of ever telling Amy Sparks or anyone in the Sparks family that when you are giving home treatment,

Case 5:13-cv-00649-FL   Document 36-10   Filed 11/24/14   Page 6 of 7

someone always has to be in the room?

A    No, no recollection of that.

Q    Earlier Mr. Chignell asked you if there were really any -- I don't want to use the word "dangerous".  I don't know what word to use.  But he asked you about as far as if someone were in the chamber three hours or more, two hours or more, your testimony was it really didn't have any extra benefit, but it really would not do any harm, is that fair?

A    I would agree with that.

Q    Because when we deposed Dr. Bradstreet, he basically said that he didn't see any problem with someone being in the chamber for five hours, as far as it doing any harm.  Do you agree with that opinion?

A    I agree with that.

Q    Okay.  Are you aware that some people, including professional athletes, actually sleep in these chambers?

A    Yes.

Q    Have you ever treated any professional athletes in your practice or you mostly focus on --

A    Mostly the children.

Q    -- autism?

Case 5:13-cv-00649-FL   Document 36-10   Filed 11/24/14   Page 7 of 7