IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| **Amy Sparks, individually, and Robert D. Sparks, as Personal Representative of the Estate of Jarred B. Sparks,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**Oxy-Health, LLC and Oxy-Health Corporation,**<br><br>**Defendants.** | Civil Action No.: <u>5:13-CV-00649-FL</u><br><br><br>**<u>PLAINTIFFS' MOTION TO EXCLUDE CERTAIN "EXPERT" TESTIMONY OF PETER LEWIS</u>** |

Plaintiffs Amy Sparks, individually, and Robert D. Sparks, as Personal Representative of the Estate of Jarred B. Sparks (collectively "Sparks") file this Motion to Exclude Certain "Expert" Testimony of Peter Lewis ("Mr. Lewis"). The opinions that Mr. Lewis intends to offer will not help the jury understand or resolve a fact at issue and are more likely to mislead than enlighten the jury. As such, the Sparks respectfully request that the Court exclude any testimony by Mr. Lewis (1) that the OxyHealth Vitaeris 320 hyperbaric chamber ("Vitaeris 320") is "safe" or (2) concerning subsequent testing or attempts to recreate the incident.

## <u>FACTUAL BACKGROUND</u>

This case involves the wrongful death of Jarred Sparks in a Vitaeris 320 after the quick disconnect valve providing the only source of fresh air into the chamber disengaged. While the Vitaeris 320 was fabricated by Hyperbaric Technologies, Inc. ("HTI"), a company of which Peter Lewis is President and CEO, OxyHealth approved the design,[1] selected the quick

---

[1] Agreement between HTI and OxyHealth, at 3.3 (June 21, 1999) ("HTI shall not implement any material changes in the design, materials or color for Chambers without advance written notice to Oxy, and written consent from Oxy (not to be unreasonably withheld).") (Attached as Exhibit A).

disconnect valve at issue[2] and other component parts, repackaged the Vitaeris 320 in its own box along with other component parts, and held itself out as the manufacturer of the chamber.[3] Additionally, OxyHealth marketed the Vitaeris 320 for self-treatment; for home use; and for use by individuals with autism despite the fact that the Vitaeris 320 was cleared by the FDA for marketing for Acute Mountain Sickness only. (*See, e.g.,* FDA 510(k), K001409 (Aug. 2, 2000) (cleared to market for intended use: "to provide mild hyperbaria for the treatment of Acute Mountain Sickness").[4] On September 12, 2013, the Sparks filed a Complaint in this Honorable Court alleging causes of action for: Inadequate Design, Inadequate Warning, Negligence and Negligent Failure to Warn, Breach of Implied Warranty of Merchantability, Breach of Express Warranty, Unfair and Deceptive Trade Practices, and Negligent Infliction of Emotional Distress.

## LEGAL STANDARD

In the Fourth Circuit, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993)). "The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy." *Id.* "The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue." *Id.*

"A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using . . . valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999); *Daubert*, 509 U.S.

---

[2] Design Change Request by OxyHealth, attached as Exhibit B.
[3] OxyHealth Manufacturer's Warranty (Filing No. 36-2, at CM/ECF, pp.36-38).
[4] Filing No. 36-4, at CM/ECF, pp.6-7.

at 590 (Expert opinions must be based on "more than subjective belief or unsupported speculation."). The Fourth Circuit has directed that "an expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Const. Co. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994).

The touchstone of the relevancy prong is whether the testimony will be helpful to the jury. *Daubert,* 509 U.S. at 591-92 (Rule 702's "helpfulness" standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."); *see United States v. Harris,* 995 F.2d 532, 534 (4th Cir. 1993) ("As Rule 702 indicates, expert testimony is only permitted if it assists the trier of fact to understand evidence or to determine a fact in issue."). The consideration of relevance requires the district court to determine whether the testimony "fits" the case at hand, as not all *reliable* expert testimony is *relevant* expert testimony. *Garlinger v. Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001) (citing *Daubert,* 509 U.S. at 591 ("Scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.")). The relevance inquiry assures that the expert's proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Rule 702. Expert testimony which does not aid the jury in resolving a factual dispute is "not relevant and, ergo, non-helpful." *Daubert,* 509 U.S. at 591.

In determining whether the evidence will be helpful to the trier of fact, the Supreme Court warned that throughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as Rule 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995) (citation omitted). "Expert evidence can be both powerful and quite misleading because of the

difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595. Expert testimony that has a greater potential to mislead than to enlighten should be excluded. *Westberry*, 178 F.3d at 261.

**I.** **The Court should Exclude Peter Lewis' Testimony that the OxyHealth Vitaeris 320 is "Safe" and that by Granting Marketing Clearance for the Vitaeris 320 the FDA Found the Hyperbaric Chamber to be "Safe."**

Peter Lewis intends to offer testimony at the trial of this case that the OxyHealth Vitaeris 320 chamber at issue in this case is safe because it was approved for sale by the FDA through the 510(k) process. However, this testimony is properly excluded, as Peter Lewis, by his own admission, is not qualified to offer such testimony; the reasoning underlying his proffered opinion is unreliable; and his testimony is likely to mislead the jury.

**A.** Peter Lewis is not Qualified to Testify about the FDA 510(k) Clearance Process or Offer the Opinion that the OxyHealth Vitaeris 320 is Safe.

Peter Lewis is not qualified to testify that the OxyHealth Vitaeris 320 at issue is safe because the FDA granted marketing clearance for the device through the 510(k) process. As an initial matter, Peter Lewis admitted in his deposition that he is not an expert in the 510(k) process for Class II medical devices. (*See* Dep. of Peter Lewis, dated Sept. 30, 2014, at pp.131, 158).[5] This admission alone is sufficient to exclude Peter Lewis' testimony on this issue. *See Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10 (1st Cir. 2001) (the opinions of an expert witness who candidly admits an issue is beyond his competence are properly excluded). Moreover, Peter Lewis admitted that he employed a consultant to handle the 510(k) submission and he personally had no direct communication with the FDA about the submission. (Peter Lewis Dep., pp.76, 156-58). It should also be noted that Peter Lewis is not an engineer, has never constructed a

---

[5] Cited portions attached as Exhibit C.

hyperbaric chamber, and has never personally performed any testing on a hyperbaric chamber. *Id.* at 76, 85, 156-58.

In *Daubert,* the Court held that the adjective "scientific" implies a grounding in certain methods and procedures. *Id* at 590. The Court further held that the word "knowledge" in Rule 702 suggests a body of known facts or of ideas inferred from such facts or accepted as true on solid ground. *Id.* As Peter Lewis admittedly has no scientific, technical, or other specialized knowledge with respect to this opinion, it should be excluded.

**B.** Peter Lewis' Opinion that the OxyHealth Vitaeris 320 is safe because the FDA Granted Marketing Clearance is Unreliable.

Peter Lewis' opinion that the OxyHealth Vitaeris 320 at issue is safe because the FDA granted marketing clearance for the device through the 510(k) process is not merely unreliable, it is invalid as a matter of law. The FDA classified the OxyHealth Vitaeris 320 as a Class II medical device. (Peter Lewis Dep., p.137). The path to getting a Class II medical device to market is through the submission of a 510(k) notification demonstrating that the device is substantially equivalent to a device already on the market (a predicate device).[6] "Substantial equivalence is determined by comparing the performance characteristics of a new device with those of a predicate device. To be considered substantially equivalent, a new device must have the same intended use and technological characteristics as the predicate; clinical data demonstrating safety and effectiveness are usually not required."[7] *Id.* As a Congressional Research Service Report to Congress on this issue points out:

> According to the FDA and the Supreme Court, when the FDA finds a device substantially equivalent to a predicate device, it has done no more than find that the new device is as safe and effective as the predicate. It is important to note that

---

[6] CRS Report for Congress, p.4 (Filing No. 36-16, at CM/ECF, p.8).
[7] "There is a fundamental difference between the PMA and 510(k) pathways. In PMA review, FDA determines if the device is reasonably safe and effective for its intended use. In a 510(k) review, FDA determines if the device is substantially equivalent to another device whose safety and effectiveness may never have been assessed." *Id.* at 7.

devices on the market before the enactment of the 1976 Medical Device Amendments (MDA)—the origin of all predicate devices for the 510(k) process— have never been systematically assessed to determine their safety and effectiveness. Because the preamendment device to which equivalence was establishish was not itself reviewed for safety or effectiveness, the committee found that clearance of a 510(k) submission was not a determination that the cleared device was safe or effective. *Id.* at 9.

Peter Lewis' opinion that the OxyHealth Vitaeris 320 is safe is based on his mere "belief" that the FDA reviews the safety and effectiveness of a Class II device during the 510(k) clearance process. (Peter Lewis Dep., p.99). In fact, Peter Lewis testified that he does not know one way or the other whether the FDA considered the safety and effectiveness of the OxyHealth Vitaeris 320 during the 510(k) process. *Id.* at 157. Similarly, when asked whether he knew one way or the other whether the FDA made a determination as to whether the Vitaeris 320 conformed to applicable design standards, Mr. Lewis answered "No. I have no recollection of what the FDA did or did not do in relation to the application other than . . . granting the license." *Id. at 58.*

"A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). The reasoning underlying Peter Lewis' opinion that the OxyHealth Vitaeris 320 is safe is not supported by "adequate validation to render it trustworthy" and must be excluded. *Westberry*, 178 F.3d at 260. Similarly, any opinions by Peter Lewis as to what the FDA reviewed during the 510(k) process should be excluded because any such testimony would be pure speculation; thus, "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995); *see generally* Peter Lewis Dep., pp.153-56 (Peter Lewis admitted that he employed a consultant

to handle the 510(k) submission, he had no direct communication with the FDA about the submission, he didn't know for sure what was submitted, and he has no knowledge of what the FDA considered when making the 510(k) marketing clearance determination.) As Peter Lewis' testimony on this issue is more likely to "mislead than to enlighten," it must be excluded. *Westberry*, 178 F.3d at 261.

**II.  The Court should Exclude Peter Lewis' Testimony Concerning Subsequent Testing of Quick Disconnect Valves, Attempts to Recreate the Incident, and Any Conclusions Reached as a Result of this Testing.**

Peter Lewis has been named as a non-retained expert in this case.  As such, he has not issued a report containing all of his opinions in this case or the support for each opinion. Nonetheless, he intends to testify that:

- HTI tested several similar quick disconnect valves and that it was determined that a force of between 3 and 4 pounds was necessary to release the quick disconnect valve;

- HTI attempted to recreate the incident using another chamber with a quick disconnect valve and placing the point of a 3/8" bolt in the center of the push button quick disconnect valve and there "is no scientific evidence to support any device failure and that the device operated within specifications"; and

- At the time the quick disconnect valve disengaged, "there would have been at least sufficient air to finish one treatment."

However, this testimony is properly excluded, as the methodology underlying these opinions is unreliable, his testimony is irrelevant, and is likely to confuse and mislead the jury.

**A.** Testimony about Testing Quick Disconnect Valves Unattached to a Chamber is Scientifically Unreliable and Not Relevant to the Facts of this Case

According to Peter Lewis, HTI selected five sample quick disconnect valves like the one used on the OxyHealth Vitaeris 320 at issue in this case and conducted performance testing. (*See* HTI Complaint Evaluation and MDR, p.5 (2/12/13)[8]; Peter Lewis Dep., p.178).  He intends

---

[8] Attached as Exhibit D.

to testify that it would have taken between 3 and 4 pounds of pressure to disengage the quick disconnect valve from the chamber. *See id.* Specifically, he testified at his deposition that "the connector was measured separately, not attached to anything. And the measurement was done on how many pounds of pressure that had to be exerted on the button to make it pop to disconnect. . . . And it was three-and-a-half pounds." *Id.* at 201. However, when he was asked how that testing was set up, what equipment was used, and how was that pressure measured, he did not know. *Id.* at 202. This is because Peter Lewis is not an engineer and did not conduct the testing: in fact, he testified that a "mechanic" performed this testing. *Id.* As such, the reasoning and methodology underlying this testing is not supported by adequate validation to render it trustworthy." *Westberry*, 178 F.3d at 260.

It is also important to note that results of testing these 5 valves "not attached to anything" conflicted with the results of HTI's "testing" of one of these valves connected to a chamber at their plant during their attempts to recreate the incident, which resulted in the quick disconnect valve disengaging with only 1 pound of pressure. *Id.* at 199-201. It is undisputed that the quick disconnect valve that disconnected on the OxyHealth Vitaeris 320 leading to Jarred's death was connected to a chamber at the time that it disconnected. Any testimony by Peter Lewis about a "mechanic's" testing of five exemplar quick disconnect valves unattached to a Vitaeris 320 chamber does not "fit" the case at hand and will not "assist the trier of fact to understand the evidence or to determine a fact in issue" as required by Federal Rule of Evidence 702. *Garlinger v. Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001); *Daubert*, 509 U.S. at 591-92 ("Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). As such, the Court should exclude Peter Lewis' testimony on this subject matter.

**B.** <u>Testimony about Attempts to Recreate the Incident is Scientifically Unreliable, Not Relevant to the Facts of this Case, and Likely to Mislead the Jury</u>

In an attempt to recreate this incident, Peter Lewis and three other HTI employees performed some testing in their plant using a different OxyHealth Vitaeris 320 hyperbaric chamber than the one in which Jarred Sparks died. (*See* HTI Complaint Evaluation and MDR; Peter Lewis Dep., p.205 (stating since the death of Jarred Sparks, Peter Lewis has not personally seen the chamber that Jarred died in)). Despite not knowing anything about the room or the set up of the OxyHealth Vitaeris 320 hyperbaric chamber on the night of Jarred's death and without any measurements from anywhere inside the Sparks' home, Peter Lewis attempted to recreate the incident inside HTI's plant. (Peter Lewis Dep., pp.177-78).  He testified as follows:

> A.   Well, we randomly selected several -- five or ten quick disconnects and functioned them, randomly selected them and functioned them, and they all functioned satisfactory.
>     And then we attached the hose to the chamber, and my first attempt was not to attach it all the ways, where you didn't hear that clicking noise, and the compressor popped it off.
>     Then we made the positive connection clicking it on, and I put a three-eighths inch bolt and put it right into the center of the quick release button and waited for the chamber to expand or an inflation, and it compressed the button and disconnected the connector.
> Q.   Okay.  How many times did you perform the -- with the quick disconnect fully connected, how many times did you perform that test?
> A.   With the bolt?
> Q.   With the bolt, yes.
> A.   I think it was just twice.
> Q.   Just twice.  Okay.
>     Do you recall whether or not the chamber became fully inflated both times or either time before the quick disconnect valve disconnected?
> A.   It became fully inflated before it disconnected.
> Q.   Was there a passage of time after it became fully inflated before it disconnected, or did it disconnected immediately as soon as it hit a certain PSI?
> A.   There was a passage of time, and I don't know what the PSI was.

*Id.* at 178-79.

This testimony of Peter Lewis, concerning two attempts to recreate the incident, must be excluded. First, Mr. Lewis' attempt to recreate the incident does not "fit" the facts of this case. Mr. Lewis did not perform the recreation in the Sparks' home, he did not use the chamber involved in the incident, and he did not use the Tupperware container or the bookshelf believed to be the source of the disconnection. Instead, Mr. Lewis used a 3/8" bolt to attempt to disengage the quick disconnect valve. Moreover, it is undisputed that the air supply hose was connected to the Vitaeris 320 when Dylan assisted Jarred into the Vitaeris 320 on the night in question. Dr. Arndt admitted this fact in his deposition:

> Doctor, can you point me to any evidence in this record that suggests that the pressure in the chamber did not reach at least 3 psi before the quick-disconnect valve became disconnected?
> A. No. As I said, I don't believe anybody has done an accident reconstruction in terms of when the disconnect valve came off. So we can't make a determination as to what the pressure was when it was disconnected.
> . . .
> Q. Well, I appreciate your last answer. Will you agree with me that there is no evidence in the record to support a hypothesis that the air supply hose was disconnected prior to Dylan putting Jarred into the chamber and starting the air pumps on the night in question?
> . . .
> THE WITNESS: I have not seen anything in the record that would reflect any analysis determining that it had been disconnected prior to him putting him in the chamber.

(Dep. of Dr. Arndt, dated Oct. 30, 2014, at p.192-93).[9] Nonetheless, Mr. Lewis' "mechanic" only attempted to disengage the quick disconnect valve while it was fully connected to a hyperbaric chamber *two times.* "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using . . . valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999); *Daubert***,** 509 U.S. at 590 (Expert opinions must be based on "more than subjective belief or unsupported speculation.") Performing a test a mere two times is not scientifically significant or

---

[9] Cited portions attached as Exhibit E.

reliable. Additionally, this testimony does not aid the jury in resolving a factual dispute and must be excluded pursuant to *Daubert. See United States v. Harris,* 995 F.2d 532, 534 (4th Cir. 1993) ("As Rule 702 indicates, expert testimony is only permitted if it assists the trier of fact to understand evidence or to determine a fact in issue."); *cf. United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985) (Court must determine whether the proffered testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). Assuming, *arguendo,* that this testimony does have some probative value; it is substantially outweighed by the "danger of unfair prejudice, confusion of the issues, or misleading the jury" and must be excluded. *See United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995) (citation omitted).

**C.** Peter Lewis' Testimony that "There would have been at Least Sufficient Air to Finish One Treatment" must be Excluded as Unreliable Speculation

Peter Lewis intends to testify that, at the time the quick disconnect valve disengaged, "there would have been at least sufficient air to finish one treatment." At his deposition, Peter Lewis testified as follows:

> Q. The next paragraph says: The air that was administered to the chamber
> would not have leaked out as the chamber is somehow airtight, thus giving a
> person inside at least sufficient air to finish one treatment, 60 minutes. It is
> unknown at this time what pressure would yield enough breathing time to survive.
>     Do you see that?
> A. Yes.
> Q. First let me ask you: What's the basis of your review team's conclusion
> that there would have been enough air in there to last 60 minutes?
> A. This is information that was given to us years and years ago by a
> hyperbaric technician.
> Q. Okay.
> A. Because we were concerned about the Gamow bag at the time; that if,
> during the inflation time, which was used by a foot pump, if somebody were to
> leave him -- leave the room or leave the area that he was being treated in, how
> long could they survive inside.
> Q. Do you have that information?

A.   I don't have it written, I just have it remembering what he had told us years ago.

  . . .

BY MR. SWETT:

Q.   You said your conclusion or HTI's conclusion was there would have been enough air inside to finish one treatment, 60 minutes.  Do you know at what PSI would the chamber have needed to be inflated at for there to have been that much time left?

A.   I don't know.  We're assuming that it was near -- it was either fully inflated or near inflation and that somebody could survive in there for an hour.  Based on the information that was given to me years ago, that somebody could survive three or four hours in that smaller bag.  Now, this is larger.  It's an assumption that we made.

Q.   And that's why I wanted to ask about the next sentence.  It seems to be contradictory, but
I was hoping you could explain it to me.

It says:  It is unknown at this time what pressure would yield enough breathing time to survive.

A.   That's correct.

Q.   Could you explain that sentence to me in the context, when you look at it, and the sentence before that, you said you there would have been enough air for 60 minutes.

A.   Assuming that it was near inflation or fully inflated.

Q.   So maybe the -- do you know – with respect to your assumption that there would be enough air for 60 minutes worth of treatment remaining after disconnection, do you have any way of knowing how much CO2 would build up during that time period?

A.   That would include that.

Q.   That would include with CO2 in the chamber?

A.   Yes.  Yes.

Q.   And this is again based on this information --

A.   This is based on information from a technical -- from a hyperbaric technician.

Q.   That you no longer -- that's not written anywhere; correct?

A.   That's not written anywhere.

Q.   It's just in your head?

A.   Yes.

Q.   And it's something that a hyperbaric technician has told you in the past?

A.   Told me, uh-huh.


(Peter Lewis Dep., pp.181-84).  "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using . . . valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999);

*Daubert*, 509 U.S. at 590 (Expert opinions must be based on "more than subjective belief or unsupported speculation."). Because Mr. Lewis' opinions are "based on assumptions which are speculative and are not supported by the record," they must be excluded. *Tyger Const. Co. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994); *see Daubert,* 509 U.S. at 591 (the proffered testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). However, Mr. Lewis' opinion is based on something that a hyperbaric technician allegedly told him with respect to a different, smaller chamber years prior to this incident. While the amount of time a particular person could survive in the chamber after the quick disconnect valve disengages is something that could possibly be calculated, Mr. Lewis admitted that he "can only speculate on trying to figure that out" in this case because there are variables that one would need to have to do the calculation that no one knows about this incident:

Q. Would there be any other way to find this information out?
A. You could probably compute it, given the amount of air that I guess somebody is expelling and measuring the content of that exhale and -- you know, I don't know.
Q. But to do --
A. I can only speculate on trying to figure that out.
Q. Would you agree with me to compute it, though, you would need to know what PSI the chamber was at when it disconnected; correct?
A. Yes. Yes.
Q. You'd probably need to know at what rate the person was expelling CO2; correct?
A. Yes. Yes.
Q. And for the purposes of your testing, you guys didn't know any of that; did you?
A. No.

(Peter Lewis Dep., pp.184-85). "[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261. Unlike a typical "accident reconstructionist" who relies on physical evidence like skid marks and damage patterns after a car wreck, Peter Lewis is relying on nothing more than speculation and assumptions that do not fit the facts of this case. Thus, Mr. Lewis's testimony in these areas must be excluded. *Daubert*, 509 U.S. at 590 (Expert opinions

must be based on "more than subjective belief or unsupported speculation."); *Tyger Const. Co. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994) (The Fourth Circuit has directed that "an expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.").

**CONCLUSION**

Based on the foregoing, Mr. Lewis' purported expert testimony (1) that the OxyHealth Vitaeris 320 hyperbaric chamber is "safe" or (2) concerning subsequent testing or attempts to recreate the incident that must be excluded. Thus, Plaintiffs respectfully request that this Honorable Court grant Plaintiffs' Motion to Exclude Certain "Expert" Testimony of Peter Lewis.

Respectfully submitted this 1st day of December, 2014,

**MOTLEY RICE LLC**

By: /s/ W. Christopher Swett
Anne McGinness Kearse
T. David Hoyle
W. Christopher Swett
Attorneys for Plaintiffs
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
cswett@motleyrice.com

Justin D. Bice
Attorney for Plaintiffs
BICE LAW LLC
6000 Fairview Road, STE 1200
Charlotte, NC 28210
Justin@Bicelaw.us
Tel: (704) 243-8778
Fax: (704) 612-0273
State Bar No. 38033
Local Civil Rule 83.1 Counsel