EXHIBIT C

MR. CHIGNELL: I will object to the form. But go ahead.

A. No. They complained that the valve popped off the end of the hose at a show, at a conference, and the reason it popped off, it was because it had a check valve in it, and they reported this to us. We got together and said, We can't let this happen again. Do they make one without a check valve? Yes, they do. We then changed it with removing or buying a component that did not have a check valve.

So they complained to us that there was a problem. We solved the problem by changing the design of the hose.

Q. And they requested that a new hose be used with a different quick disconnect valve; correct?

MR. CHIGNELL: Objection to the form of the question. That was not his testimony. But go ahead.

A. They complained that there was a problem, and we solved the problem by changing the component.

Q. They requested a design change; is that a fair statement?

MAGNA
LEGAL SERVICES

yourself?

A.   No, I do not.

Q.   Are you an engineer?

MR. CHIGNELL:  Hold on.  When you said "you," I thought you meant HTI.

BY MR. SWETT:

Q.   Okay.  Did Peter Lewis actually construct --

A.   No.  Peter Lewis --

Q.   Did Peter Lewis actually -- has Peter Lewis ever constructed any hyperbaric chamber?

A.   No.

Q.   Are you, Peter Lewis, an engineer?

A.   No, I am not an engineer.

Q.   Do you intend to offer any expert testimony on any subject in this case?

MR. CHIGNELL:  I'll object to that question, depending on designation.  But you can go ahead.

A.   I was asked to do that.

Q.   You were asked to?

A.   Provide an expert report.

Q.   Really?  Do you intend to produce a report in this matter?

MS. PACKER:  You can ask me.  I think the

MAGNA
LEGAL SERVICES

in that.

Q. And you said that the engineers perform the actual testing, correct, and you were present during the testing?

A. I was present during all testing.

Q. Do you think being present during testing qualifies you to testify about the safety design of hyperbaric chambers?

A. Sure does.

Q. It does?

A. It does, yes.

Q. Just being present during testing?

A. To observe the testing, yes.

Q. Is there anything else other than testing and serving on the PVHO committee?

MR. CHIGNELL: Objection to the form. In addition to what he's already testified about?

A. No. I think the performance testing and the requirements that PVHO has come up with, some of which we had never considered before, and -- no, those two. The years of experience I've had with Breton Industries, the performance testing of the chamber through burst testing and cycle testing and looking at what the deficiencies would be and what the wear and tear areas would be in

MAGNA
LEGAL SERVICES

document before.

A. No.

Q. I just want to know if you agree with this statement. Let me read this statement to you.

A. Okay.

Q. Second paragraph: Though we understand that compliance to ASME PVHO for hyperbaric chambers is not a mandatory requirement to obtain FDA marketing clearance, it is a regulatory expectation without question the industry norm in the United States.

Do you agree with that statement?

A. No.

Q. Okay. Thank you.

Other than being on the PVHO design committee for about ten years and then on the main committee now for about two years, what other experience do you have with respect to ASME PVHO?

MR. CHIGNELL: I will object to the form. In addition to what he has already testified about, go ahead.

MR. SWETT: Well, I haven't heard anything else about PVHO.

MR. CHIGNELL: Go ahead. I don't want

MAGNA
LEGAL SERVICES

chambers such as the Vitaeris 320?

A. I guess -- yeah, I guess it would apply.

Q. Did the Vitaeris 320 meet all of the PVHO-1 safety standards at the time it was cleared for marketing by the FDA?

A. No.

Q. Did the Vitaeris 320 at issue in this case meet all the PVHO-1 safety standards at the time it was manufactured in 2005?

A. No.

Q. As we sit here today, does Vitaeris 320 meet all the PVHO-1 safety standards?

A. No.

Q. As a fabricator of a hyperbaric chamber, what's your understanding of what a safety standard is?

A. A safety standard would be guidelines to produce a device that was safe and effective for use.

Q. Why is it important to meet safety standards?

A. Why is it important to meet safety standards? I think without safety standards, people could make anything they want and put it on the market. I think that's why FDA has the

MAGNA
LEGAL SERVICES

A. For that manufacturer of portable chambers?

Q. Yes. Have you ever served in a consultant role for other companies?

A. Oh, no.

Q. So I guess my question is: Any testimony that you may have concerning the 510(k) process in this case would be limited to your experience with Oxy-Health hyperbaric chambers; is that fair?

A. Yes.

Q. Do you consider yourself an expert in the 510(k) clearance process for medical devices, Class II medical devices?

A. No.

Q. I want to talk a little bit about the clearance for the Vitaeris 320. Did the Vitaeris 320 require premarket review prior to marketing?

A. As part of the -- as part of the family of chambers that was originally approved back in 2000.

Q. Right. But Oxy-Health wasn't allowed to legally market the Vitaeris 320 chamber just based on registration alone; is that fair?

A. I don't understand your question.

Q. Are you familiar with the difference

MAGNA
LEGAL SERVICES

sickness; correct?

A. Correct.

Q. It wasn't cleared for the treatment of cerebral palsy; was it?

A. No.

Q. The Vitaeris 320 can't be marketed for the treatment of cerebral palsy; can it?

A. No, it can't.

Q. The FDA did not clear the Vitaeris 320 for the treatment of autism; did it?

A. No, it did not.

Q. The Vitaeris 320 cannot be marketed to treat the symptoms of autism; can it?

A. No, it can't.

MR. CHIGNELL: Objection to form.

MR. SWETT: What's the basis?

MR. CHIGNELL: Leading.

MR. SWETT: And just for the record, I'll cite Federal Rule 611(c)(2).

BY MR. SWETT:

Q. I may have asked you this already, Mr. Lewis, but the FDA classified the Vitaeris 320 as what class of medical device?

A. Class II.

Q. Do you know what considerations the FDA

MAGNA
LEGAL SERVICES

inspections of how devices were manufactured are generally not required by the FDA.

Does it not say that?

A.   It says that.

Q.   But you're telling me that you believe that the FDA did review how the Vitaeris 320 was manufactured during its 510(k) process.

A.   During our 510(k) process submission we submitted benchmark testing, which was burst testing and cycle testing.  We submitted that. I'm positive we did.

Q.   Do you have any knowledge as to whether or not the FDA considered that material when determining whether or not to clear the Vitaeris 320 for marketing?

A.   I don't know that.

Q.   Do you agree that just because the Vitaeris 320 was cleared for marketing by the FDA doesn't mean that it complies with applicable safety standards?

MR. CHIGNELL:  I'll object to that.

A.   There is no safety standards.

Q.   Okay.  Would you agree with that statement?

A.   You said that it complies with safety

MAGNA
LEGAL SERVICES

standards.  What safety standards?  There isn't any.

Q.   Okay.  So just because it's cleared for marketing by FDA doesn't mean that it complies with safety standards?

MR. CHIGNELL:  Same objection.

A.   I guess so, because I don't know what safety standards they're referring to.

Q.   Would you agree with me, just because the Vitaeris 320 is cleared for marketing by the FDA doesn't mean that it complies with industry standards?

MR. CHIGNELL:  I will object to the form of that question.

A.   Because there isn't any industry standards.

Q.   Okay.  So you're saying there's no safety standards for portable hyperbaric chambers; correct?

A.   Correct.

Q.   You're saying there's no industry standards for portable hyperbaric chambers; correct?

A.   Correct.

Q.   All right.  So you agree with me that

MAGNA
LEGAL SERVICES

just because the Vitaeris 320 was cleared for marketing by the FDA doesn't mean that it conforms to applicable design standards; does it?

MR. CHIGNELL: I'll object to that. But go ahead.

A. Well, once again, the FDA has, in this application process, received the information that I've been talking about; it was their determination that it was safe.

Q. Sir, I don't mean to cut you off, but we've been talking probably for 30 minutes now that during 510(k) process, have we not, that the FDA doesn't look at the safety and effectiveness of devices during the 510(k) process.

MS. PACKER: Objection. That's what you've been testifying to, but it's not what Mr. Lewis has been testifying to.

BY MR. SWETT:

Q. You can answer the question, sir.

MS. PACKER: Well, I object to the question.

A. Well, you know, I disagree with you because of the process we went through to submit the information relative to the parameters of the chambers.

Q.   Okay.

A.   Why would they ask for it if they -- you know, they asked for this.  They said, Show us your benchmark testing, which it did on testing the integrity of this device, and so they accepted it.  That's all I can say.

You know, I didn't talk to the FDA direct.  This was a package prepared by our consultant who submitted it and now it resulted in this letter that we got approving it.

Q.   The letter did not approve it, though; did it?

MR. CHIGNELL:  Objection.

BY MR. SWETT:

Q.   Are you familiar with the PMA process which approves a device and the 510(k) process that clears a device --

A.   Clears.

Q.   -- for marketing?

A.   You're correct.

Q.   Okay.

A.   It cleared the device.

Q.   For marketing?

A.   Yes.

Q.   So just so I'm clear, if this tape is

MAGNA
LEGAL SERVICES

played for a jury or if you appear at trial, your testimony is going to be that everything that was read out of this document, this FDA Regulation of Medical Devices, you disagree with what this document says --

MR. CHIGNELL: Objection.

BY MR. SWETT:

Q. -- with respect to whether or not the FDA considers the safety and effectiveness of the device during the 510(k) process?

A. Yeah, I disagree with that.

MR. CHIGNELL: Objection.

BY MR. SWETT:

Q. Okay. Do you know one way or the other whether the FDA did consider the safety and effectiveness of the Vitaeris 320 during the 510(k) process?

MR. CHIGNELL: Objection. Asked and answer.

MS. PACKER: Answered and asked.

BY MR. SWETT:

Q. You can answer, sir.

A. No, I don't know that.

Q. Do you know one way the other whether the FDA made a determination as to whether the

MAGNA
LEGAL SERVICES

Vitaeris 320 conformed to applicable design standards during the 510(k) process?

MR. CHIGNELL: Objection. Asked and answer. But go ahead.

A. No. I have no recollection of what the FDA did or did not do in relation to the application other than approving it.

Q. And I think you testified earlier, but I can't remember --

A. Not approving it, but granting the license.

Q. And you're not an expert in the 510(k) process; are you?

A. No. That's why I hire consultants.

Q. Are you aware of products that have been cleared for marketing by the FDA through the 510(k) process and have subsequently been found unsafe and defective and caused injury?

A. No.

Q. Are you familiar with the recall of defective hip replacements going on right now?

A. No.

Q. Are you familiar with the recall of any device that has been cleared through the 510(k) process?

MAGNA
LEGAL SERVICES

Q.   I'm sorry, the only way it could be disconnected --

A.   -- disconnected is to have the push button, which is the locking device, to be compressed.

Q.   And for that specific quick disconnect valve, it can become disconnected just with a simple push; right?

A.   Not a simple push, a three-and-a-half pound push.

Q.   Okay.  And what's that based on?

A.   Testing in our plant.

Q.   Have you -- and that's where I'm getting at.  Have you attempted to recreate --

A.   Yes.

Q.   And by "you," I mean HTI.  You've attempted to recreate this incident?

A.   Yes.

Q.   Okay.  And I'll get to that.

When you tried to recreate this incident, did you have any information on the layout of the bedroom in which the chamber was in?

A.   No.

Q.   Have you ever seen Jarred Sparks -- the bedroom where Jarred -- where the chamber was that

MAGNA
LEGAL SERVICES

night?

A. No.

Q. Do you know whether or not it was in an upstairs bedroom or a downstairs bedroom?

A. I don't.

Q. Have you taken any -- did you have any measurements from anywhere in the house whenever you were performing your testing or attempted to recreate this incident?

A. No measurements.

Q. Tell me -- walk me through what you did or HTI did to attempt to recreate this incident or to test what happened.

A. Well, we randomly selected several -- five or ten quick disconnects and functioned them, randomly selected them and functioned them, and they all functioned satisfactory.

And then we attached the hose to the chamber, and my first attempt was not to attach it all the ways, where you didn't hear that clicking noise, and the compressor popped it off.

Then we made the positive connection clicking it on, and I put a three-eighths inch bolt and put it right into the center of the quick release button and waited for the chamber to

MAGNA
LEGAL SERVICES

expand or an inflation, and it compressed the button and disconnected the connector.

Q. Okay. How many times did you perform the -- with the quick disconnect fully connected, how many times did you perform that test?

A. With the bolt?

Q. With the bolt, yes.

A. I think it was just twice.

Q. Just twice. Okay.

Do you recall whether or not the chamber became fully inflated both times or either time before the quick disconnect valve disconnected?

A. It became fully inflated before it disconnected.

Q. Was there a passage of time after it became fully inflated before it disconnected, or did it disconnected immediately as soon as it hit a certain PSI?

A. There was a passage of time, and I don't know what the PSI was.

Q. Let me ask you to look at what I'm marking as Exhibit 124 and tell me if you can identify this document.

(Exhibit 124 was marked for identification.)

MAGNA
LEGAL SERVICES

A.   This is an MDR or a complaint evaluation. (Reviewing document.)  Okay.  This is a complaint description of what took place in this incident, which was reviewed by my staff.

Q.   And you actually signed this document; correct?

A.   Yes, I did.

Q.   Were you a part of this review or did you just sign off on it; do you recall?

A.   Well, all of these people were part of the review.

Q.   Right.  I see "review board."  I was just curious if you signed off on their conclusions or if you were actually part of the review yourself?

A.   We were all part of the review.

Q.   Okay.  You're not listed -- I'm sorry.

A.   And we were all part of the conclusions.

Q.   I see.  You're just not listed as under the review board, so I didn't know if they submitted their conclusions to you --

MR. CHIGNELL:  Yes, he is.  He's listed.

MR. SWETT:  Oh, I'm sorry.

THE WITNESS:  I'm in there twice.

MR. SWETT:  I've been corrected.  Sorry. I gotcha.

MAGNA
LEGAL SERVICES

BY MR. SWETT:

Q. So you were present during this testing?

A. Yes.

Q. Let me ask you to look at Page 2, the fifth paragraph down. And about midway it says: Lastly, we placed the blunt point of a three-eighths bolt in the exact center of the push button quick release, and as the chamber began to inflate, this external force on the button enabled the connection to disengage and thus stopping any further airflow.

A. Uh-huh.

Q. Now, this states that as the chamber began to inflate, the connection disengaged. Do you recall whether or not that's how it happened or whether it fully inflated?

A. It seems that I recall that it happened when it fully inflated.

Q. The next paragraph says: The air that was administered to the chamber would not have leaked out as the chamber is somehow airtight, thus giving a person inside at least sufficient air to finish one treatment, 60 minutes. It is unknown at this time what pressure would yield enough breathing time to survive.

MAGNA LEGAL SERVICES

Do you see that?

A.   Yes.

Q.   First let me ask you:  What's the basis of your review team's conclusion that there would have been enough air in there to last 60 minutes?

A.   This is information that was given to us years and years ago by a hyperbaric technician.

Q.   Okay.

A.   Because we were concerned about the Gamow bag at the time; that if, during the inflation time, which was used by a foot pump, if somebody were to leave him -- leave the room or leave the area that he was being treated in, how long could they survive inside.

Q.   Do you have that information?

A.   I don't have it written, I just have it remembering what he had told us years ago.

Q.   Do you know what PSI the chamber would have had to have been at for it to be exactly 60 minutes of air left in the chamber?

MR. CHIGNELL:  I'll object to the form of that question.  You can answer.

MR. SWETT:  I'll strike that.  I'll strike that.

MAGNA
LEGAL SERVICES

BY MR. SWETT:

Q. You said your conclusion or HTI's conclusion was there would have been enough air inside to finish one treatment, 60 minutes. Do you know at what PSI would the chamber have needed to be inflated at for there to have been that much time left?

A. I don't know. We're assuming that it was near -- it was either fully inflated or near inflation and that somebody could survive in there for an hour. Based on the information that was given to me years ago, that somebody could survive three or four hours in that smaller bag. Now, this is larger. It's an assumption that we made.

Q. And that's why I wanted to ask about the next sentence. It seems to be contradictory, but I was hoping you could explain it to me.

It says: It is unknown at this time what pressure would yield enough breathing time to survive.

A. That's correct.

Q. Could you explain that sentence to me in the context, when you look at it, and the sentence before that, you said you there would have been enough air for 60 minutes.

MAGNA
LEGAL SERVICES

A. Assuming that it was near inflation or fully inflated.

Q. So maybe the -- do you know -- with respect to your assumption that there would be enough air for 60 minutes worth of treatment remaining after disconnection, do you have any way of knowing how much $CO_2$ would build up during that time period?

A. That would include that.

Q. That would include with $CO_2$ in the chamber?

A. Yes. Yes.

Q. And this is again based on this information --

A. This is based on information from a technical -- from a hyperbaric technician.

Q. That you no longer -- that's not written anywhere; correct?

A. That's not written anywhere.

Q. It's just in your head?

A. Yes.

Q. And it's something that a hyperbaric technician has told you in the past?

A. Told me, uh-huh.

Q. Would there be any other way to find this

MAGNA
LEGAL SERVICES

information out?

A. You could probably compute it, given the amount of air that I guess somebody is expelling and measuring the content of that exhale and -- you know, I don't know.

Q. But to do --

A. I can only speculate on trying to figure that out.

Q. Would you agree with me to compute it, though, you would need to know what PSI the chamber was at when it disconnected; correct?

A. Yes. Yes.

Q. You'd probably need to know at what rate the person was expelling $CO_2$; correct?

A. Yes. Yes.

Q. And for the purposes of your testing, you guys didn't know any of that; did you?

A. No.

Q. Now, there's some conclusions I guess on the back, or it starts at the bottom of Page 2. Could you just tell me what your -- it looks like there's two conclusions. Could you tell me what those conclusions were.

A. On Page 5?

Q. They're on Page 3.

What is the fully inflated --

A.    Four PSI.

Q.    Okay.  So 1 PSI is not fully inflated?

A.    But in shape it is.  In shape it is -- at 1 PSI, it is -- well, I'd say near fully inflation, or full size.  Full expansion, put it that way.

Q.    Would you agree that that may be up to individual visual -- I represent to you that I've been -- I've seen the chamber inflate, and I wouldn't consider 1 PSI full shape, fully inflated.  Would you disagree with me?

A.    No, I guess I would not disagree with you.  That it would expand probably ever so slightly more.

Q.    Because that thing gets pretty tight.  I mean, it's pretty --

A.    It does.

Q.    At 3 PSI -- do you know whether or not -- someone could sit on that chamber easily; correct?

A.    It's ridged, yes.

Q.    Do you have an understanding of what PSI is?

A.    Uh-huh.

Q.    What is PSI?

MAGNA
LEGAL SERVICES

A.   Pounds per square inch.

Q.   Okay.  So you got a bolt in this quick disconnect, the center of --

A.   Yes.

Q.   And it's sitting there as the chamber inflates?

A.   Yes.

Q.   So would you agree with me that if it disconnects at 1 PSI, that's only one pound of pressure?

A.   Yes.

Q.   So it actually doesn't take 3.5 pounds of pressure to disconnect that valve; it only took one pound of pressure pushing out on that bolt.

A.   No.  It took three-and-a-half pounds.

Q.   Okay.  How do you calculate the three-and-a-half pounds?

A.   We measured it.

Q.   How do you measure it?

A.   With a weight.

Q.   And tell me --

A.   How much of it was applied to make that disconnection.

Q.   Were you also pushing at the back of the bolt?  Is there something applying pressure from

MAGNA
LEGAL SERVICES

the bolt into the quick disconnect valve, or is all the pressure coming from the inflation of the bladder into the bolt?

A. No. It was applied on top of the bolt -- on top of the button.

Q. Okay. Would you agree with me that in this situation, the incident that we're talking about, the death of Jarred Sparks, regardless of what theory you go under as to what happened, there's no theory that includes pressure being pushed on the back of the bolt -- on the back of the bolt as the chamber inflated; would you agree with that?

A. The back of the button?

Q. Yes.

MR. CHIGNELL: Object to the form.

A. Applied to the back of the button. I don't follow you.

Q. I'm trying to understand too, because my understanding is, one of the theories in this case is that there was a Tupperware container on a bookshelf, and at some point the button on the quick disconnect valve came into contact with that Tupperware as the chamber expanded, was my understanding.

MAGNA
LEGAL SERVICES

Now, that would be -- the Tupperware container would be a stationary device, correct, if that happened like that?

A.   I don't know.

Q.   Or if it hit a bookshelf or if it hit anything, that would a stationary device; correct?

MR. CHIGNELL:  I'll object to the form of that question.

A.   I don't know that.

Q.   Sir, I'm trying to understand your test. Because are you telling me that you apply pressure from the bolt side into the quick disconnect button?

A.   Uh-huh.  This bolt was up against a ridged surface, and as this thing was expanded, we put the bolt right on that button.

Q.   So as it expanded.  So where is the 3.5 pounds coming from if it only reaches 1 PSI?

A.   The connector was measured separately, not attached to anything.  And the measurement was done on how many pounds of pressure that had to be exerted on the button to make it pop to disconnect.

Q.   Okay.

A.   And it was three-and-a-half pounds.

MAGNA
LEGAL SERVICES

Q. And tell me how that was measured again.

A. That was measured in our shop.

Q. How? I want to know how. What was set up? What equipment did you use? How was that pressure measured?

A. Well, I'd have to ask my mechanic that did it.

Q. So as you sit here today, you don't know how that measurement was taken?

A. No.

Q. But we do know that the chamber was not set up the way it was in the Sparks' home; correct?

A. To measure the three pounds?

Q. Yes.

A. No. It was done in a machine shop.

Q. And we do know for a fact that whatever happened -- well, strike that.

You don't have any reason to believe that a bolt pushed into the quick disconnect valve on the night of Jarred Sparks' death; do you?

A. I have no idea.

Now, as I mentioned before, the relief valve, according to the -- Dylan, he heard the hissing noise coming from the relief valve.

MAGNA
LEGAL SERVICES

that what it is?

Q. Okay.

A. From two doctors. I've read that.

Q. Since the death of Jarred Sparks, have you personally looked at the chamber that Jarred Sparks died in?

A. No.

Q. Have you seen pictures of the chamber that he died in?

A. It seems like I had a picture of the connection.

MR. SWETT: I have about five to ten minutes more of questioning, but let's go ahead and change the tape and take a break. We'll take a five-minute break.

THE VIDEOGRAPHER: We are off the record.

(Break taken.)

THE VIDEOGRAPHER: We are back on the record. The time is now 3:08.

BY MR. SWETT:

Q. Mr. Lewis, earlier we briefly touched on the Chamberlite chamber, and I wanted to go back and ask you a few questions about that.

A. Okay.

Q. If I'm not mistaken, there was another

MAGNA
LEGAL SERVICES