# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

AMY SPARKS, Individually, and
ROBERT D. SPARKS, as Personal
Representative of the ESTATE OF
JARRED B. SPARKS,

              Plaintiffs,

    vs.                                Civil Actin No.
                                    5:13-CV-00649-FL

OXY-HEALTH, LLC and OXY-HEALTH
CORPORATION,

              Defendants.

------------------------------------------------------

------------------

SEPTEMBER 30, 2014

------------------

VIDEOTAPED DEPOSITION of PETER LEWIS in the above-entitled action, taken before Katherine D. Nichols, Registered Professional Reporter and Notary Public in the State of New York, at the Hilton Garden Inn, 800 Albany Shaker Road, Albany, New York, commencing at 9:37 a.m. on the above date.

**MAGNA** ⊗
LEGAL SERVICES

continuously?

A.   Ever since.  And then I was appointed to the main committee I think two years ago.

Q.   **Are you a member of any associations?**

A.   No.

Q.   **I really don't know how it works, but are your a member of the ASME?**

A.   Yes.

Q.   **Are you currently employed?**

A.   Yes, I am.

Q.   **Where are you employed?**

A.   Hyperbaric Technologies, Incorporated.

Q.   **What's your position at HTI?**

A.   I'm the president and chief executive officer.

Q.   **How long have you been president and CEO of HTI?**

A.   I believe since 1997.

Q.   **Is that since the inception of the company?**

A.   Inception was in 1993.

Q.   **Who was president and CEO prior to you?**

A.   Actually, it was James Bower who we purchased the patent on the Gamow Mountain Bag.

Q.   **Are you employed with any other entities?**

A.     Breton Industries.

Q.     **What's your position with Breton Industries?**

A.     Senior vice president.

Q.     **As president of HTI, what are your duties and responsibilities?**

A.     My duties would be to oversee the quality assurance of the operation, which is very important.  FDA requires medical device manufacturers to be guided by good manufacturing practices, so it is my responsibility, and has been, to ensure that the company follows certain standard operating procedures that are guided by FDA regulations.

I'm also responsible for sales, overseeing the sales of products to distributors. I am responsible for the design of our products in conjunction with our engineer and quality assurance folks, and production.  Also responsible for responding to customer complaints and overseeing the repair procedures.

Q.     **What are your duties and responsibilities of senior vice president at Breton Industries?**

A.     Right now, nothing.  It's just a position.

A. Uh-huh. I think that's what it is.

Q. **Do you receive a bonus at the end of the year?**

A. Sometimes I do.

Q. **Did you receive a bonus last year?**

A. Yes. In 2013, it was -- it was a hundred thousand. So that would make it like 200,000 I think it was in 2013. It was over 200,000.

Q. **What's the business of HTI?**

A. To design and manufacture portable hyperbaric chambers.

Q. **Who are the officers of HTI?**

A. Myself as president. My nephew, G. Eric Lewis is vice president. My sister-in-law, Mary Rose Lewis. And my brother is chief financial officer. Colleen Hawker is secretary. And of course myself as president.

Q. **About how many employees does HTI employ?**

A. Four.

Q. **What are their names?**

A. G. Eric Lewis, Michael Lewis, myself, and G. Richard Lewis.

Q. **Okay. And you're president. What's Michael Lewis's role?**

A. Sales, marketing.

MAGNA⦿

LEGAL SERVICES

Industries?

A.    My brother is president.

Q.    That's Richard Lewis?

A.    G. Richard Lewis.  I am senior vice president.  Colleen Hawker would be secretary. And Al Darmofal would be chief executive officer.

Q.    So if I'm looking at HTI and Breton Industries, the only officer that is different between the two -- maybe not in the same roles, but the only individual would be Al that's different?

A.    Correct.

Q.    Where is Breton Industries located?

A.    Amsterdam, New York.

Q.    Same location?

A.    Same location.

Q.    Do you share a building?

A.    Yes, I do.

Q.    What is the relationship between -- currently between HTI and Oxy-Health, LLC?

A.    They are our distributor.

Q.    Of portable hyperbaric chambers?

A.    Portable hyperbaric chambers.

Q.    Which ones?

A.    The Respiro, the Solace, Vitaeris, and

the Quamvis.

Q.   Does HTI currently have a relationship with Oxy-Health Corp. -- Corporation?

MR. CHIGNELL:  I'll object to the form of the question.  But go ahead.

A.   I've always referred to them as Oxy-Health Corporation.

Q.   Okay.

A.   But I do know they changed from Corporation to LLC, and I don't know how long ago.

Q.   Okay.  And the reason is because my understanding is that both entities are still ongoing entities, while the corporation -- I don't know what they do different than LLC, but they both exist, so I'm trying to figure out if there's a relationship with both, one, the other.

A.   I guess I can't answer that.

Q.   Okay.

A.   I guess it would be for both.  I don't know.

Q.   Fair enough.

Does Breton Industries have a relationship with Oxy-Health, LLC?

A.   No.

Q.   Let me show you what's previously been

document.

A. Yes, I do.

Q. What is that document?

A. It's a document indicating their desire to extend the exclusive marketing agreement between the two companies.

Q. Okay. How long was it extended for?

A. Five years.

Q. And this agreement was entered into on what date?

A. March 23rd, 2004.

Q. So based on this document, the original agreement was at least in effect until 2009; is that fair?

A. That's fair, yes.

Q. So would the original agreement that's been marked as Exhibit 89, this was in effect during the time that the chamber in which Jarred Sparks died in was manufactured; correct?

A. Correct.

Q. Are you aware of the date the chamber in which Jarred Sparks died in, when it was manufactured?

A. 2005.

Q. Okay. Let me ask you to look back at the

A.    Uh-huh.

Q.    And look at Paragraph 3.3.  I will read it into the record and ask you if I read it accurately.

3.3 says:  HTI shall not implement any material changes in the design, materials or color for chambers without advanced written notice to Oxy and written consent from Oxy, not to be unreasonably withheld.

Did I read that correctly?

A.    Yes.

Q.    What's your understanding of what that provision means in this agreement between HTI and Oxy?

A.    I think it simply means they didn't want to be surprised by any change in the design or materials or the color without their advanced written notice.

Q.    And for any design change to any hyperbaric chamber, Oxy-Health had to give HTI written consent for those changes to be made; correct?

A.    No.  If we -- if we decided that there was a change necessary for safety reasons, we wouldn't care whether they approved it or not.

This is our product. This is how we design it. This is how we make it. And all we're doing is telling you what we we've done so there no surprises.

Q. Well, sir, actually, this doesn't say we're just going to give you notice. This says Oxy-Health -- you have to get written consent from Oxy for the implementation of any material changes in the design.

Do you agree with that?

A. Yeah, I agree with that.

Q. So any material changes in the design of the Vitaeris 320, HTI had to get written consent from Oxy-Health; correct?

MS. PACKER: I'm sorry, I just missed what you said. Can you reask that?

MR. SWETT: Yeah.

BY MR. SWETT:

Q. Any material changes in the design of the Vitaeris 320 for any of those changes, HTI was required to get written consent from Oxy-Health; correct?

MR. CHIGNELL: I'll object to that. Go ahead.

A. That's what the agreement says. But once

MAGNA⬦
LEGAL SERVICES

Q. You're telling me the mattress is not a component of the Vitaeris 320 hyperbaric chamber?

A. It's used. It's used in the Vitaeris, but I wouldn't call it a component of the chamber.

Q. So if I have an HTI document that you filled out listing the mattress as a component of a hyperbaric chamber, that was an error on your part?

MS. PACKER: Why don't you show him the document.

MR. SWETT: Well, I've got a stack here I've got to get to. But I'm going to get to all the ones that I referenced, I assure you.

BY MR. SWETT:

Q. If Oxy-Health has ever stated in any form that it selects, Oxy-Health selects the materials used to make the Oxy-Health hyperbaric chambers, is that a false statement?

A. Yes.

MR. CHIGNELL: I'll object to that question. I didn't understand.

BY MR. SWETT:

Q. I'll show you what I'm marking as Exhibit 113 and ask if you recognize that document.

(Exhibit 113 was marked for identification.)

A. Yes. This a Device Master Record Change History.

Q. What chamber is this for?

A. This is for the 32-inch Vitaeris.

Q. All right. Looking through the description of the changes that have been made over the years to Vitaeris 320, can you tell me which of these changes were initiated at the request of Oxy-Health?

A. I wouldn't think any of them. Change label from rubber stamp. (Reading document.) No, there's none on here that was originated by Oxy-Health.

Q. And you're pretty confident about that?

A. Yes. Yes.

Q. Let me show you what's been marked as Exhibit 105 in this matter in a previous deposition and ask if you recognize that document.

A. (Reviewing document.) Yes. And as far as a customer request, I believe that was from the incident where the connection on the hose that popped off. That was reported to the FDA, incorrectly reported to the FDA I might add.

MAGNA

MR. CHIGNELL: Objection to the form.

But go ahead.

A. Yes. They requested a design change because of the problem that existed. They didn't make the design change, but they requested it.

Q. And sir, I don't mean to insinuate that they made the design change or they carried it out, but they requested it; right?

A. They requested it.

Q. And I think we are about to change the tape, but let me just ask you one more question.

From that time period, from the date the agreement was signed until 2009, they still had to give written consent for any design changes; correct?

A. I don't -- I don't know how to answer that question.

Q. Did anything change from 1999 to 2009 that eliminated provision 3.3 in the agreement between Oxy-Health and HTI?

A. No. We never made reference to that paragraph in that -- in that agreement.

I'm still having an issue with your insinuation that they were involved in the design of our part.

You know, they -- you get feedback from the customers on complaints about, Gee, you know, this would be more comfortable if this was moved or this was different. But for them to say, This is what we want, that's not the case. It just was not the case.

Q. **Well, did their role change at all? Whatever their role was in 2005, was it the same in 2006?**

A. Yes.

MR. SWETT: Okay. Let's change the tape and take a short break, and then I have some documents I want to show you.

THE VIDEOGRAPHER: The time is now 10:52 a.m. We are off the record. This is DVD number one, tape number one.

(Break taken.)

THE VIDEOGRAPHER: The time is now 11:04 a.m. We are back on the record. This begins DVD number two, tape number two.

BY MR. SWETT:

Q. **Mr. Lewis, I'd like to show you what's previously been marked as Exhibit 100 at a prior deposition and ask you if you recognize that document.**

of the Vitaeris 320; correct?

A. Yes.

Q. You participated in the design of the Vitaeris 320; correct?

A. Yes.

Q. You participated in the fabrication of the Vitaeris 320; correct?

A. Correct.

Q. Did you participate in the testing of the Vitaeris?

A. Correct.

Q. How about the inspection?

A. Correct.

Q. Look back at the agreement at Paragraph 8.4. And after you've had a chance to look at it, tell me what you're understanding of that provisions is.

A. I'm reluctant to respond to that. I think that's something that an attorney would have to explain. I would -- I would feel uncomfortable explaining what that means. I know it's part of a standard clause in an agreement or in a contract, but I don't want to venture to guess what it actually means.

Q. Let me ask you this: Do you know if HTI

Oxy-Health?

A.   Yes.

Q.   Okay.  What experience?

A.   Manufacture of the Gamow Mountain Bag.

Q.   Okay.

A.   Distributed by Chinook Medical Gear.

Q.   Did you yourself participate in the manufacture and design of the Gamow bag?

A.   The Gamow bag was designed by the patent holder, Igor Gamow.

Q.   And all you did was buy the patent; correct?

A.   We bought the patent and the product itself, yes.

Q.   You had nothing to do with the manufacture of the Gamow bag; is that fair?

MR. CHIGNELL:  Objection to the form of the question.  But you can go ahead and answer.

BY MR. SWETT:

Q.   Is that an inaccurate statement?

A.   I don't understand your question.

Q.   Did you have anything to do with the manufacture of the Gamow bag?

A.   Yes.  We made the Gamow bag.

have is a burst radio of 6 to 1.

Q.   Are there any other basis that you rely on for your opinion that the Vitaeris 320 is safe and effective for its intended use?

A.   Oh, yes.  Historical records.  We probably have over 8500 of these chambers in the market with no reported injury or -- other than the one that we have currently.  And that would include millions of treatments.

Q.   Anything else?

A.   No.

Q.   What are you looking for when you conduct burst tests?

A.   What pressure does it burst at.

Q.   What is cycle testing?

A.   Cycle testing, you bring it to its pressure -- design pressure of 4 PSI.  You hold it for about a minute, you depressurize it, you inflate it again at 4 PSI.  And it's done at a surface or a rated temperature of a hundred degrees, maximum surface temperature of a hundred degrees.

Q.   Okay.  What is puncture testing?

A.   Puncture test is something that I think the committee wanted to see, because these are

whether or not Oxy-Health is the manufacturer of the Vitaeris 320 Hyperbaric Chamber pursuant to applicable federal regulations?

MR. CHIGNELL: Objection to the form of the question.

A. Yes.

Q. So what is your opinion with respect to whether or not Oxy-Health is the manufacturer of the Vitaeris -- strike that.

What is your opinion with respect to whether or not Oxy-Health is a manufacturer of the Vitaeris 320 Hyperbaric Chamber?

A. They are not.

Q. And what is that based on?

A. It's based on that they are not involved in the design choice of materials, fabrication processes on the chamber.

Q. But we've already established that they did select some components for the Vitaeris 320; correct?

MR. CHIGNELL: I'll object, but go ahead.

A. Is it the mattress that you're referring to?

Q. Mattress.

A. Okay.

MAGNA◆ LEGAL SERVICES

Q.    -- and that increased the operating pressure to 4 PSI; is that right?

A.    Well, it was my understanding that it was always from two to ten, and then they corrected that and said no, four was the max.

Q.    And that's what's reflected here.  It says four is the max; correct?

A.    Yes, four in the max.

Q.    And this is a letter from the FDA to you dated June 14th, 2001?

A.    Okay.  Yes.

Q.    Let me ask you:  Whenever -- what's your understanding whenever that new premarket notification was issued, the K001409, whether or not it's still the case that these hyperbaric chambers could only be operated with ambient air?

A.    That's always been the case.

Q.    So is it fair to say that oxygen concentrators are not supposed to be used with these hyperbaric chambers?

A.    They're not cleared for use with oxygen concentrators.

Q.    Okay.  Whenever the Vitaeris 320 Hyperbaric Chamber was cleared in K001409, it was only cleared for the indication of acute mountain

sickness; correct?

A.    Correct.

Q.    It wasn't cleared for the treatment of cerebral palsy; was it?

A.    No.

Q.    The Vitaeris 320 can't be marketed for the treatment of cerebral palsy; can it?

A.    No, it can't.

Q.    The FDA did not clear the Vitaeris 320 for the treatment of autism; did it?

A.    No, it did not.

Q.    The Vitaeris 320 cannot be marketed to treat the symptoms of autism; can it?

A.    No, it can't.

      MR. CHIGNELL:  Objection to form.

      MR. SWETT:  What's the basis?

      MR. CHIGNELL:  Leading.

      MR. SWETT:  And just for the record, I'll cite Federal Rule 611(c)(2).

BY MR. SWETT:

Q.    I may have asked you this already, Mr. Lewis, but the FDA classified the Vitaeris 320 as what class of medical device?

A.    Class II.

Q.    Do you know what considerations the FDA

A.    Oh, yeah.  That should be 2004.

Q.    Anything else in that first paragraph which is -- well, with those corrections, is that first paragraph correct?

A.    Yes.

Q.    Okay.  Look at the second paragraph, if you would.

A.    Okay.  (Reviewing document.)  Yes, that's correct.

Q.    The next paragraph, the paragraph that starts with the words "It is anticipated that Mr. Lewis will testify that HTI designed and manufactured --

A.    Yes.

Q.    -- the subject chamber."  If you read that paragraph and let me know if there are any corrections that are needed.

A.    Right.  (Reviewing document.)

MR. SWETT:  What is this exhibit?

MR. CHIGNELL:  130.

A.    Yes, that's correct.

Q.    The final paragraph on Page 3 of Exhibit 130, where it says "It is anticipated that Mr. Lewis will testify that the FDA has designated HTI as the manufacturer of the Vitaeris 320, could

think that's just a summary paragraph.

A.   Yeah.   Okay.

Q.   Okay.

A.   Okay.

Q.   You mentioned a little bit about the number of chambers in use.   How many total chambers has -- of the ones that were manufactured by HTI and sold to Oxy-Health, and then sold by Oxy-Health to other people, how many chambers has HTI manufactured?

MR. SWETT:   Objection to form.

A.   For Oxy-Health, well, we're at 10,600 and something, but we made several for Pakistan, which would be a Gamow bag.   Probably 1500 of those over the years.   So it's going to be close to 10,000. It's probably under 10,000, but for all practical purposes, say 10,000.

Q.   And that's spanning from?

A.   Since 1999.

Q.   Up until now?

A.   Yeah.

Q.   And do you -- have you ever undertaken to determine how often these chambers are used by the end users?

A.   I've been told if it's in a doctor's

office or a clinical, every day, five days a week, probably four or five treatments a day. That's my guess. I'm told it's in the millions of treatments.

Q. And do you know how -- do you know how many of the chambers that were sold by Oxy-Health were sold to a doctor or a clinic environment versus the number that were sold for in-home use?

A. I don't.

Q. And so what is your best approximation as to the number of treatments that have been -- that have been had with these chambers over the years?

MR. SWETT: Objection to form. Calls for speculation.

A. Two. Two million.

Q. And aside from this incident involving Jarred Sparks, are you aware of any other incident involving any type of personal injury?

A. No.

Q. Or death?

A. No.

Q. Mr. Lewis, would you agree that HTI assembled the chambers?

A. Yes.

MR. SWETT:  Objection to form.

BY MR. CHIGNELL:

Q.    And did Oxy-Health ever assemble any of the chambers?

A.    No.

MR. SWETT:  Objection.  Calls for speculation.

Q.    Did HTI fabricate the chambers?

A.    Yes.

Q.    Did Oxy-Health ever fabricate any chambers?

MR. SWETT:  Object to form.  Calls for speculation.

A.    No.

MR. SWETT:  Let me get my objection in.

BY MR. CHIGNELL:

Q.    Did HTI produce the chambers?

A.    Yes.

Q.    Did Oxy-Health produce the chambers?

MR. SWETT:  Object to form.  Calls for speculation.

A.    No.

Q.    Did HTI construct the chambers?

A.    HTI did, yes.

Q.    And did Oxy-Health construct the

chambers?

MR. SWETT:  Object to form.

A.   No.

Q.   Did HTI prepare the chambers?

A.   Yes.

Q.   And did Oxy-Health prepare the changes?

MR. SWETT:  Object to form.

A.   No.

MR. CHIGNELL:  Mr. Lewis, I don't have any other questions.  I appreciate your time.

MR. SWETT:  Mr. Lewis, I have just about five follow-ups.

EXAMINATION BY MR. SWETT (Cont'd):

Q.   Mr. Lewis, at the time the Vitaeris 320 chamber was manufactured in 2005, had the code case involving the Chamberlite been -- was it in existence at that time?

A.   No.

Q.   The same question, in 2005, was the code case involving the Quamvis in existence at that time?

A.   No.

Q.   And the code case process, I think you testified earlier, is a case-by-case basis;