# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:13-cv-00649-FL

---------------------------------------

AMY SPARKS, individually, and        :
ROBERT D. SPARKS, as Personal        :
Representative of the ESTATE         :
OF JARRED B. SPARKS,                 :
                                     :
    Plaintiffs,                      :
                                     :
vs.                                  :
                                     :
OXY-HEALTH, LLC and                  :
OXY-HEALTH CORPORATION,              :
                                     :
    Defendants.                      :
---------------------------------------

VIDEOTAPED DEPOSITION OF

AMY SPARKS

Taken by the Defendants
Fayetteville, North Carolina
February 17, 2014

Reported by:   Eileen M. Dunne,
               Court Reporter and

Case 5:13-cv-00649-FL   Document 45-10   Filed 12/01/14   Page 2 of 65

Q.    Is that -- is that a fair way to -- to say it?

A.    There are different areas.  You could have -- you can be mild, moderate or severe.  And there is also people who have a diagnosis of Asperger, which is high-functioning autism.

Q.    Okay.  So on the spectrum, Asperger's would be on one end of the spectrum and then from Asperger's, you would go to a mild case of autism and up to a moderate and then to a severe case?

A.    It would go mild -- it would go -- it would go severe, moderate, mild, Asperger.

Q.    Okay.  And what kind was -- was Jarred ever diagnosed with a specific kind of autism?

A.    At first, they said he was severe, and then he made so many gains that it was more like a moderate.

Q.    And so after you started these therapies and he made some progress, he was essentially diagnosed then with a moderate case of -- of autism?

A.    Yes, sir.  What he -- are you talking about specifically diagnosed by a medical doctor?

Q.    No.  I'm just trying to get an idea of -- of where along the spectrum he -- he sat, at least initially and then, you know, as -- as time went by.

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 3 of 65

A.    Depending upon who you would speak to, some people might say that Jarred was severe; other people might say that he was moderate.  He made many, many gains.  And so we always felt that Jarred was more moderate after -- after all the work and all the things that we did to help our son.

**Q.    Okay.  So you started this -- this ABA therapy early on --**

A.    Yes, sir.

**Q.    -- with him.  And -- and did that -- did that -- did he ever make enough gains to be put back into the public school system or was he always doing the -- the program at your home?**

A.    We did our -- we did the program at our home for two years.  And our goal was that Jarred would be mainstreamed into a regular class.  And he did go into a regular class, but it was not what was best for Jarred.

And so I made a decision when he was in a -- when he was about probably eight or nine that mainstreaming him into a regular classroom was not benefitting Jarred, that he needed to be in a self-contained classroom where his needs could be met and that he could learn at a pace where it was more acceptable and more, you know -- which was best for

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 4 of 65

deal with the behaviors. And if -- if Jarred could not calm down, then they would just call me.

Q. Okay. And how far away were you down --

A. About 15 minutes.

Q. Okay. Did they ever leave Jarred unsupervised --

A. No.

Q. -- in the classroom?

A. No. Not that I'm aware of, no, sir.

Q. Okay. So we talked about -- that's -- any other behaviors at the school that you're aware of?

A. No.

Q. Okay. What about behaviors at home?

A. He had -- he would scream at times. Sometimes he would scratch. Are you talking about behaviors -- how far back?

Q. Let's say in the last five years.

A. In the last five years?

Q. Yes.

A. He would have temper tants -- temper tantrums at times. At other times, he would be very, very gentle. He would never hurt -- not that I can recall -- any child ever. He was a gentle giant. He was six foot three.

Q. Okay. And what did he weigh?

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 5 of 65

A.    About 150 pounds.

Q.    And had he stopped grow -- was -- was he -- had he reached his maximum height at the age of 19 or do you know?

A.    I -- I don't -- I don't know.

Q.    Okay.  Was he still -- was he still growing?  I mean, had -- did you --

A.    I feel that he was still growing.

Q.    Okay.  How tall is your -- your husband?

A.    Five eleven.

Q.    Okay.  Gotcha.  Okay.  And any other behaviors that he exhibited at home other than what we've already talked about?

A.    Scratching, temper tantrums, sometimes he would bite.  That's about all I can remember.

Q.    Okay.  How -- how verbal was Jarred?

A.    He could answer simple questions.

Q.    Okay.  Like can -- can you give me an example of the kinds of questions that he could answer?

A.    "What is your name?"  He could say Jarred. "Where do you live?"  He would say -- you know, we had -- always had him memorize his address so in case anything ever happened, he would be able to tell, you know, a police officer or whatever.

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 6 of 65

Q. Um-hmm.

A. He could not have a conversation like you and I. Jarred always knew what you were saying to him, but he could not always respond. If you told him to go upstairs and get his socks on or put his shoes on, then he knew exactly what you were saying, and he would go do it.

But as far as, you know, his vocabulary, you know, he -- he always could say pretty much what you asked him to. Some words were difficult for him to express. But he could not have like a sit-down conversation like you and I.

Q. Okay. When you said that he could -- he could -- if you asked him questions, he could answer you, can you give me an example, I mean, as -- as far as the kinds of things that you would ask him to do on a regular basis? I mean, is this things like going upstairs, cleaning up your room or -- or going to get your shoes on or -- or --

A. It would -- we did drills, and this was part of the ABA therapy. We had questions we were working on, "WH" questions, because we were trying to teach Jarred, you know, how to respond to WH questions, you know.

Q. And when you say --

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 7 of 65

A.   Yes, but I can't recall the names of them now.

Q.   Okay.  And did he have a doctor that was consistently seeing him to help monitor and -- and -- to help monitor and keep track of the autism?

A.   Yes, sir.

Q.   Who was that?

A.   Dr. Jerry Kartzinel.

Q.   And Dr. Kartzinel, I believe, is in California --

A.   Yes, sir.

Q.   -- is that correct?

A.   Yes, sir.

Q.   Okay.  Did you take trips to go to see Dr. Kartzinel or would Dr. -- Dr. Kartzinel come to the East Coast and see patients?

A.   We did phone consultations, and we would call him as needed and adjust medications, do whatever we needed to do.  And he was in Florida at one time and then he moved.  But we saw him on a regular basis when he lived in -- on the East Coast. We would go and take trips and drive from North Carolina to take Jarred to his office.

Q.   And where was he in Florida?

A.   He was at Melbourne, Florida.

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 8 of 65

Q. Okay. And who was the other doctor?

A. I knew you were going to ask me that.

Q. That's okay. Well, where is he located?

A. Well, there is one, Dr. Lieberman, in South Carolina.

Q. Do you know where in South Carolina?

A. Charleston.

Q. Okay. Okay. And was there another doctor as well?

A. Yes, but I cannot think. He was -- well, Dr. Bradstreet saw Jarred like maybe one or two times.

Q. And -- and where is Dr. Bradstreet?

A. He is in Melbourne, Florida.

Q. Does he -- did he practice with Kartzinel?

A. Yes, he did.

Q. Okay. Other than Lieberman and Bradstreet, did Jarred -- was Jarred ever treated for his autism by someone other than Jerry Kartzinel?

A. No. I'm not -- not that I'm aware of anybody else.

Q. And for the three or four years prior to his death, was he being treated by Dr. Kartzinel?

A. Yes, sir.

Q. So tell me, what -- what were -- what were

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 9 of 65

A.    Exactly.

Q.    Okay.  But you would check up on him on a regular basis in order to make sure that he was okay?

A.    Yes.

Q.    Okay.  And that was from the time that he was young up until the time of his death?

A.    Yes, sir.

Q.    Okay.  So let's talk real quick about the hyperbaric treatment.  This is something that I had no knowledge of until -- until very recently.  Tell me when you guys found out about it, how you learned about it and how that treatment progressed.

A.    I went to a -- a workshop I believe in Spartanburg, South Carolina.  I can't recall the exact timeline.  It was probably about six years ago.  And they had a -- a display of the hyperbaric.  And I attended a workshop, and it had information, and it showed like brain scans of before and after.  And it talked about the neurons and the oxygen and how it comes in -- in and it helps, you know, children with autism.  And Dr. Kartzinel had mentioned it to me as always an option for Jarred.  You know, anything that was coming up or anything that was brand new or anything that we felt like, you know, would help our son, you know, he was always mentioning to me.  And

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 10 of 65

so I would talk to Janet. Janet and I are good friends.

Q. Um-hmm. And did -- they -- she used to live in the Goldsboro area --

A. Yes, sir.

Q. -- I believe? Okay. And you -- at that time, where were you living?

A. I was living at Fort Bragg, Pope Air Force Base.

Q. Okay. Gotcha.

A. But I -- I learned about it, and I felt like it was a treatment that could benefit my son. And so I pursued it. I asked, you know, Dr. Bradstreet if he would consider allowing us to use the hyperbaric chamber. Because we were not wealthy and -- and -- I mean, we had done treatments and we had paid monies and -- but we needed one on a continual basis, we felt.

Q. Okay. And so Dr. Bradstreet, he was down in Melbourne with --

A. Yes.

Q. -- with Dr. Kartzinel?

A. Dr. Kartzinel.

Q. Okay. Who put on this workshop in Spartanburg?

Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 11 of 65

A. It was the -- I think it was the Autism Society.

Q. Okay.

A. And I don't -- I don't recall if it was in Spartanburg. I know it was somewhere --

Q. Was it --

A. -- in South Carolina.

Q. Okay.

A. I'm almost positive.

Q. Gotcha. And -- and who -- was there -- was there -- were there presentations at that --

A. Yes.

Q. -- at that? And do you recall any of the people that were presenting?

A. I can't remember the speakers, but I know that there was like a display, an exhibit, and the hyperbarics were set up there.

Q. Okay. Were any of the people that were at that -- at -- at that meeting or that presentation from Oxy-Health?

A. Yes, sir.

Q. Who -- do you know who was?

A. I just remember it was a gentleman. He was from the Atlanta area. Because I know they have a -- a site there where they offer hyperbaric treatment to

Case 5:13-cv-00649-FL Document 45-10 Filed 12/01/14 Page 12 of 65

children who have autism.

Q. Okay. And you -- and you heard this gentleman speak?

A. He didn't speak. He was -- he was just like showing the presentation. He was giving his spiel. You know, we had gone to the -- a workshop and we had seen the brain scans and saw --

Q. Um-hmm.

A. -- you know, how the neurons were lighting up like Christmas trees and -- and how -- you know, hearing the -- the testimonies of how children who had never spoken had gotten into the hyperbaric. And, I mean, we -- we heard that, and then we went into the -- the -- the display area where they had all the vendors and that kind of thing.

Q. Gotcha.

A. And he was there.

Q. Okay. And did you ask him at that -- at that point about anything related to purchasing one of those or --

A. Yes.

Q. -- or having -- okay. And -- and this -- this gentleman that you spoke to, was he -- was he of what -- about how old was he; do you remember?

A. Mid-thirties.

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 13 of 65

Q. Okay. White? Black?

A. White.

Q. And you said from the Atlanta area?

A. He -- I know he had a -- I -- I -- I think he was the director in charge of the hyperbarics in Atlanta, but I -- I don't -- I don't know for a fact.

Q. Okay. And then did you ever pursue anything with -- with Oxy-Health at that time?

A. I called California because I had heard that, you know -- I was going to -- I knew I didn't have $18,000. You know, some people were putting it on their credit card. I didn't -- I didn't have $18,000. And so I was going to pursue and see if they might be willing to donate. I'm the type of person where I'm going to keep going until somebody tells me no. And -- and if they tell me no, I'm going to go a step further above them.

So I called California, and I spoke to -- I don't even recall who I spoke to, just to inquire information about this hyperbaric.

Q. Okay.

A. And I had heard it from Dr. Kartzinel, and I had seen him doing it.

Q. Okay. And did you -- did you have any success when you called California?

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 14 of 65

Q.    Okay.   That's when he started?

A.    Yeah.   I'm -- I'm -- yes, sir.   I'm sorry.

Q.    So that would have been about seven or eight years ago?   Because that -- I thought that you said that you had the presentation six years ago. That's what I wrote down.   Maybe I was wrong about that.

A.    I had heard of hyperbarics.   He had never done it.   I went to a workshop about six years ago. So I -- I don't recall the exact time.

Q.    Okay.   And -- and when you had the first hyperbaric treatment, where -- where was that?

A.    I believe it was at Creation's Own in Melbourne, Florida.

Q.    Creations?

A.    Creation's Own.

Q.    Own.

A.    And I -- I apol --

Q.    And what -- what is Creation's Own?

A.    That is Dr. Bradstreet.   That's just the name of it.

Q.    Okay.   That's his office?

A.    Yes, sir.

Q.    Is that the one that he shared with Kartzinel?

Depositions, Inc.
info@NCDepo.com            www.NCDepo.com            (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 15 of 65

A. Yes, sir.

Q. **Okay.**

A. The dates, I -- I -- honestly, they're all running together.

Q. **Sure. No, and --**

A. It's very hard for me to remember when we started this or when we started this treatment.

Q. **Gotcha. I mean, and this is stuff that will be in the medical records. Those dates will be in there, so we -- we'll know for sure.**

A. Okay.

Q. **And when you -- how did you come up with the decision to start using the hyperbarics? Was this just sort of a -- your feeling about what may happen, the good stuff that Jarred may get as a result of using the hyperbarics?**

A. Well, of course I talked with Dr. Kartzinel on a regular basis, and we did our phone consultations. And there would always be, you know, okay, what's new, what's next. And so I talked with Dr. Kartzinel, and of course he was all for it, trying this treatment. I asked him about it. After seeing, you know, the -- the brain scans and -- and seeing how -- how effective it could be for children with autism, I wanted to pursue it for -- for Jarred.

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 16 of 65

Q.   Okay.  And then how often -- when Jarred started the hyperbarics, how often did he have those treatments?

A.   At first in the beginning when he started, he -- he didn't get it all the time.  I mean, it would be when we could afford it.  It might be every couple of months.  We tried not to, you know, go past every maybe three or four weeks, but we couldn't afford that.  We did start it in Florida.  And every time we would go to Melbourne, we would do the hyperbaric.  That was always part of it.  And we'd do chelation as well.

Q.   Um-hmm.

A.   But then Janet had a -- a hyperbaric which was closer to us.  And we, you know, paid for that.  But, again, it always dealt with our finances and what we could afford and what we could not.  I'm sitting here remembering when we got the hyperbaric from Dr. Kartzinel when he allowed us to use it for 10 months, it was eight years ago because I had just started at Vanstory in 2006.

Q.   Okay.  You said -- so Kartzinel let you borrow one of the --

A.   Dr. Bradstreet --

Q.   Bradstreet.

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 17 of 65

A. -- let us use a hyperbaric for around 10 months.

Q. Okay. And what kind of hyperbaric chamber was that?

A. It was the Oxy-Health.

Q. Okay. And the one that Kartzinel had and Bradstreet had in their office out of Melbourne, what kind of chamber was that?

A. Well, there were two locations. In the beginning, they had just the regular Oxy-Health one, the blue one.

Q. Um-hmm.

A. The Taeris, Vitaeris or whatever. And then later when they moved locations, Dr. Kartzinel was no longer with Dr. Bradstreet, and they had the steel hyperbaric chambers.

Q. And was that also manufactured by Oxy-Health or was that manufactured --

A. I do not --

Q. -- by somebody else?

A. -- know who that was manufactured by.

Q. Okay. Okay. And then so during -- you said it was eight years ago now that when -- when it was Bradstreet that allowed you to borrow the -- the chamber?

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 18 of 65

sorry.

Q.     Yeah, go ahead.

A.     It would have been October not February because it was 10 months.  So if you -- if you -- if it was 2006, December is when we had to -- the -- let me see.  We re -- we sent it back 2007.

Q.     Gotcha.

A.     Okay.  But we received it in 2006, if I recall correctly.  And it was around probably October --

Q.     When you --

A.     -- of two thou --

Q.     -- received it or you sent it back?

A.     When we received it.

Q.     Okay.

A.     And then we sent it back -- I remember it was right around Christmastime.

Q.     And your best recollection is that you would have sent it back December of 2007?

A.     If I'm -- yes, sir.

Q.     Okay.  And you received it sometime late 2006?

A.     Yes, sir.

Q.     And was that the -- that was the Oxy-Health chamber?

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 19 of 65

have any type of O2 concentrator in 2006 and 2007?

A. No, sir.

Q. Okay. So it was just the two air pumps that -- that filled the -- the chamber up with the air?

A. Yes, sir.

Q. Okay. Later on when you acquired the one from the Pressons, did you also acquire the O2 concentrator from them as well?

A. Yes, sir.

Q. Okay. And so -- and that's the one that has the smaller tube that goes through the wall of the -- of the chamber and then into the cannula?

A. Yes, sir.

Q. Okay. Other than that difference, the -- with the O2 concentrator, was there anything else different between the O -- the Oxy-Health chamber that you used in 2006 and 2007 and the one that you used -- the one that you acquired from the Pressons?

A. No, sir.

Q. Same size?

A. Yes, sir.

Q. Because that thing is pretty big.

A. It's about seven foot long.

Q. Yeah. And it's about like three feet --

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 20 of 65

come up to the steps to the right, there's like a little area there. And we had it against the wall, but we felt like that was too small of an area, and so, therefore, we moved it into Kelsey's room.

Q. Is that like a landing at the top of the steps?

A. Yes, sir.

Q. Okay. And so you -- and so it started off on the landing?

A. Yes, it was in the landing.

Q. And then at some point after that, it went into Kelsey's room?

A. If -- as I recall, yes, it did.

Q. And it's --

A. I -- I'm not -- honestly, I'm not 100 percent. I don't know if it stayed on the landing the whole time or if we put it in Kelsey's room. I do know the one that we purchased from Janet and Rusty was always in Kelsey's room.

Q. Okay. And when you used the -- when -- when you initially got the chamber in 2006-2007, did you get trained on how to use it?

A. We were shown how to use it. And we had also seen it in Dr. Kart -- you know, we were around it with Dr. Kartzinel's office and we were -- I made

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 21 of 65

sure that I knew how to use it before I put my son in it.

Q. Okay. Okay. And who -- and who showed you how to use it?

A. I cannot recall.

Q. Okay. Was it somebody from Dr. Bradstreet's office or was it somebody up in North Carolina?

A. I think it was someone in North Carolina, but I -- I -- I cannot be sure.

Q. Okay. Was it -- was it like a consultant? Was it somebody with like a local health provider?

A. I don't -- I don't remember who.

Q. Okay. Was it anybody from Oxy-Health?

A. No.

Q. Okay.

A. I know that.

Q. How long -- so if -- if -- if the December 2006 date is right as far as when you acquired it, or sometime in late 2006, how -- how much long -- how much -- how much time had elapsed from the time that Jarred had had his first hyperbaric treatment? In other words, how fast did you get one in your house after --

A. I think it was two --

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 22 of 65

Q. Okay. And did you notice any improvement in Jarred's condition?

A. Um, yes. Yes.

Q. Okay. How many of those treatments approximately were with the chamber that -- that was at A Small Miracle with the Pressons prior to the time that you had it in your house for the first time, the one that Dr. Bradstreet let you borrow?

A. So you're asking me from the time we purchased it from the Pressons in February?

Q. No. I'm talking -- I'm going back now to before 2006.

A. Okay. You were asking -- okay. You're asking me how many -- I -- I'd say maybe 50 hours, what we -- what we would consider to be 40 or 50 dives because what we do is we would stay up there in Florida, stay the whole week, and get our monies' worth as much as we could, and then we would go back to North Carolina and try to do it another maybe three months later so that we could get the best results, and we could also do it as many times as we possibly could with Jarred.

Q. Okay. So the trips down to Florida would be about a week each and you would do the hyperbarics on a daily basis during that trip and then would come

info@NCDepo.com          www.NCDepo.com          (919) 557-4640

was that a -- it was an inflatable one similar to the one that -- that -- that you had in your house?

A. At first, we used the -- the inflatable one, but then after -- after we saw the steel chambers and we could get better results for what they considered to be the dives, we used the steel chambers.

Q. Okay. And -- and the -- what -- what was the difference between the steel chamber and the soft-sided --

A. Well, I mean --

Q. -- chamber?

A. -- one was the steel was made out of, you know, a diff -- it was hard steel and the other one was inflatable. And the steel chamber was about $75,000 to purchase --

Q. Okay.

A. -- one. And it had the 100 percent oxygen.

Q. Gotcha. So it -- it had the higher concentration levels of oxygen?

A. Yes.

Q. Okay. Okay. And then when -- when Jarred was in the soft-sided chamber down in Florida, how was he being -- was he being monitored while he was inside?

Depositions, Inc.
info@NCDepo.com        www.NCDepo.com        (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 24 of 65

A.    They would -- they would put Jarred in, but they would not stay in the room.  They would leave occasionally going back and forth --

Q.    Um-hmm.

A.    -- as I recall to the best of my knowledge.

Q.    **Okay.  And where were you during these treatments?**

A.    I was in a room where it was a big wide open room, and I was standing -- I was there.

Q.    **Okay.  So you -- were -- were you present during the entire treatment?**

A.    Honestly, I cannot recall.  I don't think I was every minute.  I had to go to the bathroom and I had to take care of some of -- like my other children were there.  But either myself or the nurse would keep going in and out of the room.

Q.    **Okay.  And how long were the treatments down in Florida?**

A.    Are you asking me inside of the chamber?

Q.    **Yes.**

A.    No more than an hour because other people were -- they had other people scheduled behind us. If somebody wasn't behind us, we could go for a longer period of time.

Q.    **Okay.  Did you ever get inside the chamber?**

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 25 of 65

A.    I could not.

Q.    Okay.

A.    I have lung -- I have lung problems.  I've had lung surgery.

Q.    Okay.  And so when Jarred was inside the chamber down in Florida, was anybody ever inside the chamber with him?

A.    Yes.

Q.    Okay.  Tell me about that.

A.    We -- my husband would even get in with him.  Dylan would get in with him.  Kelsey would get in with him.  It was a family affair.

Q.    Okay.  Because the chamber is big enough so that you can certainly put more than one person in there, correct?

A.    Yes.

Q.    Okay.  And so what would Jarred be doing when he was inside the chamber?

A.    Are you asking me --

       (Telephone interruption.)

A.    Are you asking me when he first started?

Q.    Yes.

A.    Okay.  He would -- we would have the little DVDs, and they'd have -- they'd play the movies inside.  Sometimes they would have food for them to

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 26 of 65

eat, our gluten- and casein-free snacks. That was it.

Q. Okay. So -- so when you were down in Florida and he was being treated, were the -- was there always somebody inside the chamber with him?

A. In the beginning, yes. As he got older, no.

Q. Okay. And so for all of the treatments that he had in Florida, whenever you went down, was it -- was it during those sit -- situations -- was there always somebody inside the chamber with him?

MR. SWETT: Object to form.

A. Yes, as I recall.

Q. Okay. And that was either -- either your husband or one of your other children?

A. Yes.

Q. Okay. And was -- was Jarred able to operate the chamber from the inside? Was he -- was he able to -- to turn any of the -- the dials in there like the decompressurization valve?

A. He never did that. He would try to unzip --

Q. I gotcha.

A. -- sometimes, but, no, he would never mess with the --

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 27 of 65

Did he -- did he really care about it or how did that play out?

A. I -- I can't recall if he was just totally overjoyed. There were times that he wanted to get in; there were times that he did not want to get in.

Q. And if he didn't want to get in, then you guys just let it pass?

A. We would -- we would -- you know, we would pursue it, but we had to pick and choose our battles.

Q. Did you ever try to get him in the chamber and then have him decide that he didn't want to get in there?

A. Yes.

Q. Okay. And how often did that happen?

A. Not too often. We just made sure that, you know, during that time if he was really not wanting to do it, we made sure another person would get in. Look, Jarred, so-and-so is getting in. And that way it became more of a -- a positive thing instead of a negative.

Q. Okay. So is it fair to say that sometimes he was in the chamber by himself and sometimes he was in there with other people?

A. Yes.

Q. Okay. And did that continue from the time

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 28 of 65

that you were -- you had the chamber that you borrowed from Dr. Bradstreet up until the time that you had the chamber that you acquired from the Pressons and A Small Miracle?

A.    When we got the one that we got from Janet and Rusty, Jarred was the only one in it at that time.

Q.    Okay.  Do you ever recall anybody else getting inside the one that you acquired from the Pressons other than Jarred?

A.    Me just to clean it out.

Q.    Okay.  But as far as taking treatments inside?

A.    No.

Q.    And so you tell Jarred it's time to get in the H-box.  He gets in with his pillow.  And then, I guess, who was doing the zipping?  Who is zipping up of the chamber; was the -- the person outside doing that or would he help?

A.    No, we would.

Q.    Okay.  And it -- was there somebody -- was it the same person who did it every time?

A.    No.  There were different people in our family.

Q.    Okay.  Who -- who all used it or -- or

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 29 of 65

operated it?

A. Myself, my husband, my son, Kelsey or -- a couple of times, but for the most part, she didn't. It was main -- it was mainly myself and my husband.

Q. Okay. But Kel -- both Kelsey and Dylan knew how to use the --

A. Yes.

Q. -- chamber, correct?

A. Anybody that put Jarred in there knew how to use it.

Q. Okay. And who were they trained by?

A. Us.

Q. Okay.

A. We showed them.

Q. Gotcha. And you were trained by Dr. Kartzinel?

A. I don't -- I don't recall.

Q. Okay. My understanding is that there -- there are two zippers; is that correct?

A. Yes.

Q. There's like an internal zipper --

A. Yes.

Q. -- that you can use and then there's like a rubber flap?

A. Yes.

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 30 of 65

A. We didn't do it in Florida. I mean, we didn't do it during that -- in the beginning, yes, we did use the soft, but then as it progressed and he moved into the new building, we did --

Q. **The hard-sided?**

A. -- the hard.

Q. **Okay. I gotcha. And when you were in the first facility down in Florida when you were using the soft-sided one, who was monitoring the person inside the chamber on -- on behalf of the -- of the -- the medical practice?**

A. The nurses.

Q. **And would they come and go or would they stay?**

A. Yeah, they would come and go.

Q. **Okay.**

A. Honestly, it's been so long, I -- I can't remember, you know. But I rem -- I specifically remember going into a room where Dr. Kartzinel showed me the hyperbaric, and nobody was in that room except for the person in that hyperbaric. I specifically remember that.

Q. **Um-hmm. And then would the nurses come -- when Jarred was in the hyperbaric chamber down in Florida, the soft-sided one, before they moved to the**

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 31 of 65

other facility, was there a nurse that would come in and check on him periodically?

A.   Yeah, um-hmm.

Q.   And when you did the -- the treatment with the Pressons at A Small Miracle -- I know you said you only went there a couple of times --

A.   Um-hmm.

Q.   -- but when you had the therapy there, was there anybody on behalf of A Small Miracle that monitored the person inside the chamber?

A.   Yes.

Q.   Who -- who would that be?

A.   I cannot remember her name.  It was just an employee, but I -- it was a mutual friend that Janet and I knew.

Q.   Um-hmm.  And would that person stay there the entire time the person was in the chamber or would they come and go?

A.   I -- I can't recall.

Q.   Okay.

A.   No, they -- to the best of my knowledge, they would come and go.

Q.   Okay.  And when you borrowed the one from Dr. Bradstreet and you guys used it at the -- at the Fort Bragg house and then your house on Mobius, would

Depositions, Inc.
info@NCDepo.com        www.NCDepo.com        (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 32 of 65

A.      -- the door open.

Q.      Now, if -- if you needed to get Jarred's attention and you knew that he was awake, could you yell, you know, "Hey, Jarred, how are you doing?" and would he respond?

A.      Are you talking about if I was in the room?

Q.      You know, either in the room or outside -- well, if -- if you were in the room, would he?

A.      Yes.

Q.      Okay.  What if you were down the hall; could you yell -- would he be able to hear you?

A.      Possibly, possibly not.  I don't -- I don't know.

Q.      Gotcha.  But if you needed to get ahold of him or -- or tell him something, you would go and just --

A.      Believe me, he would hear my voice.

Q.      Fair enough.  Okay.

        Now, the cannula, the O2 concentrator, that was on the unit that you had that you acquired from the Pressons --

A.      Yes.

Q.      -- did he use the cannula?

A.      He would not put the mask on.  We tried to do it, and he just would not wear it.  So we would

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 33 of 65

stick it beside his face so that when he was asleep, it was blowing the air directly into the -- you know, where his face was.

Q. And that would be the -- the -- sort of the concentrated oxygen that --

A. Yes.

Q. -- were -- it was coming out of the --

A. Yes.

Q. -- through the small tube --

A. Yes.

Q. -- that went through the wall at the head of the unit?

A. Yes.

Q. Now, you got -- you had -- you got -- at some point, you got a prescription for the -- the chamber from Dr. Kartzinel, correct?

A. Yes, sir.

Q. Do you recall getting -- when -- when you got that?

A. I got it before -- I got it before acquiring the chamber because I gave it to Janet the day I -- she brought the chamber to us.

Q. And was that required before you acquired -- were you required to get a prescription before you acquired the chamber?

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 34 of 65

often should I do this, what's the time constraints, is there any results -- any negative results that could happen. And, basically, you know, he was our doctor. I saw the results. He saw the good results.

He always asked me, you know, What's going on? Have you gotten his hyperbaric chamber? And, you know, when I finally said, Yes, we were going to acquire it, that's when he said -- you know, I said, Please, can I have the prescription for this? I've got to have this. I need this. And he said, No problem.

Q. Okay.

A. And so we -- we went from there. But as far as telling me how far to stand beside the hyperbaric, no, he did not.

Q. Okay. What about when you -- when -- when you got it from the Pressons -- and they -- I -- I believe that they -- did they come and deliver it to you --

A. Yes.

Q. -- or did you go pick it up?

A. They brought it to our home.

Q. And did they train you and members of your family in -- in the use of the chamber?

A. Rusty and Rob were upstairs, and Janet and

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 35 of 65

I were there, as well, and we -- they were just -- we were talking in general. They knew we had already had a hyperbaric before. But they were just showing us the concentrator because we didn't have the concentrator before and Rusty and Rob were discussing that and how to set it up and everything. And that's what we -- that's what we discussed.

Q. **Okay. Did she ever talk to you about remaining in the same room as the person inside the chamber during the treatment?**

A. Honestly, I don't recall.

Q. **Okay.**

A. She may have. I -- I don't recall. It's been almost three years. It's hard for me to remember the conversation we had that day.

Q. **Sure. Tell me about your relationship with the Pressons. How long have you known them?**

A. I've known Janet for -- well, I met her in 1996.

Q. **That's when Jarred was about four?**

A. Yes.

Q. **Okay. And what were the circumstances for that meeting?**

A. I went to an autism conference, and that's where I learned about ABA therapy, applied behavioral

Depositions, Inc.
info@NCDepo.com            www.NCDepo.com            (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 36 of 65

Small Miracle.

Q. And do you know when he delivered it back to them?

A. No. I don't recall the date. It was in the summer; I know that. It was sometime in the summer. Maybe mid-July. I -- I don't even know.

Q. And you guys dropped it back off at the Goldsboro location?

A. No. It was the Fayetteville office. They had a Fayetteville office, A Small Miracle, and we took it there.

Q. Okay. And so was it -- was it your understanding that the chamber belonged to you as soon as you started the lease?

MR. SWETT: Object -- strike that.

A. My understanding was that that chamber would be mine when it was paid for in -- com -- completely paid for.

Q. Okay. And you guys never completely paid for it, correct?

A. No, unh-unh.

Q. This says the chamber and concentrator will be delivered, set up and tested to ensure it is in good working order. Did the Pressons do that?

A. They did.

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 37 of 65

Q. On February 5th, 2011?

A. Yes.

Q. When they set it up, where did they set it up in your house?

A. In Kelsey's room.

Q. Okay. And -- because it was the -- the other chamber, the one from Dr. Bradstreet was the one that started off on the landing and then ended up in Kelsey's room, correct?

A. I -- I -- honestly, I -- I -- to the best of my knowledge, yes, that is correct. It has been three or four years. I -- honestly, I cannot remember. But I know for a fact that the one that we bought from Janet and Rusty was always in Kelsey's room.

Q. Okay. And at that point, was Kelsey already in college?

A. Yes.

Q. So did -- and did you guys just keep her room the way it was when she was in high school when she left for college?

A. Yes.

Q. And so when she came back to the house for breaks or for summer or whatever, then she would just stay in the room?

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 38 of 65

A.    Yes.

Q.    When you acquired the chamber from the Pressons and A Small Miracle, did -- did you get a manual with it?

A.    Yes.

Q.    Okay.  Do you have that manual or did you have that manual at the time?

A.    I have it, and I've given it to my attorney.

Q.    Okay.  Gotcha.  Other -- and -- and do you recall; did you read the manual?

A.    I flipped through it.

Q.    Okay.  Did you ever read the manual from -- from front to back?

A.    No.

Q.    Okay.  And did you read the manual be -- before the transaction with the Pressons or after?

A.    Before.  I flipped through it before.

Q.    Okay.  That was that day that they delivered it?

A.    No.  I -- okay.  I'm sorry.  Ask --

Q.    Okay.  Let -- let me ask it differently.  The manual that -- that -- that -- when you acquired the chamber from the Pressons and --

A.    Okay.

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 39 of 65

Q.   -- A Small Miracle, did it come with a -- a manual?

A.   Yes.

Q.   Okay.  Now, when was the first time that you saw the manual?

A.   The day that they had brought it.

Q.   Okay.  So when the -- the chamber that you had that Dr. Bradstreet had sent to you, was that also accompanied with a -- with a manual?

A.   No.

Q.   Okay.  Was there any instructions at all that accompanied the manual -- that accompanied the chamber that Dr. Bradstreet sent?

A.   Not that I'm aware of.

Q.   Okay.  And so on the day when you purchased the -- or, I'm sorry, on the day that you had this transaction with the Pressons, that's the first time that you even saw the Oxy-Health manual?

A.   Yes.

Q.   Okay.

A.   I had seen information that they had given at the -- the workshops, the -- the -- the brochures with information inside of it.

Q.   Okay.

A.   I had seen that.

Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 40 of 65

benefit?

A.    Yes.

Q.    Okay.  And so, just so I'm clear, the -- that -- is it fair to say that you never reviewed any information that was on any website related to Oxy-Health?

MR. SWETT:  Object to form.

A.    I didn't review their website, but it was information given to me from them at a workshop.

Q.    Gotcha.

A.    So that would be the information that I got from them.

Q.    Okay.  And -- and --

A.    From Oxy-Health.  And it was Oxy-Health.

Q.    Okay.  And do you have -- and -- and you said you may have that information at home?

A.    Yes, sir.

Q.    Okay.  Has that already been provided to your lawyer?

A.    No.  I just found it a couple of days ago.

Q.    Okay.  And -- and what would -- how many pages is it?

A.    Thirty pages.  I -- I don't know.  I -- I can't recall.

Q.    And when -- when that was given to you,

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 41 of 65

Rusty carry in things and pumps and that kind of thing.

Q. Okay. When they came and delivered and set up the chamber, did you take any notes on any paper about how to do anything or -- or -- or the best way to handle it?

A. No, I didn't take any notes because I had done this so much -- I had done it for 10 months -- that I didn't feel that there was a need to take notes.

Q. You felt like you needed to know what you needed to know about the operation of the chamber at that point?

MR. SWETT: Object to form.

A. I -- I don't understand what you're asking me.

Q. Well, did you feel like you needed to be trained on how to use it?

A. No.

Q. And when -- when -- when Janet and Rusty were there, did they go over how to use it or did they just say, Here it is, let's test it once and then --

A. No, we --

Q. -- we'll leave?

Depositions, Inc.
info@NCDepo.com   www.NCDepo.com   (919) 557-4640
Case 5:13-cv-00649-FL   Document 45-10   Filed 12/01/14   Page 42 of 65

A. We were all looking at it making sure -- they did go over it with us. You know, and here's this and this is how this connects and, you know, but we were all in the room -- Rob, myself, Rusty and Janet. And we were -- it wasn't just throw it together and good luck. It was, Here's how you do it. And it was just a refresher for us.

Q. Gotcha.

A. And so --

Q. Because the only thing new at that point was the O2 concentrator?

A. Exactly.

Q. Okay. And my recollection of going to see the O2 concentrator was it looks kind of like a dehumidifier?

A. Yeah.

Q. With a tube that comes out of the front and essentially goes through the wall of -- of the chamber at the head and, you know, it's got a long hose on it that goes through the wall and then through that -- through that cannula. Is that the way it was when -- when it arrived at your house?

A. Yes.

Q. Did it stay that way until --

A. Yes.

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 43 of 65

Q. Okay. Now, once the -- who -- who connected the concentrator to the hyperbaric chamber when it was originally set up?

A. Rusty, I believe.

Q. Okay. And did -- did it ever -- did you ever disconnect the hype -- the O2 concentrator from the hyperbaric chamber?

A. Never.

Q. Okay. And then who connected the pumps to the Y-tubing into the hyperbaric chamber?

A. I believe it was Rusty and Rob --

Q. Okay.

A. -- my husband.

Q. And then once it was connected on the day that you took delivery, did you ever -- was it ever -- did you ever disconnect it at any time?

A. No.

Q. Okay. So, to your knowledge, from -- from June -- I'm sorry, from February 5th, 2011 until Jarred's death, it was essentially hooked up the entire time and shown as you've depicted it in Exhibit 5?

A. I never disconnected anything, no. And to my -- the -- and to the best of my knowledge, no one else did either.

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 44 of 65

Q. They were at the foot of the chamber?

A. Yeah. And you could hear them --

Q. Okay.

A. -- kind of blowing out the air.

Q. From the time that you started using the chamber that the Pressons delivered to you until the time of Jarred's death, did you ever have any trouble operating the unit?

A. No.

Q. Okay. Did you ever have any -- any malfunctions of any pieces or parts or -- or anything related to the hyperbaric chamber?

A. No.

Q. Any -- are you aware of any other -- any problems that other family members may or may not have had?

A. No, I'm not aware of any.

Q. Okay. The -- I -- and I understand that -- that the -- the -- the -- the connector of -- for the -- for the pump tubing at the head of the unit -- had -- did you ever try to unplug or plug that in or did you just leave it the way it was?

A. I left it the way it was.

Q. Okay. Were you familiar about how that was connected and disconnected?

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 45 of 65

Q.   Okay.

A.   I think they were separate.  I -- honestly, I just -- we just handed them over.

Q.   Okay.  Other than the manual for the concentrator and for the chamber, were you aware of any other documents that you received from the Pressons or A Small Miracle in connection with the transaction?

A.   No, sir.

Q.   When the Pressons set up the concentrator and the chamber, they showed you how to use them all together, correct, with --

A.   Yes.

Q.   -- with the pumps and the chamber?

A.   Um-hmm.

Q.   Each time that you treated Jarred inside the chamber, did you always use both pumps on at the same time and the concentrator on at the same time?

A.   Yes.

Q.   Okay.  Do you ever recall doing it differently at any time?

A.   We always would turn the -- we'd always turn the pumps on and we'd always use the concentrator.

Q.   Okay.  And -- and --

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL   Document 45-10   Filed 12/01/14   Page 46 of 65

A.   Always.

Q.   And your members -- other members of your family, are you aware of them ever doing it differently?

A.   They always used the concentrator.  They always used the pumps as well.

Q.   Okay.  And when -- after the chamber was delivered, did you start treating Jarred for small amounts of time and then build up to longer amounts of time or did you just start with the longer amounts of time and keep it -- keep it the same?

A.   I can't remember the exact time, but we did about an hour-and-a-half and then we would build up to two or three hours, what he could tolerate.  But we -- we always -- you know, we always tried never to go more than what we were supposed to.

Q.   When you say you were supposed to?

A.   So, in other words, we never let him sleep it -- overnight in it or anything --

Q.   Okay.

A.   -- like that.

Q.   Gotcha.  And was there -- I've gotten some of the reports from the EMTs and from the fire department, and there's some notification in there about some kind of a dead bolt on a door.  Are you

Depositions, Inc.
info@NCDepo.com   www.NCDepo.com   (919) 557-4640
Case 5:13-cv-00649-FL   Document 45-10   Filed 12/01/14   Page 47 of 65

aware of anything about -- do any of your interior doors have dead bolts?

A.    We had -- we had a -- a -- a -- a dead bolt on Jarred's room because of safety reasons.  He was getting outside at night, and we were afraid, you know, that he would get outside of our house and go to a neighbor's house or -- and it was for safety reasons only.

Q.    Okay.  And so when did you use the dead bolt on his door?

A.    We used it every night.

Q.    Okay.  So when he went to sleep --

A.    Yes.

Q.    -- you would dead bolt him in?

A.    We always had it.  Because if not, he would go downstairs and he would go through our garbage cans.  We had to have locks on our garbage cans because he would go through the garbage.  And we were afraid for his health and for his safety.

Q.    Um-hmm.  And these are the garbage cans that were outside the house --

A.    Yes.

Q.    -- or they were inside the house?

A.    They were outside the house.

Q.    Okay.  So these would be the big garbage

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 48 of 65

And I remember I just turned around and I looked at him and I was watching his feet go. And I -- and I just thought it was going to be like any other day.

And so we got him home from school, and his therapist wasn't there that day because he had to go to prom. And so we didn't have therapy. And so -- and I -- I stood in front of our -- our cabinet, and I was tired. And I had to do report cards. And I was going to not have him do hyperbaric because I was so tired. And I just thought not today; I'm tired. And then I thought no, we pay all this money, and it helps him.

So he went to sleep, and he would always strip down to his underwear. Dylan was upstairs, and I was on the couch, and I was doing my report cards. And I told Dylan, Go ahead and put him in the hyperbaric. So he woke him up. He was asleep. And he put him in the chamber.

Q. **And, Ms. Sparks, just -- we can -- we can take a break. Just take your time.**

A. And so we -- Dylan put him in the chamber, and I was downstairs, and he was upstairs for a while, and he closed the door. And I was working on my report cards, and I fell asleep. When I woke up, I thought, Oh, my goodness, he's probably had a

Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 49 of 65

bathroom accident. I've got to go get him out. So I ran up the steps, and the door was closed. And I opened up the door and the light was off. Dylan would turn the light off so that Jarred could sleep, and the light wouldn't wake him up.

When I went in there, the chamber wasn't pressurized. So I ran over there and I unzipped him. My son was dead. And I went into shock. And I ran over to see if the pumps were on. And they were both on. I turned it off and turned it on. And I was screaming his name. He was dead.

And I ran downstairs to get help, get my son to help me. And we called 911. And Dylan was on his cell phone. They were telling him what to do, and he was pushing me out the door. He didn't want me to see him. And he told me to go downstairs and wait for the ambulance, so I did. And he tried to revive Jarred, and he couldn't save his brother. We lost our life. We lost our life.

MR. CHIGNELL: Let's -- let's take a quick couple minute break.

MR. SWETT: Yeah.

MR. CHIGNELL: And then we'll get back on the record. Off the record.

(A break was had.)

Depositions, Inc.
info@NCDepo.com   www.NCDepo.com   (919) 557-4640
Case 5:13-cv-00649-FL   Document 45-10   Filed 12/01/14   Page 50 of 65

Q. Okay. And what were the arrangements?

A. That -- that Dylan would be there, and that, you know, somebody would be there to make sure that, you know, everything was okay. And I can't even recall if I got home early that day, but I know that Jarred was not unsupervised; he had somebody there with him.

Q. Okay. And was -- was Dylan -- at that time, Dylan was --

A. Sixteen.

Q. -- sixteen? Okay. Was he able to supervise Jarred?

A. Oh, yes.

Q. Okay.

A. Absolutely.

Q. And so -- so Dylan would have been home when Jarred got off the bus?

A. Yes.

Q. And then you would have gotten home some -- some number of minutes or hours later?

A. Yes.

Q. Okay. And then that -- that night was just a regular -- a regular night. You were doing?

A. I was doing report cards. I was doing my records cards on the couch.

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 51 of 65

A.   His 11th grade.

Q.   Okay.  So Dylan slept for those two hours, from 8:30 to 10:30, and then Dylan --

A.   No, he was up.

Q.   I'm sorry.  I'm sorry.  I'm sorry.  Ja --

A.   Jarred.

Q.   I'm -- I'm -- I'm getting -- I'm going to get the names confused.  Jarred was sleeping from 8:30 to 10:30?

A.   Yes.

Q.   And then Dylan woke him up?

A.   (Nods head up and down).

Q.   And then he was the one that put him in the chamber?

A.   He went to --

Q.   On that -- on --

A.   -- the bathroom.

Q.   Okay.

A.   Took him to the bathroom.  I told him to put him in the chamber.

Q.   Okay.

A.   I told him.

Q.   And so at that time, you were downstairs just doing --

A.   Report cards.

Depositions, Inc.
info@NCDepo.com     www.NCDepo.com     (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 52 of 65

Q. And then into the chamber?

A. Yes.

Q. And then Dylan is the one that would be zipping him up, correct?

A. Yes.

Q. So Jarred -- at that point, Jarred would just be essentially trying to go back to sleep again?

A. Yeah. He was just going right back to sleep.

Q. Okay. And then Dylan would have zipped up the one zipper, put the other -- put the other sort of rubber closure on it, and then zipped up the outer zipper?

A. Yes.

Q. Do you know when Dylan put -- turned the pumps on?

A. I don't know the exact time.

Q. Okay. But do you know when -- whether Dylan put the pumps on like you did, sometimes before the chamber was zipped up, or did he wait until after the chamber was zipped?

A. I don't know.

Q. Okay. Okay. And so do you know whether or not Dylan waited until the chamber was pressurized before leaving the room?

Depositions, Inc.
info@NCDepo.com        www.NCDepo.com        (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 53 of 65

A.   No, he didn't wait.

Q.   Okay.  So he would have just --

A.   He told me.

Q.   -- put him in there, turned the pumps on, and then left?

A.   Yes.  Closed the door.

Q.   And like shut the door all the way?

A.   Yes.

Q.   And then turned the light off?

A.   He turned the light off as he closed the door.

Q.   Okay.  And at that point, what did Dy -- what did Dylan do?  Did he come back down the stairs and go back to his room?

A.   No.  He stayed upstairs for a while.

Q.   Okay.  And Dylan's room -- you said it was in the bonus room above the garage?

A.   Yes.

Q.   Was there a separate staircase for that room?

A.   He was -- he happened to be on the computer upstairs.  And the computer is in the landing beside the room where Jarred was in the hyperbaric.  He wasn't going to his room.  He was up there and he was on the computer doing something.

Depositions, Inc.
info@NCDepo.com      www.NCDepo.com      (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 54 of 65

Q. And then also the O2 concentrator?

A. Yes.

Q. Okay. And then, you know, some number -- I think you said about an hour later, hour-and-a-half later or so, that's when Dylan came down the stairs to tell you that he was going to bed?

A. Yes.

Q. Okay. Did anything -- at that point, could you hear the pumps pumping the air?

A. Yes.

Q. Okay. So if the pumps are on even if the door is closed, you're going to hear it?

A. I -- I could hear the pumps.

Q. Okay. And then did -- to your knowledge, did anybody check on Jarred inside the chamber from the time that Dylan put him in until Dylan went to bed?

A. No.

Q. Okay. Did you ever -- did you -- at any point, did you go up and check on him before you fell asleep?

A. No, because Dylan was up there with him. And that's why I didn't go up there and check. Jar -- Dylan was up there with Jarred and he was awake. And I had not gone to sleep yet.

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 55 of 65

Q.    When you said he was awake, you're talking about Dylan?

A.    Yes.

Q.    Okay.

A.    Dylan was awake.

Q.    Gotcha.  And have you spoken with Dylan to see -- to -- to figure out whether or not Dylan ever went into the room where -- where Jarred was between the time that he started the chamber and the time that he came downstairs to tell you he was going to bed?

A.    No, he didn't.

Q.    Okay.  He didn't go in and check or you don't know?

A.    I don't know for certain, but as I recall, I don't think he did.

Q.    Okay.  And was that -- was that abnormal, him -- nobody going in to check on -- on Jarred?

A.    The door was closed that night, and I always said to leave the door open.  And I -- I told, you know -- I mean, Dylan was a 16-year-old, you know.

Q.    Yeah.

A.    Typical high schooler.  But he had done this hundreds of times.  I mean, he had done this.

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 56 of 65

And we had just done it Tuesday night. Nothing changed. We did -- he did everything exactly like he had done it before. And Jarred was always safe. You know, and then I would go up. This one particular night, I was doing my report cards, and Dylan just happened to be up there. I would go in and check on Jarred periodically, but this particular night, I was trying to get my report cards done.

Q. **Would you typically on a regular night go up and check on him?**

A. Yeah. If I -- if I -- you know, I'd go up there and make sure everything was okay. I'd go in there and peek and make sure he was asleep, turn the like back off, leave the light -- leave the door open and walk down the steps and do whatever I needed to do. Because I didn't want to go to sleep with him in that chamber.

Q. **Right. I mean, you were going to stay up until he finished his therapy, you'd get him back out, get him back in bed, and then you would go to bed?**

A. Exactly.

Q. **Okay. But on this occasion, it was -- it was Dylan that was watching the baseball game on the computer?**

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 57 of 65

A. It wasn't a baseball game.

Q. **I'm sorry.**

A. It was -- it was the -- it was a basketball game.

Q. **Basketball game.**

A. And I just didn't go upstairs.

Q. **Right. Okay. Did you have -- did you know Dylan to go in and check on his brother inside the chamber on other occasions after he started the -- the treatment?**

A. Yeah, there were times because I'd say, Go and check and make sure Jarred's okay. And -- I mean, and Dylan was very protective of Jarred anyways. He always took care of his brother.

Q. **Um-hmm.**

A. Even when we would go out in public or whatever, he would always -- you know, he would take him to the bathroom. He was the one that was with him. You know, we were a close family, and we took care of each other. We took care of Jarred.

Q. **Um-hmm. And on that -- on that evening, did you ever ask Dylan to go and check on Jarred?**

A. No.

Q. **Okay.**

A. After Dylan left, closely after it, I fell

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 58 of 65

asleep.

Q. Okay. And do you recall -- your best recollection was that Dylan got Jarred inside the chamber at about 10:30?

A. Yes.

Q. Okay. And then Dylan would have gone to sleep about what time?

A. It was about midnight.

Q. Okay. Did Dylan -- do you know if Dylan checked on Jarred before he came down the stairs to tell --

A. I don't --

Q. -- you good-night?

A. I don't -- I don't know.

Q. Okay. You said you typically preferred to have the door open. That was so that you could hear what was going on inside the room --

A. Yes.

Q. -- during the -- during the treatment?

A. Yes.

Q. And did -- did Dylan always close the door when he was -- when Jarred was getting his treatments when Dylan was the one setting it up?

A. Not always.

Q. Just when --

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 59 of 65

Q.   Um-hmm.   And did you see him pull Jarred out of the chamber --

A.   (Shakes head side to side).

Q.   -- or was that -- was that after you had been --

A.   No.

Q.   -- escorted from the room?

A.   It was after.

Q.   Okay.

A.   Because when I came back, Jarred was on the floor.

Q.   In Kelsey's room?

A.   In Kelsey's room.

Q.   Okay.   And Dylan was still trying to revive him with CPR or --

A.   He was pumping --

Q.   -- something else?

A.   -- his chest.

Q.   Okay.   And how long was it that -- how long was it before the -- the folks arrived, the -- you know, the emergency responders?

A.   Maybe 10 minutes.

Q.   Okay.   Now, from the time that -- that you woke up -- now, do you -- first of all, do you recall what time it was when you woke up?

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 60 of 65

A.    About three.

Q.    Okay.  And how do you -- how do you know it was three?

A.    I just -- I looked at a clock.  I don't -- I -- I just remember seeing three.

Q.    Okay.  So -- and at that point, that's when you went upstairs.  How long was it from that time until the time that you made that phone call?

A.    Probably five minutes because I ran up the steps, and as soon as I found him, I ran back down the steps.  I was -- I was in shock.  And I was screaming, Help me, Dylan, help me.  And he ran -- he came -- he woke up out of a dead sleep and jumped down the steps, and we called 911.  And I -- and I said, It's -- I said, It's Jarred.  He's in the chamber.  I think he's dead.  And I called quickly.  I didn't want anybody to think I had anything to hide.

Q.    Um-hmm.  And so when -- when you looked at the clock after you woke up, you saw it said three -- three o'clock on the nose?

A.    It was like three o'clock.  For some reason, I don't know where I get it, but I remember three o'clock.

Q.    Okay.  And you that -- was that on a watch

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 61 of 65

A.    Just a couple of hours.

Q.    So if he had -- if he had gotten in about 10:30, what time would you have anticipated getting him out?

A.    Like 12:30, something like that.

Q.    Okay.  Would that have been a typical time -- I know that you guys did -- did this on a regular basis.  Was that a typical time frame of getting him out, a little bit -- you know, around midnight, a little bit after midnight?

A.    Well, 11 o'clock is generally, but I -- we had so much going on, and I was so -- I was tired.  I was just trying to get my report cards done, and I had fallen asleep.

Q.    Okay.  When you went in the room to -- after you woke up to go find Jarred, was there any -- did you hear any air coming out of the bottom of the -- of the chamber through those pressure relief valves?

A.    No.

Q.    Did you look at the PSI -- well, first of all, is there a PSI guide -- a PSI gauge on the top of the chamber that you can see when you're using it to indicate how many pounds per square inch are -- are inside the chamber?

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 62 of 65

A.    There is -- there is a -- there is a gauge, but, no, I did not look at that.

Q.    Okay.  Do you remember typically what it would read during the therapy visits -- or therapy treatments?

A.    I don't recall what it would read now.

Q.    After Dylan removed Jarred from the chamber, did you ever go back and inspect the chamber to try to figure out what happened?

A.    No.

Q.    Okay.  How long did the chamber remain in the room, in Kelsey's room, after the -- after Jarred's death?

A.    It was at least until 9:30, 10 o'clock.

Q.    A.M. the next day?

A.    A.M.  So it was like seven or eight hours.

Q.    Okay.  And after -- at -- at that point, what happened to the chamber?

A.    After the investigators left, some friends of ours went upstairs and just removed everything out of the room.

Q.    So they took the -- the chamber out --

A.    (Nods head up and down).

Q.    -- the pumps out, the O2 concentrator out?

A.    Before that happened, I came back into the

Depositions, Inc.
info@NCDepo.com          www.NCDepo.com          (919) 557-4640
Case 5:13-cv-00649-FL     Document 45-10     Filed 12/01/14     Page 63 of 65

room after they had taken Jarred's body and they showed me the -- the -- they showed me the hyperbaric, and it was inflated. And they said that this -- a valve had come loose or it was a -- a hose or something had come loose. And they -- and they told me -- you know, because when I saw it, I was -- I didn't know what had happened. And they showed me the -- the chamber inflated or -- or pressurized.

Q. In other words, they -- they reconnected the hoses and showed you that the chamber was working?

A. Yes.

Q. Was -- was in an operable condition?

A. Yes.

Q. Okay. Did they ever talk to you about -- about the -- about the hoses being disconnected --

A. Yes.

Q. -- at any time?

A. They did tell me.

Q. What did they tell you?

A. After Jarred's body was taken, I was in the room, and they told me that one of the hoses was not connected.

Q. Okay. And -- and do you know how that hose came to be disconnected?

Depositions, Inc.
info@NCDepo.com    www.NCDepo.com    (919) 557-4640
Case 5:13-cv-00649-FL    Document 45-10    Filed 12/01/14    Page 64 of 65

the chamber?

A.   Usually, he would turn the lights out, and sometimes he would close the door; sometimes he wouldn't.  I would fuss at him for closing the door.  I would say, Don't close the door, because I wanted to be able to hear.  But he would -- you know, I would check on him.  And that particular night, I believe I was the one that would go up -- I went upstairs and checked.  It's been almost three years.  I can't remember --

Q.   Okay.

A.   -- for -- for exactly.

Q.   Do you remember how often you checked on him that Tuesday night?

A.   No, I don't.  I can't recall.

Q.   But you recall that you did check on him?

A.   I'm almost positive I did.

Q.   Okay.  In -- in -- in typical treatments when you were treating -- when Jarred was treating inside the chamber, how often in an hour- or two-hour or two-and-half hour session would you check on him?

A.   Two or three times.

Q.   Okay.  So once every 45 minutes --

A.   Yeah.

Q.   -- or so?

info@NCDepo.com    www.NCDepo.com    (919) 557-4640