IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| **Amy Sparks, individually, and Robert D. Sparks, as Personal Representative of the Estate of Jarred B. Sparks,** | **)** | Civil Action No.: <u>5:13-CV-00649-FL</u> |
| | **)** | |
| | **)** | |
| | **)** | |
| **Plaintiffs,** | **)** | **<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>** |
| | **)** | |
| **vs.** | **)** | |
| | **)** | |
| | **)** | |
| **Oxy-Health, LLC and Oxy-Health Corporation,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |
| | **)** | |

Plaintiffs Amy Sparks, individually, and Robert D. Sparks, as Personal Representative of the Estate of Jarred B. Sparks (collectively "Sparks"), file this Response in Opposition to Defendants OxyHealth, LLC and OxyHealth Corporation's (collectively "Defendants" or "OxyHealth") Motion for Summary Judgment. As discussed herein, there exist genuine issues of material fact requiring a trial with respect to each of Plaintiffs' causes of action.[1] As such, Defendants' Motion for Summary Judgment must be denied.

This case involves the wrongful death of Jarred Sparks in an OxyHealth Vitaeris 320 hyperbaric chamber ("OxyHealth Vitaeris 320") after the quick disconnect valve providing the only source of fresh air into the chamber disengaged. On September 12, 2013, the Sparks family filed a Complaint in this Honorable Court alleging causes of action for: Inadequate Design, Inadequate Warning, Negligence and Negligent Failure to Warn, Breach of Implied Warranty of Merchantability, Breach of Express Warranty, Unfair and Deceptive Trade Practices, and Negligent Infliction of Emotional Distress. On December 1, 2014, Defendants filed the instant Motion for Summary Judgment [Dkt. No. 40].

---

[1] Plaintiffs consent to dismissal of their Breach of Express Warranty and Breach of Implied Warranty claims and therefore do not respond to Defendants' Motion for Summary Judgment on those causes of action herein.

## STATEMENT OF FACTS

1. <u>OxyHealth's Role: Designer, Manufacturer, Distributor, and Marketer</u>

On June 21, 1999, OxyHealth entered into an "Exclusive Marketing, Sales and Distribution Agreement" (hereinafter "the Agreement") with Hyperbaric Technologies, Inc. (HTI). *See* Agreement, Dkt. No.48, p.1. OxyHealth and HTI worked with each other pursuant to the terms of the Agreement from 1999 to 2009. Patel Declaration, Dkt. No. 41, ¶8. Pursuant to the Agreement, HTI fabricated the chamber bladder of the OxyHealth line of portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320, pursuant to OxyHealth's design specifications. *See* Agreement, Dkt. No.48, ¶3.3; *see also* Peter Lewis Dep., pp.168-170[2]; *cf.* FDA Establishment Inspection Report of HTI, p.3 (Attached as Exhibit B) (discussing "a new revision of the mild portable hyperbaric chamber which [Peter Lewis] and OxyHealth's proprietor created."). OxyHealth was the party that initiated changes to the design of the OxyHealth portable mild hyperbaric chambers. *See* Peter Lewis Dep., pp.55-56. In fact, OxyHealth specifically requested the design change that resulted in the quick disconnect valve being incorporated into all of the OxyHealth portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320. *See* HTI Change Notice No. 34 (Mar. 6, 2002) (Attached as Exhibit C); *see also* Peter Lewis Dep., pp.54, 56-59. Not only did OxyHealth initiate the design specifications for the OxyHealth Vitaeris 320, but it had final approval authority. *See* Agreement, Dkt. No.48, ¶3.3; Peter Lewis Memo to HTI employees (June 23, 2006) (Attached as Exhibit D); *cf.* HTI Design Input Proposal (July 18, 2006) (Attached as Exhibit E) (showing OxyHealth's President Samir Patel as a member of the "Design Review Team" for redesign of the mild hyperbaric chambers). HTI even had to get written consent from OxyHealth to make repairs to the OxyHealth line of portable mild hyperbaric chambers. *See* Email from HTI to OxyHealth (June 2, 2008) (Attached as Exhibit F).

Additionally, OxyHealth was responsible for recommending and acquiring the compressors and mattresses to be incorporated into and distributed with the OxyHealth Vitaeris 320. *See* OxyHealth Dep.,

---

[2] Deposition Excerpts of Peter Lewis are Attached as Exhibit A.

p.67[3]; Peter Lewis Dep., pp.34-35, 168-69. As such, OxyHealth worked with a compressor manufacturer to develop a compressor for use with the OxyHealth line of portable mild hyperbaric chambers. *See* Email from Samir Patel to Peter Lewis (Sept. 29, 2006) (Attached as Exhibit H); *see also* Email from OxyHealth employee to Peter Lewis (January 31, 2011) (Attached as Exhibit I). The compressor is an essential component part of the OxyHealth Vitaeris 320, as the hyperbaric chamber will not operate without the compressor. *See* Peter Lewis Memo to File (Sept. 21, 2005) (Attached as Exhibit J); *see also* Peter Lewis Dep., pp.41-43.

Once OxyHealth receives the chamber bladders and other component parts from the various fabricators, OxyHealth then assembles the OxyHealth Vitaeris 320, tests it to make sure it runs, repacks it all in its own labeled box, and ships it to the consumer. *See* Samir Patel Dep., pp.13-14[4]. The OxyHealth Vitaeris 320 is shipped to consumers from OxyHealth in a box with the name OxyHealth on it and comes with an Operating and Reference Manual, which also bears the name OxyHealth. *Id.* at 23-24; Janet Presson Dep., p.160[5]. According to the Operating and Reference Manual that accompanies all OxyHealth portable mild hyperbaric chambers, "All Portable Mild Hyperbaric Chambers come with a one-year **manufacturer's warranty** (parts and labor) from the date of purchase, **by OxyHealth Corporation**, for any manufacturer defects." Operating and Reference Manual, Dkt. No.36-2, p.35 (emphasis added). Similarly, when an OxyHealth portable mild hyperbaric chamber needs repair, users have to send the hyperbaric chamber back to OxyHealth. *See* Dr. Jeff Bradstreet Dep., pp.28, 114-15[6]. OxyHealth then either makes the repair or sends the consumer a new hyperbaric chamber. *Id.*; Janet Presson Dep., pp.55, 163-64; Jack Presson Dep., p.127[7]. Statements on pages and in videos from www.OxyHealth.com represent that OxyHealth selects materials, builds, manufactures, tests, and inspects its chambers, including the OxyHealth Vitaeris 320:

---

[3] Deposition Excerpts of OxyHealth 30(b)(6) are Attached as Exhibit G.
[4] Deposition Excerpts of Samir Patel are Attached as Exhibit K.
[5] Deposition Excerpts of Janet Presson are Attached as Exhibit L.
[6] Deposition Excerpts of Dr. Jeff Bradstreet are Attached as Exhibit M.
[7] Deposition Excerpts of Jack Presson are Attached as Exhibit N.

<u>A Tradition of Safety Video</u>
- "We put a lot of work into the materials; we went to thicker materials; the zipper system was completely revamped."
- "When selecting materials, we are not just looking for strength, we are looking for the type of material it is."
- "We have inspectors that will check the valve process, how was the valve installed or how well was it installed. Did it meet specifications. . . Anything we build in the chamber is checked and double checked and all the parts are tested to destruction as well. Every tenth zipper we install, we'll basically take that section of zipper and see if it holds up to the weights and pulls that the specifications require."
- "There are safety precautions that we take when we build our chambers that the other brands don't really take into consideration."
- "We've made more units than the entire hyperbaric industry combined and we've had zero, zero, zero failures. Perfect is all we will stand for, nothing less."
- Whereas there are multiple references to the importance of safety the Vitaeris 320 does not comply with the two most widely recognized hyperbaric safety standards: ASME PVHO-1 and NFPA 99, Health Care Facilities.
- OxyHealth stated in the Defendants' Responses to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production Documents that "Defendants object to this interrogatory on the grounds that it refers to the connection of an oxygen concentrator to hyperbaric chambers because Defendants do not advertise, market or sell hyperbaric chambers with oxygen concentrators consistent with FDA requirements." I find it interesting that in this video clip at the 8 minute, 2 second mark, there is an oxygen concentrator clearly visible in the background.

<u>McCue Video</u>
OxyHealth salesman Tom Melone talks about the "different models of equipment that we manufacturer" to include the Vitaeris 320.

Expert Report of Tom Workman, p.8 (June 27, 2014) (Attached as Exhibit O).[8]

Under the terms of the Agreement with HTI, OxyHealth is also exclusively responsible for using "its best efforts to actively promote the marketing, sale, and distribution, maintenance and service" of the OxyHealth line of portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320. *See* Agreement, Dkt. No.48, ¶2.1. Peter Lewis understood this to mean that OxyHealth would advertise, create brochures, sponsor and attend conferences, and maintain a website. Peter Lewis Dep., pp.26-28. It is undisputed that all of these activities constitute forms of marketing. *See* OxyHealth Dep., pp.122-25.

---

[8] The following OxyHealth videos are being sent to the Court on CD: "A Tradition of Safety"; "McCue": and "Portable Hyperbaric Chamber."

2. <u>FDA Marketing Clearance for the Treatment of Acute Mountain Sickness</u>

On August 2, 2000, the FDA cleared the OxyHealth line of portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320, to market "for the treatment of Acute Mountain Sickness." FDA 510(k), K001409 (Aug. 2, 2000), Dkt. No.36-4, p.1 (cleared to market for intended use: "to provide mild hyperbaria for the treatment of Acute Mountain Sickness"). AMS is a condition that results from exposure to altitudes in excess of 8,000 feet. It affects approximately 20% of people who are unable to properly acclimate to the increased altitude (reduced pressure); AMS is relatively rare. Declaration of Tom Workman, dated 12/26/2014, ¶28 (hereinafter Workman Declaration) (Attached as Exhibit P). As such, the OxyHealth line of portable mild hyperbaric chambers can only be marketed by OxyHealth for the treatment of acute mountain sickness. It is undisputed that the OxyHealth Vitaeris 320 was not approved by the FDA for the treatment of autism and cannot be marketed for the treatment of the symptoms of autism. Samir Patel Dep., p.53; Peter Lewis Dep., p.137.

3. <u>OxyHealth's Marketing Activities and the Sparks Family</u>

Despite the fact that the OxyHealth Vitaeris 320 and the other OxyHealth portable mild hyperbaric chambers were only cleared by the FDA for marketing for the treatment of acute mountain sickness, OxyHealth began making claims about "anything and everything" they found on the internet, including that "hyperbaric will help you lose weight." OxyHealth Dep., pp.139-40. The FDA had to get involved before OxyHealth stopped making these claims. *See* FDA Letter to Peter Lewis (June 14, 2001) (Attached as Exhibit S). From 2005 to 2010, OxyHealth attended approximately 80 conferences primarily focused on the treatment of autism. OxyHealth Dep., pp.24-39; *see* List of Autism Conferences Attended by OxyHealth (Attached as Exhibit T). Parents of children with autism spectrum disorders attended many of these conferences. OxyHealth Dep., p.39. At these conferences, OxyHealth purchased a booth, set up an OxyHealth portable mild hyperbaric chamber, and distributed brochures for their hyperbaric chambers, including the OxyHealth Vitaeris 320. *Id.* at 16-17. At her deposition in connection with this case, when Janet Presson was asked, based on her experience at autism conferences at which OxyHealth representatives were present, "is OxyHealth promoting or marketing their chambers for the

treatment of autism," Janet answered "They are marketing the use with individuals with autism." Janet Presson Dep., p.178.

4. Portable Mild Hyperbaric Chamber Operating and Reference Manual

OxyHealth markets its OxyHealth portable mild hyperbaric chambers for home use and represents that the OxyHealth Vitaeris 320 is safe to be used in the home setting. OxyHealth Dep., p.176. According to OxyHealth, no training is necessary to use the OxyHealth Vitaeris 320. *Id.* at 178. In fact, the Portable Mild Hyperbaric Chamber Operating and Reference Manual provides as follows:

- The revolutionary design of the Mild Hyperbaric chambers offers a safe and effective means of providing mild hyperbaria. Its unique design allows the mild hyperbaric chamber to easily fit in the office, the clinic, and even a home. (P.2)

- The manual shows a woman in an OxyHealth portable mild hyperbaric chamber in a cluttered room without an attendant present. (P.3)

- Air Pressurization/depressurization valve—accessible internally. (P.6)

- Fresh air is constantly pumped into the chamber while 'old' air is exhausted via these relief valves (air exchange valves) to eliminate $CO_2$ buildup. (P.7)

- Each zipper has a double-sided head that allows the user to zip or unzip the chamber even from the inside. With the proper training, a user can easily give 'self-treatments'- a feature that no other hyperbaric chamber can offer. (P.8)

- The Pressurization/Depressurization valve is located near the large view window for easy access by the occupant. . . . By simply turning the knob clockwise, this valve can be used by the occupant inside the chamber to depressurize and deflate the chamber for ease in exiting. (P.8)

- **Note: No specialized training is required** to operate the portable mild hyperbaric chamber. However, please follow the "Initial Chamber Setup" procedure before administering treatment. **There are no known usage hazards associated with these portable mild hyperbaric chambers.** (P.11)

Similarly, the Portable Hyperbaric Chamber video appearing on www.oxyhealth.com states "No special training is required to operate the portable mild hyperbaric chamber. Once familiar with the unit, a user can easily give self treatments, a feature no other hyperbaric chamber can offer. A unique two zipper seal makes self treatments easy, as the user can do it all without any assistance."

6

5. Jarred's Autism and Treatment

Between the ages of two and three, Jarred Sparks was diagnosed with autism. Amy Sparks Dep., p.35[9]. Over the course of his life, there was a "waxing and waning" of Jarred's abilities, but near the end of his life Jarred was "self-sufficient." Dr. Jerry Kartzinel Dep., pp.86-87[10]. He bathed himself, dressed himself, and could eat without assistance. Dylan Sparks Dep., pp.21-24[11]. He also performed normal chores around the house just like his brother Dylan did, including washing dishes, vacuuming floors, and taking out the garbage. *Id.* at 171. Jarred could express his "needs, wants, and desires." Jack Presson Dep., p.138. Moreover, he did not require constant supervision. Rob Sparks Dep., p.125[12]. Jarred could be left alone unsupervised; in fact, Rob Sparks would leave Jarred alone in the house for hours while he would cut the grass. *Id.* at 93-94. Jarred enjoyed riding bikes and swimming, and Rob took him hunting and fishing. *Id.* at 68-71; Dylan Sparks Dep., pp.21-24. Shortly before his death, Jarred won first place in the Special Olympics 50m swim. *See* Dr. Kartzinel Records, JK0001. The biggest challenge that Jarred's autism posed was his diet; because Jarred was gluten and casein free, they prepared all of his meals at home. Rob Sparks Dep., pp.79-80.

On November 14, 2005, Dr. Bradstreet wrote a prescription for Jarred to have hyperbaric treatments, and the Sparks family began traveling to his clinic in Florida, Creations Own, arranging family vacations around Jarred's treatments. *See* Dr. Jeff Bradstreet Dep., p.76; Bradstreet Prescription for HBOT (Nov. 14, 2005), Dkt. No.45-21. From November 2006 to late 2007, Creations Own donated a hyperbaric chamber for home use to the Sparks family. *See* Bradstreet Encounter (Nov. 20, 2006) (Attached as Exhibit Y); Amy Sparks Dep., p.79. Jarred Sparks' last visit at Creations Own in Florida was on July 1. 2008. Jeff Bradstreet Dep., p.69. Subsequently, Janet Presson, owner of A Small Miracle, Inc., offered to sell an OxyHealth Vitaeris 320 hyperbaric chamber to the Sparks family. On February 5, 2011,

---

[9] Deposition Excerpts of Amy Sparks are Attached as Exhibit U.
[10] Deposition Excerpts of Dr. Jerry Kartzinel are Attached as Exhibit V.
[11] Deposition Excerpts of Dylan Sparks are Attached as Exhibit W.
[12] Deposition Excerpts of Rob Sparks are Attached as Exhibit X.

7

the Sparks family entered into an "Agreement to Purchase" an OxyHealth Vitaeris 320 hyperbaric chamber from A Small Miracle, Inc. *See* Agreement to Purchase (Feb. 5, 2011), Dkt. No.45-16.

The Sparks family used the OxyHealth Vitaeris 320 to treat Jarred's autism in their home.  It was set up in an upstairs bedroom by Jack Presson. *See* Jack Presson Dep., pp.65-67.  There was enough room between the OxyHealth Vitaeris 320 and the bedroom door to shut the door without hitting the hyperbaric chamber, and Dylan never recalls having problems closing the bedroom door because of the positioning of the hyperbaric chamber. Dylan Sparks Dep., p.86.  Sometimes the Sparks family would shut the door to the bedroom while Jarred was in the hyperbaric chamber; they usually cut the bedroom light off so that Jarred could sleep. *See, e.g.,* Rob Sparks Dep., pp.215-17.  Typically, Jarred would go to sleep around 8:30 p.m., someone would wake him up about 30 minutes later, and then he would get in the OxyHealth Vitaeris 320 so that he could sleep during the treatment period. Dylan Sparks Dep., pp.57-59; Amy Sparks Dep., pp.116-17.  Jarred could get in the chamber without someone else present. Janet Presson Dep., p.94.  Moreover, Jarred was able to communicate with other members of his family in their home while he was treating in the hyperbaric chamber. Dylan Sparks Dep., pp.84-85; Amy Sparks Dep., pp.122-23.  Jarred also knew how to unzip the chamber and get out if something was wrong, and it was a common occurrence for Jarred to get himself out of the chamber.  Dylan Sparks Dep., pp.180-81 (stating Jarred would know how to get out of the chamber in an emergency situation); Amy Sparks Dep., p.103 (stating Jarred could physically open the zipper from the inside); Rob Sparks Dep., pp.200-02 (Jarred knew how to get in and out of the chamber and he had done it before); Laura Lawyer Dep., p.88[13] ("he knew how to get himself out," and "that was a very common thing.").

6. <u>Incident</u>

On the evening of June 9, 2011, at approximately 10:30 p.m., Jarred's brother, Dylan, assisted Jarred into the OxyHealth Vitaeris 320 hyperbaric chamber. Dylan Sparks Dep., p.91; Amy Sparks Dep., p.209.  He turned the pumps on, helped Jarred get in, and zipped him up. Dylan Sparks Dep., p.91.  Dylan observed the chamber begin to inflate before he exited the room and went to the computer located just

---

[13] Deposition Excerpts of Laura Lawyer are Attached as Exhibit Z.

outside of the bedroom where Jarred was treating. *Id.* at 100, 104, 143-44. Dylan testified that he had no trouble closing the bedroom door.[14] *Id.* at 112-13. The undisputed evidence in this case is that Dylan heard the pressure relief valves on the OxyHealth Vitaeris 320 making a hissing sound, which indicated that it was properly regulating the pressure inside the chamber, after Jarred began his treatment on the night of the incident. *Id.* at 108-09. As Peter Lewis explained in his deposition, Jarred "indicated that he heard the hissing noise coming from the relief valves, which would indicate that [the chamber] was fully pressurized." Peter Lewis Dep., p.176.

During this time, Amy, who is a school teacher, was downstairs grading report cards. Amy Sparks Dep., pp.202-03. Around 11:30 p.m., Dylan let his mother know he was going to bed. *See id.* at 215. Subsequently, an exhausted Amy fell asleep on the couch. She awoke at 3:00 a.m. panicking, thinking Jarred needed to use the restroom. Amy Sparks Dep., pp.115, 202-03. When she entered the bedroom, the chamber was partially deflated and the pressure relief valves were not expelling air. *Id.* at 203. As she unzipped the chamber, she saw that Jarred was not breathing. Amy began screaming for Dylan, who raced downstairs and called 911, and Amy immediately went into shock. Dylan Sparks Dep., pp.91-93. The 911 operator advised Dylan to remove Jarred from the chamber and begin compressions. *Id.* EMS arrived first, followed by the Cumberland County Sherriff's Office, who began their investigation. The Sheriff's office determined that the quick disconnect valve that supplied the fresh air to the chamber had disconnected by coming into contact with an object on a bookcase located at the head of the OxyHealth Vitaeris 320.[15]

---

[14] Despite what the Defendants deem "undisputed fact" in their Motion for Summary Judgment, Plaintiffs' expert Ron Natoli did not opine that the quick disconnect became disengaged when Dylan pushed the chamber against an object on the bookshelf so that he could close the bedroom door (*See* Dkt. No.40, at 4); instead, Mr. Natoli testified that the Sheriff's Report mentioned that Dylan had to push the chamber against the bookshelf to close the door. *See* Ron Natoli Dep., pp.93-94 ("I believe that the Sherriff's report and his findings conclude that that's what occurred . . . I'm using the Sheriff's report and the information to say that the unit was pressurized to a point that the air valves were relieving, which means that air was going into the chamber and it was operating as it was designed or intended. Some how that valve was inadvertently disconnected. Based on the Sheriff's information, it's more likely than not that the container depressed the button. . .")

[15] Portions of the Cumberland County Sheriff's Office Report are attached (under seal) as Exhibit AA.

9

**LEGAL STANDARD**

Summary judgment is appropriate when there exists no genuine dispute as to any of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge." *Id.* at 255. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Id.*; *see United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

**ARGUMENT**

I:      GENUINE ISSUES OF MATERIAL FACT EXIST WITH RESPECT TO PLAINTIFFS' § 99B-6 INADEQUATE DESIGN CLAIM, WHICH REQUIRE A TRIAL AND PRECLUDE SUMMARY JUDGMENT.

According to Defendants, Plaintiffs' inadequate design claims "fail because: (1) OxyHealth did not manufacture the Chamber and did not have a duty related to the manufacture of the Chamber; (2) OxyHealth did not design the Chamber and did not have a duty related to the design of the Chamber; and (3) there is insufficient evidence of a defect that breached the manufacturer's standard of care." [Dkt. No. 40, at 9]. However, summary judgment is inappropriate with respect to Plaintiffs' § 99B-6 Inadequate Design Claim because OxyHealth (1) was a "manufacturer" of the OxyHealth Vitaeris 320, (2) designed the OxyHealth Vitaeris 320 and specified the use of the quick disconnect valve that unintentionally disengaged resulting in the death of Jarred Sparks, and (3) breached the standards of care owed to the

10

Plaintiffs. Essentially, the Plaintiffs have alleged two design defects: (1) the use of the quick disconnect valve to provide the only source of fresh air into the OxyHealth Vitaeris 320, and (2) the lack of an oxygen sensor/ carbon dioxide monitor with audible alarm. Importantly, Plaintiffs do not "contend that the Incident was caused by a *design defect in the quick disconnect valve* that supplied air to the hyperbaric chamber" as misstated by the Defendants; rather, the Incident was caused by the negligent design and *selection* of the quick disconnect valve incorporated into the OxyHealth Vitaeris 320 to provide the only source of fresh air. The specification of the quick disconnect valve for such an application and the incorporation of the valve into the OxyHealth Vitaeris 320 constitutes negligence and rendered the OxyHealth Vitaeris 320 defective.

1. **OxyHealth is a Manufacturer of the OxyHealth Vitaeris 320, is Responsible for the Design Change that Incorporated the Quick Disconnect Valve, and Owed the Plaintiffs a Duty Related to the Manufacture and Design of the Chamber**

Pursuant to N.C. Gen. Stat. § 99B-1:

"Manufacturer" means a person or entity who **designs, assembles**, fabricates, produces, constructs or **otherwise prepares a product or component part of a product prior to its sale to a user or consumer**, including a seller owned in whole or significant part by the manufacturer or a seller owning the manufacturer in whole or significant part.

*Id.* (emphasis added). Based on the evidence in this case, it is clear that OxyHealth designed, assembled, and otherwise prepared the OxyHealth Vitaeris 320 or a component part prior to its sale to consumers; and, therefore, is a "manufacturer" of the OxyHealth Vitaeris 320. At the very least, OxyHealth is the "apparent manufacturer" of the OxyHealth Vitaeris 320 and owed the Plaintiffs a duty related to the manufacture and design of the portable mild hyperbaric chamber.

a. *OxyHealth was responsible for the design of the OxyHealth Vitaeris 320.*

OxyHealth had complete control over the design of the OxyHealth Vitaeris 320 hyperbaric chamber. Pursuant to the "Exclusive Marketing, Sales and Distribution Agreement" that OxyHealth entered into with HTI, HTI fabricated the chamber bladder of the OxyHealth Vitaeris 320 pursuant to OxyHealth's design specifications. *See* Agreement, Dkt. No.48, ¶3.3. ("HTI shall not implement any material changes in the design, materials or color for Chambers without advance written notice to Oxy,

and written consent from Oxy (not to be unreasonably withheld)."); *cf.* Exhibit B, p.3 (discussing "a new revision of the mild portable hyperbaric chamber which [Peter Lewis] and OxyHealth's proprietor created."). Moreover, OxyHealth was the party that initiated changes to the design of the OxyHealth portable mild hyperbaric chambers. *See* Peter Lewis Dep., pp.55-56 (testifying OxyHealth has initiated changes to the OxyHealth portable mild hyperbaric chambers, including a label change and the change that incorporated the quick disconnect valve). In fact, OxyHealth specifically initiated the design change that resulted in the quick disconnect valve being incorporated into all of the OxyHealth portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320. *See* Exhibit C; Peter Lewis Dep., pp.54, 56-59. Not only did OxyHealth initiate the design specifications for the OxyHealth Vitaeris 320, but it had final approval authority over its design. *See* Agreement, Dkt. No.48, ¶3.3; Exhibit D (Memo wherein HTI employee states "I want to present a nice looking prototype to Oxy"); Exhibit E (Design Input Proposal showing OxyHealth's President Samir Patel as a member of the "Design Review Team" for redesign of the mild hyperbaric chambers). HTI even had to get written consent from OxyHealth to make repairs to the OxyHealth line of portable mild hyperbaric chambers. *See* Exhibit F (Email from HTI to OxyHealth wherein HTI employee seeking approval from OxyHealth employee prior to replacing a zipper on the OxyHealth Vitaeris 320).

As part of its design activities, OxyHealth was also responsible for recommending and acquiring the compressors and mattresses to be incorporated into and distributed with the OxyHealth Vitaeris 320. OxyHealth Dep., p.67; Peter Lewis Dep., pp.34-35, 168-69. Accordingly, OxyHealth worked with a compressor manufacturer to develop a compressor for use with the OxyHealth line of portable mild hyperbaric chambers. *See* Exhibit H (Email from Samir Patel to Peter Lewis stating "[w]e have spent a lot of money working with Gast to develop the enclosure and we have given all the guarantees of volume Gast so as to absorb the tooling costs. . . I am scrambling to find ways to make the product better in an attempt to show the market that we are constantly improving our line."). Viewing all facts in the light most favorable to the Plaintiffs and drawing all justifiable inferences in their favor, the evidence supports

the conclusion that OxyHealth designed the OxyHealth Vitaeris 320, and therefore is a "manufacturer" of the hyperbaric chamber.

        b. *OxyHealth assembled and prepared the OxyHealth Vitaeris 320 or a component part prior to its sale to consumers*

Not only did OxyHealth design the OxyHealth Vitaeris 320 and related component parts, but it assembled and prepared them prior to sale as well. For example, when OxyHealth received a compressor from Gast, OxyHealth added a capacitor and power cord to the compressor before boxing it up and distributing it for use with the OxyHealth portable mild hyperbaric chamber. *See* Exhibit I. Importantly, the compressor is not an accessory item, but rather an essential component part of the OxyHealth Vitaeris 320. In fact, Peter Lewis put it this way: "I would certainly hope that there would not be an issue with using a compressor as this is the backbone of our chamber business. Without a compressor we cannot operate the mild chambers." Exhibit J; *see* Peter Lewis Dep., pp.41-43.

Along those same lines, once OxyHealth received the chamber bladders from HTI and other component parts from the various fabricators, OxyHealth assembled the OxyHealth Vitaeris 320, tested it to make sure it was assembled properly and worked, repacked it all in their own labeled box, and shiped it to the consumer. *See* Samir Patel Dep., pp.13-14 ("**Q. What do you do to set up a Vitaeris 320 chamber?** A. Put the bladder on a bench. . . [h]ook up a pump, zip it up, inflate it, see if it's clean . . . see if it's still under pressure, and then pack it up, roll it up, put it in a box and ship it.. . . . **Q. Have you ever assembled a Vitaeris 320 hyperbaric chamber?** A. To me assembled and set up is the same."). As evidenced above, OxyHealth's role goes well beyond that discussed in *Morrison v. Sears, Roebuck & Co.*[16] and alleged by Defendants. Viewing all facts in the light most favorable to the Plaintiffs and drawing all justifiable inferences in their favor, the evidence supports the conclusion that OxyHealth designed, assembled and otherwise prepared the OxyHealth Vitaeris 320 prior to sale and therefore is a "manufacturer" of the OxyHealth Vitaeris 320.

---

[16] 80 N.C. App. 224, 227, 341 S.E.2d 40, 41 (1986) (where the retailer also had access to testing facilities but did not have a role in the design or specifications of component parts). *Morrison* has been reversed.

c. *OxyHealth is the "Apparent Manufacturer" of the OxyHealth Vitaeris 320.*

In *Warzynski v. Empire Comfort Systems, Inc.*, 102 N.C. App. 222, 401 S.E.2d 801 (1991), the court held that a seller is precluded from asserting a § 99B defense if he "holds himself out to the public as the manufacturer of a product." *Id.* at 225, 401 S.E.2d at 803. Specifically, the court reversed summary judgment in favor of Empire, the defendant seller, because a genuine issue of material fact existed as to whether Empire was the apparent manufacturer of the products at issue. *Id*. The evidence in that case showed that: (1) Empire and the manufacturer shared the expenses of advertising the product; (2) Empire repaired the product; (3) the product came with an Empire warranty; (4) all of the advertising promoting the products referred to Empire and did not state that Empire was not the manufacturer; and (5) there was a decal on the product which said that it was made in Spain, which is where the actual manufacturer was incorporated and had its principal offices. *Id.* at 228, 401 S.E.2d at 804-05. The *Warzynski* court adopted § 400 of the Restatement of Torts. *Id.* Comment (d) to § 400 explains that sellers will be held liable as manufacturers in cases where they put out a chattel as their own product. *See id.* This can happen "where the actor appears to be the manufacturer of the chattel" or "where the chattel appears to have been made particularly for the actor." *Jones v. GMRI, Inc.,* 144 N.C. App. 558, 563-64, 551 S.E. 2d 867 (2001).

The facts in the instant matter are nearly identical to the facts in *Warzynski.* (1) Under the terms of the "Exclusive Marketing, Sales and Distribution Agreement" with HTI, OxyHealth is responsible for using "its best efforts to actively promote the marketing, sale, and distribution, maintenance and service" of the OxyHealth line of portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320, and all associated expenses. *See* Agreement, Dkt. No.48, ¶2.1. Peter Lewis understood this to mean that OxyHealth would advertise, create brochures, sponsor and attend conferences, and maintain a website. Peter Lewis Dep., pp.26-28. (2) Moreover, when an OxyHealth portable mild hyperbaric chamber needs repair, users have to send the hyperbaric chamber back to OxyHealth. *See* Dr. Jeff Bradstreet Dep., pp.28, 114-15. OxyHealth then either makes the repair or sends the consumer a new hyperbaric chamber. *Id.*; Janet Presson Dep.,pp.55, 163-64; Jack Presson Dep., p.127; *see* Samir Patel Dep., pp.119-20 (OxyHealth performs repairs such as changing a hose or changing a pump). (3) The OxyHealth Vitaeris 320 is shipped

14

to consumers from OxyHealth in a box with the name "OxyHealth" on it and comes with an Operating and Reference Manual. Samir Patel Dep., pp.23-24; Janet Presson Dep., p.160. According to the Operating and Reference Manual that accompanies all OxyHealth portable mild hyperbaric chambers, "All Portable Mild Hyperbaric Chambers come with a one-year **manufacturer's warranty** (parts and labor) from the date of purchase, **by OxyHealth Corporation**, for any manufacturer defects. Operating and Reference Manual, Dkt. No.36-2, p.35 (emphasis added). (4) Finally, the Operating and Reference Manual and all of the advertising, marketing material, and brochures refer to OxyHealth and fail to state that OxyHealth is not the manufacturer of the OxyHealth Vitaeris 320. *See, e.g., id.*; OxyHealth Vitaeris 320 Brochure (Attached as Exhibit BB); OxyHealth Dep., p.84 ("We are always available. **I don't care who you bought it from. You call Oxy-Health. It's an Oxy-Health chamber**. We'll help you out, and we'll guide you.") (Emphasis added).

Statements in videos from www.OxyHealth.com also represent that OxyHealth selects materials, builds, manufactures, tests, and inspects its chambers, including the OxyHealth Vitaeris 320:

A Tradition of Safety Video
- "We put a lot of work into the materials; we went to thicker materials; the zipper system was completely revamped."
- "When selecting materials, we are not just looking for strength, we are looking for the type of material it is."
- "We have inspectors that will check the valve process, how was the valve installed or how well was it installed. Did it meet specifications. . . Anything we build in the chamber is checked and double checked and all the parts are tested to destruction as well. Every tenth zipper we install, we'll basically take that section of zipper and see if it holds up to the weights and pulls that the specifications require."
- "There are safety precautions that we take when we build our chambers that the other brands don't really take into consideration."
- "We've made more units than the entire hyperbaric industry combined and we've had zero, zero, zero failures. Perfect is all we will stand for, nothing less."
- Whereas there are multiple references to the importance of safety the Vitaeris 320 does not comply with the two most widely recognized hyperbaric safety standards: ASME PVHO-1 and NFPA 99, Health Care Facilities.
- OxyHealth stated in the Defendants' Responses to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production Documents that "Defendants object to this interrogatory on the grounds that it refers to the connection of an oxygen concentrator to hyperbaric chambers because Defendants do not advertise, market or sell hyperbaric chambers with oxygen concentrators consistent with FDA requirements." I find it interesting that in this video clip at the 8 minute, 2 second mark, there is an oxygen concentrator clearly visible in the background.

McCue Video
OxyHealth salesman Tom Melone talks about the "different models of equipment that we manufacturer" to include the Vitaeris 320.

Exhibit O, p.8. When Jack Presson was asked about his understanding of the role that OxyHealth had in the manufacturing, assembly, or sale of the OxyHealth Vitaeris 320, he testified that "That's what they did. They make them." Jack Presson Dep., p.125. Similarly, Janet Presson testified as follows:

> Q. With regard to the Sparks' chamber, what's your understanding of the role, if any, that OxyHealth had in the manufacturing, assembly, or sale of that chamber?
> A. I think they are kind of responsible for it all. I kind of had the understanding that OxyHealth is where those things come from.

Janet Presson Dep., pp.159-60. The Sparks family believed that OxyHealth was the manufacturer of the OxyHealth Vitaeris 320 as well. *See, e.g.,* Amy Sparks Dep., pp.79-81. Based on the evidence in this case that OxyHealth is more than a "mere conduit" of the OxyHealth Vitaeris 320 and the fact that a genuine issue of material fact exists with respect to whether or not OxyHealth is the "apparent manufacturer" of the hyperbaric chamber, *Warzynski* instructs that Defendants' Motion for Summary Judgment must be denied.

2. **There is Sufficient Evidence of a Design Defect Resulting from OxyHealth's Negligence to Create a Genuine Issue of Material Fact that Precludes Summary Judgment**

As an initial matter, negligence claims are rarely susceptible of summary adjudication, and should ordinarily be resolved by trial of the issues. *Vassey v. Burch,* 301 N.C. 68, 73, 269 S.E. 2d 137, 140 (1980). A products liability claim grounded in negligence requires the plaintiff to prove (1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff's damage. *Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.*, 138 N.C. App. 70, 75, 530 S.E. 2d 321 (2000); *Jolley v. Gen. Motors,* 55 N.C. App. 383, 385-86, 285 S.E. 2d 301 (1982). A product is defective if its proper use would involve an unreasonable risk of harm to those using it for the purpose for which it was manufactured. *DeWitt v. Eveready Battery Co.,* 144 N.C. App. 143, 150, 550 S.E. 2d 511 (2001); *Smith v. Selco Prods., Inc.,* 96 N.C. App. 151, 385 S.E. 2d 173 (1989). Further, a product defect may be inferred from evidence of the product's malfunction, if there is evidence the product has been put to its ordinary use. *Red Hill Hosiery Mill, Inc.,* 138 N.C. App. at 76-77, 530 S.E. 2d at 327. "Expert testimony is enough to provide direct evidence of a defect." *Id.* at 75, 530 S.E. 2d at 326.

16

As an initial matter, the burden to show that the OxyHealth Vitaeris 320 was defective is satisfied inferentially in this case by the fact that the hyperbaric chamber malfunctioned (the quick disconnect valve unintentionally disengaged causing death to the user) while it was being put to its ordinary, intended and foreseeable use (hyperbaric oxygen treatment in the home setting). *Red Hill Hosiery Mill, Inc.,* 138 N.C. App. at 76-77, 530 S.E. 2d at 327.  Nonetheless, the testimony of Plaintiffs' expert Ronald Natoli constitutes <u>direct evidence</u> of a defect with respect to the OxyHealth Vitaeris 320.  In his expert report, Mr. Natoli opined that "The Oxy Health Vitaeris 320 hyperbaric chamber was defective, unreasonably dangerous, and unsafe for its intended use, and was a direct cause of Jarred Spark's asphyxiation." Expert Report of Ronald Natoli and Nancy Grugle, p.16 (June 26, 2014) (Attached as Exhibit CC).  Specifically, Mr. Natoli opines that

> Oxy Health's failure to provide threaded style or safety-locking style valve connections on the ventilation/pressurization supply air; or make other design changes to prevent or warn against the inadvertent loss of the required continuous fresh air supply, while operating the Oxy Health Vitaeris 320, was a design defect and was a cause of Jarred Sparks' asphyxiation [and]

> Oxy Health's failure to provide a visual and audible indication that a dangerous level of carbon dioxide or reduction in oxygen levels exists, made the Oxy Health Vitaeris 320 hyperbaric chamber defective, unreasonably dangerous, unsafe for its intended use, and a cause of Jarred Sparks' asphyxiation.

*Id.; see* Ron Natoli Dep., p.139[17] ("It's my opinion that no push button disconnect should be used for this application."); p.153 ("This was a failure. The failure was caused by improperly selected valve, in my opinion."); p.180 (testifying that the incorporation of the quick disconnect valve made the OxyHealth Vitaeris 320 unreasonably defective); p.182 ("You know, that is a critical life supporting system. So multiple actions should be required, not just a push of a button."); p.241 ("I'm saying a $CO_2$ monitor and alarming in general is—is required."); p.270 ("So had a detector, a monitor, been in there . . . that had a visual and audible indication, the incident probably would not have occurred.").  Thus, Mr. Natoli's expert testimony constitutes direct evidence of multiple design defects in the OxyHealth Vitaeris 320.

---

[17] Deposition Excerpts of Ronald Natoli are Attached as Exhibit DD.

Because Plaintiffs have proven the existence of a defect through direct evidence, they may prove that the defect was the result of the defendant's negligence through circumstantial evidence.  In fact, "[a]n inference of manufacturer's negligence arises upon proof of an actual defect in the product." *Red Hill Hosiery Mill, Inc.,* 138 N.C. App. at 75, 530 S.E.2d at 326.

A manufacturer has the "duty to use reasonable care throughout the manufacturing process, including making sure the product is free of any potentially dangerous defect in manufacturing or design." *Id.* A manufacturer "must inform itself about what safety designs and methods are available in its industry and is under a duty to make reasonable tests and inspections to discover any latent hazards." *Morgan v. Cavalier Acquisitions Corp.,* 111 N.C. App. 520, 528, 432 S.E. 2d 915 (1993) (citations omitted).  In order to show that a defect was the result of the defendant's negligence, the Plaintiff must present evidence that the defect resulted from negligent design, selection of materials, assembly, inspection, testing, or evidence of failure to adequately warn or instruct about unreasonably dangerous conditions which the manufacturer or seller knew, or should have known, posed a substantial risk of harm and were not open, obvious risks. *See, e.g., Red Hill Hosiery Mill, Inc.,* 138 N.C. App. at 75, 530 S.E. 2d at 326*; Jolley,* 55 N.C. App. at 385, 285 S.E. 2d 301; *Sutton v. Major Products Co.,* 91 N.C. App. 610, 612, 372 S.E. 2d 897 (1988).

In the instant matter, OxyHealth's negligent design and selection of the quick disconnect valve to supply the only source of fresh air into the hyperbaric chamber (as well as its failure to warn) rendered the OxyHealth Vitaeris 320 defective. The fact that the defect was the result of OxyHealth's negligent acts and omissions is proven by Mr. Natoli's expert testimony that OxyHealth's failure to incorporate a $CO_2$ monitor with audible alarm and its design specification of the quick disconnect valve made the OxyHealth Vitaeris 320 hyperbaric chamber "defective, unreasonably dangerous, unsafe for its intended use, and a cause of Jarred Sparks' asphyxiation." Exhibit CC, p.16.

In their Motion for Summary Judgment, Defendants claim that "there is no evidence concerning [the § 99B-6] factors, and Plaintiffs cannot establish that the manufacturer acted unreasonably." Dkt. No.

40, p.14. However, Plaintiffs have presented substantial evidence that OxyHealth unreasonably failed to adopt an alternative design under § 99B-6.

    a. *The nature and magnitude of the risks of harm associated with the design in light of the intended and reasonably forseeable uses*

The nature and the magnitude of the risks of harm associated with the incorporation of the quick disconnect valve into the design of the OxyHealth Vitaeris 320 is death by asphyxiation. OxyHealth Dep., pp.89, 95, 101, 108. In fact, prior to the death of Jarred Sparks, OxyHealth knew that someone could asphyxiate inside their portable mild hyperbaric chambers. *Id.* at 108-09. OxyHealth knew that if a user is sleeping in the hyperbaric chamber during treatment and the quick disconnect valve disengages, then there would no longer be fresh air coming in the chamber. *Id.* at 162. Moreover, prior to 2005, OxyHealth knew that $CO_2$ would no longer be exhausted from the chamber if the quick disconnect valve unintentionally disengaged. *Id.* at 104-05. Nonetheless, OxyHealth never warned consumers of these hazards. *Id.* at 156-57.

    b. *The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm*

OxyHealth knew that the OxyHealth Vitaeris 320 would be used in the home setting for self-treatment by users without a medical background and without an attendant present and that consumers sometimes sleep in OxyHealth portable mild hyperbaric chambers. Samir Patel Dep., pp.85-86; *see* OxyHealth Dep., p.160. OxyHealth also knew that if a user is sleeping in the hyperbaric chamber during treatment and the quick disconnect valve disengages, then there would no longer be fresh air coming in the chamber and $CO_2$ would no longer be exhausted from the chamber. *See* OxyHealth Dep., pp.104-05, 162. With respect to OxyHealth, "an inadvertent release of the quick disconnect used [was] foreseeable." Ronald Natoli Dep., p.201. In contrast, the Sparks family was not aware of the risks inherent in the OxyHealth Vitaeris 320 as designed with the quick disconnect valve and without a $CO_2$ monitor. *See, e.g.,* Dylan Sparks Dep., pp.62, 136-38 ("Q. Did you ever think that there was any risk of him suffocating inside the chamber? **A. No, Sir** . . ."); Rob Sparks Dep., pp.276, 281 ("Q. Did you ever recognize the chamber as any type of potential suffocation hazard--- **A. No. . . . I didn't know you could suffocate in**

**it.**"); Amy Sparks Declaration, dated 11/26/2014, at ¶15 (hereinafter "Sparks Declaration") (Attached as Exhibit EE) ("If I had known that the OxyHealth Vitaeris 320 hyperbaric chamber used a quick disconnect valve, which could become disconnected just by bumping into another piece of furniture, to supply the only source of fresh air into the chamber, I would not have purchased it and brought it in my home to treat Jarred's autism and he would still be alive."). Nonetheless, OxyHealth did not warn the Sparks about these hazards. *See* OxyHealth Dep., pp.114-15, 159, 166, 179.

According to Dr. Grugle, product users such as the Sparks family are unlikely to be aware of the risks associated with the OxyHealth Vitaeris 320 without adequate warnings:

> Oxy Health should have provided an on-product warning about the asphyxiation hazard resulting from unintentional disconnection of the quick-disconnect valve and provided instructions telling the user not to push the hyperbaric chamber up against any object that might unintentionally push the quick-disconnect button. Oxy Health's failure to provide an on-product warning deprived end users of the hyperbaric chamber from having, noticing, and reading critical product warnings and from the ability to modify their behavior as a result. . . .

> Oxy Health's failure to provide an effective warning system deprived the user of critical information needed for the safe use of the hyperbaric chamber. Oxy Health's failure to provide an effective warning system was unreasonably dangerous, rendered the product defective, and was a cause of Jarred Sparks' asphyxiation.

Exhibit CC, pp.14-15.

     c.   *The extent to which the design conformed to any applicable government standard that was in effect at the time of manufacture*

ASME PVHO-1, Safety Standard for Pressure Vessels for Human Occupancy, An American National Standard, "provides requirements for the design, fabrication, inspection, testing, marking, and stamping of pressure vessels for human occupancy, having an internal or external pressure differential exceeding 2 psi, hereafter called PVHOs or chambers. This standard also provides requirements for the design, fabrication, inspection, testing, cleaning, and certification of piping systems for PVHOs." ASME, *Safety Standard for Pressure Vessels for Human Occupancy: An American National Standard*, ¶1.1.1 (ASME PVHO-1-2002) (Attached as Exhibit FF). A hyperbaric chamber is a PVHO. *Id.* Specifically, the OxyHealth Vitaeris 320 is a PVHO that has an internal or external pressure differential exceeding 2

20

PSI. Peter Lewis Dep., pp.94-97. ASME PVHO-1 does not differentiate between traditional hard-sided chambers and portable mild hyperbaric chambers. *See id.* ASME PVHO-1 has been recognized by the FDA as a consensus standard[18] and constitutes the "industry standard" for all hyperbaric chambers. *See* Ron Natoli Dep., p.285; Workman Declaration, ¶26 ("The FDA does not require compliance with these standards for marketing clearance, but these remain industry safety standards for hyperbaric chambers."). As such, ASME PVHO-1 applies to the design of the OxyHealth Vitaeris 320 hyperbaric chamber;[19] nonetheless, the OxyHealth Vitaeris 320 did not comply with this standard when the hyperbaric chamber was manufactured and still does not comply today. Peter Lewis Dep., pp.96-97; Samir Patel Dep., p.45; Ronald Natoli Dep., pp.32-33; Tom Workman Dep., pp.317, 331-33[20].

> d. *The utility of the product, including the performance, safety, and other advantages associated with that design*

As Mr. Natoli opined in his expert report,

Quick disconnect fittings, such as the incident fitting on the OxyHealth Vitaeris 320 hyperbaric chamber, allows a person to make and break tubing connections without separating the tubing from the fitting. A quick disconnect, provides a means of quickly disconnecting a line without the loss of fluid or entrance of air into a system. . . .

There were no concerns for saving of manpower, bleeding air out of lines, purging trapped air or recharging of any fluid in the supply air hose for the Oxy Health Vitaeris 320 hyperbaric chamber. **The [only] benefits of using a quick disconnect for the air supply connections on the Oxy Health Vitaeris 320 was the simplicity of not requiring a special tool and speed of setup.**

**The detriment of a quick disconnect such as the incident quick disconnect, is that it requires no tools to disengage the latching system, is simple to operate, and can inadvertently become disengaged if the release is accidentally depressed. This type of connector is not proper where the security of the connection is a safety issue.** In the design of products, speed and simplicity is secondary to safety. . . .

Oxy Health's failure to provide threaded style or safety-locking style valve connections on the ventilation/pressurization supply air; or make other design changes to prevent or warn against the inadvertent loss of the required continuous fresh air supply, while

---

[18] *See* FDA Product Classification (Attached as Exhibit HH) (FDA recognizes ASME PVHO-1 Safety Standard for Pressure Vessels for Human Occupancy as a consensus standard).

[19] Ron Natoli Dep., pp.32-33 (testifying that ASME PVHO requirements "did apply" to the OxyHealth Vitaeris 320 that was manufactured in 2005); Tom Workman Dep., pp.317, 331-33 (testifying that ASME PVHO-1 applies to the OxyHealth Vitaeris 320 hyperbaric chamber at issue in this case).

[20] Deposition Excerpts of Tom Workman are Attached as Exhibit GG.

operating the Oxy Health Vitaeris 320, was a design defect and was a cause of Jarred Sparks' asphyxiation [and]

Oxy Health's failure to provide a visual and audible indication that a dangerous level of carbon dioxide or reduction in oxygen levels exists, made the Oxy Health Vitaeris 320 hyperbaric chamber defective, unreasonably dangerous, unsafe for its intended use, and a cause of Jarred Sparks' asphyxiation

Exhibit CC, pp.8-9, 16. Thus, the potentially deadly hazards associated with the design of the OxyHealth Vitaeris 320 greatly outweigh the utility- speed of setup.

  e. *The technical, economic, and practical feasibility of using an alternative design at the time of manufacture*

By the time the OxyHealth Vitaeris 320 at issue was manufactured in 2005, there was already another portable hyperbaric chamber that was using an alternative, PVHO-compliant design as proposed by Mr. Natoli. Specifically, the SOS Hyperlite portable hyperbaric stretcher is a hyperbaric chamber that does not use a quick disconnect valve for oxygen supply, uses a positive locking style connection for the air supply, and incorporates an oxygen and carbon dioxide monitor. *See* Ron Natoli Dep., pp.146, 193-94; *see also* SOS Hyperlite Brochure (Attached as Exhibit II) (listing "Oxygen & carbon dioxide monitor" under "optional extras"). The SOS Hyperlite met ASME PVHO-1 standards in the mid-1990s. Ron Natoli Dep., pp.37-38; Peter Lewis Dep., p.115. The fact that another portable hyperbaric chamber implemented the type of alternative design that Mr. Natoli proposes for the OxyHealth Vitaeris 320 nearly a decade before the OxyHealth Vitaeris 320 was manufactured demonstrates that the alternative design was both technically and practically feasible at the time of manufacture and could then have been reasonably adopted. *Cf.* Exhibit CC, p.12 ("It would have been easy for Oxy Health to provide guarding that would have monitored the carbon dioxide ($CO_2$) levels within the chamber and also alarmed in the event that elevated carbon dioxide levels within the hyperbaric chamber were detected."). It also evidences the fact that the alternative design would not have substantially impaired the usefulness, practicality or desirability of the hyperbaric chamber. Economic feasibility is supported by the fact that the SOS "Hyperlite is cost effective with unprecedented versatility." Exhibit II, at MR_Sparks000590.

f. *The nature and magnitude of any foreseeable risks associated with the alternative design*

When asked about the "disengagement risks" of the alternative design, Mr. Natoli testified that "[t]here are less risks than a quick disconnect." Ron Natoli Dep., pp.219-20. "Unlike the incident quick disconnect valve currently being used, the threaded valve requires 2-1/2 to 3-1/2 full turns of the valve ring to disengage the spring loaded connection. . . . The use of a threaded style valved connection would have minimized the risk of an inadvertent release of the critical supply air connection." Exhibit CC, p.10; *see* Ron Natoli Dep., p.265 (testifying that a different valve connector and a $CO_2$ meter "would have prevented the incident from occurring."). As such, the alternative design does not pose the same hazardous disengagement and potentially deadly asphyxiation risks as the current design of the OxyHealth Vitaeris 320 and constitutes a "safer, practical, feasible, and otherwise reasonable" design. *See DeWitt v. Eveready Battery Co.,* 144 N.C. App. 143, 155, 550 S.E. 2d 511 (2001) (citing N.C. Gen. Stat. § 99B-6(a)(1)).

In sum, Plaintiffs have presented substantial evidence to create a genuine issue of material fact as to whether OxyHealth unreasonably failed to adopt a reasonable alternative design that would have substantially reduced the risks of harm. Along those same lines, Plaintiffs have presented substantial evidence to prove that the design of the OxyHealth Vitaeris 320 was so unreasonable and dangerous that a reasonable person, aware of the relevant facts, would not use it. *See* Sparks Declaration, ¶15 ("If I had known that the OxyHealth Vitaeris 320 hyperbaric chamber used a quick disconnect valve, which could become disconnected just by bumping into another piece of furniture, to supply the only source of fresh air into the chamber, I would not have purchased it and brought it in my home to treat Jarred's autism and he would still be alive."). As such, Plaintiffs have presented sufficient evidence to meet the requirements of § 99B-6, and Defendants' Motion for Summary Judgment should be denied.

A product is defective if it is not accompanied by adequate warnings and instructions about unreasonably dangerous conditions which the manufacturer or distributor knows, or should know, pose substantial risks of harm. N.C. Gen. Stat. § 99B-5.  As a manufacturer and distributor of the OxyHealth Vitaeris 320 hyperbaric chamber, OxyHealth owed a duty to the Plaintiffs to provide adequate instructions and warnings about the reasonably foreseeable risks inherent in the use of the OxyHealth Vitaeris 320 in the home setting.  OxyHealth's breach of this duty was a proximate cause of Jarred's death and Plaintiffs' injuries.

1. **OxyHealth Owed the Plaintiffs a Duty to Warn of the Reasonably Foreseeable Hazards Inherent in the Use of the OxyHealth Vitaeris 320 in the Home Setting.**

A manufacturer and distributor "will be subject to liability under a negligence theory for damages which proximately result from the failure to provide adequate warnings as to the product's dangerous propensities which are known or which by exercise of care commensurate with the danger should be known by the manufacturer, or from the failure to provide adequate directions for the foreseeable user as to how the dangerous product should or should not be used with respect to foreseeable uses." *Driver v. Burlington Aviation,* 110 N.C. App. 519, 526-27, 430 S.E. 2d 476 (1993); *Lee v. Crest Chem. Co.,* 583 F. Supp. 131, 134 (M.D.N.C. 1984) (stating a manufacturer has a duty to warn of known dangers which can be encountered during foreseeable use of the product). Both manufacturers and distributors must "anticipate the environment which is normal for the use of [the] product and where, as here, the environment is the home, [they] must anticipate the reasonably foreseeable risks of the use of [the] product in such environment . . . and . . . warn [the consumer] of them." *Jackson v. Volkswagon of America, Inc.,* No. 84-857-CIV-5, 1986 U.S. Dist. LEXIS 24640, 15-16 (E.D.N.C. June 4, 1986) (unpublished) (citing *Spruill v. Boyle-Midway, Inc.,* 308 F.2d 79, 83-84 (4th Cir. 1962)).  "[T]he failure of manufacturers and distributors to properly inform purchasers and other users of a product's hazards, uses,

24

and misuses is a basis for rendering them legally liable for injuries resulting therefrom." *Driver v. Burlington Aviation,* 110 N.C. App. 519, 526-27, 430 S.E. 2d 476 (1993).

While the Defendants cite two of the design defects that make the OxyHealth Vitaeris 320 hyperbaric chamber unreasonably dangerous (quick disconnect valve and lack of $CO_2$ monitor with an audible alarm), the actual hazard associated with these defects about which OxyHealth had knowledge and failed to warn is the risk of asphyxiation. OxyHealth admits that asphyxiation is a hazard associated with the use of the OxyHealth Vitaeris 320. OxyHealth Dep., pp.89, 95, 101, 108. In fact, prior to the death of Jarred Sparks, OxyHealth knew that someone could asphyxiate inside their portable mild hyperbaric chambers. *Id.* at 108-09. OxyHealth knew that if a user is sleeping in the hyperbaric chamber during treatment and the quick disconnect valve disengages, then there would no longer be fresh air coming in the chamber. *Id.* at 162. Moreover, prior to the death of Jarred Sparks, OxyHealth knew that $CO_2$ would no longer be exhausted from the chamber if the quick disconnect valve unintentionally disengaged. *Id.* at 104-05. Nonetheless, OxyHealth never warned consumers of these hazards. *Id.* at 156-57. Prior to 2000, OxyHealth was so concerned about the potential lack of oxygen in the hyperbaric chamber that it actually performed a small simulation with a couple of its warehouse employees to see if they would wake up inside the chamber in the event of air loss. *Id.* at 166. Nonetheless, OxyHealth never warned consumers of the asphyxiation risks associated with the use of its portable mild hyperbaric chambers. *Id.* at 114-15, 166.

Notably, the risk of asphyxiation was a risk about which the Sparks had no knowledge. *See, e.g.,* Dylan Sparks Dep., pp.62, 136-38 ("Q. Did you ever think that there was any risk of him suffocating inside the chamber? **A. No, Sir.** . . . . Q. Let me ask it a different way. Did you know that carbon dioxide could build up inside the chamber? **A. No, sir.**"); Amy Sparks Dep., p.303 ("I thought it was safe, but had I known what I know now, absolutely, it was not safe."); Rob Sparks Dep., pp.276, 281 ("Q. Did you ever

recognize the chamber as any type of potential suffocation hazard--- **A. No. . . . I didn't know you could suffocate in it.**").[21]

OxyHealth also failed to "provide adequate directions for the foreseeable user as to how the dangerous product should or should not be used with respect to foreseeable uses." *Driver v. Burlington Aviation,* 110 N.C. App. 519, 526-27, 430 S.E. 2d 476 (1993). OxyHealth knew that the OxyHealth Vitaeris 320 would be used in the home setting for self-treatment by users without a medical background and without an attendant present. Samir Patel Dep., pp.85-86. In fact, the OxyHealth Vitaeris 320 was designed so users can perform self-treatments in the home setting. *See, e.g.,* Peter Lewis Dep., p.196. However, OxyHealth does not warn potential users of any hazards if someone is left unattended while self-treating in an OxyHealth portable mild hyperbaric chamber. OxyHealth Dep., pp.93-94; *see* Dr. Nancy Grugle Dep., p.159[22] (OxyHealth manual contains no "warnings about leaving someone in for a certain period of time being hazardous."). Further, despite knowledge that consumers sleep in the OxyHealth portable mild hyperbaric chambers, OxyHealth never instructs users not to sleep in the chambers during self-treatment. OxyHealth Dep., p.160. Significantly, OxyHealth also failed to instruct consumers that the quick disconnect valve can unintentionally become disengaged and, therefore, the portable mild hyperbaric chamber should not be set up near other furniture such as a bookcase when used in the home setting. *Id.* at 159, 179; Peter Lewis Dep., p.188. Notably, the Sparks were unaware of these hazards as well. *See, e.g.,* Amy Sparks Dep., p.308 ("Q. Have you seen anything in any of the materials that you received from Oxy-Health or the Pressons or anything that says anything about the proper set up of a hyperbaric chamber in a home? **A. No.**"). Thus, Plaintiffs have presented sufficient evidence such

---

[21] The Defendants cite to the deposition of Plaintiff's expert Ronald Natoli at pp.120-21 in support of their argument that "the asphyxiation risk associated with the Chamber was a matter of common knowledge." The Defendants' mischaracterization of Mr. Natoli's deposition testimony is disingenuous at best. While Mr. Natoli agreed that being inside a sealed chamber without fresh air creates an asphyxiation risk and agreed that elevated levels of carbon dioxide "compose a dangerous condition," he did not state that those hazards were "common knowledge." Mr. Natoli stated: "A. Well, define common knowledge. I'm sure there are people out there that don't know that." *Id.* at 120-21. Additionally, whether someone appreciates the risks posed by carbon dioxide or a sealed container has little to do with whether or not the risk of asphyxiation is an open and obvious danger associated with a hyperbaric chamber. *See, e.g.,* Dylan Sparks Dep., p. 138 ("I mean, I understand, like, if you don't have oxygen, you could die from carbon dioxide, but I didn't know that it would happen in the chamber.")

[22] Deposition Excerpts of Dr. Nancy Grugle are Attached as Exhibit JJ.

that reasonable minds could differ as to whether or not OxyHealth owed the Plaintiffs a duty to warn of the reasonably foreseeable hazards inherent in the foreseeable use of the OxyHealth Vitaeris 320 and breached that duty, and summary judgment must be denied.

2. **A Genuine Issue of Material Fact Exists as to Whether OxyHealth's Failure to Warn was a Proximate Cause of Plaintiffs' Injuries**

As an initial matter, proximate cause is generally a question of fact for the jury. *See Hastings v. Seegars Fence Co.,* 128 N.C. App. 166, 170, 493 S.E. 2d 782, 785 (1997) (finding grant of summary judgment improper since "[i]ssues of proximate cause and foreseeability. . . are ordinarily best left for resolution by a jury . . ."); *see Hairston v. Alexander Tank and Equip. Co.,* 310 N.C. 227, 234, 311 S.E. 2d 559, 565 (1984) ("Proximate cause is an inference of fact to be drawn from other facts and circumstances."). In their Motion for Summary Judgment, Defendants argue that "the evidence shows that Plaintiffs would not have followed any additional warnings or instructions." Dkt. No. 40, p.19. However, this is pure, inadmissible speculation and directly contradicts substantial, competent evidence in this case.

In her Expert Report, Dr. Grugle opines that "Oxy Health failed to provide effective warnings that were available at the time and location needed, conspicuous, and explicit." Exhibit CC, p.13. Specifically,

> Oxy Health failed to provide any information related to the hazards associated with the inadvertent release of the quick-disconnect valve at the time and location needed by product user (i.e., on the product). . . .
>
> The instructions fail to explicitly warn users that the quick-disconnect valve can be inadvertently disconnected and that a disconnected pressurization valve will result in a loss of fresh air to the chamber and possible asphyxiation and death. The instructions also fail to explicitly identify the possibility that the quick-disconnect button on the pressurization valve could be unintentionally disconnected by an object (e.g., wall, bookshelf) being pushed up against the release button. . . .
>
> Oxy Health failed to conspicuously identify asphyxiation warning information on the hyperbaric chamber or in the Operating and Reference Guide. . . .
> **Oxy Health should have provided an on-product warning about the asphyxiation hazard resulting from unintentional disconnection of the quick-disconnect valve and provided instructions telling the user not to push the hyperbaric chamber up against any object that might unintentionally push the quick-disconnect button.** Oxy Health's failure to provide an on-product warning deprived end users of the hyperbaric

chamber from having, noticing, and reading critical product warnings and from the ability to modify their behavior as a result. . . .

**Oxy Health's failure to provide an effective warning system deprived the user of critical information needed for the safe use of the hyperbaric chamber. Oxy Health's failure to provide an effective warning system was unreasonably dangerous, rendered the product defective, <u>and was a cause of Jarred Sparks' asphyxiation.</u>**

*Id.* at 13-15 (Emphasis Added).

As part of her work in this case, Dr. Grugle created an adequate on-product warning of the asphyxiation hazard associated with the reasonably foreseeable use of the OxyHealth Vitaeris 320 hyperbaric chamber. *See id.* at 15; Dr. Nancy Grugle Dep., pp.96-97. Despite Defendants' insinuation to the contrary,[23] Dr. Grugle testified that the lack of such an adequate on-product warning was a substantial contributing cause of Jarred Sparks' asphyxiation and death:

> Q. . . . Do you believe that including the warning sticker on the end of the chamber where you have it there on page 15 of your report would have prevented this incident?
>
> A. It would have provided them with the information that they needed to prevent the quick disconnect valve from disconnecting and causing the asphyxiation, and if they read it and if they complied, it would have prevented it. . . .
>
> A. So like I said before, without this information, it was a contributing factor to Jarred Sparks' death. The example that I provided is [sic] an example of an adequate and effective warning. It would have given the information to the users that they needed to prevent this particular incident from occurring. I cannot guarantee that someone will read it or comply with it. But without it, they do not have the information that they need to prevent it.

Dr. Nancy Grugle Dep., pp.139, 144.

In an attempt to somehow offset Dr. Grugle's proximate cause opinion, Defendants allege that "No matter what instructions or warnings were provided with the Chamber, the Sparks family has demonstrated that they did not intend to follow them." Dkt. No.40, p.20. In support of this allegation, Defendants appear to claim that the Sparks family rebelliously refrained from using the OxyHealth

---

[23] Defendants' argument that "additional warnings on the Chamber would not have prevented the Incident because Plaintiffs did not follow the warnings that were already on the Chamber" is insidious. *See* Dkt. No. 40, p.19. As an initial matter, this argument is comprised of pure speculation and unsupported by competent expert testimony. Notwithstanding, there is a clear difference between "inflating" the hyperbaric chamber with enriched oxygen and inflating the hyperbaric chamber with compressed air as the Sparks family did.

Vitaeris 320 as they observed the portable mild hyperbaric chambers being used at Dr. Bradstreet's office. *Id.* However, that is simply not true. The way that Jarred used the OxyHealth Vitaeris 320 in the home was substantially similar to the way that he received treatment at Creations Own and consisted of foreseeable use. Jarred would sleep in the hyperbaric chamber during treatments at Creations Own and in the home setting. *See* Rob Sparks Dep., p.197; Dylan Sparks Dep., pp.57-59. According to Dr. Bradstreet, it was common for users to sleep in portable mild hyperbaric chambers during treatment. *See* Dr. Jeff Bradstreet Dep., pp.32-33. While Jarred's hyperbaric oxygen treatment typically lasted 2 to 4 hours,[24] Dr. Bradstreet testified that professional athletes stay in portable mild hyperbaric chambers for 8 to 10 hours at a time. *Id.* While the prescription that Dr. Bradstreet wrote Jarred on November 14, 2005 for "hyperbaric treatment" stated "1 hour sessions x 40," this prescription was "presumably not for home therapy." *Id.* at 85; *see* Bradstreet Prescription for HBOT (Nov. 14, 2005), Dkt. No.45-21. According to Dr. Bradstreet, in the home, "there's really no restraints on time of exposure." *Id.* at 85-86; *see* Jerry Kartzinel Dep., p.157 (testifying that he has no problem with someone being in the chamber for five hours); Jack Presson Dep., p.142 (testifying that there are no safety concerns from a physical point of view if someone spends the night treating in a hyperbaric chamber); Rob Sparks Dep., pp.203-04 ("Amy was told that we could leave him in there however long we wanted to leave him.").

The evidence in this case establishes that no one told the Sparks family one way or another whether someone should remain in the same room the entire time Jarred was in the OxyHealth Vitaeris 320. Dr. Jerry Kartzinel neither provided verbal warnings to the Sparks about the risk of asphyxiation nor provided instructions to always remain in the room with Jarred while he was treating in the hyperbaric chamber. Jerry Kartzinel Dep., pp.104-06, 156-57; Amy Sparks Dep., pp.133, 200. It is also undisputed that the Pressons did not tell the Sparks to always remain in the room while Jarred was using the portable mild hyperbaric chamber and did not warn the Sparks about the risk of asphyxiation associated with the use of the OxyHealth Vitaeris 320. Jack Presson Dep., pp.83, 112-13; Janet Presson Dep., pp.124-25, 131; Amy Sparks Dep., p.200. Similarly, there is no evidence in the record that Dr. Jeff Bradstreet or

---

[24] Amy Sparks Dep., pp.117-18; Dylan Sparks Dep., p.90.

anyone at his office provided verbal warnings to the Sparks about the risk of asphyxiation or provided instructions to always remain in the room with Jarred while he was treating in the portable mild hyperbaric chamber. *See* Dr. Jeff Bradstreet Dep., pp.54, 117-19.[25]

The lone case that Defendants cite in support of their position, *Rule v. Best Indus., Inc.*, which is actually an unpublished opinion, is easily distinguishable from the instant matter. First, the Plaintiff in *Rule* did not allege that the product itself was defective in either design or manufacture; instead, she alleged that the actions of the third-party doctors were a foreseeable and dangerous misuse of the product, and the Defendant therefore had a duty to warn against such misuse. *Id.* at *5. In the instant matter, the Sparks family alleges that the OxyHealth Vitaeris 320 hyperbaric chamber is defective, in part, because of the lack of adequate warnings and instructions and that the Defendants negligently failed to warn Plaintiffs of the hazards associated with the foreseeable, <u>intended use</u> of the hyperbaric chamber. In *Rule,* the product at issue was only sold to medical professionals and the learned intermediary defense was a deciding factor in the court's ruling. *See id.* at *6, *8 ("We believe that, especially inasmuch as the user is a professional, this 'warning' is sufficient."). In contrast, OxyHealth sells their line of portable mild hyperbaric chambers directly to consumers without a medical background, and it is undisputed that OxyHealth never warned of the risk of asphyxiation.

Contrary to the Defendants' contention in their Motion for Summary Judgment, the undisputed evidence does not support summary judgment on Plaintiffs' § 99B-5 claim. Defendants' allegations are pure speculation and directly contradict sworn testimony and signed declarations, as well as the opinions of Plaintiffs' experts and other competent evidence in this case. Defendants are essentially asking this

---

[25] Dr. Bradstreet testified as follows:

> I believe you testified that Ms. Patti Hawkins would provide some training to -- well, let me try and split this up. Would she provide training to people who would treat in your clinic? First -- that's the first question. Would Ms. Hawkins provide training to people who would treat in your clinic on how to use a hyperbaric chamber?
>   A  No.
> . . .
>   Q  . . . Do you have any knowledge one way or the other whether Ms. Hawkins ever warned the Sparks about the suffocation hazard associated with hyperbaric chambers?
>   A   I don't know if she ever even talked to the Sparks. I have no independent knowledge or way to verify that at this time.

30

Honorable Court to draw far-fetched inferences from bits and pieces of the record and grant summary judgment while conveniently ignoring the fact that "[o]n summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The issue of proximate cause is one for the jury and where, as here, there exists genuine issues of material fact that warrant a trial, summary judgment must be denied.

III:  PLAINTIFFS HAVE PRESENTED SUBSTANTIAL EVIDENCE THAT OXYHEALTH CAUSED THE PLAINTIFFS' INJURIES AND GENUINE ISSUES OF MATERIAL FACT EXIST, WHICH PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF PROXIMATE CAUSE

In their Motion for Summary Judgment, Defendants argue that "there is no competent evidence of how the Incident occurred and, therefore, no evidence that OxyHealth proximately caused the Incident. Without that evidence, all of Plaintiffs' claims fail." Dkt. No.40, pp.21-22. However, to the contrary, there is substantial evidence that Defendants' negligence caused the death of Jarred Sparks and the Plaintiffs' damages.

1. **There is Substantial Evidence that Defendants' Negligent Acts and Omissions Proximately Caused Plaintiffs Injuries.**

All of the evidence in this case supports the conclusion that Jarred Sparks died of asphyxiation as a result of the quick disconnect valve unintentionally disengaging after coming into contact with an object on a bookshelf in the Sparks family's home while Jarred Sparks was treating in the OxyHealth Vitaeris 320. *See, e.g.,* Exhibit AA[26]; Report of Autopsy Examination, Dkt. No.45-18, p.3 ("Given the autopsy and investigation findings, it is my opinion that the cause of death in this case is asphyxiation secondary to the collapse of the chamber."). Contrary to Defendants' assertion that "Natoli's theory is that Dylan caused the Incident," Mr. Natoli actually testified "I'm using the Sheriff's report and the information to say that the unit was pressurized to a point that the air valves were relieving, which means that air was going into the chamber and it was operating as it was designed or intended. Some how that valve was

---

[26] Defendants criticize Mr. Natoli's reliance on the Sheriff's Report, calling it "hearsay." Dkt. No.40, p.21. Notwithstanding the fact that the Sheriff's Report fits within an exception to the hearsay rule, it is the type of report that experts would reasonably rely on in forming an opinion and "need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

inadvertently disconnected. Based on the Sheriff's information, it's more likely than not that the container depressed the button. . ." Ron Natoli Dep., pp.93-94. Moreover, Mr. Natoli testified that OxyHealth's negligent acts and omissions were the direct cause of Jarred's asphyxiation. *See* Exhibit CC, p.16. Specifically,

> Oxy Health's failure to provide threaded style or safety-locking style valve connections on the ventilation/pressurization supply air; or make other design changes to prevent or warn against the inadvertent loss of the required continuous fresh air supply, while operating the Oxy Health Vitaeris 320, was a design defect and was a cause of Jarred Sparks' asphyxiation. . .

> Oxy Health's failure to provide a visual and audible indication that a dangerous level of carbon dioxide or reduction in oxygen levels exists, made the Oxy Health Vitaeris 320 hyperbaric chamber defective, unreasonably dangerous, unsafe for its intended use, and a cause of Jarred Sparks' asphyxiation [and]

> The Oxy Health Vitaeris 320 hyperbaric chamber was defective, unreasonably dangerous, and unsafe for its intended use, and was a direct cause of Jarred Sparks' asphyxiation.

*Id.*; *see* Ron Natoli Dep., p.153 ("This was a failure. The failure was caused by improperly selected valve, in my opinion."). Similarly, Dr. Grugle provides competent evidence that OxyHealth caused Plaintiffs' damages through its negligent acts and omissions:

> Oxy Health should have provided an on-product warning about the asphyxiation hazard resulting from unintentional disconnection of the quick-disconnect valve and provided instructions telling the user not to push the hyperbaric chamber up against any object that might unintentionally push the quick-disconnect button. Oxy Health's failure to provide an on-product warning deprived end users of the hyperbaric chamber from having, noticing, and reading critical product warnings and from the ability to modify their behavior as a result. . . .

> Oxy Health's failure to provide an effective warning system deprived the user of critical information needed for the safe use of the hyperbaric chamber. Oxy Health's failure to provide an effective warning system was unreasonably dangerous, rendered the product defective, and was a cause of Jarred Sparks' asphyxiation.

Exhibit CC, pp.14-15; *See* Dr. Nancy Grugle Dep., pp.145-46 (stating use of quick disconnect valve and lack of $CO_2$ alarm were contributing causes).

Defendants point out that there is a dispute with respect to exactly how the quick disconnect valve came into contact with the bookcase and disengaged. In the Sheriff's Report, on which Mr. Natoli relied, the Sheriff's office determined that the quick disconnect valve that supplied the fresh air to the chamber

32

disconnected by coming into contact with an object on a bookcase located at the head of the OxyHealth Vitaeris 320 when Dylan shut the bedroom door. *See* Exhibit AA.   However, Dylan testified that he had no trouble closing the bedroom door. Dylan Sparks Dep., pp.112-13.  The Sparks family believes Jarred must have moved during his sleep, causing the portable hyperbaric chamber to shift, and then the quick disconnect valve disengaged by coming in contact with an object on the bookshelf. Dylan Sparks Dep., pp.141-44; Amy Sparks Dep., p.247. The fact that there is a material fact in dispute with respect to the exact manner in which the quick disconnect valve came into contact with the bookshelf precludes summary judgment and does not lead to the absurd conclusion that "Plaintiffs' entire theory has no evidentiary support and all of their claims fail as a matter of law." Dkt. No.40, p.22.   In fact, "[c]ontradictions or discrepancies in the evidence, even when arising from claimant's own evidence, must be resolved by the jury rather than the trial judge." *Allen v. Pullen*, 82 N.C. App. 61, 65, 345 S.E.2d 469 (1986); *Federal Paper Bd. Co. v. Kamyr, Inc.*, 101 N.C. App. 329, 399 S.E. 2d 411 (1991) (holding that based on the contradictions in the evidence, summary judgment should have been denied).  In this case, the fact remains that there is a genuine dispute over which reasonable minds could differ with respect to whether or not OxyHealth's negligence was a proximate cause of Plaintiffs' injuries.[27]

2. **Intervening Cause, like Proximate Cause, is an Issue for the Jury, and the Undisputed Evidence does not Show that Amy and Dylan were Intervening and Superseding Causes of the Incident.**

As noted above, "the question of causation in a negligence action is a question of fact which is best resolved by the jury's determination.  As the intervening cause is naturally associated with proximate cause, it, too, should be submitted to the jury." *Brown & Williamson Tobacco Corp. v. CSX Transp.,* 882

---

[27] Even Defendants' purported "expert" testified that OxyHealth's negligent design and selection of the quick disconnect valve to provide the only source of fresh air into the OxyHealth Vitaeris 320 hyperbaric chamber was the proximate cause of Jarred Sparks' death.  *See* Steven Arndt Dep., Dkt. No.36-5, p.229 ("But for that quick disconnection, as I've said, it would still be supplying -- it would have still supplied fresh air.").

F. Supp. 511, 515 (E.D.N.C. 1995) (citations omitted); *see Hester v. Miller,* 41 N.C. App. 509, 513, 255

S.E.2d 318, 320 (1979) ("[T]he question of intervening . . . negligence is also ordinarily for the jury").[28]

The North Carolina Supreme Court has summarized the doctrine as follows:

> An efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted.

*Barber v. Constien*, 130 N.C. App. 380, 383-384, 502 S.E. 2d 912, 914-15 (1998) (citing *Harton v. Telephone Co.,* 141 N.C. 455, 462-63, 54 S.E. 299, 301-02 (1906)). As such, "reasonable unforeseeability is the critical test for determining when intervening negligence relieves the original tort-feasor of liability." *Id.* at 385-86, 54 S.E. 2d 916; *see, e.g., Hairston v. Alexander Tank and Equip. Co.,* 310 N.C. 227, 237, 311 S.E. 2d 559, 567 (1984) (The test to determine whether the negligent conduct is insulated by the negligence of another is "reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury."). However, the original tortfeasor need not have been able to forsee "the injury in the precise form in which it actually occurred. All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in 'the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.'" *Hairston,* 310 N.C. at 233-34, 311 S.E.2d at 565 (citation omitted); *see also Riddle v. Artis, 243 N.C. 668, 672, 91 S.E.2d 894, 897 (1956)* ("Ordinarily, 'the connection is not actually broken if the intervening event is one which might in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation'") (citation omitted).

According to Defendants, "The negligence of Amy and Dylan Sparks was unforeseeable and was an intervening and superseding cause of the Incident that insulates OxyHealth from liability." Dkt. No.40,

---

[28] *See generally Beckles-Palomares v. Logan*, 202 N.C. App. 235, 688 S.E. 2d 758 (2010) (concluding "there is a genuine issue of material fact as to whether defendant City's actions were the proximate cause of plaintiff's injury or whether defendant Logan's acts were an intervening cause.")

p.24.  However, there was nothing that Amy or Dylan did prior to Jarred asphyxiating in the OxyHealth Vitaeris 320 hyperbaric chamber that was unreasonably unforeseeable or that contributed to his death.[29] The fact that Dylan did not read the manual is not an intervening cause of Jarred's death. *See* OxyHealth Dep., p.147 (OxyHealth admits that it is foreseeable that a consumer may not read the Operating and Reference Manual or "may just flip through a manual" when they receive it with the OxyHealth portable mild hyperbaric chamber).  To the extent that Defendants suggest an intervening cause of Jarred's death was the fact that Dylan put Jarred in the OxyHealth Vitaeris 320 hyperbaric chamber instead of Amy, this suggestion fails as well. *See, e.g.,* Dr. Jerry Kartzinel Dep., p.117 (having a 16 year-old operate the chamber does not raise concerns); Dr. Nancy Grugle Dep., p.164 ("There was no hazard identified by the company that having someone as young as 16 operate the chamber presented a danger to the person inside the chamber.").  Before Dylan left the landing outside the bedroom in which Jarred was treating, the chamber was properly hooked up and fully inflated. Dylan Sparks Dep., pp.108-09; Peter Lewis Dep., p.176 (Jarred "indicated that he heard the hissing noise coming from the relief valves, which would indicate that [the chamber] was fully pressurized.").

Throughout the Motion for Summary Judgment, Defense counsel renders opinions about how the incident "would not have occurred" if the Sparks read and responded to certain instructions.   With respect to his unsupported, conclusory opinions about what instructions were available to the Sparks that would have prevented this incident had the Sparks interpreted the instructions the same way that he does and followed them, such opinions are based on pure speculation and unsupported by any competent evidence in the record.  For example, Defense counsel:

- States "Had Amy properly administered Jarred's hyperbaric treatments or properly supervised Jarred on the night of the Incident, the Incident would not have occurred." (P.23).

---

[29] Assuming, *arguendo,* that Jarred did push the OxyHealth Vitaeris 320 into the bookshelf to close the bedroom door and that the quick disconnect valve disengaged at some point thereafter, Jarred's actions would still not constitute intervening negligence. Dr. Grugle testified that it was both forseeable and reasonable for Jarred to push the chamber into the bookshelf or other objects in the home setting because OxyHealth supplied no warning that "provides the user with any information that it's unsafe to do so." Dr. Nancy Grugle Dep., pp.263-64; *see also id.* at 152, 178, 205.

- Points to a recommendation in the manual that an attendant be present during treatment[30] and states "An attendant could have observed any alleged disconnection of the quick disconnect valve and could have prevented the Incident." (P.24).
- Points to the section of the manual titled "Operating the Chamber" and specifically notes instructions about setting a timer and ensuring the chamber fully inflates; Defense counsel states "If step 7 was followed, Dylan would have monitored Jarred throughout the treatment, and Amy and Dylan would not have left him alone for approximately five hours."
- States "If Amy or Dylan had followed the Manual's instructions or monitored Jarred, the Incident would not have occurred." (P.25).

However, Defense counsel cites absolutely no support for these speculative assertions, and the testimony of Plaintiffs' experts contradicts Defense counsel's conjecture. Even Defendants' own purported expert admits that because of the intended length of Jarred's treatments and the fact that he doesn't know when the quick disconnect valve disengaged and he doesn't know how long Jarred was in the chamber prior to asphyxiation, he cannot testify that setting a clock or timer as mentioned in the manual would have prevented this incident. Arndt Dep., Dkt. No.36-5, pp.195-96. Without knowing how long it took Jarred to asphyxiate inside the chamber, there is no objective methodology to determine whether the Sparks' following of any instructions would have prevented the incident in this case. For example, Jarred could have asphyxiated in the chamber despite the fact that someone "regularly" checked on him, depending on how soon after being put into the chamber the quick disconnect valve disengaged and how long it took for him to asphyxiate inside the chamber with no supply of fresh air and no way for expelled $CO_2$ to exit.

Significantly, once the OxyHealth Vitaeris 320 hyperbaric chamber was zipped up and began to inflate, Jarred was self-treating without an attendant in the same room. There was absolutely no reason for Amy or Dylan to monitor Jarred. At that point, Jarred Sparks was self-treating without a medical attendant as referenced in the OxyHealth Vitaeris 320 Operating and Reference Manual and OxyHealth's own marketing materials. *See, e.g.,* Operating and Reference Manual, Dkt. No.36-2, pp.3, 6, 8; Portable Hyperbaric Chamber video; OxyHealth Vitaeris 320 Brochure. Jarred could get in the chamber without someone else present. Janet Presson Dep., p.94. He was able to communicate with other members of his

---

[30] The recommendation does not state that an attendant should be present while someone is self-treating and such an interpretation conflicts with other portions of the manual. Likewise, the recommendation is unclear whether an attendant should be present in the same room or just the home during monitored treatment.

36

family in their home while he was treating in the hyperbaric chamber. Dylan Sparks Dep., pp.84-85; Amy Sparks Dep., pp.122-23. Finally, Jarred knew how to unzip the chamber and get out if something was wrong, and it was a common occurrence for Jarred to get himself out of the chamber. Dylan Sparks Dep., pp.180-81; Amy Sparks Dep., p.103; Rob Sparks Dep., pp.200-02; Laura Lawyer Dep., p.88.

As discussed previously in this memorandum, it is undisputed that OxyHealth knew that the OxyHealth Vitaeris 320 would be used in the home setting for self-treatment by users without a medical background and without an attendant present. Samir Patel Dep., pp.85-86; *see* Janet Presson Dep., pp.167-68, 177 (stating that she is aware that users self-treat without an attendant and sleep in OxyHealth portable mild hyperbaric chambers during treatment and that OxyHealth promotes this by giving instructions how to self-treat without an attendant present in the manual). Thus, the fact that a user such as Jarred would self-treat in the Chamber without an attendant present was reasonably foreseeable. Similarly, it was reasonably foreseeable that a user such as Jarred would sleep in the Chamber and treat in the Chamber for a period exceeding 1 hour. OxyHealth knew that users would sleep in their chambers. *OxyHealth* Dep., p.160. According to Dr. Bradstreet, it was common for users to sleep in portable mild hyperbaric chambers during treatment. Jeff Bradstreet Dep., pp.32-33. While Jarred's hyperbaric oxygen treatment typically lasted 2 to 4 hours, Dr. Bradstreet testified that professional athletes stay in portable mild hyperbaric chambers for 8 to 10 hours at a time. *Id.* Thus, the manner in which the Sparks family used the OxyHealth Vitaeris 320 hyperbaric chamber on the night of the Incident was reasonably foreseeable.

In this case, as in *Hairston,* the actions by the Sparks family were not "so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm threatened by" OxyHealth's original negligent acts and omissions.[31] *Id.* at 238, 311 S.E. 2d at 567. Thus, at the very least, there is a factual question whether Amy and Dylan Sparks were in fact negligent and

---

[31] "[T]he mechanism of it actually getting disconnected is not germane to my findings. It's the fact that it could inadvertently be disconnected." Dr. Nancy Grugle Dep., p.151.

37

whether their actions were an intervening, insulating cause of the Incident. These factual questions are for the jury to determine.[32]

<u>IV: OXYHEALTH COMMITTED UNFAIR AND DECEPTIVE ACTS, WHICH PRECLUDE SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON PLAINTIFFS' UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM</u>

North Carolina General Statute § 75-1.1 provides that "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." The scope of the statute includes "activities surrounding the sale of goods" and "practices affecting sales" of such goods. *CF Industries, Inc. v. Transcontinental Gas Pipe Line Corp.,* 448 F. Supp. 475, 484 (W.D.N.C. 1978); *see United Roasters, Inc. v. Colgate-Palmolive Co.,* 485 F. Supp. 1041 (E.D.N.C. 1979) (inducing a sale not required); *cf. Hyde v. Abbott Lab, Inc.,* 123 N.C. App. 572, 473 S.E. 2d 680 (1996) (This section allows a suit by an indirect customer). North Carolina General Statute § 75-16 was enacted to provide civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public and to enable a person injured by deceptive acts or practices to recover treble damages from a wrongdoer. *Hardy v. Toler,* 24 N.C. App. 625, 211 S.E. 2d 809 (1975); *Lindner v. Durham Hosiery Mills, Inc.,* 761 F.2d 162, 165 (4th Cir. 1985) (purpose of this section was the protection of the consuming public).

An unfair and deceptive trade practice claim requires plaintiff to show: (1) that defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) plaintiffs were injured thereby. *Edwards v. West,* 128 N.C. App. 570, 574, 495 S.E.2d 920 (1998). The Plaintiffs did not file a motion for summary judgment on this cause of action because the issue of whether there is a causal relation between a violation of the statute and the injury complained of is an issue for the jury. *See, e.g., Ellis v. Smith-Broadhurst, Inc.,* 48 N.C. App. 180, 184, 268 S.E. 2d 271 (1980); *Ausley v. Bishop,* 133

---

[32] "There may be two or more proximate causes of an injury." *Barber v. Wooten*, 234 N.C. 107, 109, 66 S.E. 2d 690, 691 (1951). Thus, even assuming that Dylan or Amy was negligent; it would not insulate the negligence of OxyHealth, which caused and contributed to Plaintiffs' injuries. *See Johnson v. Skinner,* 99 N.C. App. 1, 13, 392 S.E.2d 634, 641 (1990) ("[A] defendant may be liable despite the negligent act of another if at the time of his act he is on notice of circumstances that make the intervention of others likely . . . [and] reasonable people must anticipate . . . occasional negligence which is one of the incidents of human life." (internal quotations omitted)). As the Western District of North Carolina has concluded, "Defendants' negligence, in order to be actionable, need not be the sole proximate cause of injury, nor the last act of negligence." *Martin v. Smith*, 534 F. Supp. 804, 806-07 (W.D.N.C. 1982) (citations omitted).

N.C. App. 210, 217, 515 S.E. 2d 72 (1999) ("The jury determines what amount, if any, the complaining party is injured and whether the occurrence was the proximate cause of those injuries."). Nonetheless, if either side is entitled to summary judgment on this cause of action, it is the Plaintiffs. Defendants have admittedly engaged in false and misleading marketing of the OxyHealth Vitaeris 320 hyperbaric chamber, yet they still move for summary judgment on the basis that "[t]here is no evidence of an unfair or deceptive act by OxyHealth[.]" Dkt. No.40, p.30.

In *Marshall v. Miller*, 302 N.C. 539, 276 S.E. 2d 397 (1981), the North Carolina Supreme Court addressed the question of what acts constitute an unfair and deceptive practice pursuant to N.C. Gen. Stat. §75-1.1:

> Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace. A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or **substantially injurious to consumers**. . . . [A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required.

*Torrance v. AS&L Motors,* 119 N.C. App. 552, 555, 459 S.E. 2d 67 (1995) (citing *Marshall,* 302 N.C. at 548, 276 S.E. 2d at 403). Importantly, for a plaintiff to succeed on such a claim, deliberate acts of deceit or bad faith do not have to be shown. *Id.* "[I]ntent of the [defendant] is irrelevant. Good faith is equally irrelevant." *Marshall,* 302 N.C. at 548, 276 S.E. 2d at 403. The Plaintiff must merely demonstrate the act "possessed the tendency or capacity to mislead, or created the likelihood of deception." *Edwards,* 128 N.C. App. at 575, 495 S.E. 2d at 924 (citation omitted). Additionally, failure to disclose information may be tantamount to misrepresentation and thus an unfair and deceptive practice. *Kron Medical Corp. v. Collier Cobb & Associates, Inc.,* 107 N.C. App. 331, 339, 420 S.E. 2d 192, 196 (1992). OxyHealth engaged in three separate unfair and deceptive trade practices, and their Motion for Summary Judgment on this cause of action must be denied.

1. **OxyHealth Marketed the OxyHealth Vitaeris 320 as Approved and Safe for the Treatment of Autism Despite the Fact that the Only Cleared Indication for Marketing is Acute Mountain Sickness.**

On August 2, 2000, the FDA cleared the OxyHealth line of portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320, to market "for the treatment of Acute Mountain Sickness." FDA 510(k), K001409, (Aug. 2, 2000), Dkt. No.36-4, p.1 (cleared to market for intended use: "to provide mild hyperbaria for the treatment of Acute Mountain Sickness"). AMS is a condition that results from exposure to altitudes in excess of 8,000 feet. It affects approximately 20% of people who are unable to properly acclimate to the increased altitude (reduced pressure); AMS is relatively rare. Tom Workman Declaration, ¶28. As such, the OxyHealth line of portable mild hyperbaric chambers can only be marketed by OxyHealth for the treatment of acute mountain sickness. It is undisputed that the OxyHealth Vitaeris 320 was not approved by the FDA for the treatment of autism and cannot be marketed for treatment of the symptoms of autism. Samir Patel Dep., p.53; Peter Lewis Dep., p.137.

Despite the fact that the OxyHealth Vitaeris 320 and the other OxyHealth portable mild hyperbaric chambers were only cleared by the FDA for marketing for the treatment of acute mountain sickness, OxyHealth began making claims about "anything and everything" they found on the internet, including that "hyperbaric will help you lose weight." OxyHealth Dep., pp.139-40. The FDA had to get involved before OxyHealth stopped making these claims.[33] *See* Exhibit S. From 2005 to 2010, OxyHealth attended approximately 80 conferences primarily focused on the treatment of autism. OxyHealth Dep., pp.24-39; *see* Exhibit T. Parents of children with autism spectrum disorders attended many of these conferences. OxyHealth Dep., p.39. At these conferences, OxyHealth purchased a booth, set up an OxyHealth portable mild hyperbaric chamber, and distributed brochures for their hyperbaric

---

[33] OxyHealth was still engaging in improper marketing in 2010 when the FDA made the company remove two autism articles from its website. *See* Email from Peter Lewis to Samir Patel (May 18, 2010) (Attached as Exhibit Q); Peter Lewis Dep., pp.28-29. In fact, OxyHealth has continued this pattern of deceptive conduct even after Jarred's death. *See* FDA Warning Letter to OxyHealth (Aug. 8, 2013) (Attached as Exhibit R) (Warning letter for marketing the OxyHealth Vitaeris 320 hyperbaric chamber without marketing clearance or approval, in violation of the Federal Food, Drug, and Cosmetic Act).

chambers, including the OxyHealth Vitaeris 320. *Id.* at 16-17. It is undisputed that OxyHealth's activities at these conferences constituted marketing. *See id.* at 122-25; *see also* Janet Presson Dep., p.178.

OxyHealth's marketing of its OxyHealth line of portable mild hyperbaric chambers at conferences solely focused on the treatment of autism is an unfair and deceptive trade practice because it has the "capacity or tendency to deceive" consumers into believing that OxyHealth's portable mild hyperbaric chambers are approved for the treatment of autism. *See Torrance v. AS&L Motors,* 119 N.C. App. 552, 555, 459 S.E. 2d 67 (1995) (citing *Marshall,* 302 N.C. at 548, 276 S.E. 2d at 403). Not only did OxyHealth's actions at these conferences create the "likelihood of deception," consumers were actually deceived. In May 2009, Amy Sparks attended a Hope for Autism Conference in Charleston, South Carolina. Sparks Declaration, ¶4. OxyHealth was present and exhibiting their portable mild hyperbaric chambers, including the OxyHealth Vitaeris 320, at this conference. *Id.,* ¶5. At the Hope for Autism Conference, an OxyHealth sales representative represented that OxyHealth hyperbaric chambers were approved by the FDA for the treatment of autism. *Id.,* ¶7. The OxyHealth sales representative took credit card information and sold OxyHealth hyperbaric chambers, including the OxyHealth Vitaeris 320, directly to parents of autistic children in Amy's presence at this conference. *Id.,* ¶8. Additionally, Amy received marketing material from the OxyHealth sales representative, including a brochure for the OxyHealth Vitaeris 320[34] and an article appearing in the IHA Journal The Pressure Point called "Autism and Its Growing Hyperbaric Movement"[35] *Id.,* ¶9. Based on the statements of the OxyHealth sales representative and the OxyHealth marketing material that Amy received at the Hope for Autism Conference, she believed that the Vitaeris 320 was approved by the FDA and safe to be used to treat individuals with autism. *Id.,* ¶13.

In August 2013, after the death of Jarred Sparks, the FDA warned the public that "hyperbaric oxygen therapy has not been clinically proven to cure or be effective in the treatment of cancer, autism, or diabetes"; in fact, this was the first sentence in an FDA publication entitled: "Hyperbaric Oxygen

---

[34] *See* Exhibit BB- OxyHealth Vitaeris 320 Brochure
[35] IHA, *Autism and Its Growing Hyperbaric Movement* (Sept. 2005) (Attached as Exhibit KK).

41

Therapy: Don't Be Misled." (Attached as Exhibit LL). According to the FDA, hyperbaric oxygen therapy has not been proven "to be the kind of universal treatment it has been touted to be on some Internet sites . . . 'Patients may incorrectly believe that these devices have been proven safe and effective for uses not cleared by the FDA. . .'" *Id.* If Amy Sparks had known that the OxyHealth Vitaeris 320 hyperbaric chamber was not approved by the FDA and not safe to be used to treat individuals with autism prior to Jarred's death, Amy would not have purchased it and brought it into the Sparks family home to treat Jarred's autism and he would still be alive. Sparks Declaration, ¶15.

2. **OxyHealth Falsely Represented that the OxyHealth Vitaeris 320 was Fabricated According to ASME PVHO-1.**

After receiving the OxyHealth Vitaeris 320 Brochure from the OxyHealth sales representative at the Hope for Autism Conference, Amy read it cover-to-cover, which included the statements "Patented 2-zipper seal facilitates self treatments" and "OxyHealth chambers are manufactured in the USA in accordance with FDA, ASME, PVHO, NFPA, and GMP regulations and codes." *Id., ¶*11; Exhibit BB. During the deposition of Samir Patel in this case, not only did he admit that the OxyHealth Vitaeris 320 did not comply with ASME PVHO, but he admitted that any such statement was both false and misleading:

> Q   Using the common English language understanding of the word "misleading," if anyone at OxyHealth, LLC or OxyHealth Corp has ever made a statement Vitaeris 320 was manufactured in accordance with PVHO, would that be a **misleading statement**?
> . . .
> THE WITNESS:  I suppose, yes.
> Q   If anyone at OxyHealth, LLC or OxyHealth Corp has ever said that the Vitaeris 320 was manufactured in accordance with PVHO, would that be a **false statement**?
> . . .
> THE WITNESS:  Yes.

Samir Patel Dep., p.50 (emphasis added).  Similarly, Peter Lewis testified as follows:

> Q.   Would you agree with me that any statement that's made -- that has been made that the Vitaeris 320 was manufactured in accordance with ASME PVHO would be a **misleading statement**?
> A.   Yes.
> Q.   Would it be a **false statement**?
> A.   A false statement.
> Q.   Would you agree that any statement that has been made that the Vitaeris 320 was manufactured in accordance with NFPA 99 standards would be a misleading statement?

42

A. Misleading.
Q. Would that also be a false statement?
A. Yes.

Peter Lewis Dep., pp.167-68 (emphasis added). Thus, OxyHealth's statement that "Oxyhealth chambers are manufactured in the USA in accordance with FDA, ASME, PVHO, NFPA, and GMP regulations and codes" is both false and misleading.[36] Not only does this statement create the "likelihood of deception," but consumers were actually deceived. Based on the OxyHealth Vitaeris 320 Brochure that she received at the Hope for Autism Conference and the statements of OxyHealth, Amy Sparks believed that the Vitaeris 320 was manufactured according to the proper standards, codes and regulations. *See* Sparks Declaration, ¶13. If Amy Sparks had known that the OxyHealth Vitaeris 320 hyperbaric chamber was not manufactured according to the codes, regulations and standards that existed to make sure that hyperbaric chambers are safely constructed with the proper materials, she would not have purchased it and brought it into the Sparks family home to treat Jarred's autism and he would still be alive. *Id., ¶*17.

3. **OxyHealth Marketed the OxyHealth Vitaeris 320 as Safe for Use in the Home Setting without Medical Supervision.**

The Portable Mild Hyperbaric Chamber Operating and Reference Manual provides as follows:

- The revolutionary design of the Mild Hyperbaric chambers offers a safe and effective means of providing mild hyperbaria. Its unique design allows the mild hyperbaric chamber to easily fit in the office, the clinic, and even a home. (P.2)

- The manual shows a woman in an OxyHealth portable mild hyperbaric chamber in a cluttered room without an attendant present. (P.3)

Operating and Reference Manual, Dkt. No.36-2. Additionally, the Portable Hyperbaric Chamber video appearing on www.oxyhealth.com states "No special training is required to operate the portable mild hyperbaric chamber. Once familiar with the unit, a user can easily give self treatments, a feature no other hyperbaric chamber can offer. A unique two zipper seal makes self treatments easy, as the user can do it

---

[36] ASME PVHO-1 applies to the design of the OxyHealth Vitaeris 320; nonetheless, the OxyHealth Vitaeris 320 did not comply with this standard when the hyperbaric chamber was manufactured and still does not comply today. Peter Lewis Dep., pp.96-97; Samir Patel Dep., p.45; Ron Natoli Dep., pp.32-33; Tom Workman Dep., pp.317, 331-33

all without any assistance."[37]  At the Hope for Autism Conference that Amy Sparks attended, an OxyHealth sales representative also stated that OxyHealth hyperbaric chambers were safe to use in the home setting. Sparks Declaration, ¶6.  However, these representations constitute an unfair and deceptive trade practice because they have the "capacity or tendency to deceive" consumers into believing that the OxyHealth Vitaeris 320 is safe for use in the home setting without medical supervision.  In fact, Amy Sparks was deceived into believing this.  *See* Sparks Declaration, ¶13 ("Based on the statements of the OxyHealth sales representative and the OxyHealth marketing material that I received at the Hope for Autism Conference, I believed that the Vitaeris 320 was . . . safe to be used in the home setting.").

The problem with these representations is that they simply are not true.  Prior to the death of Jarred Sparks, OxyHealth knew that someone could asphyxiate inside their portable mild hyperbaric chambers. OxyHealth Dep., pp.108-09.  OxyHealth knew that if a user is sleeping in the hyperbaric chamber during treatment and the quick disconnect valve disengages, then there would no longer be fresh air coming in the chamber. *Id.* at 162.  Moreover, prior to 2005, OxyHealth knew that $CO_2$ would no longer be exhausted from the chamber if the quick disconnect valve unintentionally disengaged. *Id.* at 104-05.  Nonetheless, OxyHealth never warned consumers of these hazards. *Id.* at 156-57.  OxyHealth was so concerned about the potential lack of oxygen in the hyperbaric chamber that it actually performed a small simulation with a couple of its warehouse employees to see if they would wake up inside the chamber in the event of power loss. *Id.* at 166.  Nonetheless, OxyHealth never warned consumers of the asphyxiation risks associated with the use of its portable mild hyperbaric chambers. *Id.* at 114-15, 166. OxyHealth also failed to warn consumers that the quick disconnect valve can unintentionally become disengaged and, therefore, the portable mild hyperbaric chamber should not be set up near other furniture such as a bookcase when used in the home setting. *Id.* at 159, 179; Peter Lewis Dep., p.188. OxyHealth's failure to disclose this information about risks and hazards associated with the OxyHealth Vitaeris 320 constitutes an unfair and deceptive practice. *See Kron Medical Corp. v. Collier Cobb & Associates, Inc.,*

---

[37] The following OxyHealth videos are being sent to the Court on CD: "A Tradition of Safety"; "McCue": and "Portable Hyperbaric Chamber."

107 N.C. App. 331, 339, 420 S.E. 2d 192, 196 (1992). Put simply, OxyHealth's pattern and practice of unfair and deceptive acts precludes the Court's granting of Defendants' Motion for Summary Judgment on this cause of action.

V: THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OXYHEALTH'S CONDUCT WARRANTS PUNITIVE DAMAGES

Plaintiffs have presented substantial evidence of willful and wanton conduct on the part of OxyHealth such that reasonable minds could differ on this issue. As discussed throughout this memorandum, OxyHealth knew of the hazards associated with the OxyHealth Vitaeris 320. OxyHealth knew that if the quick disconnect valve disengaged during foreseeable use, it was reasonably likely that fresh air would no longer enter the chamber and $CO_2$ would no longer exit the chamber, thus leading to asphyxiation. Nonetheless, OxyHealth did not warn consumers of these hazards. A reasonable conclusion to be drawn from this evidence is that OxyHealth intentionally disregarded the rights and safety of consumers, knowing that it was likely to result in injury. Moreover, OxyHealth's pattern and practice of deceptive and fraudulent acts further supports an award of punitive damages.

**CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment on Plaintiffs' causes of action for Inadequate Design, Inadequate Warning, Negligence and Negligent Failure to Warn, Unfair and Deceptive Trade Practices, and Negligent Infliction of Emotional Distress, as well as the issue of punitive damages.

Respectfully submitted this 9th day of January, 2015,

**MOTLEY RICE LLC**

By: /s/ W. Christopher Swett
Anne McGinness Kearse
T. David Hoyle
W. Christopher Swett
Attorneys for Plaintiffs
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

Justin D. Bice
Attorney for Plaintiffs
BICE LAW LLC
6000 Fairview Road, STE 1200
Charlotte, NC 28210
Justin@Bicelaw.us
Tel: (704) 243-8778
Fax: (704) 612-0273
State Bar No. 38033
Local Civil Rule 83.1 Counsel

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing *PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

     Kevin L. Chignell, Esquire
     Melanie Black Dubis, Esquire
     Parker Poe Adams & Bernstein
     150 Fayetteville Street
     Suite 1400
     Raleigh, North Carolina  27601
     kevinchignell@parkerpoe.com
     melaniedubis@parkerpoe.com
     *Attorneys for Defendants*


     Justin D. Bice
     BICE LAW LLC
     6000 Fairview Road
     STE 1200
     Charlotte, North Carolina  28210
     Justin@Bicelaw.us
     *Local Civil Rule 83.1 Counsel*


This the 9th day of January, 2015

          /s/ W. Christopher Swett
          W. Christopher Swett
          MOTLEY RICE LLC
          28 Bridgeside Boulevard
          Mount Pleasant, SC  29464
          Tel: (843) 216-9000
          Fax: (843) 216-9450
          cswett@motleyrice.com
          *Attorney for Plaintiffs*