# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION


AMY SPARKS, Individually, and
ROBERT D. SPARKS, as Personal
Representative of the ESTATE OF
JARRED B. SPARKS,

              Plaintiffs,


   vs.                          Civil Actin No.
                              5:13-CV-00649-FL

 OXY-HEALTH, LLC and OXY-HEALTH
 CORPORATION,

              Defendants.

------------------------------------------------------------

-----------------
SEPTEMBER 30, 2014
-----------------


    VIDEOTAPED DEPOSITION of PETER LEWIS in the
above-entitled action, taken before Katherine D.
Nichols, Registered Professional Reporter and Notary
Public in the State of New York, at the Hilton Garden
Inn, 800 Albany Shaker Road, Albany, New York,
commencing at 9:37 a.m. on the above date.

Case 5:13-cv-00649-FL    Document 69-2    Filed 01/09/15    Page 2 of 35

MAGNA
LEGAL SERVICES

agreement, Exhibit 89, and I'm going to have some questions for you.

As far as HTI is concerned for the Respiro, Solace, Vitaeris and Quamvis chambers, is Oxy-Health your sole customer?

A. Yes.

Q. You sell those chambers exclusively to Oxy-Health, who then distributes those chambers; correct?

A. Yes, correct.

Q. What is -- under this agreement, what's your understanding of Oxy-Health's duties under this agreement? What were they responsible for doing?

A. They were responsible to sell the chambers at a price that they determined and -- well...

Q. We can look at it to make it easier. I mean, they were supposed to distribute the chambers; correct?

A. Yes.

Q. Were they also responsible for marketing the chambers?

A. Yes.

Q. Do you have an understanding of what the

MAGNA
LEGAL SERVICES

term "marketing" means as used commonly in the English language?

A. Yes.

Q. And I'm not asking for a legal definition of marketing. I'm just asking, do you have a general understanding of what marketing is?

A. Yes.

Q. Based on that understanding, what is it that you expected Oxy-Health to do to market these chambers?

A. To use the claims that we were given by FDA, which is to be treating high altitude sickness, and only using those claims to advertise, brochures, conferences, whatever, for the purpose of selling the hyperbaric chambers with the requirement of having a prescription. I don't know if that says that in here, but that's -- my understanding is that they have to have a prescription.

Q. And you mentioned conferences. Do you agree with me that attending a conference is a form of marketing?

MR. CHIGNELL: I will object to the form. But you can go ahead and answer.

A. Yes, conferences would be a form of

MAGNA
LEGAL SERVICES

marketing.

Q. Likewise, having a member of your sales team, Oxy-Health's sales team member, at an exhibit at a conference is a form of marketing; correct?

A. To have who at the exhibit?

Q. For Oxy-Health to have a sales team member there to set up an exhibit at a conference --

A. Yes.

Q. -- would you agree with me that's marketing?

A. I would agree with that.

Q. Would you agree with me that sponsoring a conference is a form of marketing?

A. Yes, I would agree with that.

Q. And I think you mentioned brochure earlier. Would you agree with me that a brochure is a form of marketing?

A. Yes, I would.

Q. Would you agree that maintaining a website is a form of marketing?

A. Yes, I would.

Q. Now, are you aware that Oxy-Health has marketed Oxy-Health chambers for the use of

MAGNA
LEGAL SERVICES

treating autism in the past?

A.    They had mentioned that on a website, which I had to have them take down.

Q.    And what's your understanding when you say they had mentioned it on a website?

A.    It was pointed out to me by FDA.

Q.    Let me show you what's been previously marked as Exhibit 92 and ask if you recognize that document.

A.    Okay.

Q.    Sorry.  What is this document?

A.    This was an email that I sent in 2010 acknowledging that they had taken down articles on autism on the website.

Q.    What other instances prior to 2010 are you aware of that Oxy-Health marketed Oxy-Health hyperbaric chambers for the treatment of autism?

A.    I think when we first started, we were marketing it for a lot of things, and we received a warning letter to that effect back in 2000 by FDA saying, Hey, you can't say these things, and we kind of took exception to that because that wasn't part of a demo that we bought.

We bought the patent in 1993, and he made such claims.  But you know, we're not going to

MAGNA
LEGAL SERVICES

me that it says "the following statement sent by"?

A.    Sent by, yes.

Q.    Thank you.

Let me ask you to look back at the agreement, Exhibit 89, and look at Section 2.3.1. I'll read it into the record and you tell me if I read it accurately.

It says:  Oxy shall supply its own compressors or air filtration systems for chambers, subject to approval by HTI, which approval shall not be unreasonably withheld.

Did I read that accurately?

A.    Yes, you did.

Q.    Based on this provision, what was Oxy-Health's responsibility with respect to compressors used with the hyperbaric chambers?

A.    Due to the fact that these compressors had a weight to them, we decided after this agreement that they should not be supplying the compressors that we were approved on, which is the Gast compressors, which is a double head compressor; and that they should be drop shipped from a company out on the West Coast, which was Brenner-Fielder, and that was to save freight costs.

MAGNA
LEGAL SERVICES

So we made orders to Brenner-Fielder for the compressors that were drop shipped to Oxy-Health.

Q. You say a lot there, so we'll break it down.

Well, let me ask you a question again. What was Oxy-Health's responsibility with respect to compressors pursuant to this agreement?

A. That they would be receiving the compressors that would be drop shipped from Brenner-Fielder.

Q. And it says: Oxy shall supply its own compressors.

What's your understanding of that language?

A. I don't know. I can't answer that.

Q. Sir, you signed this contract; didn't you?

A. Yes, I did.

Q. Are you telling me you signed a legal binding document that you don't understand?

A. I don't remember. We purchased the Gast compressor, and that's what we submitted to get our 510(k) approved on, and then it was decided that this should be purchased out on the West

MAGNA
LEGAL SERVICES

fax to Samir Patel on December -- in December of 2002?

A.    I probably -- to keep him informed on, Would it have an impact on a 510(k), and I was just reassuring him that it did not.

Q.    What's Samir Patel's involvement with any 510(k) that would be submitted to the FDA?

A.    There wouldn't be.

Q.    So why are you sending him this fax?

A.    To make him feel comfortable that by adding this device to the chambers, that we're doing it legally and that FDA would not have an issue with it.

Q.    Oxy-Health doesn't sell these chambers, including the Vitaeris 320, without a compressor; correct?

A.    That's correct.

Q.    These chambers won't operate without a compressor; is that correct?

A.    That's correct.

Q.    Let me show you a document that I'm going to mark as Exhibit 112 and ask if you recognize that document.

          (Exhibit 112 was marked for
          identification.)

MAGNA
LEGAL SERVICES

A.    (Reviewing document.)  Yes.  This is a closeout for file after an inspection by FDA.

Q.    What's the date of this memo?

A.    September 21st, 2005.

Q.    You are the author of this memo?

A.    Yes.

Q.    Let me ask you to turn to the last page, and I'll just read into the record a portion of that top paragraph.

It says:  On the page of our 510(k) where it lists the specifications, it clearly indicates compressor.  I would certainly hope that there would not be an issue with using a compressor as this is the a backbone of our chamber business.  Without a compressor we cannot operate the mild chambers.

Did I read that correctly?

A.    Yes.

Q.    So part of the submission for the 510(k) clearance, you listed the compressor to be used with the chamber?

A.    Yes.  Compressor and foot pump.

Q.    You state:  The compressor, this is the -- well, you state:  This is the backbone of our chamber business.

MAGNA
LEGAL SERVICES

What do you mean by that?

A. Well, you can't -- you can't -- you could probably sell a chamber without a compressor, but it doesn't make sense to do that. You need the compressor to operate the chamber.

Q. Okay. So the compressor is an important component to the hyperbaric chamber without which the chamber won't operate as is intended; right?

A. Unless you supplied your own compressor.

Q. Well, doesn't the user manual state that the consumer must use the compressor provided by the manufacturer?

A. Yes, we do state that.

Q. So the compressors -- I'll ask the question again. The compressors that Oxy-Health provides to the consumer with the hyperbaric chambers --

A. Yes.

Q. -- they're an important component to the chamber without which it won't operate as intended; correct?

A. Correct.

Q. Thank you, sir.

Let me ask you to look back at the agreement again, Exhibit 89.

MAGNA
LEGAL SERVICES

Q.   Okay.  What is the date of this document?

A.   Looks like February '02.

Q.   And A for the change, it says:  All chambers to Oxy-Health would have new hose to compressor.

A.   Right.

Q.   Hose has quick disconnect to compressor. Correct?

A.   Yes.

Q.   Who's HTI's sole customer with respect to Oxy-Health chambers?

A.   Who's sole customer?

Q.   You've already testified to this earlier. Oxy-Health is your sole customer?  HTI?

A.   Yes.

Q.   The reason for the change A, it says "customer's request;" correct?

A.   Yes.

Q.   Okay.  Thank you, sir.

All right.  Let me show you what's been previously marked as Exhibit 104 and ask if you recognize this document.

A.   Yes.

Q.   What's the date of this document?

A.   December 7th, '05.

MAGNA
LEGAL SERVICES

Q.   And it says:  Originator's description of the change.  It says:  Add made in USA labels to all mild chamber jacket carry bags; correct?

A.   Correct.

Q.   And it says:  Originator's reason for the change.  Requested by distributor.

Do you see that?

A.   Yes.

Q.   Who's the distributor of your mild hyperbaric chambers?

A.   We have two.  We have -- we have one that distributes the Gamow bag and we have Oxy-Health.

Q.   Okay.  You see up at the top where it says "Description of the change," it says:  All mild chamber jacket carry bags.  But then it also says something different, Add a label to strap-on Gamow bag; correct?

A.   Yes.

Q.   So you agree with me that the Made in the USA label that was added to all mild chamber jacket carry bags was at the request of Oxy-Health?

A.   Yes.

Q.   Thank you.

So just based on those two documents

MAGNA
LEGAL SERVICES

alone, you would agree with me that Oxy-Health has initiated changes to the mild hyperbaric chambers; correct?

MR. CHIGNELL: I'll object to the form of that question. But you can go ahead and answer.

A. Yes.

Q. Thank you.

I asked you earlier -- well, give me a moment.

With respect to that USA label on the mild hyperbaric chambers, Oxy-Health requested it and then it was then put on there; right?

A. Yes.

Q. With respect to the hose with the quick disconnect valve, the document that I showed you before that, Oxy-Health requested that and that change was made too; correct?

A. Yes.

Q. Has Oxy-Health's role with respect to these chambers changed -- did it change at all from the date that this agreement was signed until 2009?

A. No.

MR. CHIGNELL: Object to the form. But

MAGNA
LEGAL SERVICES

go ahead.

BY MR. SWETT:

Q.   And when I'm asking that, they were your -- HTI's sole customer during that time period, correct, for the chambers that we've previously discussed?

A.   Yes.

Q.   They were the sole distributor of those same chambers; correct?

A.   Yes.

Q.   They participated in the selection of materials for those chambers; correct?

A.   No, I can't agree with that.  I know you're talking about the accessory items, and I'm focusing on the chamber itself.

Q.   Sir, do you consider the hose and the quick disconnect valve that hooks the only source of air coming into chamber an accessory item?

A.   No.

Q.   That's a component part of the chamber; correct?

A.   That is a component part, yes.

Q.   And Oxy-Health participated in the -- they had a say in the selection of that specific part that was used on the Vitaeris 320; correct?

MAGNA
LEGAL SERVICES

MR. CHIGNELL: I will object to the form. But go ahead.

A. No. They complained that the valve popped off the end of the hose at a show, at a conference, and the reason it popped off, it was because it had a check valve in it, and they reported this to us. We got together and said, We can't let this happen again. Do they make one without a check valve? Yes, they do. We then changed it with removing or buying a component that did not have a check valve.

So they complained to us that there was a problem. We solved the problem by changing the design of the hose.

Q. And they requested that a new hose be used with a different quick disconnect valve; correct?

MR. CHIGNELL: Objection to the form of the question. That was not his testimony. But go ahead.

A. They complained that there was a problem, and we solved the problem by changing the component.

Q. They requested a design change; is that a fair statement?

MAGNA
LEGAL SERVICES

MR. CHIGNELL: Objection to the form. But go ahead.

A. Yes. They requested a design change because of the problem that existed. They didn't make the design change, but they requested it.

Q. And sir, I don't mean to insinuate that they made the design change or they carried it out, but they requested it; right?

A. They requested it.

Q. And I think we are about to change the tape, but let me just ask you one more question.

From that time period, from the date the agreement was signed until 2009, they still had to give written consent for any design changes; correct?

A. I don't -- I don't know how to answer that question.

Q. Did anything change from 1999 to 2009 that eliminated provision 3.3 in the agreement between Oxy-Health and HTI?

A. No. We never made reference to that paragraph in that -- in that agreement.

I'm still having an issue with your insinuation that they were involved in the design of our part.

MAGNA
LEGAL SERVICES

A.   Okay.  1.1.1.

Q.   I'll read it into the record.  You tell me if I read it correctly.

A.   Okay.

Q.   (Reading.)  This standard provides requirements for the design, fabrication, inspection, testing, marking and stamping of pressure vessels for human occupancy having an internal or external pressure differential exceeding 2 PSI, hereafter called PVHOs or chambers.

Did I read that correctly?

A.   Yes, you did.

Q.   All right.  The first thing it says, "this standard provides requirements."It doesn't say it provides recommendations; is that fair?

A.   It says it provides requirements.

Q.   Okay.  Is the Vitaeris 320 a pressure vessel for human occupancy?

A.   Yes, it is.

Q.   Is the Vitaeris 320 a PVHO having an internal or external pressure differential exceeding 2 PSI?

A.   Yes, it does.

Q.   By ASME definition, a hyperbaric chamber

MAGNA
LEGAL SERVICES

is a PVHO; correct?

A.   By definition a what?

Q.   A pressure vessel for human occupancy. It's at the bottom of that paragraph if you want to read it.

A.   It says --

Q.   PVHOs include hyperbaric chambers; correct?

A.   Yes.  Yes.

Q.   Anywhere in this scope does it differentiate between a soft-sided hyperbaric chamber and a hard-sided hyperbaric chamber?

A.   No.

Q.   And you're familiar with this document in its entirety; correct?

A.   I'm familiar with it, yes.

Q.   Is there anywhere in the entire document that differentiates between whether it applies to soft-sided chambers or hard-sided chambers?

A.   Yes.  There's a non-mandatory appendix that's part of this which addresses chambers that don't fall within these categories.

Q.   And what you're referring to are specific code cases where --

A.   Code cases.

MAGNA
LEGAL SERVICES

Q. -- where manufacturers have applied to have their chambers become PVHO-compliant pursuant to PVHO standards; correct?

A. Correct.

Q. Okay. So you would agree with me that PVHO-1 does apply to soft-sided chambers, but they review it a case-by-case basis?

A. Yes, they review it on a case-by-case basis.

Q. Do you agree with me by the scope of this document, ASME PVHO-1 clearly provides requirements for the design, fabrication, inspection and testing of the Vitaeris 320?

A. No. Because that's a portable chamber that doesn't apply to PVHO-1.

Q. Let me ask my question again. Just looking at the scope of this document, there's nothing in here that says it does not apply to the Vitaeris 320.

MS. PACKER: Just for clarification, are you asking him about the entire document now?

MR. SWETT: 1.1., Scope.

BY MR. SWETT:

Q. Is there anything in the scope that says this does not apply to soft-sided hyperbaric

MAGNA
LEGAL SERVICES

chambers such as the Vitaeris 320?

A. I guess -- yeah, I guess it would apply.

Q. Did the Vitaeris 320 meet all of the PVHO-1 safety standards at the time it was cleared for marketing by the FDA?

A. No.

Q. Did the Vitaeris 320 at issue in this case meet all the PVHO-1 safety standards at the time it was manufactured in 2005?

A. No.

Q. As we sit here today, does Vitaeris 320 meet all the PVHO-1 safety standards?

A. No.

Q. As a fabricator of a hyperbaric chamber, what's your understanding of what a safety standard is?

A. A safety standard would be guidelines to produce a device that was safe and effective for use.

Q. Why is it important to meet safety standards?

A. Why is it important to meet safety standards? I think without safety standards, people could make anything they want and put it on the market. I think that's why FDA has the

MAGNA
LEGAL SERVICES

chambers on the market, other than SOS, that doesn't -- that meets an international standard.

Q. The SOS Hyperlite did meet PVHO standards; correct?

A. Yes. Their case eight or nine, whatever case code they had, yes.

Q. Do you recall when that was issued?

A. I'm thinking 19 -- mid-1990s, something like that. Quite a long time ago.

Q. All right. Moving along, switching gears a little bit. Do you intend to offer an opinion in this case whether the Vitaeris 320, back in 2005, and I guess even the present day, is safe and effective for its intended use?

A. Yes.

Q. And what is your opinion in that regard?

A. Because of the performance testing that we did on it. We did burst testing with a ratio of three to three and a half. We have since increased that burst ratio to four, according to this, 4 to 1.

We did cycle testing. 10,000 cycles we put the thing through. We did drop testing. We did puncture testing. I mean, all the testing that PVHO has indicated. The thing that we don't

MAGNA
LEGAL SERVICES

sickness; correct?

A.   Correct.

Q.   It wasn't cleared for the treatment of cerebral palsy; was it?

A.   No.

Q.   The Vitaeris 320 can't be marketed for the treatment of cerebral palsy; can it?

A.   No, it can't.

Q.   The FDA did not clear the Vitaeris 320 for the treatment of autism; did it?

A.   No, it did not.

Q.   The Vitaeris 320 cannot be marketed to treat the symptoms of autism; can it?

A.   No, it can't.

MR. CHIGNELL:  Objection to form.

MR. SWETT:  What's the basis?

MR. CHIGNELL:  Leading.

MR. SWETT:  And just for the record, I'll cite Federal Rule 611(c)(2).

BY MR. SWETT:

Q.   I may have asked you this already, Mr. Lewis, but the FDA classified the Vitaeris 320 as what class of medical device?

A.   Class II.

Q.   Do you know what considerations the FDA

320 falls within the scope of NFPA 99 standards?

A. It does not.

Q. It does not fall within the design pressure of the NFPA 99 standards?

A. I don't think NFPA 99 has pressure related in it. I think it has more to do with flammability, which it doesn't meet the flammability of the requirement.

Q. If I represent to you that the NFPA 99's design pressures is from 0 to 100 PSI, would you have any reason to dispute that?

A. No.

Q. What knowledge or experience do you have with NFPA 99?

A. I have read it. I've responded to FDA on every component of it as it compared to the Quamvis.

Q. Anything other than reading it and responding to the FDA?

A. No.

Q. Would you agree with me that any statement that's made -- that has been made that the Vitaeris 320 was manufactured in accordance with ASME PVHO would be a misleading statement?

A. Yes.

MAGNA

LEGAL SERVICES

Q.   Would it be a false statement?

A.   A false statement.

Q.   Would you agree that any statement that has been made that the Vitaeris 320 was manufactured in accordance with NFPA 99 standards would be a misleading statement?

A.   Misleading.

Q.   Would that also be a false statement?

A.   Yes.

Q.   Are you aware that both of those statements has appeared in marketing brochures for the Vitaeris 320?

A.   No.

Q.   Let me show you what's previously been marked as Exhibit 106.

A.   (Reviewing document.)

Q.   Are you familiar with this set of documents?

A.   Yes.

Q.   Okay.  What is this top page?

A.   Pardon me?

Q.   What are we looking at, the HT 00414?

A.   This is an invoice to Oxy-Health for five Vitaeris 320 chambers.

Q.   One of those chambers being the chamber

MAGNA
LEGAL SERVICES

in which Jarred Sparks died; correct?

A. Yes.

Q. Can you tell me from this invoice exactly what component parts, everything that HTI sent to Oxy-Health with respect to that chamber.

A. We would have sent a chamber, a jacket, a carry bag, hoses with connections, bolster covers, and that's all.

Q. Can you tell me from this document whether or not HTI sent a mattress?

A. No, it did not.

Q. Did HTI send a compressor?

A. No.

Q. Do you know where Oxy-Health obtained the mattress that was sent with the Vitaeris 320, Serial No. 3398?

A. No, I don't.

Q. Do you know where Oxy-Health obtained the compressors that were sent with Vitaeris 320, Serial No. 3398?

A. Yes.

Q. And where did those compressors come from?

A. They came from Brenner-Fiedler in California.

MAGNA
LEGAL SERVICES

Q.   Were they shipped directly to Oxy-Health?

A.   Yes.

Q.   Now, do you know if Oxy-Health received any other parts from any other entity other than what we've just discussed?

A.   There is a frame that goes with them. They probably received a frame.

Q.   Do you know where they received the frame from?

A.   No.

Q.   Any other components that make up this whole system that we haven't discussed?

A.   No.

Q.   Now, once they receive all these parts -- or wait.  Let me back up one minute and ask you one more questions.

When you said you sent them a chamber, what does that consist of?

A.   The bladder with the jacket on it.

Q.   Okay.

A.   Ready to be zipped up and connected to a compressor with a hose that we provide.

Q.   Now, once Oxy-Health receives all these parts, do you know what Oxy-Health does with these parts, if anything, prior to shipping them to the

MAGNA
LEGAL SERVICES

consumer?

A. Yeah. I think they inspect them to see that if it's clean because they've had complaints about smudge marks on our chamber, which we try to avoid. But it's a cleanliness-type inspection.

Q. Do you know whether or not they run the chambers?

A. I don't know if they do.

Q. You don't know one way or the other?

A. No.

Q. Do you know how they box them up and ship them out?

A. They have their own -- they have their own box for that.

Q. Do you know if there's writing or anything on that box that they use?

A. Yeah. I think their name is on it.

Q. If that is the case, sir, would you agree with me that that would constitute repacking the device prior to sending it to the consumer?

A. I don't know.

Q. You don't have an opinion on that?

A. No.

Q. Whether taking it out of the boxes -- how many boxes do you ship those parts in?

MAGNA
LEGAL SERVICES

A. We ship them four in a box.

Q. And if they put those materials in their own box or boxes, would you not agree with me that that's repackaging the product?

A. That's a stretch. Repackaging. That's hard to say.

Q. You believe that's a stretch?

A. Yeah, I think so.

Q. What would they need to do to constitute repackaging as you understand the term used in the common English language?

A. I think they would have to do something to the product itself.

Q. To repackage it?

A. Uh-huh. To repackage it, you would have to do something to the product.

Q. Such as what?

A. I don't know. I don't know. Take it out?

Q. Let me ask you this: If they take it out of the box that you send it in and put it in their own box, is that repackaging?

A. No, I wouldn't call that repackaging.

Q. Okay. If they take it out of the box that you send it in, take the compressor out of

MAGNA
LEGAL SERVICES

the box that it comes in from this company that drop shipped it, hook it up, run it to make sure it runs, unhook it, puts it in their own box; is that repackaging?

A. No.

Q. That's not repackaging?

A. I would not say so.

Q. Sir, in your opinion, in your understanding of the word, what constitutes repackaging then?

A. If they do something to the product. They're not doing anything to it. They inspect it, they might turn it on, but they're not doing anything to the product.

Q. So you expect the jury to believe that they would need to do something to the product in order to repackage it?

A. Uh-huh.

MS. PACKER: Objection. Asked and answered.

BY MR. SWETT:

Q. Okay. Thank you, sir.

Just so I'm clear, they would need to do something to the product other than taking it out of the boxes that it comes in, hooking it up,

MAGNA

LEGAL SERVICES

turning it on, unhooking it, putting it a box with the mattress that it obtained, putting the compressors in boxes with its name on it, and then shipping it to the consumer; that would not be repackaging it?

        MR. CHIGNELL:  I'll object to the form of the question.

        MS. PACKER:  Objection.

    A.   I don't know the specific procedures they have for shipping these out.

    Q.   I'm asking you to assume that fact scenario that I just told you; would that be repackaging?

        MS. PACKER:  Objection.

        MR. CHIGNELL:  I'll object.

BY MR. SWETT:

    Q.   It's support by evidence in the record, that's why I'm asking you that question.

    A.   No.  I would not consider that repackaging it.

    Q.   Thank you.

        On that exhibit we were just looking at, exhibit -- what number is it, the invoice?

        MR. CHIGNELL:  106.

MAGNA
LEGAL SERVICES

BY MR. SWETT:

Q.   106, can you just tell me what the back two pages are.  It says a pick list.  I was just curious if you could tell me what that is.

A.   A pick list is a bill of material for the bladder.  And we give each of the components code numbers, and as -- for traceability, which is a requirement of the FDA.  When a lot comes in, when we receive a lot, we give it a lot number so we can trace it back to a purchase order from the vendor.

So when they pick these for a -- normally it's a lot of five to eight chambers, they would put what lot number it was picked from.

Q.   Okay.  Just so I'm clear, this pick list just references parts that are attached to the chamber bladder; is that what you said?

A.   And jacket and carry case.

Q.   Would it also include the hose and the disconnect valves?

A.   It would include the hose and a disconnect.

Q.   So would it be fair to say that everything that you send to Oxy-Health with respect to a chamber would be listed on this pick

MAGNA
LEGAL SERVICES

list?

A.   Yes.

Q.   Okay.  Thank you, sir.

What do you know about Jarred Sparks' death and the use of the Oxy-Health chamber on that night?

A.   Well, I know that the mother asked the youngest son to prepare his brother to go into the chamber, and -- which he did.  And he claims that he made the connection to the -- from the compressor to the chamber, he turned it on, and when he left, he indicated that he heard the hissing noise coming from the relief valves, which would indicate that this was fully pressurized.

And then the mother was to let him out after a certain period of time, and I don't know, normally it's an hour, but perhaps it was longer, and she fell asleep.  And he was left unattended, and the hose became disconnected somehow and he suffocated.

Q.   Do you have any opinion as to how that quick disconnect and the hose became disconnected?

A.   I don't know.  The only way it can be connected [sic] is if the push button was to be compressed.

MAGNA
LEGAL SERVICES

that CO2 will not be exhausted from the chamber if one of those quick disconnect valves becomes disconnected?

A. No.

Q. Is there a warning anywhere on the chamber to that respect?

A. No.

Q. Is there a warning anywhere in the manual that if one of the quick disconnect valves facilitating the flow of fresh air to the chamber -- strike that.

Is there a warning anywhere in the manual that one of the quick disconnect valves facilitating the flow of fresh air in the chamber can become disconnected unintentionally?

A. No.

Q. Is there a warning as to that effect anywhere on the chamber?

A. No.

Q. Is there a warning anywhere in the manual that the chamber should not be set up near other furniture in the home setting?

A. I don't think so.

Q. Any warning anywhere on the chamber saying that?

MAGNA
LEGAL SERVICES

of the treatment.

Q.   But this chamber is designed so an individual can perform self-treatments; isn't that right?

A.   Yes.  Yes.

Q.   And in the manual it says that one, a person can perform self-treatments; correct?

A.   Yes, they can.

Q.   And therefore, it's foreseeable that someone could perform self-treatments without the use of an attendant?  They don't need an attendant?

A.   Not according to our caution areas, that we recommend that an attendant be present at all times.

Q.   Do you have an opinion on whether or not that is an adequate warning?

A.   Yes.  Yes, I consider that adequate.

Q.   And do you intend to offer -- earlier I asked you about whether you intended to offer opinions on whether warnings met ANSI warning standards, and you said no.  I'm curious if that's your personal opinion, or are you intending to offer an expert opinion based on --

A.   It's my personal opinion.

MAGNA
LEGAL SERVICES