# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

AMY SPARKS, INDIVUALLY,      )
AND ROBERT D. SPARKS, AS     )
PERSONAL REPRESENTATIVE OF)
THE ESTATE OF JARRED B.      )
SPARKS,                      )   Case No. 5:13-CV-00649-FL
                             )
          Plaintiffs,        )
                             )
     vs.                     )
                             )
OXY-HEALTH, LLC AND          )
OXY-HEALTH CORPORATION,      )
                             )
          Defendants.        )
_____)

30(b)(6) DEPOSITION OF THE PERSON MOST
KNOWLEDGEABLE FROM OXY-HEALTH, LLC AND OXY-HEALTH
CORPORATION, SAMIR PATEL, taken on behalf of
Plaintiffs, at 9801 Airport Boulevard, Los Angeles,
California, commencing at 9:34 A.M. on Wednesday,
September 17, 2014, before SHANNA GRAY, Certified
Shorthand Reporter Certificate No. 13690.

-   -   -

MAGNA LEGAL SERVICES
(866) 624-6221
www.magnaLS.com

MAGNA
LEGAL SERVICES

Page 16

Oxy-Health -- of any speeches that anyone affiliated with Oxy-Health would have given at these conventions?

A. No. We don't have anybody affiliated with Oxy-Health that gives speeches. I -- I will say I give a presentation.

Q. Okay. Presentations.

A. Of safety and things. We've done maybe three, three safety, and it's called hands-on hyperbarics and how to use the hyperbarics.

Q. Okay.

A. At a physician conference.

Q. So dating back -- let me ask you, dating back, let's say, ten years --

A. We've given three.

Q. You've given three yourself?

A. Three. Three myself.

Q. Has anyone else at Oxy-Health, affiliated with Oxy-Health given any presentations?

A. I use a model, if you would, like somebody to get in the chamber, get out of the chamber, that type of thing, but I'm doing the talking.

Q. So when you say -- well, let me say -- and I'll try to generalize and you can correct me if I'm wrong, but at all of these shows listed on Exhibit 88 typically Oxy-Health has an exhibit or something set up, correct?

MAGNA
LEGAL SERVICES

Page 17

A. We have a booth set up, yes.

Q. Okay. And as part of that booth do you have a sales rep affiliated with Oxy-Health there sort of demonstrating the use of the chamber?

A. Yes, including myself.

Q. Okay.

A. Demonstrating the chamber, we don't necessarily show the use. It's -- the chamber is there.

Q. Do you cut it on?

A. It is on. I mean, just to show that -- how it is inflated.

Q. Do you have anyone -- have you ever had anyone do a dive at any of these shows in your Oxy-Health chambers?

A. Sometimes. Not necessarily all the time.

Q. And just, again, glancing through this list of shows here over the last -- this looks like a ten-year list, some of these shows are specific to topics of autism, correct?

A. Some, yes.

Q. There's -- one of the areas of inquiry is policies of insurance. I know there was an -- in response to the discovery there was a mention of an insurance policy, and I'll get to it a little bit later.

But it appears that Oxy-Health may also be an additional insured on an insurance policy taken out by

MAGNA
LEGAL SERVICES

Page 24

stuff is just not kept.

MR. SWETT:  Sure.

MR. CHIGNELL:  But that's --

MR. SWETT:  But he's indicated that he'd be able to pull a list of the amounts of the sponsorships, and I would request that you pull that and provide that to your attorney who can then get that to us.

Would you be able to do that?

THE WITNESS:  It would take some time because we're going back to 2005.

BY MR. SWETT:

Q.  Okay.  And I could even narrow it for you if you just wanted to pull any of them dealing with IHA or any event touching on autism.  If that would speed up the process, I'd be happy to limit it to just those two areas.

A.  IHA is simple because we don't give much to them.

Q.  Okay.

A.  And autism --

Q.  I saw a Defeat Autism Now and some other autism --

A.  At those we basically buy a booth so it would be like 2- to $3,000 for a booth that we buy.

Q.  Okay.  Or actually if you wanted, you could go -- if you have knowledge, you could go through the list and sort of just look at the different ones touching on autism

MAGNA
LEGAL SERVICES

and tell me that type of information, whether you sponsor -- I mean, I've seen in the past where I believe Oxy-Health has sponsored some of those $50,000 range?

A. So Parker Seminars is chiropractic. Stroke is stroke. Orthomolecular is nothing to them --

MR. CHIGNELL: Do you want him to go through the whole list?

MR. SWETT: No, he can just go through the ones -- identify the ones dealing with autism. That's fine.

MR. CHIGNELL: Do you have a...

MR. SWETT: I don't have another copy.

MR. CHIGNELL: I need -- make sure these are the right ones. I believe -- it doesn't have the Bates number on it, though. I actually had to hand Bates-stamp mine.

THE WITNESS: So in 2005 we only have DAN, Defeat Autism Now, Long Beach.

BY MR. SWETT:

Q. Okay. And what was Oxy-Health's sponsorship? That would have been a booth?

A. We didn't sponsor. We just bought a booth.

Q. Okay. So you would have purchased a booth?

A. I remember that one.

Q. All right.

A. We bought a booth, exhibited, called it a day.

MAGNA
LEGAL SERVICES

Page 26

Q. All right. How about 2006?

A. TACA, Talk about Curing Autism, in Corona, California. That was a booth. Autism Society -- and that booth would have cost 2,500, 3,000.

Q. Okay.

A. Autism Society of America, LA Chapter Conference. Again, that would be a very cheap booth. $1,500.

Autism Fair and Conference in New York, Lake Grove, New York, third annual conference. That is a 2- to 3,000.

Q. That's a booth?

A. That's a booth.

Q. Okay.

A. DAN conference is a booth. TACA Costa Mesa is a picnic where that's considered a sponsorship, but it's really a booth -- but so I don't know how to define that. You can ask them how they categorize it but...

Q. Did Oxy-Health provide any money for that?

A. We gave 2- to $3,000.

Q. Okay.

A. Autism One, Chicago is a double-booth so probably 5,000.

Q. Okay.

A. Mini-DAN is very cheap. It's 1,500, and that's in July.

MAGNA
LEGAL SERVICES

Page 27

Q. How about the Autism Society of America's conference right up above there?

A. Did I skip that? I thought I said that. Oh, sorry. Rhode Island. That's 1,500. 1,500 to 2,000 that was what it was.

Q. Okay.

A. U.S. Autism and Asperger's Association, we gave 20,000 for that one.

Q. Okay. That's in August 2006?

A. Park City, Utah.

Q. Okay.

A. Yeah, 20 grand. The 20 grand is a sponsorship, and then the booth space which is like 2- to 3,000.

Q. Okay. Looks like there's another DAN Style conference.

A. DAN Style Conference, Hong Kong. Oh, gosh. I got that free except my cost to go out there. They wanted us out there because there were a lot of Asian physicians out there. So that was a free booth.

Q. Okay.

A. My gosh. My memory is better than I thought. Mini-DAN Vermont is another 1,500, cheap.

Moving on to 280, whatever that is, the page number.

Q. Looks like there's a Defeat Autism Now, Seattle

MAGNA
LEGAL SERVICES

at the top.

A.    Oh, there it is.  Seattle, small conference.  I would say 2,500, 2,000, 2,500.

Q.    Okay.

A.    There's another Mini-DAN in Jacksonville.  Again, 2- to 2,500.

Q.    That's getting us into 2007, correct?

A.    Now, right.  Correct.  January.  Autism conference in Anaheim that would be generally 15 -- 2,000.

Q.    2,000?

A.    2,000.

I really have no clue about the Illinois conference, Natural Approaches for Autism Treatment.  That one -- it seems like a very tiny conference so I would say two -- no more than 2,500 but...

Q.    Okay.

A.    But just looking at the name, but this is pretty old.  I didn't know I was going to be talking about money.  Autism '07, Lafayette.  That's a funny one.  That was $500 as I recall.  The cab ride was more than the cost of the conference.  That's how I remember it.

DAN Spring Conference, Virginia, 3 grand.  TACA Cost Mesa, I -- 2007, I started giving them some money.  So I would say about 5,000.

Q.    Okay.

MAGNA
LEGAL SERVICES

Page 29

A. Autism One, Chicago, 20,000. That's in May of 2007.

Moving on to the next page --

Q. Going back to June, looks like there's a Lyme-Autism Connection Conference?

A. June?

Q. June.

A. Oh, Lyme-Autism is -- forgive me. I'm thinking of the person. That's a small conference so 1,500 to 2,000.

Q. Okay.

A. Yeah, 15 to 2,000.

USAA, Denver, Colorado. I would -- that was 15,000.

Q. 15,000?

A. 15.

Q. Okay.

A. Mini-DAN, less than 2k. Fall DAN Conference, Garden Grove. I bought a booth for 3,000.

Can you hear me? I'm sorry. I tend to mumble.

Q. So maybe if you could speak up just a little bit. I don't know how --

A. Okay.

Q. -- well his camera picks up volume.

A. Yeah, Mini-DAN would be -- yeah, it's a small

MAGNA
LEGAL SERVICES

Page 30

conference. So 1,500.

NATTAP ASA is almost 500, it's tiny, tiny.

Fall DAN Conference, Garden Grove, I bought a booth for 3,000. It was on a corner. Yeah, for 3,000.

Q. Okay.

A. Long Island Autism Conference is probably 1,500.

Skip, skip, skip, skip.

Q. That gets us into 2008, right?

A. Now we're in 2008. Dan Spring Conference, 3 grand, 3,000.

ASA would be 1,500, maybe 2,000. That's May. AutismOne is -- what was that? I would say no more than 5,000 in 2008.

Q. Okay.

A. NAA, Kansas, 15,000. No, sorry. That was a small one. So -- Kansas. No. NAA would be about 5,000.

Q. Okay.

A. It's not a big show. Lyme-Autism, I'd go back to 1,500, 2,000 max.

ASA, Florida was a $2,000 booth, I would say.

THE REPORTER: 2,000?

THE WITNESS: 2,000, yes.

USAAA Autism in Kansas -- oh, sorry, Austin. Austin, sorry. Probably 15,000, 15 to 20. Keep it vague in that sense. Autism Symposium in Long Beach in -- what

MAGNA
LEGAL SERVICES

Page 31

month is that?

BY MR. SWETT:

Q.   2008?

A.   September 2008, right?

Q.   Yes.

A.   Autism Symposium, it was a small show.  That was 1,500.  Going to October now, International Summit was just a meeting, so it was less than 1,000.  DAN Clinic Seminar, San Diego was big.  I probably spent 5,000 for that booth.

Q.   Okay.

A.   And these are all booths.  Remember that.

Q.   Okay.

A.   I'll tell you -- when it's big numbers, that's a sponsorship.

Q.   So the 15 to 20,000 those --

A.   Those were the sponsorships.

Q.   Okay.

A.   Yeah.

NAA, Weston, Florida, 15,000 sponsorship with a booth.  NATTAP Conference, I would say that's about 3,000.  Skip, skip, skip.  Bio, South Bend, Indiana.  That's 1,500.

Q.   And that's in January 2009?

A.   That would -- 2009 now.

MAGNA
LEGAL SERVICES

Page 32

Autism Conferences of America.  That was actually a -- they gave it to us.  The autism conferences started giving us free booths.  It's -- we supported them.  We helped their kids and the guy that runs it, a physician, loves us.  So...

American Medical Autism Board was less than a thousand.  Tiny, tiny conference.  Integrative Medicine for Autism conference in Bangkok, Thailand.  I don't even know why this is on here because it's not something we exhibited at.  I just attended.

Q.   Okay.  Fair enough.

A.   Some -- one of our -- one of our doctors that uses our chambers was speaking there.  So I went there to support him.  So this sounds like a mistake.

Vancouver 3 grand.  That's February.  2009.

Defeat Autism Now, Atlanta, 3,000 -- 3 to 5,000, I'll correct myself.  I don't know for sure.

USAAA, New Jersey.  We went small, 10,000.  Hope for Autism, 1,500.

Q.   1,500?

A.   1,500.  1,500.  I know that lady.  Can't think of her name.  Yeah.  I see her face.  I don't know her name. AutismOne, Chicago, Illinois.  I went big there, 20 to 25.

Q.   20 to 25,000?

A.   Thousand.  And that was a sponsorship with a free

MAGNA

LEGAL SERVICES

Page 33

booth.

Q. Okay.

A. I just want to check the year.

Q. May 2009.

A. Yes, probably more 20, 2009, I would say.

THE REPORTER: Probably more 20?

THE WITNESS: 20, 20 is what I would say.

Where are we at? I lost my page.

MR. SWETT: We're on --

MR. CHIGNELL: What number at the bottom?

MR. SWETT: June. I don't have a number at the

bottom. June, 2009. So...

MR. CHIGNELL: Oh, shoot.

MR. SWETT: At the top. Still should be the

first month at the top.

MR. CHIGNELL: 283.

THE WITNESS: 283? Okay. Mini-DAN is -- they

charged 1,500, Mini DANs. I would go there. Mini-DAN.

Autism Resource Fair in Plantation. No clue. I

got to give you that. No clue.

BY MR. SWETT:

Q. Okay.

A. USAAA Los Angeles, we did all the, what do you

call, logistics for them so free booth.

Q. Okay.

Case 5:13-cv-00649-FL   Document 69-8   Filed 01/09/15   Page 14 of 51

MAGNA

LEGAL SERVICES

Page 34

A.    But my labor.

ASA 40th National Conference, I think they charge about 2,000, 2,500 something like that.  It was a small booth.  Mini-DAN Autism Conference is Mini-DAN.  Again, that's one of these freebies where I do logistics because it's local, and I help them warehouse their shipments and so they give it to me.

Autism Asperger's conference, again, I do -- that's the same thing -- that's the same as the one in August.  They give it to me.

Q.    Okay.

A.    Again, New York.  New York, actually I probably paid.  I didn't do logistics.  No more than 2,000.

Defeat Autism Now we're looking at about 3,000, Dallas, Texas.  Actually you know what, on that one they refunded the money.  I didn't exhibit in Dallas.  I bought the booth, registered, and they backed off.  So -- so but it was 3,000.

Autism Society of Illinois, 1,500.

AutismOne Canada, 5,000.  That was a sponsorship with a booth.

NAA 20,000.

Q.    Okay.

A.    That's November.

Q.    Okay.  Does that get us to 2010?

Case 5:13-cv-00649-FL    Document 69-8    Filed 01/09/15    Page 15 of 51

MAGNA
LEGAL SERVICES

Page 35

A. We're in 2010 now.

Q. Okay.

A. Autism: Hope in Action. That's like $1,000. Tiny, tiny show.

DAN, clinician seminar in February, 1,500.

I have zero clue on the Fourth Annual -- I don't even recognize this thing in Anaheim, California in February.

Q. Okay.

A. Of 2010. I don't recognize it. I -- no, I don't recognize that. I mean, I don't --

Q. That's fair.

A. -- remember.

The Curando El Autismo is in Puerto Rico. That was like 2 grand. I didn't do that show. I can't pronounce it even.

Autism Society in Phoenix is the autism -- that was a freebie. We did logistics. We drove our trucks and all their stuff out there. That's the same as the other freebies we got. Same company.

Q. Sure.

A. Autism Today, 5,000. Sponsorship with booth for 5 grand.

Q. Okay.

A. Hope for Autism was free. Yeah, it was free.

MAGNA
LEGAL SERVICES

Page 36

Autism Around the World Symposium, 3,000.  That's in Dubai.

World Autism Congress in Asia, Hong Kong.  When did I go there?  That would have been 4,000.  And that's just a booth cost, not a sponsorship.

Okay.  Now we get AutismOne/Generation Rescue okay.  I gave 30,000.

Q.   That was May of 2010, correct?

A.   Yes.

Q.   Okay.

A.   We basically -- they basically pitched to me to pay for all the attendees.  That's what it was.  But that gave me the booth, too, and I got a significant booth.

THE REPORTER:  Significant booth?

THE WITNESS:  Yeah.

Autism Resource Fair would be 1,500.  I have no clue about this mini conference on Autism and Biomedical in New Jersey.

BY MR. SWETT:

Q.   Okay.

A.   I think that -- I believe that was at a doctor's clinic.  I don't believe we paid for it.  We just -- it was one of our doctors that bought our chamber that put on a conference in their clinic.  So we just showed up.  So it shows up on my calendar because this is a calendar date

MAGNA
LEGAL SERVICES

Page 37

just filled out.

Q. Okay.

A. So I don't think we paid for that. But New Jersey sounds like Dr. Dornfeld.

THE REPORTER: Like?

THE WITNESS: Dr. Dornfeld. He did his own conference.

TACA Family Picnic is just a thing we attend. It's not even a conference. We don't even display. We just go there and have fun with the kids. It's a picnic.

ASA National, Dallas, 2,000.

Back to School is same as the other -- or it's the same group that we do logistics for. So they give it to us. Minnesota TACA is free. California TACA is free. Back to School is free. It's the same one. TACA chapter meeting is free. USAAA, tempted to say 10 to 15,000.

BY MR. SWETT:

Q. Okay.

A. What year are we in?

Q. Still in 2010.

A. I don't believe we attended the ARI meeting.

Q. Okay.

A. I just attended it. We didn't exhibit.

Q. Okay.

A. TACA Nevada was free. TACA Wisconsin was free.

MAGNA
LEGAL SERVICES

NAA, St. Pete, so 20,000.

Q.   Okay.  Does that get us to 2011?

A.   We're now in 2011.

Q.   All right.  Let's stop there.  Just stop from 2005 to 2011.

A.   Okay.

Q.   Were any of those put on, co-sponsored or anything by IHA, any of the autism conferences we just discussed?

A.   No.

Q.   Okay.  At these shows when you were just by the booth --

A.   Pause a second.  Let me look at them if you don't mind.

Q.   Sure.

MR. CHIGNELL:  Just in response to the prior question or --

MR. SWETT:  I think it's in the response to the prior question.

MR. CHIGNELL:  Okay.

THE WITNESS:  No, IHA did not -- they didn't have money, so no.

BY MR. SWETT:

Q.   Okay.  At these shows when you would purchase a booth, you said you have basically a sales rep there set

MAGNA
LEGAL SERVICES

Page 39

up the chamber. It'd be on. Do you have any poster boards, blowups, any type of material there? I'm assuming maybe a banner with the Oxy-Health name. Describe to me what a booth looks like when you have it set up.

A. It's the backdrop, it's kind of like a display that has Oxy-Health's name on it. It has pictures of the chamber. We have a chamber sitting in front of it. We have a tabletop with all our different chamber brochures --

Q. Okay.

A. -- on that table.

Q. Sure. Any other promotional materials similar to a brochure other than just a brochure for each chamber?

A. No.

Q. And do -- I'm assuming doctors attend these shows, correct?

A. Yes.

Q. Parents of autism children also attends -- attend these shows?

A. Some of them, not all of them.

Q. All right. Let me change gears a little bit and ask you just about corporate structure of Oxy-Health Corporation and also Oxy-Health, LLC.

A. Okay.

Q. I guess I'll start with Oxy-Health Corporation.

MAGNA
LEGAL SERVICES

compressors, correct?

A.   Correct.  They have to provide us a complete chamber.

Q.   But Oxy-Health selects the compressors, correct?

A.   No.

Q.   All right.  In this e-mail, are you not educating Peter Lewis -- well, let me ask you:  Peter Lewis says he received three purchase orders for compressors today.  Is that your understanding of what POs mean?

A.   Yes.

Q.   Okay.  He says, "Samir, I don't know what the BFB-COERP with 220 volt is for."  He says that, correct?

A.   Correct.

Q.   And then in your response you have to tell Peter Lewis that "the BFB-COERP is for the enclosure pump that we are using for the Respiro and Vitaeris"; do you not say that?

A.   Correct, because that's his ignorance.  He didn't go through his committee yet, and his committee still has to approve it.

Q.   But Oxy-Health was involved in selecting which compressors would be used for the hyperbaric chambers, correct?

A.   We recommend.

Q.   Okay.  So Oxy-Health --

MAGNA
LEGAL SERVICES

Page 84

use the chamber. They've been trained when we provide the chamber.

So we don't get strangers that are just randomly buying it off the internet. They've been using it. So they know. Everybody's been trained to train, too.

Q. So as you sit here today, it's your testimony that as far as you're aware, Oxy-Health has never sold a chamber to anyone who did not have training on how to use that chamber?

MR. CHIGNELL: Objection to form. Go ahead.

THE WITNESS: When it comes to a $20,000 device or a $10,000 device, it's random to -- for somebody to just buy it clean and jump into the pool type thing, you know. So most likely in the Sparks family they were using the chamber in a clinical setting. They knew how to use it. So and then they ended up buying it not from us but from somebody else, a third party almost. I think it was a third-party. And so they knew how to use it.

Now, they -- when they received the boxes, they would have our 800 number to ask any questions, and we would have gladly helped them out. So that's our safety concept. We are always available. I don't care who you bought it from. You call Oxy-Health. It's an Oxy-Health chamber. We'll help you out, and we'll guide you.

///

MAGNA
LEGAL SERVICES

Page 89

Q. Sure.

A. No.

Q. Okay. So let's just talk about the Vitaeris 320. Is it your testimony that there are no dangers associated with foreseeable uses of the Vitaeris 320 hyperbaric chambers?

MR. CHIGNELL: You're asking on behalf of Oxy-Health?

MR. SWETT: Yeah, this is -- this is knowledge, for one.

MR. CHIGNELL: Okay. You can go ahead.

THE WITNESS: From a mechanical point, no, but there might be an indication or a disease or something that a patient might have where there might be danger, but not from a mechanical -- is that the right word even -- but from the mechanical point, no.

BY MR. SWETT:

Q. Is asphyxiation a potential hazard in the intended use of a Vitaeris 320 hyperbaric chamber?

MR. CHIGNELL: I'll object to the form of the question.

THE WITNESS: If you leave a child unmonitored and -- yes, it's similar to a child left in a car in the hot sun in Southern California.

///

MAGNA
LEGAL SERVICES

Page 93

MR. SWETT:  What's the objection based on?

MR. CHIGNELL:  You're misstating the record.

MR. SWETT:  I'm asking him a question.  I'm not misstating anything.

THE WITNESS:  Due to any unforeseen emergency.  It's -- I don't understand.  Maybe my English is bad.  All right.  It says it clearly.  "We recommend that an attendant be present during the entire time someone is in the chamber."  What part of that do I not get?

BY MR. SWETT:

Q.  I agree with you that it says that.

A.  I ask the jury this that's going to listen to this testimony:  What part of that do we not get, especially when we have a special-needs child.

Q.  It's a recommendation; you agree with me there, correct?

A.  I understand.

Q.  Okay.  Does anywhere on this page or anywhere else in this manual do you inform the consumer of any hazard that may occur if someone is left unattended in the hyperbaric chambers?

MR. CHIGNELL:  I'll object to the form of the question.

BY MR. SWETT:

Q.  Either you do or you don't; do you?

MAGNA
LEGAL SERVICES

Page 94

A. It does not say that, but it's common sense.

Q. It's common sense?

A. Yes. My car manual does not say do not leave your child unattended in the car while you go shopping. Does yours?

Q. Okay. Will you agree with me that someone being left in a hot car is totally different than being left alone in a hyperbaric chamber, correct?

A. It's the same thing.

Q. What's the risk of a child being left in a hot car?

A. They will die.

Q. Of what?

A. Heat exhaustion.

Q. Okay. Is there -- is there any way that a child is going to die of heat exhaustion of being left in a hyperbaric chamber?

A. No.

Q. Thank you. Okay.

MR. CHIGNELL: Do you want him to go to the other parts of the chamber or the book where it talks about other cautions?

MR. SWETT: We're going to get to those.

MR. CHIGNELL: Okay.

///

MAGNA
LEGAL SERVICES

Page 95

BY MR. SWETT:

Q. So you agree with me that asphyxiation can occur in a Oxy-Health hyperbaric chamber?

A. If the power goes off, the chamber pump is not turned on.

Q. Yes.

A. If you -- if there's negligence, yes.

Q. Pardon?

A. If there's negligence, sure; you leave a child unattended.

Q. Well, let me ask it this way: Is asphyxiation a potential hazard with the use of an Oxy-Health hyperbaric chamber if someone is left unattended and for some reason oxygen quits flowing into the chamber?

MR. CHIGNELL: I'll object to the form of the question, but go ahead.

BY MR. SWETT:

Q. Let me restate that. Let me restate. Is asphyxiation a potential danger associated with the use of an Oxy-Health hyperbaric chamber when someone is left unattended and for whatever reason fresh air ceases to flow into the chamber?

MR. CHIGNELL: Same objection.

THE WITNESS: Yes, yes.

///

MAGNA
LEGAL SERVICES

Page 101

THE WITNESS: Yes.

BY MR. SWETT:

Q. At some point Oxy-Health became aware that a consumer could asphyxiate inside a Oxy-Health hyperbaric chamber, correct?

A. No.

Q. Well, today -- even today you testified, you agreed with me that asphyxiation is a hazard associated with the use of an Oxy-Health hyperbaric chamber, correct?

A. Yes.

Q. Okay. At what point did Oxy-Health realize that?

A. When this child passed.

Q. So prior to the death of Jarred Sparks, it's your testimony today for the jury that Oxy-Health never knew prior to that date that someone could asphyxiate in a Oxy-Health hyperbaric chamber?

MR. CHIGNELL: I'll object to the form of that question.

THE WITNESS: There was a murder of two children, but it was never proven that it was the chamber that did it.

BY MR. SWETT:

Q. Was that up in Canada or somewhere?

A. Yes.

Q. Okay.

MAGNA
LEGAL SERVICES

Page 104

then get into a car accident and die.  Unless it's self-inflicted or -- no.  No, it's not possible, not if it's used properly according to the instruction manual.

Q.  All right.  We'll get back to that in a bit.  At least in 2002, Oxy-Health knew that the quick disconnect valve could become disconnected from the chamber, correct?

A.  Absolutely --

MR. CHIGNELL:  Object to the form.

THE WITNESS:  Absolutely no.

BY MR. SWETT:

Q.  Okay.  Let me ask you this:  At least in 2002, you knew that if the quick disconnect valve became disconnected from the chamber, there would be no more flow of fresh air coming into the chamber, correct?

MR. CHIGNELL:  I'll object to the form of the question.

THE WITNESS:  I'm going to say it's irrelevant if you turn the air off.

BY MR. SWETT:

Q.  Well, I'm not talking about turning the air off.  Listen to the question.

MR. CHIGNELL:  Listen to the question.

BY MR. SWETT:

Q.  Listen to my question.  And I don't even have to do 2002.  Let's do it like this:  Prior -- any time prior

MAGNA
LEGAL SERVICES

Page 105

to 2005, Oxy-Health knew that if the quick disconnect became disconnected from the chamber bladder while the air compressor was on, there would no longer be a flow of fresh air coming into the chamber, correct?

MR. CHIGNELL: Objection to the form.

THE WITNESS: Yes, that's obvious.

BY MR. SWETT:

Q. Okay. At least by 2005, Oxy-Health knew that if the quick disconnect valve became disconnected from the chamber, expelled $CO_2$ would no longer be exhausted out of the chamber, correct?

MR. CHIGNELL: I'll object, but you can go ahead.

THE WITNESS: Yes.

BY MR. SWETT:

Q. Because the flow of fresh air is what creates -- what basically forces the $CO_2$ to exhaust out of the chamber, correct?

A. Correct. As --

Q. The continuous flow?

A. As with any other hyperbaric chamber in the world.

Q. Okay. You agree with me that when Oxy-Health became aware that a consumer could asphyxiate inside a Oxy-Health chamber, it had an obligation to inform the consumers of the nature of this hazard?

MAGNA
LEGAL SERVICES

Page 108

cease flowing into the chamber for any reason?

MR. CHIGNELL: I'll object to that, but go ahead.

THE WITNESS: Yes.

BY MR. SWETT:

Q. Okay. What would cause fresh air to cease flowing into the chamber during normal operation?

A. Power outage.

Q. Okay. And when did Oxy-Health become aware of that?

A. I don't recall. It's just common sense.

Q. Oxy-Health is aware of that prior to the death of Jarred Sparks, correct?

A. Sure.

Q. And the logical conclusion is that if the power goes out -- strike that.

If the power goes out and someone is in the chamber, if they don't get out of the chamber, they're going to an asphyxiate, correct?

MR. CHIGNELL: Objection to the form of the question. Go ahead.

THE WITNESS: Yes.

BY MR. SWETT:

Q. So Oxy-Health was aware prior to the death of Jarred Sparks that someone could asphyxiate inside the chamber?

MAGNA
LEGAL SERVICES

Page 109

A. But if it's a special-needs child like Jarred Sparks, you would have a person monitoring them knowing that the power went out. We have earthquakes in California, power outages in Tennessee.

BY MR. SWETT:

Q. Okay.

A. People run to rescue their child.

Q. I understand. And just so I'm clear, but prior to the death of Jarred Sparks, Oxy-Health knew that someone could asphyxiate inside a chamber?

A. That is always possible in emergency situations.

Q. And Oxy-Health knew that?

MR. CHIGNELL: I'll object to the form, but you can go ahead and answer.

THE WITNESS: Yes.

MR. SWETT: We'll take a five-minute break.

(Brief recess taken.)

BY MR. SWETT:

Q. Mr. Patel, before we took a break, we were discussing Oxy-Health's knowledge of the risk of asphyxiation inside of hyperbaric chambers. Would you agree with me that when Oxy-Health became aware that a consumer could asphyxiate inside an Oxy-Health hyperbaric chamber it had an obligation to inform consumers of the nature of this hazard?

MAGNA
LEGAL SERVICES

Page 114

A. You can call the inspectors that have talked to me over the years.

Q. Does Oxy-Health have an obligation in Oxy-Health's view to warn consumers about any potential hazards associated with the use of Oxy-Health hyperbaric chambers?

MR. CHIGNELL: Objection to the form. Asked and answered.

You can answer it again.

THE WITNESS: We are concerned with safety always, and we care about the patients and doctors and the consumers, whomever. So yes, we are diligent about safety. We are the most safety-conscious hyperbaric -- hyperbaric companies, if you would, that -- and that's known throughout the industry. The industry respects us for our safety consciousness. We have the best safety record. That's all I can tell you. I mean, that's -- my -- we have the best safety record.

(Reporter clarification.)

THE WITNESS: We have the best safety record.

BY MR. SWETT:

Q. Can you show me anywhere in that user manual that Oxy-Health warned consumers about the risk of asphyxiation?

MR. CHIGNELL: Including CO2 or just

MAGNA
LEGAL SERVICES

Page 115

asphyxiation?

BY MR. SWETT:

Q. Asphyxiation.

A. No, but this is something HTI works with the FDA with, the federal government, to develop and approve. I have no control over what gets done here other than recommendations from consumers to help them out.

Q. When I took your -- I've taken your deposition before in your personal capacity, correct?

A. Correct.

Q. Do you recall testifying in that deposition that you were involved working with HTI in developing and editing that user manual?

A. We gave edits to HTI to say it's not clear for the consumers. They're complaining. They don't understand. They need pictures. So we provide pictures, and we provided some text and HTI decides what they print. That's the law. That's what FDA requires. HTI has to produce this manual. We will -- we certainly took these pictures, absolutely. We wrote some text. But HTI will take that text and edit it, or do whatever they want to do and approve or disapprove or whatever it is.

So, yes, I did provide some input. A lot of input. With pictures and stuff. And I said make a beautiful manual, rather than a Word document that's a

MAGNA
LEGAL SERVICES

Page 122

agree with me that attending conferences is a form of marketing?

MR. CHIGNELL: Objection to the form.

MR. SWETT: Based on?

MR. CHIGNELL: Same thing. Because what I don't want to do is to have you later on talk about equating his version of marketing as the statutorily defined definition of marketing.

MR. SWETT: Where is marketing statutorily defined?

MR. CHIGNELL: In 99b. It's in there, but that, again, I'll -- I don't want to -- I don't want to -- I mean that's -- I'll just make the objection for the record and move on.

BY MR. SWETT:

Q. Okay. Would you agree with me that attending conferences is a form of marketing?

MR. CHIGNELL: Objection to the form.

THE WITNESS: I have to say yes and no.

BY MR. SWETT:

Q. Okay. Explain, please.

A. We attend conferences to present our technology in front of physicians and patients. I won't say no to patients. We do a few, maybe five a year, patient conferences. But we are presenting our technology in

MAGNA
LEGAL SERVICES

Page 123

front of scientists to have them consider it and see if it works for them.

Q. You agree with me that setting up a booth at a conference with sales reps there is a form of marketing?

A. We rarely sell at a booth. Rarely. It happened maybe seven years ago. But I go into a conference now, I'm not going to plan on selling anything. I'm intriguing scientists, speakers of conference to look at the technology, consider it.

Q. But you agree with me that setting up a booth at a conference is a form of marketing?

MR. CHIGNELL: Same objection.

You can go ahead.

THE WITNESS: I would say yes and no.

BY MR. SWETT:

Q. I mean, because what I want to understand -- I just want to know what you're going to say in front of the jury because I think this is a pretty obvious -- well, strike that.

Marketing is commonly -- you admit that you have a clear understanding of marketing as that term is used in the common English language, correct?

A. Sure.

Q. All right.

A. Okay. Yes.

MAGNA
LEGAL SERVICES

Page 124

Q. And using that definition, just so we're clear, would you agree with me that sponsoring a conference is a form of marketing?

MR. CHIGNELL: Objection to the form.

THE WITNESS: That's -- I guess is what my answer is. I'm not going to give a yes/no. I guess. I'm giving back.

BY MR. SWETT:

Q. Well, I mean do you watch sporting events? Do you watch NASCAR?

A. Mm-hm.

Q. Whoever is sponsoring the Kotex 500, that's a form of marketing, is it not?

A. I am creating awareness.

Q. Okay. But --

A. That's what it is.

Q. But whoever sponsors an event is marketing, would you agree with that?

MR. CHIGNELL: Objection to the form.

THE WITNESS: With that, yes I do.

BY MR. SWETT:

Q. Okay. You agree with me that a brochure is a form of marketing?

A. Yes.

Q. Agree with me that maintaining a website is a

MAGNA
LEGAL SERVICES

Page 125

form of marketing?

A. Yes.

MR. CHIGNELL: You can go ahead. It's fine.

BY MR. SWETT:

Q. Do you agree with me that Oxy-Health has marketed hyperbaric chambers for the use of autism in the past?

MR. CHIGNELL: Objection to the form of the question.

THE WITNESS: I disagree.

BY MR. SWETT:

Q. All right. As you sit here today, can you recall any time in the past when Oxy-Health has marketed the use of chambers for the treatment of autism or the symptoms of autism?

A. Not that I recall, no.

Q. Let me show you what's been marked as Exhibit 92. I'll ask you to take a look at that document.

(Plaintiffs' Exhibit 92 marked.)

MR. CHIGNELL: That's yours. Thank you.

Go ahead and just read the entire document.

THE WITNESS: Okay.

BY MR. SWETT:

Q. Have you seen this document before?

A. I must have. It's pretty old. 2010.

Q. The bottom there is an e-mail from Peter Lewis to

MAGNA
LEGAL SERVICES

Page 139

Q. Okay. Is it a predecessor to the Vitaeris 320?

A. It's a predecessor to the Solace 210.

Q. Solace 210. Okay. All right. And then I want you to look at --

A. It's actually the Solace 210 renamed because they didn't like the Oxy word. In the previous wording we already -- the previous letter we talked about? They didn't like the word Oxy on the label of the chamber so it was renamed Solace.

Q. Okay. Then I'd like you to look at page 803 and under the section Persons Interviewed and Individual Responsibility, and primarily my question is going to relate to the second paragraph. If you just want to read that whole paragraph.

A. Okay.

Q. In the middle there in that paragraph it says Mr. Lewis said that "he notified Samir Patel of Oxy-Health Santa Fe Springs, California to cease from marketing the hyperbaric chamber referenced Hyper-Oxy and Solace for indications other than acute mountain sickness."

A. Right.

Q. What's your understanding of what the FDA is talking about there?

A. He called me and said we can't make -- back then, this is in 2001. We were just like two years old. Three

MAGNA
LEGAL SERVICES

Page 140

years old maybe. Two years old. We were making claims and we didn't know, so we stopped.

Q. What type of claims were you making?

A. Just anything and everything we find on the internet. Literally, I mean, I don't want to be casual about it, but we got hyperbaric will help you lose weight, this, that, and the other. In international countries you can do this. But they said stop making claims, so we did.

Q. Were the --

A. We cleaned up our website to where we just specified specifications of the chamber. That's it. We don't say what it helps. We -- that's all. It's clean. It's been clean for the longest time. And we were inspected. He was inspected right around the same time, and we both got hit with a warning letter, and it was taken care of.

Q. Where were those claims being made if you recall?

A. On our website.

Q. Were any claims appearing in the user manual at that time if there was a user manual at that time?

A. The HAPE and HACE. That's the previous document we looked at. That was his big thing.

Q. Okay.

A. And we may have had HAPE and HACE on our website just following his manual.

MAGNA
LEGAL SERVICES

Page 156

compressors on that provide the fresh air, are the two compressors the only source of fresh air going into the chamber?

A. Yes.

Q. And that air gets into the chamber through a hose that's connected to the compressor on one end with a quick disconnect valve and connected to the chamber on the other end with a quick disconnect valve, correct?

A. Correct.

Q. Are the quick disconnect valves on each side of that hose the same quick disconnect valve?

A. Yes.

MR. CHIGNELL: And, Chris, you're talking specifically about the one involved in the time frame of this incident?

MR. SWETT: Yes.

MR. CHIGNELL: Because --

BY MR. SWETT:

Q. If I'm just referring to the Vitaeris chamber that's involved in this incident is your testimony the same?

A. Yes.

Q. Okay. And I apologize for not clarifying.

In the operating manual for the Vitaeris 320 does Oxy-Health warn anywhere in that manual that fresh air

MAGNA
LEGAL SERVICES

Page 157

will not continuously flow into the chamber if one of those quick disconnect valves becomes disconnected?

A. Not to my knowledge, no.

Q. Is there a warning anywhere in the chamber that fresh air will not continuously flow into the chamber if one of those quick disconnect valves become disconnected?

A. Not to my knowledge.

Q. Does Oxy-Health warn anywhere in the manual that CO2 will not be exhausted from the chamber if one of those quick disconnect valves becomes disconnected in the manual?

MR. CHIGNELL: Objection to the form.

BY MR. SWETT:

Q. Do you warn in the manual that CO2 will not be exhausted -- will not continue to exhaust out of the chamber if one of the quick disconnect valves becomes disconnected?

A. HTI does not have that in the manual.

Q. Does Oxy-Health warn anywhere on the chamber that CO2 will not be exhausted from the chamber if one of those quick disconnect valves becomes disconnected?

MR. CHIGNELL: Same objections.

THE WITNESS: We're not allowed to put any warnings so that's HTI's job.

///

MAGNA

LEGAL SERVICES

Page 158

BY MR. SWETT:

Q.   But you can recommend labels to be placed on the chamber, correct?

A.   Correct.

Q.   And you have done so in the past; Oxy-Health has recommended labels for HTI to put on the chambers; correct?

MR. CHIGNELL:  Same objection.

THE WITNESS:  No.

BY MR. SWETT:

Q.   Okay.  So in a minute if I show you a document where -- let me ask you this:  Has Oxy-Health ever in writing requested a label be placed on a chamber jacket for an Oxy-Health hyperbaric chamber?

A.   The jacket is not considered a label.  It's a logo.  A label is "take two pills twice a day" type thing. You know, so a logo is not a label.  It's a label but not a label.  But it's got more leniency so there I can recommend.  But HTI determines exactly what's affixed to the chamber.  When it's -- so when it's sealed onto the label -- onto the chamber, then HTI is in control, and they have to go through heavy scrutiny as far as I understand from what Peter Lewis has told me.  I cannot specify what to put on something that's affixed to the chamber.  A jacket is a loose thing.  It's just a jacket.

MAGNA
LEGAL SERVICES

Page 159

Q.   Okay.  But Oxy-Health can specify -- I don't want to call it a label.  I'm not talking about the jacket itself.  I'm talking about a patch or label affixed to the jacket.  You can specify that but you cannot specify --

A.   I could, yes.

Q.   Okay.  Does Oxy-Health warn anywhere in the manual that one of those quick disconnect valves facilitating the flow of fresh air can become disconnected unintentionally?

A.   HTI does not.

Q.   Does Oxy-Health?

A.   It's not my manual.

Q.   Have you ever suggested that such a warning be placed in the manual?

A.   No.

Q.   Does Oxy-Health warn anywhere on the chamber that one of those quick disconnect valves facilitating the flow of fresh air can become disconnected unintentionally?

A.   No.

Q.   Does Oxy-Health warn anywhere in the manual that chambers should not be set up near other furniture in the home setting?

A.   No.

Q.   Is there any such warning on the chamber?

A.   No.

MAGNA®
LEGAL SERVICES

Page 160

Q. Does Oxy-Health warn anywhere in the manual that consumers should not sleep in the chamber?

A. No.

Q. Is there any such warning on the chamber?

A. No.

Q. And you would agree with me that Oxy-Health has known for well before Jarred Sparks' death that individuals sleep in these chambers, correct?

A. I have known of one incidence of a doctor that slept in the chamber. I don't know his name.

Q. I think previously when we -- previously when you gave deposition testimony I remember you testified that it's foreseeable that people would sleep in the chambers, correct?

A. It's foreseeable. It's a play on words. So it's possible. If you want to, you can. I just know of one person that has done it.

Q. And I'm trying to remember if there was some testimony about when you guys first got started when you first got hooked up with Peter Lewis or someone it was around the time of the Superbowl involving T.O. Do you remember that -- Terrell Owens. Do you remember --

A. Terrell Owens, right.

Q. And you knew -- you all knew that Terrell Owens used a hyperbaric chamber, correct?

MAGNA
LEGAL SERVICES

Page 161

A. Yes.

Q. And you all knew that he slept in the hyperbaric chamber, correct?

A. I -- if I said something, then I -- it was -- I don't recall him sleeping in it.

Q. As you sit here now you don't recall whether or not he slept in it?

A. If I said it, I was incorrect.

Q. Okay. So you just don't know.

A. I don't know about Terrell Owens. I know about a chiropractor -- not a chiropractor. Actually it was a naturopath that came to a booth and said he slept in the chamber.

Q. When did this conversation take place?

A. Oh, gosh. Many, many, many years ago. Ten years ago.

Q. Okay.

A. Somebody reported to me that he did -- he did personally. I don't have no recollection who he is so.

Q. You agree with me that it's foreseeable that if a consumer is sleeping in the chamber, the Vitaeris 320, and a quick disconnect valve becomes disconnected or the power goes out, then there would no longer be continuous fresh air coming into the chamber?

MR. CHIGNELL: Objection to the form.

MAGNA
LEGAL SERVICES

Page 162

THE WITNESS: I want to hear the first part of that question.

BY MR. SWETT:

Q. It's foreseeable -- would you agree with me, that if a consumer is sleeping in the chamber and either the quick disconnect valve becomes disconnected or the power goes out, then there would no longer be any fresh air coming into the chamber?

MR. CHIGNELL: Objection to form.

You can go ahead.

THE WITNESS: Correct.

BY MR. SWETT:

Q. Would you agree with me that without an audible alarm to indicate the lack of oxygen flowing into the chamber, the quick disconnect valve becoming disconnected, or a power failure, could present hazard to a consumer sleeping in the chamber?

MR. CHIGNELL: Objection to the form.

THE WITNESS: I will ask a repeat.

MR. SWETT: Read it back, please.

(The last question was read back by the reporter as follows: "QUESTION: Would you agree with me that without an audible alarm to indicate the lack of oxygen flowing into the chamber, the quick disconnect valve becoming disconnected, or

MAGNA
LEGAL SERVICES

Page 166

BY MR. SWETT:

Q. They all woke up within two minutes?

A. Two to three minutes. It was immediate. You'd get...

Q. So I'm going to ask you this. I'm not trying to mischaracterize because you haven't testified about this yet. I'm going to ask you this. In 1998 -- as early as 1998 --

A. But later -- between '98 and 2000.

Q. Prior to 2000, you were concerned enough about the lack of -- a potential lack of oxygen in the chamber that you actually tested to see whether or not someone would wake up with loss of power?

A. Yes.

Q. Any time after 2000 did you warn of asphyxiation risk?

A. No.

Q. In the user manual you recall that it states a user can easily give self-treatments. Do you remember that statement? It's on page 8 if you --

A. Yes.

Q. You do recall that statement in the manual?

Would you agree with me that it's foreseeable that a consumer may actually give him or herself self-treatment in the chamber?

MAGNA
LEGAL SERVICES

Page 176

Q.   Okay.  Let me ask you this.  You agree that these, the Vitaeris 320 chamber is marketed for clinical use as well as use in a home setting.  Do you agree with that?

A.   That's what it says.

Q.   You agree with me that it's foreseeable that the Vitaeris 320 will be used in the home setting?

A.   That's what it says.

Q.   And you agree with me that its foreseeable it will be used -- the Vitaeris 320 will be used in a clinical setting?

A.   That's what it says.

Q.   Okay.  Do you agree with me that Oxy-Health represents that the Vitaeris 320 chamber is safe to be used in the home setting?

A.   As Oxy-Health, yes.  But that's what also HTI claims.  And the FDA claims.

Q.   It's your opinion that the FDA has stated that the chamber is safe for use in the home setting or approved for use in the home setting?  Do you have an understanding of which one of those the FDA opines to?

A.   They say that -- that I don't know.  But --

Q.   Okay.

A.   -- but they do say it's okay for home use.  So I don't know.  The play on words.

MAGNA
LEGAL SERVICES

Page 177

Q. Do you agree with me that Oxy-Health markets this chamber as safe for use in the clinical setting as well?

A. Yes.

Q. You agree with me that the home setting and the clinical setting are two different settings which present different hazards associated with the use of a hyperbaric chamber?

A. No.

Q. Okay. Why is that? Why do you disagree with that statement?

A. There's no difference.

Q. Okay. In a clinical setting, there's typically someone with medical training present, correct?

A. Yes.

Q. In a home setting these chambers are often being used by individuals without any sort of medical training, correct?

A. Correct.

Q. So then would you agree with me that consumers that are using these chambers in the home setting need more information in order to safely use these chambers than those using these chambers in the clinical settings?

MR. CHIGNELL: Objection to the form of the question.

You can go ahead and answer it.

MAGNA
LEGAL SERVICES

Page 178

THE WITNESS: Yes, but they would not be able to get a chamber in their home without a prescription, and the medical doctor that prescribed would give them the instructions -- would give them the training and instruction.

BY MR. SWETT:

Q. So you're just assuming that a doctor's going to train whoever they write a prescription for?

A. Train versus instruct.

MR. CHIGNELL: Objection. Go ahead.

THE WITNESS: Train versus instruct. There's no training necessary. You need to instruct to monitor the child.

BY MR. SWETT:

Q. Okay.

A. Or monitor the patient if necessary.

Q. You agree with me that when these chambers are used in the home setting as opposed to clinical setting there should be warnings provided to those consumers using it in the home setting?

MR. CHIGNELL: Objection to the form of the question.

THE WITNESS: No, the manual is very thorough and has all the warnings necessary.

///

MAGNA
LEGAL SERVICES

Page 179

BY MR. SWETT:

Q. Okay. Is there a warning in the manual that the chamber should not be set up in the home close to other furniture?

A. No.

Q. Okay. Is that a concern -- is that a concern in a clinical setting?

A. No.

Q. Is that a concern in a home setting; that someone would set up one of these chambers without any indication they shouldn't in close proximity to another piece of furniture?

MR. CHIGNELL: Object to the form. You can go ahead.

THE WITNESS: I believe that's common sense. So no.

BY MR. SWETT:

Q. You believe it's common sense that someone wouldn't set up this chamber next to a bookshelf?

A. Not if it's -- it's -- yes, I believe it's common sense.

Q. Okay. There's no warning about the risk of asphyxiation due to power failure in that manual, is there?

A. No.

MAGNA
LEGAL SERVICES