# EXHIBIT N

cranked it up, inflated it, said, "Da-da," and then deflated it, and then that was about it.

Q. Okay. Who was there? Who was at the Sparks house when you arrived?

A. To the best of my recollection, other than Janet and I, there was Amy, Rob, Jarred, Dylan, and then one of their cap workers was there.

Q. One of their?

A. Cap workers. One of the -- one of the -- one of the guys that was our employee that worked with the -- with Jarred.

Q. Was that Charles Williams?

A. A black guy.

Q. Okay. And that was somebody who was dispatched or hired through A Small Miracle to do --

A. Yes.

Q. -- to give services --

A. Yes.

Q. -- to Jarred Sparks?

A. Yes.

Q. Did you have any trouble getting the chamber upstairs?

A. No.

Q. Did you have any trouble setting it up?

A. No.

SPERLING & BARRACO, INC.

Q. Who was there after -- who was there while it was being set up?

A. Well, predominantly, it would have been Amy and -- because it was -- it was never any -- you know, we're not going to teach Dylan. So it would be Amy and Rob, Janet and I. Jarred is off doing things with his cap worker, and I couldn't tell you where Dylan was.

Q. You said you weren't going to teach Dylan. Why not?

A. I wasn't selling it to Dylan. I was selling it to his parents.

Q. Okay. And so was Dylan around at all during the training or the orientation that you were giving Rob and Amy with the chamber?

A. I -- not to my -- not to my recollection.

Q. Okay. And did you -- before you delivered it, or as you delivered it, did you have any understanding as to how the Sparks family intended to use the chamber?

A. Same as we use it.

Q. Did you know whether or not -- the way that you and your wife use it, it's always somebody gets in the chamber --

A. Right.

Q. -- with the son?

A.    Uh-huh.

Q.    Did you talk to the Sparks family about how they intended to use it?

A.    I did not.

Q.    Okay.  Did you have any understanding as to whether Rob Sparks, or Dylan Sparks, or Amy Sparks were going to get into the chamber when Jarred was getting his treatments?

A.    We knew that Amy would not because that was a requirement.

Q.    And that was because of her medical conditions?

A.    Her prior health conditions.

Q.    Okay.  But what about the other two?

A.    I would not have discussed that with them.

Q.    Do you recall that being discussed by anybody while you were there delivering and setting up the chamber?

A.    No.  Realizing, this is -- this is what everybody needs to realize.  They had -- they had had and operated a chamber for almost a full year prior.  So this wasn't like we just dumped something on them and walked away.

Q.    And did you know, was the prior chamber that they used was an Oxy-Health chamber?

SPERLING & BARRACO, INC.

surprise.

So now if we had had a steel side or hard side, as they call them, the deep divers, that's an entirely different story.  You just don't go buy those and put them in your house.  That's not the intent.

And from our point of view as a perceived benign environment that we've been using for years, the things you can and can't do, you know.  And basically the one thing you can't do is be in there when it's pressurized and reach up and unzip it.

Q.   Got you.  Did you talk to the Sparks at all about monitoring the people that were being -- that were being treated inside the chamber?

A.   Nope.

Q.   One way or the other?

A.   Nope.

Q.   Was there any discussion in -- did they ask you any questions about how you used the chamber or whether or not you monitored the people inside the chamber?

A.   They knew that we -- when we went in there with Robbie, we got in there with him.  Now, once again, how they operate their own chamber is their decision.

Q.   And did they share with you any details about how they intended to use the chamber while you were

family in connection with the -- the delivery of the chamber to them?

A. No.

Q. Take a look at page 26. And before we do that, were you aware that that language was in the -- in the manual?

A. No.

Q. Okay. Had you -- did you ever read the manual that you brought to the Sparks home or the one that accompanied your chamber?

A. Front to back, no. I read the applicable portions for operation.

Once again, let's go back to the statement, because this is -- this is where you talk about how you treat -- how you do it differently than other folks. Okay.

So it says, "We recommend an attendant be present." I'm in the chamber with him. I'm the control, or Janet is the control. So, yep, duly noted. But we already go beyond what this even recommends. So to me this statement for my family is a nonissue.

Q. Because you were already doing that and more?

A. Yeah.

Q. Understood.

A. Okay.

SPERLING & BARRACO, INC.

Q.  And so you -- but you didn't discuss that at all with Mr. Sparks when you delivered the chamber, correct?

A.  No.  Once again, they had already operated the chamber for over a year or for a year.  They -- they know -- they will make their decisions on how they're going to operate it and who is going to operate it. Okay.

Q.  Okay.  Take a look at page 26 under step 7 of operating the chamber.

A.  Okay.

Q.  Have you ever read this section before today?

A.  No.

Q.  Okay.  So under step 7 it says, "Set a clock or timer for the prescribed treatment period."  Do you see that?

A.  Yeah.

Q.  Did you do that?

A.  With the Sparks?

Q.  When you were using the chamber, did you sometimes use a clock or timer?

A.  Yeah, when we first started.

Q.  Got you.  And then after awhile, did you stop doing that?

A.  Yes.  We do not use one now.

Q. So you do not know. But would you defer to her testimony?

A. Sure.

Q. What is your understanding of the role, if any, that Oxy-Health had in the manufacturing, or assembly, or sale of that chamber?

A. That's what they did. They make them.

Q. Okay. So it's your understanding that they manufactured the chamber?

A. Yes.

Q. It's your understanding that they assembled the chamber?

A. Yes.

Q. And is it your understanding that they sell the chamber?

MR. CHIGNELL: Objection to the form, but you can go ahead.

A. They may sell it, but that's not who we purchased it through.

BY MR. SWETT:

Q. What's your understanding as to any inspection that they may conduct on hyperbaric chambers?

A. They --

MR. CHIGNELL: I'll object, but go ahead.

A. I don't -- I don't know of any -- how do you

SPERLING & BARRACO, INC.

A.    Okay.

Q.    -- while that was in your possession or in your control, was that chamber ever sent back for repair to Oxy-Health?

A.    Yes.

Q.    Are you aware as to whether or not Oxy-Health ever conducted a similar retesting on that chamber before they sent it back to you?

A.    Not aware.  I would refer that question to Oxy-Health.

Q.    On the day that you sold the Sparks chamber to the Sparks --

A.    Okay.

Q.    -- except for the replaced zipper that Oxy-Health replaced, was the chamber and all component parts, to your knowledge, in the same condition as they were when you originally purchased the chamber?

A.    Yes.

Q.    On the day that you sold the Sparks chamber to the Sparks, was the chamber and all component parts in the same condition as when you received the chamber back from Oxy-Health after they replaced the zipper?

A.    Yes.

Let me amend one thing here.  It's not even germane, but if somebody gets into lawyerease.  When the

of something, something is going to fail. This is their demonstrator model that they move from A to B and set up and take down, and set up and take down, and set up and take down. Did the hose disconnect? Did the guy not -- did the guy improperly install it? I don't know.

What I do know is that the ones that I put on my Vitaeris device were connected properly and had operated properly for years, and they're still operating properly.

Q. You were asked earlier about Robbie's treatment, and mentioned that you would never leave him in the chamber for treatment alone, primarily because he's non-verbal, correct?

A. Correct.

Q. Are you aware -- how would you compare Jarred in terms of verbalization compared with Robbie?

A. Jarred was more verbal, but -- he was more verbal. Okay. I'll say that. But a lot of his was, you know, what's he going to tell you?

Jarred still was not going to sit down and talk about geopolitical events. He was not going to sit around and talk to you about the weather. He would express his needs, wants, and desires. Okay? Every kid is different.

Q. And if the Sparks believe that Jarred was

SPERLING & BARRACO, INC.

A.    Specialized training.

Q.    Training.

A.    I'd agree with that.  Specialized.

Q.    And just so the record is clear, let me get the question out corrected.

You would agree with me that Oxy-Health markets this chamber as no specialized training is required to operate the chamber?

MR. CHIGNELL:  Objection to the form.  Go ahead.

A.    I would agree.  Now, you have to define what is specialized.  I do not.

BY MR. SWETT:

Q.    Would you agree with me that if the chamber operates properly, you don't believe there's any safety concerns with someone spending the night in the chamber?

A.    No, not from a physical point of view.

Q.    This is -- hyperbaric chamber, I mean, it's pretty easy to operate; is that fair?

A.    Yes.

Q.    Basically tell me if you're going to put somebody in the chamber, just sort of walk me through the steps.

A.    Okay.  If the chamber -- okay.  Am I getting in the chamber or not getting in the chamber.  If I'm

SPERLING & BARRACO, INC.