# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.: 5:13-cv-00649-FL


AMY SPARKS, individually, and
ROBERT D. SPARKS, as Personal
Representative of the ESTATE OF
JARRED B. SPARKS,

       Plaintiffs,

vs.

OXY-HEALTH, LLC and
OXY-HEALTH CORPORATION,

       Defendants.

_____/




| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | JERRY KARTZINEL, M.D. |
| DATE TAKEN: | August 4, 2014 |
| TIME: | 1:00 - 5:20 p.m. |
| PLACE: | Akerman, LLP<br>420 South Orange Avenue<br>Suite 1200<br>Orlando, FL |
| REPORTED BY: | Helen Bennett, RPR, Ph.D.<br>Notary Public<br>State of Florida at Large |

A    Correct.

Q    But you were --

A    On those dates part of that treatment team.

Q    Okay.  Thank you.  How would you -- if you had to explain or describe what Jarred's condition was and how it affected him to somebody who didn't know him, what would you say?

A    In what respect?

Q    Well, how would you describe -- I mean to --

A    Autistic?

Q    Yes.

A    Yes, he is autistic.

Q    Okay.  But as far as on the spectrum of autism, how would you characterize him or how did you characterize him when you were seeing him?

A    Depending on where he was, moderate to severe.

Q    And when you say depending on where he was?

A    When I first started working with him he was noncommunicative or very sparsely communicative.  He was rageful.  He was -- had strange, strange obsessions of dumping things, of eating, periods of

Case 5:13-cv-00649-FL   Document 69-23   Filed 01/09/15   Page 3 of 9

time where he would pee on couches and carpeting and just everywhere.

At his better times he was communicative, nonrageful, totally potty trained, self-sufficient. So he would have this waxing and waning of abilities.

**Q     And did that continue from the time that you met him until his death?**

A     Yeah, but it seemed to be getting better.

**Q     Okay.**

A     He was improving.

**Q     Let me show you what has been marked previously as Exhibit 62.  I'm going to ask if you can identify Exhibit 62.**

A     I can identify 62.

**Q     Okay.  What is it?**

A     It is a letter of generality, "To Whom It May Concern", giving Jarred's -- at 16 months -- 16 years, 8 months of his life kind of where he was from an autistic point of view.

**Q     And do you know what caused this letter to be written?  I mean, was there -- and can you look in your notes to see if there is a --**

A     January 16, (reviewing documents).  No, I do not know.  That's December 31st, and then we go

Case 5:13-cv-00649-FL   Document 69-23   Filed 01/09/15   Page 4 of 9

A   -- and do them in the same manner as she was doing them.

Q   As far as length of time?

A   Length of time.

Q   And frequency?

A   That's correct.

Q   And pressure?

A   That's correct.

Q   And with the oxygen?

A   Correct.

Q   Okay.

A   With oxygen.  And I do not know if she was using oxygen with the other one.

Q   Were you aware of whether or not she was going to be using oxygen with this one, the new one?

A   I believe, yes.

Q   Okay.  Do you recall having discussions with her at that point about sort of the difference between using the chamber in the clinic and in the home?

A   Since she had already been using the other chamber in the home, I did not.

Q   Okay.  Would you have had any discussions with her about whether or not there was going to be a dive partner --

Case 5:13-cv-00649-FL   Document 69-23   Filed 01/09/15   Page 5 of 9

A    No.

Q    -- or what about monitoring --

A    No.

Q    -- about who was going to be there in the room with or without the child?

A    No, we did not.

Q    Okay.  And why not?

A    Because she had already done over 100 hours of intervention.  I wrote 400 at one point and -- but she already had a significant amount of time in the chamber, so I figured that she was pretty well versed on how to do this.

Q    And you were expecting her to do it now the way that she had done it the same way before?

A    Correct.

MR. SWETT:  Object to form.

Q    Did you talk to Ms. Sparks at that point about the manual that would have accompanied the chamber, whether to read the manual?

A    No.

Q    Okay.  And other than providing the prescription, were there any oral instructions that you would have given to Amy Sparks at that point?

A    No.

Q    Okay.  Did you provide her any warnings or

Case 5:13-cv-00649-FL    Document 69-23    Filed 01/09/15    Page 6 of 9

cautions related to the hyperbaric treatment?

A    No.

Q    And who would have done -- I guess who would have done that before for the treatment that was provided by the chamber from Creation Zone?

A    You would have to ask them.

Q    Got you.  So that would have all been through Dr. Bradstreet?

A    Correct.

Q    Okay.  Did you advise the Sparks family to keep a log of how often the treatments were given?

A    (Shakes head).

Q    Is that a yes or a no?

A    No, I'm sorry.

Q    Thank you.  Did you ever -- Did you talk to the Sparks family at all about what to do with the chamber between uses?

A    No.

Q    And so what would you typically tell new parents that were using these chambers in-home that haven't previously used it about what to do with the chamber between uses?

A    Well, we would talk about how to clean them.

Q    Okay.  And how would -- what would you

Case 5:13-cv-00649-FL    Document 69-23    Filed 01/09/15    Page 7 of 9

clinic?

MR. SWETT:  Object to form.

A     Sometime after his passing.

Q     Okay.  Did she ever tell you that -- well, did Amy Sparks ever tell you that Dillon was going to be the one who was going to be operating the chamber with his brother inside?

A     No.

Q     Would that have been a problem for you, having a 16 year old operate the chamber?

A     No.

Q     Okay.  Did Amy Sparks ever tell you that on occasion Jarred -- I'm sorry, on occasion Dillon would put his brother in the chamber and leave the room before the chamber had even fully pressurized to 4 PSI?

A     I was not aware of that.

Q     And if you would have been aware of that, what would you have done?

MR. SWETT:  Object to form.  Calls for speculation.

Q     You can go ahead.

A     I would ask her to make sure somebody was in there all the time.

Q     Okay.  And did you know that, that he was

Case 5:13-cv-00649-FL    Document 69-23    Filed 01/09/15    Page 8 of 9

someone always has to be in the room?

A    No, no recollection of that.

Q    Earlier Mr. Chignell asked you if there were really any -- I don't want to use the word "dangerous".  I don't know what word to use.  But he asked you about as far as if someone were in the chamber three hours or more, two hours or more, your testimony was it really didn't have any extra benefit, but it really would not do any harm, is that fair?

A    I would agree with that.

Q    Because when we deposed Dr. Bradstreet, he basically said that he didn't see any problem with someone being in the chamber for five hours, as far as it doing any harm.  Do you agree with that opinion?

A    I agree with that.

Q    Okay.  Are you aware that some people, including professional athletes, actually sleep in these chambers?

A    Yes.

Q    Have you ever treated any professional athletes in your practice or you mostly focus on --

A    Mostly the children.

Q    -- autism?

Case 5:13-cv-00649-FL    Document 69-23    Filed 01/09/15    Page 9 of 9