# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:13-cv-00649-FL

```
------------------------------------
AMY SPARKS, individually, and      :
ROBERT D. SPARKS, as Personal      :
Representative of the ESTATE       :
OF JARRED B. SPARKS,               :
                                   :
    Plaintiffs,                    :
                                   :
vs.                                :
                                   :
OXY-HEALTH, LLC and                :
OXY-HEALTH CORPORATION,            :
                                   :
    Defendants.                    :
------------------------------------
```

VIDEOTAPED DEPOSITION OF

ROBERT D. SPARKS

Taken by the Defendants
Fayetteville, North Carolina
October 3, 2014

Reported by:  Eileen M. Dunne,
              Court Reporter and
              Notary Public

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

go out on hunting trips with the kids and your wife?

A. Yeah. I mean, I'm from Kentucky. We'd go up there and hunt, you know.

Q. Right.

A. We'd go out and hunt, and it's just what I do.

Q. I gotcha. And you would do that with -- would you do that with your wife as well?

A. She's been with me a couple times.

Q. But you would take some of the kids alone sometimes as well?

A. Yes.

Q. Okay. And you said that -- how was Jarred involved in the hunting?

A. Well, usually, I didn't really take him physically hunting with a weapon. He would go out and walk through the woods with me and scout and things like that before hunting. So you could consider that part of the hunt, you know, depending on who you are, but I consider that part of the -- part of the hunt.

Q. Well, you've got to do that before you -- you've got to scout before you --

A. Right.

Q. -- got out, right?

Electronically signed by Eileen Dunne (501-192-689-1740)          2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A. Yeah.

Q. And what about the fishing?

A. Yeah, he's fished before, Jarred. All of us do.

Q. Okay.

A. Have.

Q. Camping. I'm sorry. Cars?

A. Nah, that's pretty much me.

Q. That's you, right? Okay.

All right. And the camping, is that a family activity as well?

A. Yes.

Q. How often did you go camping?

A. I don't know. I can't -- I can't say. I mean --

Q. More than five times --

A. Sometimes --

Q. -- a year?

A. Sometimes we'd go a year and not go. Sometimes we'd go twice a year. So -- sometimes five times. It just depends.

Q. You just work it in when you can?

A. Yes.

Q. Okay. And how often would you go hunting with the kids?

Electronically signed by Eileen Dunne (501-192-689-1740)                              2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   Oh, with the kids?  Hmm, five or six times at least a year --

Q.   Okay.

A.   -- in the fall.

Q.   And then would you go hunting in addition to those times with the kids?

A.   Oh, yeah.  Yeah.

Q.   I mean, were -- were you pretty much -- I mean, did you shoot -- what -- what weapons did you shoot when you were hunting?

A.   Bow usually.

Q.   Okay.  Guns as well?

A.   Guns, too, but bow usually.

Q.   Gotcha.  Okay.  And do you still do that now?

A.   Yes.

Q.   And how -- how often would you go fishing with the kids?

A.   Uh, probably not as much.  I don't know.  A couple, three times a year.

Q.   And would this be local trips or like --

A.   Usually local, yeah.

Q.   Just to the --

A.   To the lake.

Q.   -- to the local pond?

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   To the lake, yeah.

Q.   And do you still enjoy all of these hobbies now?

A.   Yes.

Q.   Okay.  Tell me about the kinds of things that you -- you did with Jarred.  I mean, when you -- you know, what kinds of things were you and he actively engaged in?

A.   Uh, we'd swim together in our pool.

Q.   Um-hmm.

A.   Trampoline.

Q.   The pool is in the back yard?

A.   Yes.

Q.   And so is the trampoline, correct?

A.   Yes.

Q.   Okay.

A.   Ride bikes, as far as hobby-type stuff. I'd take him to the woods with me sometimes and we'd walk, you know, but that's about all I can think of --

Q.   Okay.

A.   -- off the top of my head.

Q.   And how much -- I mean, how much time were you spending with Jarred, you know, in the last -- so let's say five years of his life?  I mean, were -- I

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   I don't understand what you mean.

Q.   Like, you know, I mean so -- so Dylan would have been just recently born?

A.   He was born in '94.

Q.   Okay.  And so that was about the time that Jarred got diagnosed?

A.   It was right before that I believe.

Q.   When you talk to people who've never had a chance to meet Jarred, how -- how would -- how did you describe him?  How would you describe him?

A.   He was a great kid, I mean.  He was very love -- lovable and -- he would hug anybody.  I don't know.  I don't know how -- what else to say.  But I thought he was a great kid.  I mean, I would describe him as a tall, very active young man, you know.

Q.   Okay.  What were the biggest challenges that your family faced with -- with his condition?

A.   Just day-to-day life as far as him -- of course, he could do most everything.  It wasn't like, you know, he was laying in a bed and we had to do everything for him.  Um, just bathing him and, you know, he'd take a bath by himself.  Getting his food prepared was probably the biggest -- the food issue was definitely the biggest challenge.

Q.   Because he was gluten and casein free?

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   Yes.

Q.   And --

A.   That was the biggest challenge.

Q.   Okay.

A.   And we cooked -- every meal he ate was cooked by us.  He didn't eat McDonald's or Wendy's or Pizza Hut.  It was cooked at our home, so ...

Q.   And that's --

A.   That was a big challenge, you know.

Q.   Back in '90 -- you know, '94, in the mid-'90s, late '90s, there was not a lot of gluten-free/casein free options outside the home, correct?

A.   Exactly.

Q.   Did you guys -- did you guys go out to eat on a regular basis?

A.   Not a lot because there wasn't a lot out there he could have.

Q.   Okay.  Any other big challenges with Jarred's autism other than the food that you had to prepare for him and the --

A.   Not really, I mean -- I'm trying to think.  Um, I mean, he had a lot of quirks too.  And what I mean by that, he'd pour out drinks, you know, things like that.  That was a challenge.  When we went

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

a drink.  You didn't know if he was going to pour it out, you know.  That's unpredictable.  Walk into a room and, you know, if there's that glass of water sitting there that you're drinking, if he seen that, he would grab your drink and pour it on the floor and set your cup right back where it was.

Q.   Okay.  Other than --

A.   No offense to you, but that's what he would do.

Q.   Right.  Any -- anything else other than -- unpredictable that he would do other than pour drinks out?

A.   Not that I can think of off the top --

Q.   Okay.

A.   -- you know.

Q.   Was Jarred able to be left alone?

A.   Oh, yeah, depending on the setting of where he was.

Q.   Okay.  So where would he be left alone; where would you -- where would you leave him alone?

A.   If he's in his room.  You know, we'd leave him in the living room sometimes.  I'd go outside, you know.

Q.   Would there be anybody else inside the house to monitor him or supervise him?

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   Uh, no.  I mean, if there was a movie on he liked, he'd sit there and watch it.

Q.   Okay.

A.   We left him alone before.

Q.   And how long would you leave him alone for?

A.   Just a few minutes, whatever.

Q.   I gotcha.  So if you had to go -- if you had to go and get something out of the car or go and, you know, get the mail or whatever, you could leave him alone and come back?

A.   Well, I mean, I'd -- longer periods than that.  I'd cut my grass and come back in, you know.  That's a couple hours.  I wouldn't leave him and then go to the store, you know, or any -- I would not leave the premises.  But, yeah, I left him in there.  I've changed my oil before with him in the house, you know, whatever.

Q.   And would you be the only adult -- the only other adult around?

A.   Yeah.  I'd be the only one there, me and Jarred.

Q.   Okay.  Do you -- well, let me ask you a different -- differently.  Did Jarred require constant supervision?

A.   Not one hundred percent of the time, no.

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

document had nothing to do with in the home. It says right here. I mean, if you want to specify what you're asking him, where -- when he needs supervision and in what settings, that's fine.

Or if you want to ask him about all settings, but ...

BY MR. CHIGNELL:

Q. Well, the document that I just marked as Exhibit 135, that -- that specifies in the home, correct?

MR. SWETT: And that's one person not all.

So ask him specifically about this one person.

BY MR. CHIGNELL:

Q. You can go ahead.

A. I don't even remember the question now.

Q. Yeah. I mean, you don't believe that Jarred required constant supervision at all times to ensure his safety, correct?

A. No, I do not agree with that.

Q. Let me show you what's already marked as Exhibit 76. These are documents -- these are records from Dr. Kartzinel's office. If you could page to -- turn to page 36 at the bottom. Let me know when you're at page 36.

A. Okay.

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

their longest?

A. Nope.

Q. When Jarred was down in the chamber with the -- with Dr. Bradstreet's clinic, what would Jarred be doing inside the chamber during the treatments?

A. Usually sleeping, I believe.

Q. Okay. What about, you know, watching movies; did he ever do that?

A. Possibly. I mean, they had little DVD players. But he could -- possibly could have been doing that. I don't -- I don't even remember what he was doing.

Q. So how did you end up with a borrowed chamber from Bradstreet's clinic? I mean, that's a big -- that's a big deal.

A. It is a big deal. That was my wife's doing, so ...

Q. Do you know how your family was selected to get it?

A. No, I do not.

Q. Do you know what make or model of the chamber you were going to get?

A. No. I didn't know anything about it. My wife made all that happen. So I --

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.   Yes.

Q.   Did you also teach him not to mess with the zippers?

A.   No.  He knew how to get in and out of the zipper.  He just wouldn't do it because we told him, Don't do it.

Q.   And -- and the reason that you told him not to do it is because it could damage the chamber --

A.   Yes.

Q.   -- correct?

A.   Well, that and damage you, you know.

Q.   Both?

A.   Both.  We just taught him not to do it.

Q.   Okay.  Do you ever remember any instances where Jarred tried to get out of the chamber by himself?

A.   When it was deflating, yes.

Q.   Okay.  Tell me about that.

A.   Well, when we went in there to deflate it, of course you'd back the pressure off of the main value, and as it's hissing out, it's still inflated, but he -- you know, he knows it's deflating, so he wants to get on out of there, and he tries to unzip it.  And you have to say, No, no, no, not yet.  Wait.  You have to wait until it gets down to a certain

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

pressure. It will still blow the zippers out.

So you have to wait until it's deflated to a certain point. So, you know, if he hears it deflating, he knows it's being deflated, so ...

Q. And did -- and did you always train him after that incident always to let the person from the outside do the zippers?

MR. SWETT: Object to form.

BY MR. CHIGNELL:

Q. You can go ahead and answer.

A. He knew how to get in and out of it, if that's what you're asking.

Q. Right. I know that he knew how to get -- but I'm -- I'm wondering whether or not he did get in and out of it by himself.

A. When it was deflated, yes, he could get in and out of it by himself. And I've seen him do it, if that's what you're asking.

Q. Okay. And so -- and so you would see him open the zipper from the inside himself?

A. Yes.

Q. And this was after he had reached the pressure where it was okay to do that?

A. Where it was okay, yes.

Q. What about getting in and zipping the

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

chamber up?

A. Mmm ...

Q. Do you ever remember him zipping up the chamber himself?

A. I don't recall whether he did that. I did see him unzip it, but I don't think he ever zipped it up himself.

Q. Okay. How often was he getting treatments with the borrowed chamber?

A. I don't know. Every other day maybe.

Q. And for how long?

A. Since February.

Q. I'm sorry. How long were the chamber treatments?

A. Oh, it varied. It varied. Sometimes it was -- depending on what time we put him to bed and what time we woke him up.

Q. Okay.

A. Because we would wake him up and put him in the chamber.

Q. Is that always the way that you did it with the borrowed chamber as well as the leased chamber?

A. I believe so, yes.

Q. Okay. So with the borrowed chamber, you would do the treatments after --

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A. Bedtime.

Q. -- after -- after bedtime?

A. Yes.

Q. Okay. And same thing with the -- with the -- with the leased chamber, correct?

A. Correct.

Q. Did Jarred ever sleep at night in the chamber, the whole night?

A. No, not all night long.

Q. Okay. What is the longest chamber treatment that you recall giving to Jarred?

A. I don't know. Four to six hours maybe. I don't recall.

Q. And how -- how often were the chamber treatments four to six hours?

MR. SWETT: Object to form.

A. I don't know.

Q. How did you de long -- how did you decide how long to put him in for?

A. My wife was told we could leave him in there as long as he could take it or long as he wanted to be. Of course, we wouldn't overdo it like all night long. I don't ever remember him sleeping in there and waking up for breakfast in there. But we were told -- or Amy was told that we could leave

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

him in there however long we wanted to leave him.

Q. So you would put him in --

A. Within reason, you know.

Q. Gotcha. So you would put him in there -- was -- was the -- was the general way that you did it you would let him go to sleep for a while, and then wake him up and then put him in the chamber?

A. Wake him up, make him go to the bathroom and get straight in there.

Q. And then at some point, he would be taken out and then put back in bed?

A. Yes.

Q. Okay. Was that -- and was that -- was that sort of just before you guys went to sleep? I mean, would you leave him in the chamber until you and Amy would go to sleep?

A. No, we wouldn't go to sleep.

Q. No. I'm sorry. Let me rephrase the question. If you put him in there at -- well, give me an I -- give me an example of when did you generally put Jarred to bed?

A. Usually pretty early, about seven, eight o'clock.

Q. Okay. And he would sleep for how long before you woke him up?

Electronically signed by Eileen Dunne (501-192-689-1740)                2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

A.  Usually an hour or two, hour-and-a-half. We'd wake him up and put him in there.

Q.  Okay.  And then he would remain in the chamber for how -- un -- until --

A.  Until we would go to bed sometimes, which is two or three hours later.

Q.  Okay.  Was that generally the way that the schedule worked?

A.  Roughly, yeah.

Q.  Okay.  And then when you're doing these night treatments with the borrowed chamber and with the leased chamber, would Dylan ever accompany Jarred inside the chamber?

A.  Mmm, don't recall.  Don't recall.  I think he did at the one -- the borrowed one.

Q.  And why did --

A.  I believe.

Q.  Why did Jar -- why did Dylan not get into the leased one?

A.  He was just too big then.

Q.  Yeah.  At that point, he was 16 or so?

A.  Yeah.

Q.  Was there enough room in there?

A.  Yeah.  I went in there with Jarred.  I had to lay on my side, but I could lay in there with him.

Electronically signed by Eileen Dunne (501-192-689-1740)　　　　　　2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

Q. Basically -- is it -- is it fair to say that basically whoever was going up and down the stairs by Kelsey's room would go and check on him?

A. Yes.

Q. Okay. And what does checking --

A. Whoever it was.

Q. What does checking on him mean; what did you do to check on him?

A. Me, personally, I would look in the top window, make sure he's okay and asleep, and make sure the valves are working right, letting out pressure, and that's it.

Q. You would -- and would the door always be open or was it sometimes closed?

A. No, sometimes cracked. Sometimes closed, sometimes open. You could always hear it, so ...

Q. So if you were checking on him, you would open the door, correct?

A. If it was closed, yeah.

Q. And you would walk in the room?

A. Yes.

Q. Would you turn the light on?

A. Sometimes. Sometimes not. Most of the time not.

Q. Okay. And so -- and then would you walk

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

over to the chamber?

A. Yes.

Q. And you would look into the window?

A. Yes.

Q. And would you -- were you able to see inside the window if the lights weren't on?

A. Yes. The hallway light shined in there.

Q. Okay.

A. I just didn't want him -- if you turned the light on in there, he wakes up.

Q. He may wake up.

A. So I never --

Q. Yeah.

A. Rarely did I turn that light on.

Q. Gotcha. So you would --

A. I just looked in.

Q. You would look in to see what? What would you be looking for?

A. Jarred laying there asleep.

Q. Asleep with his eyes closed and --

A. Yeah.

Q. -- and resting?

A. Yeah, asleep.

Q. Okay.

A. Just like he was in his bed.

Electronically signed by Eileen Dunne (501-192-689-1740)                                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

Q. And -- and would you also -- would you check any of the equipment --

MR. SWETT: Object to form.

BY MR. CHIGNELL:

Q. -- when you were checking on Jarred inside the chamber?

A. No.

Q. Would you listen for the air coming out of the relief valves at the foot of the chamber?

A. Yes.

Q. Okay. And was it -- that was sort of a hissing noise when the pressure built up, correct?

A. Yes.

Q. Were you able to hear that from downstairs?

A. Oh, yeah. Yes.

Q. And when you went into the room, if you didn't hear the hissing noise, you would know that something was wrong, correct?

A. Yes.

Q. Did you also hear the pumps running when you checked for the pumps to be running when you went into the chamber room?

A. Well, they're loud, so yeah.

Q. And would you check to make sure that both of them were running?

Electronically signed by Eileen Dunne (501-192-689-1740)          2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

into --

MR. SWETT: Object to form.

BY MR. CHIGNELL:

Q. -- correct?

A. I guess.

Q. Okay.

A. I don't know.

Q. And -- and have you ever -- you -- you've never used one of those like a -- like an oxygen meter to -- to see if there's too much $CO_2$ or CO or enough $O_2$ in a place?

A. No.

Q. Did you -- prior to Jarred's death, did you ever -- did you ever think about the chamber as sort of a -- a closed environment?

A. Yes, I guess so.

Q. And -- and -- I mean, isn't the chamber kind of a confined space as well?

A. Yeah. I mean, there's not a lot of room to move around in there.

Q. Did you ever recognize the chamber as any type of potential suffocation hazard --

A. No.

Q. -- prior to his death?

A. I never saw it as that, no.

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b

that an enclosure like the -- the chamber is a potential suffocation risk?

MR. SWETT: Object to form. He's already testified.

BY MR. CHIGNELL:

Q. You can go ahead.

A. I mean, it's not common knowledge. Some people don't know that.

Q. Okay. And -- and that includes you, right? You didn't know that at the time?

MR. SWETT: About the chamber or the confined space?

BY MR. CHIGNELL:

Q. I'm talking about the chamber.

A. I didn't know you could suffocate in it.

Q. Did you know that you could suffocate in a -- in a -- an enclosure?

MR. SWETT: Object.

BY MR. CHIGNELL:

Q. A confined space?

MR. SWETT: Object to form. It depends on the confined space.

A. Yeah. It depends on what -- what you're talking about. Inside of a box or inside of a wing of an aircraft, you know. It depends.

Electronically signed by Eileen Dunne (501-192-689-1740)                    2d7cca5f-d416-47eb-a5ea-7b83cecf0d2b