# EXHIBIT DD

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION


AMY SPARKS, individually, and
ROBERT D. SPARKS, as Personal
Representative of the ESTATE
OF JARRED B. SPARKS,

                    Plaintiffs,        CIVIL ACTION NO.
                                       5:13-cv-00649-FL
              -vs-

OXY-HEALTH, LLC and
OXY-HEALTH CORPORATION,

                    Defendants.



                    *   *   *

                 DEPOSITION OF:

            RONALD J. NATOLI, JR., P.E.

             Thursday, July 17, 2014

                  12:48 p.m.

                    *   *   *

              Robson Forensic, Inc.
                301 Grant Street
                  Suite 4300
           Pittsburgh, Pennsylvania 15219


          Susan R. Perkins, Court Reporter

A.    Yes.

Q.    **Okay.  What are those?**

A.    They're not -- they're typically called
      accumulators.  They are used for more surge
      protection in mechanical applications.  These
      are not human occupancy.

Q.    **Gotcha.**

A.    So I did not address -- was not retained to
      look at the stitching of the actual unit,
      whether it met the ASME pressure vessel code,
      whether the window material was acceptable and
      met the code.

Q.    **So today -- sitting here today, do you have any**
      **opinions or do you intend to express any**
      **opinions at trial related to whether or not the**
      **ASME PVHO requirements apply to the Vitaeris**
      **chamber that was manufactured in 2005?**

A.    Yes, I do have opinions that they did apply.

Q.    **So maybe I misunderstand you.  Maybe I**
      **misunderstood your prior answer.  Okay.**

               **What is your opinion in that regard,**
      **as to whether or not the manufacturer of the**
      **chamber had to meet any type of ASME PVHO**
      **requirements when the chamber was manufactured**
      **in 2005?**

A.    Yes, I have opinions that they were required.

Q.    And what is that based on?

A.    The Code of Federal Regulations.

Q.    And does that include chambers that operated less than 15 psi?

A.    That was for chambers, yes.

Q.    Are you relying on the fact that that's a consensus standard?

A.    Yes.

Q.    You're saying that consensus standards are mandatory?

A.    Yes.

Q.    What's the basis for your statement that you believe that consensus standards for ASME PVHO are mandatory?

A.    When the standard is recognized, it is my opinion that you go by the general requirements of the standard itself.  In our case, the operation of the boundary layer was greater than 2 psi.  My interpretation is that the standard thus applies.

Q.    Okay.  Including the one -- and what year was that passed?  What year was it recognized as a consensus standard?

A.    This particular one was in 2002.

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 4 of 25

device that did conform to PVHO standards.  So I believe that they were looking at those.

Q.  **And which ones were those?**

A.  The design of the window, the design of the relief system, the fact that it could maintain the pressures.

Q.  **Do you agree -- would you agree with the statement that consensus standards -- strike that.**

**Do you agree with the statement that the FDA -- the FDA's position on consensus standards is that they are voluntary and not mandatory?**

A.  I can't speak for the FDA.  The standard of care of any manufacturer includes mandatory regulations or codes and standards.

Q.  **Do you know whether or not, according to the FDA, that those PVHO standards are mandatory or if they're voluntary?**

A.  I interpret them as being mandatory.

Q.  **How many manufacturers of soft-sided hyperbaric chambers, like the one that was sold by Oxy-Health, exists?**

A.  That I do not know.  Not very many.

Q.  **Okay.  Okay.  And do you know whether or not**

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 5 of 25

other manufacturers or other sellers of

hyperbaric chambers, that operate at 4 psi,

have their chambers comply with PVHO standards?

A.    I did a simple search and I did find one

manufacturer that operates above the 2 psi

differential --

Q.    Is that SOS Hyperlite?

A.    Yes, it is.

Q.    Okay.  And they -- they operate at 15 psi;

correct?

A.    The way I interpreted their data is that they

could run it at almost pressure up to 15.

Q.    And that's different than what Oxy-Health --

the Oxy-Health chamber; correct?

MR. SWETT:  Object to form.

THE WITNESS:  It's a very similar --

it's a very similar soft -- what I would

consider soft shell hyperbaric chamber,

portable.  Very similar to what we are looking

at today.

BY MR. CHIGNELL:

Q.    The Vitaeris only goes up to 4 psi; correct?

A.    That is correct.

Q.    The SOS Hyperlite goes up to 15; correct?

A.    It can.  It doesn't say that they have to

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 6 of 25

came disconnected when Dylan closed the door, pushed it up against the chamber and the top of the chamber come in contact with the lip on this container?

MR. SWETT: Object to form. Asked and answered.

THE WITNESS: I'm putting -- I'm putting -- I'm not putting, but I believe that the Sheriff's report and his findings conclude that that's what occurred. Is it possible -- are you asking me is it possible that that valve inadvertently released on its own and didn't come in contact with the shelf? That's certainly possible as well. But you know what, it's -- that would be in itself difficult to prove, because no one else was there when it actually happened.

Q. And you used the Sheriff's report and all that information as a basis for your opinion that the valve came disconnected as Dylan was closing the door; correct?

MR. SWETT: Object to form. Asked and answered.

THE WITNESS: Correct. I'm using the Sheriff's report and the information to say

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 7 of 25

that the unit was pressurized to a point that the air valves were relieving, which means that air was going into the chamber and it was operating as it was designed or intended.

Some how that valve was inadvertently disconnected. Based on the Sheriff's information, it's more likely than not that the container depressed the button as opposed to it inadvertently releasing on its own, which is still a possibility.

BY MR. CHIGNELL:

Q. **Do you hold the opinion that it disconnected on its own?**

A. I believe it's more probable than not that the Sheriff's report is more -- is accurate and that it released due to contact with the container on the shelf.

Q. **Just so I'm understanding this correctly, you think that -- that the air supply hose was disconnected from the chamber -- let me strike that.**

**Dylan closed the door to the room; correct?**

A. Yes.

Q. **It's your opinion, based on your review of the**

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 8 of 25

Q. Would somebody be able to survive longer inside a chamber that would be at 4 psi initially when the hose is disconnected than compared to a chamber that is essentially not rigid at zero psi when the chamber is sealed or is it the same?

A. I don't have an opinion. I would have to do calculations.

Q. You agree that being inside a sealed chamber without fresh air creates an asphyxiation risk?

A. Yes.

Q. And you agree that it is well known that the elevated carbon dioxide levels that are a hazard -- that are -- I'm sorry. I misread that.

You agree that it's well-known that elevated carbon dioxide levels are a hazardous situation that can cause asphyxiation or injury or death; correct?

A. Yes. They compose a dangerous condition.

Q. That's common knowledge; correct?

A. Yes.

Q. Is it well known that occupying a confined space without proper ventilation or fresh air increases the risk of asphyxiation and creates

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 9 of 25

a dangerous condition?

A.   Yes.

Q.   And you agree that's common knowledge as well; correct?

A.   Yes.

Q.   If the air --

A.   Well, define common knowledge.  I'm sure there are people out there that don't know that.

Q.   Well, again, I think common knowledge is common knowledge.  I mean -- I think common knowledge is different than universally known; right?

A.   Right.

Q.   There's some people that don't know anything?

A.   I'm sure there's somebody out there that doesn't know it.

Q.   If the air compressors are running and attached -- strike that.

Are you an expert on the effects of $CO_2$ on humans?

A.   From a design standpoint in my field, yes, I'm very familiar with air quality requirements, industrial hygienist requirements.

Q.   You cite Susan Rice in your report.  Are you relying on her?

A.   No.

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 10 of 25

MR. SWETT:  Object to form.

THE WITNESS:  I would say that --
that there is a certain degree, yes.

BY MS. CHIGNELL:

Q.    **You would agree that the quick disconnect, with
the button on it that was used in this case, is
better than some other button quick
disconnects, which could have a different
design, which would be less -- which would be
less likely -- I'm sorry -- which would be more
likely to disengage?**

MR. SWETT:  Object to form.

THE WITNESS:  It's my opinion that no
push button disconnect should be used for this
application.

BY MR. CHIGNELL:

Q.    **Okay.  I think that's different than what you
said about five minutes ago, because I asked
you if there's any quick -- push button quick
disconnects that were appropriate.  And I
thought you said yes but not this one.**

A.    You were talking about putting a secondary
cover over the entire device.

Q.    **Okay.  So I get it clear, is there any quick
disconnect push buttons that you think would be**

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 11 of 25

To me, this is an inside unit, so carbon monoxide is a low risk.  Somewhere there should have been an assessment of all the risks when operating this chamber.  That's all part of the FDA requirements under the current good manufacturing requirements.

I haven't seen any documents on the manufacturing of this or who did what hazard analysis.  But certainly carbon dioxide monitoring is something that -- that should have been done and would have prevented this accident.

Q.  Are you aware of any hyperbaric manufacturer -- hyperbaric chamber manufacturer that operates about 4 psi that has a CO2 monitor?

A.  There is monitoring in the Hyperlite.

Q.  That's the one that goes up to 15 but can be operated at lower levels; correct?

A.  Absolutely.  It's designed to go that high.

Q.  Any -- are you aware of any chambers that operate at the maximum of 4 psi that have CO2 meters?

A.  No, but that's irrelevant.  Even if Oxy-Health was the only manufacturer of this type of device, there are standards and there's a

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 12 of 25

identify it.

MR. SWETT:  That's asking for a legal conclusion.

MR. CHIGNELL:  He's the expert.

MR. SWETT:  It's a legal conclusion. He doesn't have to opine on a legal conclusion.

BY MR. CHIGNELL:

Q.  Do you consult with manufacturers about the misuse and use of their products?

A.  No, not directly.

Q.  Have you ever consulted with a manufacturer about what constitutes a proper use or what constitutes a misuse of a product?

A.  Not as an engineer, no.

Q.  Okay.

A.  What we conclude is what possible failure modes, whether due to a failure directly of the product or system or component itself, or a secondary cause.

Q.  And so in this case with the Sparks, was this a failure of a component on -- of the chamber?

A.  This was a -- a -- this was a failure.  The failure was caused by improperly selected valve, in my opinion.

Q.  Okay.  But the valve -- did the valve break as

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 13 of 25

They can't hear. There's no lights on that compressor that says, hey, I'm running.

**Q. And when they're checking on the chamber though there's the -- there's the valve -- I'm sorry -- there's the pressure gauge, right, which would go down in that event; correct?**

A. Yes, it would. So you are relying on, again, somebody to notice that. They might look in and say, you know what, he's sleeping. He looks healthy. He looks good. And I'm going to go back and sit back down. You don't know.

**Q. Are you aware -- strike that.**

**I think I know the answer to these questions, but let me ask it anyway. Do you believe that -- so we talked about how you believe the quick disconnect made the chamber defective; correct?**

A. Right. Unreasonably -- yeah, unreasonable -- unreasonably safe.

**Q. Okay. Is the fact that -- and is it -- do you believe there's any type of quick disconnect with a push button that could be appropriate?**

MR. SWETT: Object to form.

THE WITNESS: My personal opinion, no.

BY MR. CHIGNELL:

Q. Okay. If this quick disconnect had been exchanged with another one that had a more extensive guard around the button, would that make it not defective?

MR. SWETT: Object to form.

A. If it could become inadvertently released, it would be no different.

Q. So any type of inadvertent release, in your mind, is inappropriate?

A. Absolutely.

Q. Okay. Even an unforeseeable inadvertent release?

A. Define unforeseeable.

Q. The -- one of the rafters gives way in the house and a piece of -- a 2-by-4 comes down through the ceiling and hits the quick disconnect?

A. I don't think any action, any single action should be able to release that.

Q. Okay. What if the dog walks by and he's got a really, really heavy tail and he walks by and the wagging tail hits the button and disconnects it? Do you believe that -- I mean, is that inadvertent?

A.    For me, I have dogs at home and that would be definitely foreseeable to me.

Q.    **Okay.  Would you think it's foreseeable for somebody to come down -- basically, it doesn't matter what happens --**

A.    When you are doing a failure mode analysis, any single action on a device like that should not be required.

Q.    **Even if it's an unforeseeable action?**

A.    I don't care if it's somebody self treating and their grandchild is crawling on the floor and pushes it with their own thumb.  You know, that is a critical life supporting system.  So multiple actions should be required, not just a push of a button.

Q.    **Let me make sure I understand is that -- what you are saying, there needs to be a connector there that cannot be disengaged by a single action?**

A.    That's my opinion, yes.

Q.    **And anything that disengages with a single action is, in your mind, defective?**

A.    For that -- for that type of system, yes.  When you go through the failure mode in effects analysis, that's what everyone is going --

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 16 of 25

mean, the bottom line is, if they had known that there's an issue with the connector, change it. They actually should have known there was a problem with the connector long before they started manufacturing these devices.

Q. Based on what?

A. Based on going through and doing current good manufacturing process required by the FDA, doing a failure mode and effects analysis.

Q. Do you know why -- whether either -- whether the manufacturer did either one of those things?

A. I have not been provided information to show --

Q. So you can't say one way or the other.

MR. SWETT: Yet.

A. Well, I think any engineer would have not selected a quick disconnect for a life preserving application.

Q. And do you know how many other hyperbaric chamber manufacturers use a quick disconnect for this application?

A. No, I don't. That doesn't make it right.

Q. I'm not asking if it makes it right. I'm just asking if you know whether or not --

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 17 of 25

A.   No, I don't.  I think the Hyper one that we looked at I think that was threaded or had a different type of connector from what I saw.

Q.   Do you -- you've read the MAUDE report.  Do you know who did the MAUDE report?  Who reported it?

A.   I didn't at the time.

Q.   But you do now?

A.   Yeah.

Q.   Who was it?

A.   I think you told me today that it was Workman, but I didn't know that at the time of the report.

Q.   So at the time of -- does that matter to you?

A.   No.

Q.   But the person who did the MAUDE report did it anonymously; correct?

A.   Uh-huh.  I don't know.

Q.   And did it to the FDA -- I mean, his name is not in the MAUDE report; is it?

A.   Well, I don't know.  It might be on some other thing that he did.

Q.   But it's not on the MAUDE report that you read?

A.   No.  That's why I had no clue who did it until actually this morning.

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 18 of 25

container on a shelf that's precisely the right
height and the chamber is pushed up against it
by someone who is leaving the room.  Fair?

A.    Fair.  Yes.

Q.    Do you think that that is foreseeable?

            MR. SWETT:  Object to form.

Q.    That the chamber will be in a relatively tight
quarter where the head of it is up against a
plastic container on a shelf and that somebody
leaving the room would need to push the chamber
in that direction in order to close the door
before leaving?  Do you believe that is
foreseeable?

            MR. SWETT:  Object to form.

            THE WITNESS:  I believe that an
inadvertent release of the quick disconnect
used is foreseeable.

            MR. CHIGNELL:  That's not what I'm
asking.  I'm asking you whether or not the
exact way this occurred, in your mind, is
foreseeable?

            MR. SWETT:  Object to form.  Outside
the scope.

            THE WITNESS:  I'm stating again that
any inadvertent release or actuate of that

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 19 of 25

recommended?

A. A threaded style, yes.

Q. And this particular threaded style; correct?

A. No. Something similar to that.

Q. Similar. Who manufacturers this?

A. That I don't know.

Q. What does it cost?

A. I don't know. 7, $8.

Q. And do you know -- do you know whether or not the manufacturer approves this type of threaded connector for this type of application?

A. No.

Q. You don't know or it does not?

A. For that type of application? That I don't know. That's food grade and that is not the one I'm saying. I said a style, threaded style.

Q. Gotcha. So not this particular one but a thread style?

A. Right. Maybe the design -- maybe the designer decides to go to brass or stainless steel.

Q. Is there any risk to this age -- a thread -- what other -- strike that.

Are there any disengagement risks on the threaded end for the threaded connector?

Case 5:13-cv-00649-FL        Document 69-31        Filed 01/09/15        Page 20 of 25

A.      There are less risks than a quick disconnect.

Q.      **That's not what I'm asking you.  I'm asking you, are there -- is there any risk of disengagement with a threaded style connector?**

A.      There can be, yes.

Q.      **Under what circumstances can there be an inadvertent disengagement with a threaded style connector?**

MR. SWETT:  Object to form.

THE WITNESS:  I would say it would not be inadvertent, but there could be a failure.  As I mentioned, if somebody uses a pipe wrench to tighten that instead of just hand tighten, you could potentially crack that --

Q.      **Cracking was one.  What about --**

THE WITNESS:  -- or damage to threads, cross thread them.

Q.      **And that would make it weaker?**

A.      Absolutely.

Q.      **And that could cause it to disengage at some point?**

A.      It could, yes.

Q.      **Okay. What other risks?  So we've got over-tightening to the point of cracking.  We**

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 21 of 25

A. Again, that was just a quick internet search. I'm not saying that that's the one or if that's the best. But that one was a hundred bucks, and it alarms. They can download it to a computer to see whether the environment was safe or what the environment looked like during the course of the treatment. And it was only a hundred and some dollars.

**Q. And so do you believe that a monitor like the one shown in your report, this CO2 meter dot com, $109 meter, would be appropriate for inclusion in the chamber?**

A. I'm saying a CO2 monitor and alarming in general is -- is required.

**Q. How did you pick this one to put in the report?**

A. That was one of the first ones that popped up.

**Q. Also the cheapest?**

A. No, there were cheaper ones.

**Q. But also more expensive; correct?**

A. Sure.

**Q. You're aware that some of the CO2 monitors that are used to determine whether or not there's CO or CO2 in a confined space can be more than a thousand dollars?**

A. Absolutely.

Case 5:13-cv-00649-FL    Document 69-31    Filed 01/09/15    Page 22 of 25

A.    I think both.

Q.    **So with a threaded connector --**

A.    A different connector, do you want to say that?

Q.    **With a different connector and a C02 meter, do you still think it's a design defect?**

A.    I think that would handle the two conditions that would have prevented the incident from occurring, the death of Jarred Sparks.  There may be other design defects out there.

Q.    **But you put your finger one two.  And we've talked about those today; correct?**

A.    Two that would be related to the continuous ventilation system.  We also talked about the hose analysis should be done on the hose.

Q.    **But that didn't have anything to do with Jarred's death?**

A.    Correct.  What is the failure, what is the failure mode of that particular hose.  I don't know where it came from.

Q.    **Sure.**

A.    I don't know what pressure it's rated at.  We are operating at 4 psi.  If that hose is rated at 40 psi and the crimp connection doesn't pull off for 200 pounds then, yeah, you're good to go probably.

A. Well, what I reference in my report is a carbon dioxide monitors and alarms. I never said just --

Q. **You also did refer to this specific one as one such simple solution; correct?**

A. The one in the picture. I didn't pull down the information. I don't know what --

Q. **But these are your words. One such simple solution; correct?**

A. Yes.

Q. **So if this particular meter was in the chamber on the night of the incident --**

A. What I say: Oxy-Health's failure to provide a visual and audible indication that a dangerous level of carbon dioxide or reduction oxygen levels exists made the Oxy-Health Vitaeris 320 hyperbaric chamber defective, unreasonably dangerous, unsafe for its intended use and the cause of Jarred Sparks' asphyxiation.

So had a detector, a monitor, been in there, whether it looked like this one that had a visual and audible indication, the incident probably would not have occurred.

Q. **I appreciate that and I don't think I disagree with you. But my question is: If Exhibit 33**

approval through some other means.

Q.  So you say highly recommended?

A.  Correct.

Q.  Do you understand that to be mandatory or voluntary?

MR. SWETT:  Object to form.

THE WITNESS:  Between the two choices, it would be voluntary.  But the FDA 21 800 is mandatory.

BY MR. CHIGNELL:

Q.  Again, I'm just talking about the recognized consensus standards.  You agree that the FDA --

A.  Recognizes that they are -- they are best practices in there, the documented best practices.  They suggest that you follow them, but they are not saying that you have to.

Q.  So a manufacturer is not legally required to follow the PVHO requirements; correct?

A.  They're not legally required, correct.  But they do set a bar for standard of care that manufacturers should be following.

Q.  And, so, do you know what the standard in the hyperbaric chamber manufacturing industry is as it relates to following ASME PVHO guidelines for chambers like the Vitaeris that has a

Case 5:13-cv-00649-FL     Document 69-31     Filed 01/09/15     Page 25 of 25