# EXHIBIT JJ

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

Civil Action No. 5:13-cv-00649-FL

_____

VIDEOTAPE DEPOSITION OF:

NANCY L. GRUGLE, Ph.D. - July 21, 2014

_____

AMY SPARKS, individually, and ROBERT D. SPARKS, as Personal Representative of the ESTATE OF JARRED B. SPARKS,

Plaintiffs,

v.

OXY-HEALTH, LLC and OXY-HEALTH CORPORATION,

Defendants.

_____

PURSUANT TO NOTICE AND SUBPOENA, the videotape deposition of NANCY L. GRUGLE, Ph.D., was taken on behalf of the Defendants at the Hampton Inn DIA, 6290 Tower Road, Evergreen Room, Denver, Colorado 80249, on July 21, 2014, at 8:52 a.m., before Marchelle Hartwig, Certified Shorthand Reporter and Notary Public within Colorado.

injury, but I'm going to put it in terms of death at this point. If a product is involved in a death, does that automatically mean that there was insufficient instructions or warnings? I'm sorry, inadequate instructions or warnings?

A. Not necessarily.

Q. If Oxy-Health -- strike that.

If the warning that you have on page 15 of your report -- if that had been put on the Vitaeris chamber and the same information put in the instruction manual, would it be your opinion that that would have made the instructions and warnings in this case adequate?

MR. SWETT: As to just the asphyxiation risk?

MR. CHIGNELL: Overall.

A. The warning that I provided in my report is only for the asphyxiation hazard.

Q. (BY MR. CHIGNELL) So let me back up and ask the question differently, then. If the warning was included on the product and the instructions, would that, in your opinion, have been -- have made the product have adequate warnings and instructions as it related to the asphyxiation hazard?

A. If this on-product label had been added

and additional information had been added to the reference manual with respect to the asphyxiation hazard, it would have been adequate.

Q.    For the asphyxiation hazard, correct?

A.    For that hazard only.

Q.    Okay.  What about for all other hazards that are in the hazard analysis and/or risk matrix?

A.    Can you rephrase the question?

Q.    Yeah.  I mean, I'm just trying to figure out -- I'm just trying to figure out if -- you said that this is only good for the asphyxiation hazard and it's not good for -- I mean, in other words, if you were to advise Oxy-Health about what to include in the manual or on the product, would you be able to say today, Hey, Oxy-Health.  If you put this label on the product or if you put that information and other asphyxiation risks in the instruction manual, then, as a whole, the product will be -- will have adequate instructions and warnings?

MR. SWETT:  Object to form.

A.    I don't have all of the hazard information for the entire product.  I am sure that there are other hazards associated with this product, and until they're identified to me, I can't make that determination.

Case 5:13-cv-00649-FL     Document 69-37     Filed 01/09/15     Page 4 of 15

A.    It would have provided the users of the chamber with the information that they needed to safely operate the chamber with respect to the quick disconnect valve.

Q.    But that assumes that they would have read it, correct?  If they wouldn't have read it, then they wouldn't have -- they wouldn't have known?

A.    Unless they read it in the manual.

Q.    Right.

A.    Or were trained on it.

Q.    Okay.  But back to my original question: Do you believe that including that warning sticker on the end of the chamber where you have it there on page 15 of your report would have prevented this incident?

A.    It would have provided them with the information that they needed to prevent the quick disconnect valve from disconnecting and causing the asphyxiation, and if they read it and if they complied, it would have prevented it.

Q.    Okay.  But if either they wouldn't have read it or if they wouldn't have complied with it, then you agree that the same thing could have occurred?

A.    The purpose of the warning label is to

testify at trial if Dylan (sic) Sparks would have successfully made it out of the chamber that night had this warning been on the end of the chamber.

A. So like I said before, without this information, it was a contributing factor to Jarred Sparks' death. The example that I provide isn't an example of an adequate and effective warning. It would have given the information to the users that they needed to prevent this particular incident from occurring. I cannot guarantee that someone will read it or comply with it. But without it, they do not have the information that they need to prevent it.

MR. CHIGNELL: Okay. And I'll ask it just to make sure that I fully understand, because I'm entitled to an answer. If she doesn't want to answer, that's fine.

MR. SWETT: She's answered it. She answered the question.

MR. CHIGNELL: No, she has not.

Q. **(BY MR. CHIGNELL) The question is -- and I believe it's a yes-no answer.**

MR. SWETT: You want to ask her based on the evidence in the case?

MR. CHIGNELL: No. I want to ask her -- I don't care what she bases it on. I just want to

Case 5:13-cv-00649-FL    Document 69-37    Filed 01/09/15    Page 6 of 15

know if she's going to get up on the stand at trial and say that Jarred Sparks would have come out of the chamber alive on the day of the incident had this warning been on the chamber.

MR. SWETT: It's not even a standard. Whatever she says, I don't even know that it's relevant to this case.

MR. CHIGNELL: It's completely fair cross-examination.

Q. (BY MR. CHIGNELL) So Dr. Grugle, I'll ask it one more time and then we can move on, because I've got plenty of other questions to ask you.

Are you going to -- I mean, do you believe that the inclusion of that label on page 15 of your report would have prevented Jarred's death on the night of the incident?

A. There are any number of circumstances that potentially contributed to his death. The lack of the warning was one of them.

Q. Okay. What were the others? What were the other circumstances that contributed to Jarred's death on the night of the incident?

A. For example, the amount of time that he was in the chamber with the quick valve disconnected without any feedback to people in the house that

Case 5:13-cv-00649-FL   Document 69-37   Filed 01/09/15   Page 7 of 15

something had gone wrong.

Q. Okay. What other circumstances?

A. The lack of a CO2 alarm to notify the people in the house that his CO2 levels had dropped.

Q. Okay.

A. The fact that this quick disconnect valve was easily disconnected rather than being guarded against with a different type of valve.

Q. Okay. Any other circumstances that contributed?

A. That's all that I can think of at this time.

Q. Okay. Do you believe that anything that Jarred Sparks -- I'm sorry -- that Dylan Sparks did in any way contributed to Jarred's death?

MR. SWETT: Object to form.

A. Not based on the information that I have available to me right now.

Q. (BY MR. CHIGNELL) What information -- what information do you have about what Dylan did or did not do?

A. His deposition testimony and Mrs. Sparks'.

Q. And have you read his entire deposition?

A. Yes.

Case 5:13-cv-00649-FL    Document 69-37   Filed 01/09/15    Page 8 of 15

Q.   In the Robson Forensic report, the report that you authored with Mr. Natoli, it says in there that Dylan was pushing the chamber towards the bookshelf in order to close the door.  Do you recall that in the report?

A.   It's my understanding that the sheriff's report included that and that the testimony of both Dylan and Mrs. Sparks indicated that he did not push it to close the door.

Q.   And have you discussed with Mr. Natoli what his opinion is in that regard?

A.   I have not.

Q.   Okay.  Does it matter to you whether or not Dylan pushed the chamber against the bookcase and the plastic container as it relates to any of your opinions in this case?

A.   So my opinion is based on the fact that somehow this quick disconnect valve became disconnected without feedback to either an observer or the person in the chamber that the valve had become disconnected and that there were no warnings about the possible quick disconnect valve being inadvertently pushed.  So the mechanism of it actually getting disconnected is not germane to my findings.  It's the fact that it could inadvertently be disconnected.

Case 5:13-cv-00649-FL     Document 69-37     Filed 01/09/15     Page 9 of 15

Q.   So for purposes of your opinions, is it fair to say it's not relevant whether or not it was Dylan who pushed the chamber towards the shelf and as a result disconnected it or if it happened some other way?

MR. SWETT:  Object to form.

A.   So it would be relevant in that if he -- if Dylan did push the chamber, there were no warnings provided telling him that there is the potential for this quick disconnect valve to be pushed against by an object, inadvertently disconnected and there was no feedback to let him know that it was disconnected.  So there was no warning saying, Do not push this within X number of feet from a wall or some other object, so it's relevant in that regard.  If it were some other mechanism for the quick disconnect to become disconnected, well, there was no warning about that either.

So in this particular case, just with respect to whether or not he pushed it, there was nothing telling him he shouldn't push it and the consequences of what might happen if he did.

Q.   (BY MR. CHIGNELL)  Okay.  And based on Dylan's experience with the chamber in the months before that when he was operating the chamber and also

Case 5:13-cv-00649-FL     Document 69-37     Filed 01/09/15     Page 10 of 15

Question for the jury.

A.   I do not have an opinion on how long people can remain in the chamber safely, but I do know that there is nothing in the user manual or in the warnings about leaving someone in for a certain period of time being hazardous.

Q.   (BY MR. CHIGNELL)  Okay.  Do you -- have you gotten any information from either Dr. Bradstreet or Dr. Kartzinel, one of the two doctors that were treating Jarred for his autism?

A.   No.

Q.   Do you know how long they told Mrs. Sparks to leave Jarred in the chamber for?

A.   No.

Q.   Do you know whether or not they put any limit on the amount of time that he was allowed to be treated inside the chamber?

A.   I do not know.

Q.   Now, this raises the issue of sort of this doctor involved in the provision of medical services and how it relates to the chamber.  Are you aware of what instructions, explicit instructions, Dr. -- either Dr. Kartzinel or Dr. Bradstreet provided to the Sparks family in connection with Jarred's treatment inside the chamber?

Case 5:13-cv-00649-FL      Document 69-37    Filed 01/09/15      Page 11 of 15

Q.   Okay.  Any other feedback on the first -- on Step 1 called "Prepare Equipment"?

A.   Nothing additional than what's in my report and what I just said.

Q.   Okay.  Let me just ask you.  Do you think that it's common sense to put -- to leave or to not install -- strike that.

Do you believe that it's common sense not to place the chamber in a location where it comes into contact with other items in the room during normal operation?

MR. SWETT:  Object to form.

A.   I don't think it's common sense, and without information that tells you that it's unsafe, there is no reason why people shouldn't unless there is a hazard there that I don't know about.  As a user, why shouldn't I push it up against the wall?  It's in my way, for example, which is why a warning is needed in this case, because you cannot expect that people would assume there is a hazard if they're not familiar with the potential inadvertent disconnect of the valve.

Q.   (BY MR. CHIGNELL)  Okay.  Go on to the next citation that you have.

A.   Okay.  Page 26.  For "Observe," it says,

Case 5:13-cv-00649-FL     Document 69-37     Filed 01/09/15     Page 12 of 15

**reasonable.**

A.   Given the information that he didn't have and the fact that he would not appreciate the consequences of that, I think it was reasonable for him to leave.

**Q.   Okay.  Do you think it was reasonable for him to push the chamber into the shelf when he was trying to close the door?**

A.   There is contradictory testimony that he -- in his testimony, he said he didn't push it and the police report says that he did, but regardless, there was no information in the warnings or the instructions that pushing the chamber up against the wall posed any kind of hazard.  So if there is no information that it was hazardous, yes, it's reasonable.

**Q.   Okay.  And let's just assume for a minute -- again, I recognize that there is some testimony on both sides of this, but if it is concluded by the jury that Dylan caused the quick disconnect to come off when he pushed the chamber when he was trying to close the door, do you think that it was reasonable for him to push the chamber into the shelf while he was trying to close the door?**

MR. SWETT:  Object to the

Case 5:13-cv-00649-FL    Document 69-37   Filed 01/09/15   Page 13 of 15

addition, those three hazards, if they could result in serious injury or death, should be placed on the product.

Q. Okay. Assuming that these three hazards are separate from the hazards that the manufacturer attempted to warn of in what was marked Exhibit 38, do you have an opinion as to whether or not five on-product warnings could have been placed on this chamber without the danger of warning overload?

A. In this case, I don't think that five product warnings would have resulted in warning overload.

Q. Based on your review of the evidence in this case, did Oxy-Health ever warn that this chamber should not be set up close to an object or within a certain amount of feet of any object in the home?

MR. CHIGNELL: I will object, but go ahead.

A. No, they didn't.

Q. (BY MR. SWETT) Assuming that Dylan did push the chamber up against the bookshelf, do you have an opinion on whether or not that would be foreseeable based on the lack of such a warning in this case?

A. Yes, I think it would be foreseeable. So it's a portable chamber, it's foreseeable that people

Case 5:13-cv-00649-FL     Document 69-37     Filed 01/09/15     Page 14 of 15

would move it around. It's acceptable to be used in the home, which means that it might be in tight quarters, and it's reasonable to assume that a chamber of this size would be in tight quarters. There is nothing in the manual or on the product that provides the user with any information that it's unsafe to do so.

Q.   **Okay. Anywhere in the user manual do you recall seeing any adequate warnings of the hazard associated with asphyxiation?**

A.   There were no adequate asphyxiation hazard warnings.

Q.   **Okay. Were there any adequate asphyxiation warnings on the product in this case?**

A.   No.

Q.   **In your opinion, were there any adequate warnings of the possibility that the quick disconnect valve could become quickly disconnected without pushing the button anywhere in this manual?**

MR. CHIGNELL:  I'll object, but go ahead.

A.   No.

Q.   **(BY MR. SWETT)  Was there any on-product warning -- adequate warning that the quick disconnect valve could become disconnected without pushing the button -- without a user manually pushing the button?**