

**User Name:** Lisa Ranaldo

**Date and Time:** Jan 09, 2015   8:53 a.m. EST

**Job Number:** 15970601

## Document(1)

1.   *JACKSON v. VOLKSWAGEN OF AMERICA, INC., 1986 U.S. Dist. LEXIS 24640*

    **Client/Matter:** 509029000-ldr

    **Narrowed by:**

| Content Type | Narrowed by |
| --- | --- |
| Cases | -None- |

About LexisNexis | Privacy Policy | Terms & Conditions | Copyright © LexisNexis.

Lisa Ranaldo


# JACKSON v. VOLKSWAGEN OF AMERICA, INC.

United States District Court for the Eastern District of North Carolina, Raleigh Division

June 4, 1986, Decided

*No*. *84-857-CIV-5*

**Reporter**

1986 U.S. Dist. LEXIS 24640

JAMES R. *JACKSON*, Et Al., Plaintiffs, *v*. VOLKSWAGEN OF *AMERICA*, *INC*., Et Al., Defendants

## Core Terms

crashworthiness, manufacturer, collision, injuries, cases, courts, foreseeable, cause of action, decisions, damages, enhanced, intended use, proximate cause, federal court, jurisdictions, passenger, principles, unreasonable risk, reasonable care, prediction, defects, state law, state court, anticipate, vehicles, strict liability, proximate, law of torts, court finds, predicated

## Case Summary

### Procedural Posture

Defendant car manufacturers filed a motion to dismiss the complaint of plaintiff injured parties or, alternatively, for summary judgment. Plaintiffs' suit was brought under a crashworthiness doctrine to recover from defendant car manufacturers for personal injuries they sustained in an automobile accident with a third party.

### Overview

Plaintiff injured parties sought to recover from defendant car manufacturers for personal injuries they sustained in an automobile accident. Defendants filed a motion to dismiss the complaint or alternatively for summary judgment. The court denied the motion to dismiss the crashworthiness cause of predicated on general negligence principles. After a review of prevailing state law and the current trends in other states as to the crashworthiness doctrine, the court concluded that the state appellate courts would adopt the doctrine of crashworthiness when predicated on negligence principles. It granted the motion to dismiss the crashworthiness cause of action predicated upon strict liability principles as North Carolina had clearly rejected the doctrine of strict liability and dismissed the crashworthiness cause of action predicated upon breach of warranty. The court denied defendants' motion for summary judgment without prejudice to their right to renew the motion after the completion of substantial discovery.

### Outcome

The court denied the motion to dismiss of defendant car manufacturers as to the crashworthiness cause based on negligence because the state appellate court would adopt the doctrine. The motion to dismiss the crashworthiness causes predicated on strict liability and breach of warranty was granted. Defendants' motion for summary judgment was denied without prejudice to renewal.

## LexisNexis® Headnotes

Civil Procedure > Preliminary Considerations > Venue > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > Convenience Transfers

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

**HN1** The transferee district court is obligated to apply the state law that would have been applied if there had been **_no_** change of venue. A change of venue under _28 U.S.C.S. § 1404(a)_ generally should be, with respect to state law, but a change of courtrooms.

Torts > Products Liability > General Overview

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

**HN2** The term crashworthiness refers to the ability of the vehicle to protect its passengers from enhanced injuries following a collision. Crashworthiness has also been defined in the Motor Vehicle Information and Cost Savings Act, _15 U.S.C.S. § 1901_, as the protection that a passenger motor vehicle offers its passengers against personal injury or death as a result of a motor vehicle accident. _15 U.S.C.S. § 1901(14)_.

Torts > Products Liability > General Overview

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

**HN3** The concept of crashworthiness generally focuses on the vehicle's capacity to withstand the physical stresses from a collision and its capacity to minimize the additional or enhanced injuries the passengers may sustain as a result of the second collision between the occupants and the interior of the vehicle. Thus, the inquiry centers on the events following the initial accident and includes both the collision of the passenger with the interior of the vehicle (the second collision) and the structural integrity of the vehicle upon impact.

Torts > Products Liability > General Overview

Torts > Products Liability > Types of Defects > Design Defects

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

**HN4** In crashworthiness cases, the cause of the initial accident is irrelevant to the enhanced injury issue. Plaintiff's suit against the manufacturer is not grounded upon the theory that a defect in the car caused the primary impact, but rather that the injuries sustained were exacerbated by a defect in design. The question of causation is addressed to the instrumentality causing the enhanced injury, not that which caused the initial collision.

Torts > Products Liability > Types of Defects > Marketing & Warning Defects

Torts > Products Liability > Theories of Liability > Negligence

**HN5** "Intended use" is but a convenient adaptation of the basic test of reasonable foreseeability framed to more specifically fit the factual situations out of which arise questions of a manufacturer's negligence. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use. However, he must also be expected to anticipate the environment which is normal for the use of his product and anticipate the reasonably foreseeable risks of the use of his product in such environment and warn the consumer of them.

Admiralty & Maritime Law > Collisions > Liability > General Overview

Admiralty & Maritime Law > Collisions > Liability > Acts of God & Inevitable Collisions

Torts > ... > Standards of Care > Reasonable Care > General Overview

Lisa Ranaldo

Torts > Transportation Torts > Motor Vehicles

Torts > ... > Motor Vehicles > Particular Actors, Circumstances, & Liabilities > Personal Vehicle Operators & Owners

*HN6* Under the present state of the art, an automobile manufacturer is under **_no_** duty to design an accident-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision. Collisions with or without fault of the user are clearly foreseeable by the manufacturer and are statistically inevitable.

Torts > Remedies > Damages > Reductions of Damages

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > Transportation Torts > Motor Vehicles

*HN7* The duty of reasonable care in design should be viewed in light of the risk. While all risks cannot be eliminated nor can a crash-proof vehicle be designed, there are many common-sense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision. The standard of reasonable care is applied in many other negligence situations and should be applied here.

Torts > Remedies > Damages > General Overview

Torts > Products Liability > Types of Defects > Design Defects

Torts > Transportation Torts > Motor Vehicles

*HN8* The manufacturer is not liable for the entire damages, but only for that portion attributable to the defective design.

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > Transportation Torts > Motor Vehicles

*HN9* Manufacturers are not held to the standard of insurers; only to the familiar standard of reasonable care. The manufacturer is not required to design against bizarre accidents nor must he produce a crash-proof vehicle. The manufacturer is not required to eliminate every risk, but only to eliminate unreasonable risks by taking reasonable steps, within the limitations of cost, technology, and marketability, to design and produce a vehicle that will minimize the injurious effects of the unavoidable danger of collisions.

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > Products Liability > Types of Defects > Design Defects

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN10* Unreasonableness is an essential element of the plaintiff's case. The manufacturer's duty to produce crashworthy vehicles is simply a specific application of the general duty of all manufacturers to make their products reasonably safe for the accident environment. Whether a design is unreasonable is a decision for the trier of fact, guided by general negligence principles, balancing the likelihood and gravity of the harm against the burden of effective precautions. In applying this test, a wide variety of factors are relevant and come into play: the intended use of the vehicle, styling, cost to change design, the obviousness of the defect, and the circumstances of the accident.

Torts > Products Liability > Types of Defects > Design Defects

Torts > Products Liability > Theories of Liability > Negligence

Torts > Transportation Torts > Motor Vehicles

*HN11* Because the collision and resulting injuries are recognizable and foreseeable, a design is defective if the injury-producing feature presents a foreseeable, appreciable risk which could have been averted by a different design without substantially affecting the utility, price, and attractiveness of the product.

Torts > Products Liability > Theories of Liability > Negligence

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN12* Although a collision is not the intended use of a car, it is a clearly foreseeable danger arising out of the vehicle's intended use. Foreseeability alone does not define the manufacturer's duty. Based on traditional negligence principles, the manufacturer is held to the duty of designing a crashworthy vehicle.

Torts > Products Liability > Theories of Liability > Negligence

Torts > Transportation Torts > Motor Vehicles

*HN13* A manufacturer of motor vehicles owes a duty to design and construct its product to be reasonably fit for its intended use and to be reasonably free from hidden defects which would render it unsafe for that use. The intended use of a vehicle encompasses the normal incidents of its being driven on the streets and highways, including the potentiality of collisions. The rule does not make manufacturers insurers of their products. The duty owed requires merely precautions to be taken against an unreasonable risk of injury. Plaintiff will still have the burden of proving that there is a defect presenting an unreasonable risk of harm and that such defect was the proximate cause of the injury.

Torts > ... > Causation > Proximate Cause > General Overview

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN14* A crashworthiness defect would be considered a proximate cause of any enhanced damages suffered by the plaintiff.

Torts > ... > Causation > Proximate Cause > General Overview

Torts > Products Liability > Theories of Liability > Negligence

*HN15* Negligence is conduct which falls below the standard established by law for the protection of others against unreasonably great risk of harm. An essential element in proving a negligence cause of action is a reasonably close causal connection between the conduct of an actor and the resulting injury to another. Once it is established that defendant's conduct has in fact been one of the causes of plaintiff's injury, the question remains whether the defendant should be considered legally responsible for what he has caused. Essentially, this issue is a problem of law; it is the question of proximate cause, the gravamen of which is whether the defendant was under a duty to protect the plaintiff against the event which did in fact occur.

Torts > ... > Elements > Causation > General Overview

Torts > ... > Causation > Proximate Cause > General Overview

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

*HN16* Proximate cause is specifically defined as a cause that produced the result in continuous sequence, without which it should not have occurred, and one from which a man of ordinary prudence could have foreseen that such result was probable. Foreseeability of injury is an essential element of proximate cause. If a defendant could not reasonably foresee any injury as the result of his act, or if his conduct was reasonable in light of what he could anticipate, there is *no* negligence. In sum, the test of proximate cause is whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant.

Torts > ... > Elements > Causation > General Overview

Torts > ... > Causation > Proximate Cause > General Overview

*HN17* There may be more than one proximate cause of an injury. It is not required that defendant's negligence be the sole proximate cause of injury nor that it be the last act of negligence. It is sufficient if defendant's negligence is one of proximate causes.

Torts > ... > Elements > Causation > General Overview

Torts > ... > Causation > Proximate Cause > General Overview

Torts > ... > Elements > Causation > Concurrent Causation

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN18* A crashworthiness defect must be established as a proximate cause of plaintiff's injuries. As a starting point, the first impact is the sole proximate cause for plaintiff's injuries which would have been suffered in the collision absent the crashworthiness defect. Moreover, the initial impact is also a proximate cause of enhanced injuries suffered as a result of the crashworthiness defect, since there would have been *__no__* injuries at all absent the collision. By the same token, however, the crashworthiness defect is also a proximate cause of the enhanced injuries, for without the defect, these injuries would not have occurred. As to the enhanced injuries, then, the cause of the collision and the crashworthiness defect are concurrent proximate causes, given that automobile accidents occur with sufficient frequency so as to be reasonably foreseeable to manufacturers.

Civil Procedure > Preliminary Considerations > Venue > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > Convenience Transfers

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

*HN19* When an action has been transferred under *28 U.S.C.S. § 1404(a)*, pursuant to a defendant's motion, the transferee court must apply the same law as the original federal court would have applied. The transferee district is obligated to apply the state law that would have been applied if there had been *__no__* change of venue.

Civil Procedure > Preliminary Considerations > Venue > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > General Overview

Civil Procedure > ... > Venue > Federal Venue Transfers > Convenience Transfers

*HN20* A change in venue under *28 U.S.C.S. § 1404(a)* generally should be, with respect to state law, but a change of courtrooms.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN21* In undertaking the task of predicting the predispositions of state law not yet determined, a federal court should have regard for any persuasive data that is available, such as compelling inferences or logical implications from other related adjudications and considered pronouncements. The responsibility of the federal courts, in matters of local law, is not to formulate the legal mind of the state, but merely to ascertain and apply it. Any convincing manifestation of local law, having a clear root in judicial conscience and responsibility, whether resting in direct expression or obvious implication and inference, should accordingly be given appropriate heed.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN22* In vicariously creating law for a state, the federal court may look to such sources as the restatements of law, treatises, law review commentary, and the majority rule. The federal court must keep in mind, however, that its function is not to choose the rule that it would adopt for itself, if free to do so, but to choose the rule that it believes the state court, from all that is known about its methods of reaching decisions, is likely in the future to adopt.

> Torts > ... > Standards of Care > Appropriate Standard > Objectivity

> Torts > ... > Standards of Care > Reasonable Care > Reasonable Person

> Torts > Products Liability > General Overview

> Torts > Products Liability > Theories of Liability > Strict Liability

*HN23* A products liability claim sounding in tort, must include the same elements as any negligence claim: evidence of a standard of care owed by the reasonably prudent person in similar circumstances; breach of that standard of care; injury caused directly or proximately by the breach; and loss because of the injury.

> Torts > Products Liability > Theories of Liability > Negligence

> Torts > Transportation Torts > Motor Vehicles

*HN24* A manufacturer has a duty to the ultimate consumer, irrespective of contract, to use reasonable care in its manufacturing and to make reasonable inspections of the construction process in its plants where vehicles are manufactured.

> Torts > Products Liability > Theories of Liability > Negligence

*HN25* A negligent defendant cannot escape liability because of the failure on the part of some third person to perform an affirmative duty which, if properly performed, would have enabled the plaintiff to avoid the risk created by the defendant's negligence. The failure of the other to inspect adequately may make him liable to the party harmed, but it will not relieve the defendant whose negligence was responsible for the hazard in the first place.

> Torts > ... > Standards of Care > Reasonable Care > General Overview

> Torts > ... > Standards of Care > Reasonable Care > Reasonable Person

> Torts > Products Liability > Types of Defects > Marketing & Warning Defects

> Torts > Products Liability > Theories of Liability > Negligence

*HN26* When the liability is to be based on negligence, the defendant is required to exercise the care of a reasonable man under the circumstances. His negligence may be found over an area quite as broad as his whole activity in preparing and selling the product. He may be negligent first of all in designing it, so that it becomes unsafe for the intended use. He may be negligent in failing to inspect or test his materials, or the work itself, to discover possible defects or dangerous propensities. He may fail to use proper care to give adequate warning to the user, not only as to dangers arising from unsafe design, or other negligence, but also as to dangers inseparable from a properly made product. The warning must be sufficient to protect third persons who may reasonably be expected to come in contact with the product and be harmed by it. The duty continues even after sale, when the seller first discovers that the product is dangerous. He is also required to give adequate directions for use, when reasonable care calls for them.

> Torts > ... > Duty > Affirmative Duty to Act > Failure to Act

> Torts > Products Liability > Theories of Liability > Negligence

*HN27* The manufacturer is liable for an injury to a third person resulting from a failure to perform the duty to use reasonable care provided that such injuries could reasonably be anticipated.

> Torts > Products Liability > Theories of Liability > Negligence

*HN28* A manufacturer's negligence may arise from the selection of materials for use in the manufacturing process or in failing to make reasonable inspection for hidden defects in the product. A manufacturer owes a duty to the ultimate consumer not to construct a product with hidden defects which might result in injury and to give notice to the consumer of any concealed danger.

> Torts > ... > Standards of Care > Appropriate Standard > General Overview

> Torts > Products Liability > Theories of Liability > Negligence

*HN29* The standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect and the expedience of the course pursued.

> Torts > Products Liability > Theories of Liability > Negligence

*HN30* A manufacturer, who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.

> Torts > Products Liability > Theories of Liability > Negligence

*HN31* A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design. The manufacturer may, however, reasonably anticipate other uses than the one for which the chattel is primarily intended.

> Torts > Products Liability > Theories of Liability > Negligence

> Torts > Transportation Torts > Motor Vehicles

> Business & Corporate Compliance > ... > Transportation Law > Commercial Vehicles > Maintenance & Safety

> Transportation Law > Private Vehicles > Safety Standards > General Overview

*HN32* See *15 U.S.C.S. § 1391(1)*.

> Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

> Torts > ... > Elements > Causation > General Overview

> Torts > ... > Causation > Proximate Cause > General Overview

> Torts > ... > Elements > Causation > Intervening Causation

*HN33* If the negligence of an actor is a proximate cause of any part of the plaintiff's injuries, he is liable. If the intervening negligence of a third party is reasonably foreseeable, it does not insulate a previously negligent party from liability for injuries caused by that party's original negligence.

> Torts > Products Liability > Theories of Liability > Negligence

> Torts > Transportation Torts > Motor Vehicles

> Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN34* In a crashworthiness case, when a vehicle is being driven in a normal manner, a manufacturer's negligence in design or construction is not automatically insulated by a foreseeable intervening collision.

> Torts > Products Liability > Theories of Liability > Negligence

Torts > Transportation Torts > Motor Vehicles

Transportation Law > Private Vehicles > Safety Standards > Crashworthiness

*HN35* The final element in a negligence cause of action is that there be actual loss or damage because of the injury. The question in crashworthiness cases is not whether there was any cognizable damage, but how to determine what part of the damage is attributable to each cause; i.e., the rule of apportionment.

**Counsel:** [*1] Local Counsel: William Thorp, Anne Slifkin, Thorp, Fuller & Slifkin; Joseph F. Roda, Attorney at Law, William R. Seikaly, Richard M. Goodman, Richard M. Goodman, P.C., for Plaintiffs.

Local Counsel: Bynum M. Hunter, Smith, Helms, Mulliss & Moore; James S. Sargent, Pepper, Hamilton & Scheetz, for Defendants.

**Opinion by:** FOX

# Opinion

*ORDER*

Plaintiffs initiated this products liability action on April 4, 1983, in the state courts of Pennsylvania, seeking to recover for personal injuries sustained in an automobile accident which occurred on April 4, 1981, near Raleigh, North Carolina, when a 1979 Volkswagen van being driven by plaintiff James R. *Jackson*, and in which the other plaintiffs were passengers, was stuck head-on by a 1965 Chevrolet which had crossed the centerline of a highway. The *Jackson* plaintiffs are citizens and residents of North Carolina. The Ehrenberg plaintiffs are citizens and residents of Pennsylvania. Defendant Volkswagen of *America*. *Inc*. (VWOA) is a New Jersey corporation, with its principal place of business in Troy, Michigan. Defendant Volkswagenwerk Aktiengesellschaft (VWAG) is a foreign corporation, with its principal place of business in Wolfsburg, West Germany.

[*2] Plaintiffs' complaint was initially filed in the Court of Common Pleas of Philadelphia County, Pennsylvania. The issue presented is whether a manufacturer has the duty to design a motor vehicle to avoid subjecting its users to unreasonable risks of harm when a faulty design, although not causing or contributing to the collision, produces or enhances an injury received in the accident. *See Huff v*. White Motor Corp*., 565 F.2d 104, 105 (7th Cir. 1977)*. The complaint alleges liability on three independent bases: (1) strict liability; (2) negligence; and (3) breach of warranty. Defendants filed timely answers denying the material allegations of the complaint.

Pursuant to *28 U.S.C. § 1441(a)*, defendants subsequently removed this case to the United States District Court for the Eastern District of Pennsylvania. On November 1, 1983, again upon defendants' motion, this action was ordered transferred to this court pursuant to *28 U.S.C. § 1404(a)*. On June 26, 1984, plaintiffs' motion to remand the case to the Court of Common Pleas was denied by the federal court in Pennsylvania. The case was officially transferred to this District on August 1, 1984. Since that time, upon recommendation [*3] of Magistrate Dixon, plaintiffs' motion to transfer this action to the Eastern District of Michigan has been denied.

On September 18, 1984, defendants moved to dismiss plaintiffs' complaint or, alternatively, for summary judgment, arguing that (1) Pennsylvania conflicts of law applies to determine which state's substantive law controls; (2) Pennsylvania would decide that North Carolina substantive law applies; (3) *no* North Carolina appellate court has ruled on whether this state would accept the doctrine of "crashworthiness"; (4) the Fourth Circuit Court of Appeals in 1981 and again in 1983 predicted North Carolina would not adopt this theory of liability; (5) this court is bound by the Fourth Circuit's prior holdings; and (6) even if this court is not bound, a review of North Carolina tort law indicates that North Carolina would not recognize this theory of products liability. Plaintiffs responded, agreeing that Pennsylvania conflicts law applies, but strenuously contesting the remainder of defendants' argument. Both sides having submitted excellent briefs, this matter was referred to Magistrate Denson For his recommendation pursuant to *28 U.S.C. § 636(b)(1)(B)*.

Lisa Ranaldo

Case 5:13-cv-00649-FL    Document 69-40    Filed 01/09/15    Page 9 of 39

On June 25, 1985, [*4] the Magistrate issued his Memorandum and Recommendation, finding that North Carolina substantive law controlled and that this court was bound by Fourth Circuit precedent. Accordingly, Magistrate Denson recommended dismissal of this action. This matter is now before the court on plaintiffs objections to the Magistrate's recommendation. Plaintiffs contend that due to the unusual procedural posture of this case (one that was transferred from the federal district court in Pennsylvania), the court ;s not bound by the 1981 and 1983 decisions of the Fourth Circuit and that this court ;s Free to predict and indeed should find that North Carolina, if presented with the issue today, would adopt the doctrine of crashworthiness. Although neither the procedural nor the substantive issues at bar admit of easy resolution, for the reasons that follow, this court is persuaded by plaintiFFs' analysis and, accordingly, defendants' motion to dismiss, at least as to the negligence count, is hereby DENIED.

As an initial matter, the court adopts the Magistrate's recommendation that Pennsylvania conflicts of law applies to determine which state's substantive law controls. *Van Dusen v*. Barrack*, 376 U.S.* [*5] *612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) HN1* ("[t]he transferee district court must be obligated to apply the state law that would have been applied if there had been *no* change of venue. A change of venue under *§ 1404(a)* generally should be, with respect to state law, but a change of courtrooms." In addition, the court also finds the Magistrate's recommendation that North Carolina substantive law controls correct and in accordance with law. Pennsylvania clearly has abandoned its inflexible *lex loci* rule, *see Griffith v*. United Airlines, *Inc., 416 Pa. 1, 203 A.2d 796 (1964)*, in favor of a more flexible rule which focuses on which state has the most relevant qualitative contracts with the event at issue. *Id.*, *Cipolla v*. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970)*. *See also VanTine v*. Nissan Motor Co., Ltd*., 463 F.Supp. 1274, 1277 (W.D.Pa. 1979)*. In the case at bar, North Carolina's relevant contacts substantially outweigh any relevant contacts and interests of the state of Pennsylvania:

*Pennsylvania's Relevant Contacts*

- Two of the plaintiffs are citizens of Pennsylvania.

- North Carolina law on the legal issue at bar is, at best, ambiguous, whereas [*6] interpretations of Pennsylvania law are unequivocal, that state having adopted the doctrine of crashworthiness, *see Dyson v*. General Motors Corp*., 298 F.Supp. 1064 (E.D.Pa. 1969)* and *Jeng v*. Witters*, 452 F.Supp. 1349 (M.D.Pa. 1978)*.

*North Carolina's Relevant Contacts*

- Five of the plaintiFfs are citizens of North Carolina.

- The collision occurred in North Carolina.

- Any enhancement of injuries by virtue of unsafe design, improper resting, or faulty manufacture occurred in North Carolina.

- Medical treatment to all seven plaintiffs was rendered in North Carolina.

- The vehicle was purchased by plaintiff James *Jackson*, a North Carolina resident, in North Carolina.

- The vehicle was registered, licensed, safety inspected, and garaged in North Carolina.

Accordingly, the court is bound to apply the law of North Carolina to this diversity case. *Erie R.R.Co. v Tompkins 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)*. Unfortunately, as previously indicated, there are *no* decisions from the North Carolina appellate courts bearing directly on the precise issue at bar and the North Carolina courts do not provide for the process of certification [*7] from a federal court. Thus, this court must predict what rule the North Carolina Supreme Court would adopt in such a case today and forthrightly apply it. Resolution of this question requires (1) a detailed understanding of the doctrine of crashworthiness, its origin, and the rationale underpinning the theory; (2) a review of prior federal court determinations of the issue at bar and a procedural analysis to determine whether this court is bound by any of those decisions and (3) an in-depth study of the basic principles of North Carolina products liability and tort law in conjunction with a determination of whether the concept of crashworthiness fits within that state law framework. Discussion of these factors follows *seriatim*.

I. *THE DOCTRINE OF CRASHWORTHINESS*

*HN2* The term ″crashworthiness″ refers to the ability of the vehicle to protect its passengers from enhanced injuries following a collision. Crashworthiness has also been defined in the Motor Vehicle Information and Cost Savings Act, *15 U.S.C. § 1901 (14)*, as ″the protection that a passenger motor vehicle offers its passengers against personal injury or death as a result of a motor vehicle accident.″ *See also Dreisonstok* [*8] *v*. Volkswagenwerk, A.G*., 489 F.2d 1066, 1069 n.3 (4th Cir. 1974)*.

*HN3* The concept of crashworthiness generally focuses on the vehicle's capacity to withstand the physical stresses from a collision and its capacity to minimize the additional or enhanced injuries the passengers may sustain as a result of the ″second collision″ between the occupants and the interior of the vehicle. [1] Thus, the inquiry centers on the events following the initial accident and includes both the collision of the passenger with the interior of the vehicle (the second collision) and the structural integrity of the vehicle upon impact. *See* Comment, *Automobile Crashworthiness*: Evans *Takes a Backseat*, 21 Vill. L.Rev. 72, 73 (1976). [2]

*HN4* In crashworthiness cases, the cause of the initial accident is irrelevant to the enhanced injury issue. Plaintiff's suit against the manufacturer is ″not grounded upon the theory that a defect in the car caused the primary impact, but rather that the injuries sustained were exacerbated by a defect in design.″ Sklaw, ″*Second Collision*″ *Liability. The Need for Uniformity,* 4 Seton Hall L.Rev. 499, 507 (1973). The question of causation is addressed to the instrumentality causing the enhanced injury, not that which caused the initial collision. *Toliver v*. General Motors Corp., *482 So. 2d 213, 214 (Miss. 1985)*.

Whether manufacturers should be obligated to design crashworthy vehicles was one of the major debates in products liability law in this country in the late 1960's and 1970's. The [*10] controversy originated with the case of *Evans v*. General Motors Corp*., 359 F.2d 822 (7th Cir. 1966)*, cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966). In *Evans*, the decedent-consumer was killed when another vehicle struck the side of his vehicle broadside. Since the car was designed with an ″X″ frame, rather than a perimeter frame used in other models, the sides of the car provided less protection for its occupants in the event of a side-impact collision. Predictably, upon impact, the side of the decedent's vehicle collapsed in upon him.

Plaintiff, the personal representative of the decedent, alleged that the omission of the side frame rails created an unreasonable risk of harm to the occupants of the car in light of the forseeability of side-impact collisions. Further, plaintiff argued that since the condition of the vehicle was the proximate cause of the decedent's injuries, the manufacturer was liable for its negligent design of the car. *359 F.2d at 823-24*.

The federal district court dismissed the complaint. The Seventh Circuit, in a 2-1 panel opinion, affirmed. The court recognized that the central issue was the extent of the manufacturer's duty to [*11] users of its product and, in Fact, found the manufacturer had a duty to design an automobile reasonably. Fit for its intended use and free from any hidden, dangerous defects. *Id. at 824*. However, the court held that the intended use of an automobile does not include participation in collisions, regardless of the fact that such collisions are foreseeable. *Id. at 824-25*. Therefore, the court stated, *no* manufacturer has a duty to design an accident-proof vehicle nor a vehicle that is safer from the obvious danger of collision than any other vehicle. *Id*. [3] In addition, since the design of the car without side frame rails did not cause the accident in

---

[1]  It may, however, be somewhat misleading to define crashworthiness strictly in terms of the impact of the car's occupants with the interior of the vehicle (i.e., the ″second collision″) since not all design defects require a second collision to exacerbate injuries. There are a number of possible manufacturing or design defects: (1) structural collapse of the occupant compartment; (2) the ″second collision″; (3) post-crash fire - a defect in the fuel assembly; and (4) improper retention - the ejection of the passenger from the vehicle due to defective safety features such as windows, door latches and seat belts. *See generally* L.Frumer and M.Friedman, *Products Liability* § 605[14] (1981); Sklaw, ″*Second Collision*″ *Liability: The Need for Uniformity*, 4 Seton Hall L.Rev. 499. 507 n.40 (1973).

[2]  [*9] The crashworthiness doctrine is not limited to automobile defects, but also applies to airplanes, trucks, buses, motorcycles and other passenger vehicles. *See*, *e.g*., Bruce *V*. Martin-Marietta Corp., 544 F.2d 442 (10th Cir. 1976) (airplane); Perez *v*. Ford Motor Co., 497 F.2d 82 (5th Cir. 1974) (truck); Bolm *v*. Triumph Corp., 33 N.Y. 2d 151, 305 N.E.2d 769, 350 N.Y.S.2d 644 (1973).

[3]  The court found it was for the legislature, not the judiciary, to require manufacturers to construct automobiles in which it would be safe to collide. 359 F.2d 824.

the first instance, any defect, whether in construction or design, did not cause decedent's injuries resulting from the collision. *Id.* [4]

[*12] *Evans* elicited much scholarly criticism, [5] but was initially accepted by the judiciary. [6] However, a contrary position was quickly established by the Eighth Circuit in *Larsen v*. General Motors Corp*., 391 F.2d 495 (8th Cir. 1968)*. In *Larsen*, the plaintiff, while driving a Corvair, was involved in a head-on collision with another vehicle which propelled the steering mechanism of plaintiff's car rearward into the plaintiff's head, causing severe injuries. *391 F.2d at 497*. Plaintiff argued that the defendant was negligent in its design of the steering assembly, in that the driver was exposed to an unreasonable risk of injury from the rearward displacement of the steering shaft upon the collision. *Id*. The plaintiff also predicated liability upon the defendant's failure to warn purchasers of the dangerous design and breach of express and implied warranties. *Id*.

[*13] The federal district court rendered summary judgment for the manufacturer, but the Eighth Circuit reversed. As did the *Evans* court, the Eighth Circuit defined the issue in terms of the scope of the manufacturer's duty in the design of its automobiles, and reached the same conclusion as *Evans*, that the manufacturer's duty of design and construction extends to producing a product reasonably fit for its intended use and free from hidden defects. *Id. at 501* [7] However, the *Larsen* court parted company with *Evans* in its interpretation of the intended use of an automobile. Citing *Spruill v*. Boyle-Midway, *Inc., 308 F.2d 79 (4th Cir. 1962)*, the court held that the manufacturer was responsible for anticipating the environment in which his product would be used. [8] The Eighth Circuit stated:

Accepting, therefore, the principle that a manufacturer's duty of design and construction extends to producing a product that is reasonably fit for its intended use and free of hidden defects that could render it unsafe for such use, the issue narrows

---

[4] Judge Kiley authored a forceful dissent. He reasoned that the manufacturer's duty extended to the environment of the product's use and that accidents within that environment were foreseeable. Accordingly, he argued, a manufacturer was required to exercise reasonable care to minimize collision-related injury. 359 F.2d at 827.

[5] *See* the list of articles collected in n.36 of 21 Vi11. L. Rev. at 79 and *infra* at 67.

[6] *See e.g.,* Shumard *v*. General Motors Corp., 270 F.Supp. 311 (S.D. Ohio 1967); Walton *v*. Chrysler Motor Corp., 229 So.2d 568 (Miss. 1969); McClung *v*. Ford Motor Co., 333 F.Supp. 17 (S.D.W.Va. 1971), *aff'd.*, 472 F.2d 240 (4th Cir.), *cert. denied*, **412 U.S. 940 (1973)**.

[7] The court traced the manufacturer's liability for negligence in construction and design from Justice Cardozo's opinion in MacPherson *v*. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916) through Ford Motor Co. *v*. Zahn, 265 F.2d 729 (8th Cir. 1959). In *MacPherson*, although the car manufacturer had purchased wheels for its cars from a reputable wheel manufacturer, one of the wheels on plaintiff s car was defective.

[*14] While plaintiff was driving, the wheel collapsed and plaintiff was injured. The defect would have been discovered had the car manufacturer inspected the wheels before assembly. The car manufacturer insisted it only had a duty of care to the immediate purchaser (the dealer). Justice Cardozo disagreed and held that the manufacturer's duty to construct vehicles free of latent defects extended to the remote purchaser, notwithstanding the lack of privity. 217 N.Y. at 390, 111 N.E. at 1053.

Dean Prosser has observed that the opinion's reasoning and its fundamental philosophy were clearly that the manufacturer, by placing the car upon the market, assumed a responsibility to the consumer resting not upon the contract but upon the relation arising from his purchase, together with the foreseeability of harm if proper care were not used.

W. Prosser, *The Handbook of the Law of Torts* § 96 at 643 (4th ed. 1971). The significance of *MacPherson* lies in its focus upon the risk of harm and not upon the manner in which it was caused or the number of intervening events between the defendant's act and the injury. *See* Seavy, *Mr. Justice Cardozo and the Law of Torts*, 52 Harv. L. Rev. 372, 381 (1939).

[*15] In *Zahn, supra*, a negligently constructed ashtray blinded a passenger thrown against it when the driver made an emergency stop. Thus, although Zahn involved a construction defect like *MacPherson*, the defect in *Zahn* did not cause the initial emergency - the jolt - rather it exacerbated the plaintiff's injury upon impact with the dashboard area of the car. 265 F.2d at 730.

[8] In *Spruill*, plaintiff's child died as a result of swallowing furniture polish manufactured by the defendant. Defendant was found negligent in failing to adequately warn of the danger involved in ingesting the polish, notwithstanding defendant's contention that the intended use of the product did not include consumption, and that it did not have to anticipate consumption and warn of the danger. 308 F.2d at 83.

The Fourth Circuit stated in *Spruill*:

on the proper interpretation of "intended use." Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points.

*This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-producing impacts of various types.* The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, **[*17]** that it will be involved in some type of injury-producing accident. [Statistics exist to establish] that between one-fourth to two-thirds of all automobiles during their use at some time are involved in an accident producing injury or death. . . .

We think the "intended use" construction urged by General Motors is much too narrow and unrealistic. Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. *These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No* rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called "second collision of the passenger with the interior part of the automobile, are all foreseeable. **[*18]** *Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art.*

We do agree that *HN6* under the present state of the art an automobile manufacturer is under **no** duty to design an accident-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision. *Collisions with or without fault of the user are clearly foreseeable by the manufacturer and are statistically inevitable.*

The intended use and purpose of an automobile is to travel on the streets and highways, which travel more often than not is in close proximity to other vehicles and at speeds that carry the possibility, probability, and potential of injury-producing impacts. The realities of the **[*19]** intended and actual use are well known to the manufacturer and to the public and those realities should be squarely faced by the manufacturer and the courts. We *perceive of **no*** sound reason, either in logic or experience, nor any command in precedent, why the manufacturer should not be held to a reasonable duty of care in the design of its vehicle consonant with the state of the art to minimize the effect of accidents. *391 F.2d at 501-03*. (emphasis added) (citations and footnotes omitted).

Thus, the *Larsen* court did not place the manufacturer in the position of an insurer, but held only that the manufacturer had a duty of reasonable care "consonant with the state of the art to minimize the effect of accidents." The manufacturer, therefore, is liable only for *unreasonable risks* of *foreseeable injury,* created by its design, which would arise in the event of a collision. As the court further held:

---

*HN5* "Intended use" is but a convenient adaptation of the basic test of "reasonable foreseeability" framed to more specifically fit the factual situations out of which arise questions of a manufacturer's negligence. . . . Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

**[*16]** However, he must also be expected to anticipate the environment which is normal for the use of his product and where, as here, the environment is the home, he must anticipate the reasonably foreseeable risks of the use of his product in such environment. . . . and . . . warn [the consumer] of them. . . .

*Id*. at 83-84. *See also* Filler *v*. Rayex Corp., 435 F.2d 336 (7th Cir. 1970).

*HN7* The duty of reasonable care in design should be viewed in light of the risk. While all risks cannot be eliminated nor can a crash-proof vehicle be designed . . . there are many common-sense factors in design, which are or should be well known to the manufacturer that **[\*20]** will minimize or lessen the injurious effects of a collision. The standard of reasonable care is applied in many other negligence situations and should be applied here.

*Id. at 503*.

Moreover, *Larsen* held that *HN8* the manufacturer was not liable for the entire damages, but only for that portion attributable to the defective design. *Id*. In conclusion, the court found it unnecessary to discuss possible liability premised upon breach of warranties or strict liability, *id. at 506*, and specifically rejected the defendant's final contention that any duty regarding safety in design should be imposed by the Legislature or a regulatory agency. *Id*.

Unlike *Evans*, *Larsen* initially elicited much scholarly praise, [9] but little judicial acceptance. However, as will be discussed *infra*, the rationale and logic of *Larsen* has now been adopted or followed by virtually every jurisdiction called upon to address the issue of crashworthiness. Although the overwhelming trend in the case law and the dominant weight of authority favors *Larsen*'s extended scope of liability, the choice between the two rules is not simply a numbers game. As a first step, this court must **[\*21]** carefully consider the policies underlying each rule and the implications which flow from them. *See Knippen v*. Ford Motor Co*., 546 F.2d 993, 998 (D.C. Cir. 1976)*.

The rationale behind the crashworthiness doctrine can be succinctly summarized: since manufacturers are already under a duty to construct vehicles that are free of latent defects, *MacPherson v*. Buick Motor Co*., supra*, it follows that the manufacturers' liability for injuries proximately caused by these defects should not be limited to collisions in which the defect causes the accident, but instead should extend to situations in which the defect causes injuries over and above that which would have occurred from the accident but for the defective design. *Caiazzo v*. Volkswagenwerk, A.G*., 647 F.2d 241, 245 (2d Cir. 1981)*.

The reluctance of the *Evans* court and those initially following it to extend a manufacturer's duty beyond a narrow construction of the term "intended use" is generally based on two interrelated reasons. *Knippen v*. Ford Motor Co*., 546 F.2d at 998*. First, it is argued that without such **[\*22]** a limit, manufacturers would always and sometimes unfairly be held liable for injuries from any defective design for which a resourceful plaintiff could suggest a safer design. After all. reason these courts, any part of a motor vehicle involved in an accident can be said - after the fact - to have been capable of a safer design. *See*, *e.g*., *Yetter v*. Rajeski*, 364 F.Supp. 105, 108 (D.N.J. 1973)*.

Thus, the *Evans* courts and commentators are clearly concerned that manufacturers who have produced an automobile which performs its tasks without undue risk would nonetheless be held liable for any injury caused by their product simply because accidents are logically foreseeable. *Knippen, 546 F.2d at 998*. The "intended use" rule announced in *Evans* eliminates that legitimate concern hy automatically insulating manufacturers from all claims by a particular class of claimants - those injured in "second collision" cases.

Unfortunately, achieving what may be a reasonable level of manufacturer liability is effected by the wholesale exclusion of both reasonable and unreasonable claims. *Id*. As Judge Tamm stated for the *Court of Appeals for the District of Columbia in* **[\*23]** *Knippen, supra*:

> Regardless of how grossly unreasonable a manufacturer's conduct is under the circumstances, it can escape liability under the [Evans] "intended use" rule by showing **_no_** more than that the accident leading up to plaintiff's injury was not caused by its product. The rule arises from a concern for fairness but is not focused on fairness. It does not consider the reasonableness of the manufacturer's conduct but only the position of a plaintiff's injury in the chain of causation.

*546 F.2d at 998*.

Moreover, the courts which follow *Evans* due to their concern over unlimited manufacturer liability, seemingly do so through a misreading of the rule of liability established by *Larsen*. The Eighth Circuit held in *Larsen* that "an automobile

---

[9]  *See* the list of articles collected in n.69 of 21 Vill. L. Rev. at 83 amd *infra*. at 67.

Lisa Ranaldo

manufacturer is under **_no_** duty to design an accident-proof″ car; however, that principle does not excuse manufacturers from ″a duty, to use reasonable care . . . to avoid . . . an unreasonable risk of injury in the event of a collision.″ _391 F.2d at 502_.

Therefore, as previously stated, under _Larsen_, **HN9** manufacturers are not held to the standard of insurers - only to the familiar standard of reasonable care. The **[\*24]** manufacturer is not required to design against bizarre accidents nor must he produce a crash-proof vehicle. The manufacturer is not required to eliminate every risk, but only to eliminate _unreasonable_ risks by taking reasonable steps - within the limitations of cost, technology and marketability - to design and produce a vehicle that will minimize the injurious effects of the unavoidable danger of collisions. _Knippen, 546 F.2d at 999_; _Huddell v_. Levin_, 537 F.2d 726, 735 (3d Cir. 1976)_. _See also_ _Dyson v_. General Motors Corp_., 298 F.Supp. 1064, 1068 n.6 (E.D.Pa. 1969)_.

Those courts which follow _Larsen_ emphasize that **HN10** ″unreasonableness″ is an essential element of the plaintiff's case. _See_, _e.g._, _Wooten v_. White Trucks_, 514 F.2d 634, 636-37 (5th Cir. 1975)_; _Dreisonstok v_. Volkswagenwerk, A.G_., 489 F.2d at 1071_; _Turner v_. General Motors Corp_., 514 S.W.2d 497, 504 (Tex.Civ.App. 1974)_; _Mickle v_. Blackmon_, 252 S.C. 202, 166 S.E.2d 173 (1969)_. The manufacturer's duty to produce crashworthy vehicles is simply a specific application of the general duty of all manufacturers to make their products reasonably safe for the accident environment. Whether a design **[\*25]** is unreasonable is a decision for the trier of fact, guided by general negligence principles - balancing the likelihood and gravity of the harm against the burden of effective precautions. _Stonehocker v_. General Motors Corp_., 587 F.2d 151, 154 (4th Cir. 1978)_; _Knippen, 546 F.2d at 999_; _Dreisonstok, 489 F.2d at 1071_; _Larsen, 391 F.2d at 502 n.3_. In applying this test, a wide variety of factors are relevant and come into play: the intended use of the vehicle, styling, cost to change design, the obviousness of the defect, and the circumstances of the accident. _Dreisenstok, 489 F.2d at 1071-73_. _See also_ Wade, _On Product ″Desion Defects″ & Their Actionability_, 33 Vand.L.Rev. 551 (1980).

Whether a design is defective, under traditional negligence analysis, depends first upon the existence of an apparent risk - a foreseeable, recognizable danger. Both _Evans_ and _Larsen_ acknowledge that automobile collisions are foreseeable - indeed inevitable. The purpose of motor vehicles is to provide transportation and this involves a tremendous number of vehicles being driven on our streets and highways every day. Statistically and pragmatically, collisions are foreseeable **[\*26]** incidents of the vehicles' normal use. To suggest that collisions are not within their ″intended use″ is unrealistic. This view ″narrowly refuses to include the obvious risks against which a manufacturer can take precautions.″ _Huff v_. White Motor Corp_., 565 F.2d at 109_ (overruling _Evans_). _See also_ _Roberts v_. May_, 41 Colo. App. 82, 583 P.2d 805 (1978)_; _Buehler v_. Whalen_, 70 Ill.2d 51, 15 Ill. Dec. 852, 374 N.E.2d 460 (1977)_; _Smith v_. Ariens Co_., 375 Mass. 620, 377 N.E.2d 954 (1978)_; _Elsasser v_. American Motors Corp_., 81 Mich. App. 379, 265 N.W.2d 339 (1978)_; _Friedrich v_. Anderson_, 191 Neb. 724, 217 N.W.2d 831 (1974)_; _Johnson v_. American Motors Corp_., 225 N.W.2d 57 (N.D. 1974)_; _Engberg v_. Ford Motor Co_., 205 N.W.2d 104 (S.D. 1973)_ (all holding that automobile accidents occur with sufficient frequency so as to be foreseeable to manufacturers).

Thus, **HN11** because the collision and resulting injuries are recognizable and foreseeable, a design is defective if the injury-producing feature presents a foreseeable, appreciable risk which could have been averted by a different design without substantially affecting the utility, price and attractiveness of the product. **[\*27]** In _Evans_, for example, the manufacturer could have guarded against the risk of collapse upon broadside impact had it used a perimeter frame rather than the ″X″ frame. This design would have been defective and the manufacturer negligent if the factfinder determined that the ″X″ frame choice, in the face of the foreseeable appreciable risk of collisions and concomitant collapse of the frame, was _unreasonable_ in light of the factors delineated above.

In sum, **HN12** although a collision is not _the_ intended use of a car, it is a clearly foreseeable danger arising out of the vehicle's intended use. Prosser, _The Law of Torts_ § 96 at 646 (4th ed. 1971). _See_ _Also Perez v_. Ford Motor Co_., 497 F.2d 82, 86-87 (5th Cir. 1974)_. Further, foreseeability alone does not define the manufacturer's duty under _Larsen_. Based on traditional negligence principles, _Larsen_ seeks merely to hold the manufacturer to the duty of designing a crashworthy vehicle. While all courts agree that there is **_no_** duty to design a crash-proof car, it is a non-sequitur to use this truism as a basis for saying there is **_no_** duty to desion a crashworthy car. _Badorek v_. General Motors Corp_., 11 Cal. App._ **[\*28]** _3d 902, 919, 90 Cal. Rptr. 305, 316 (1970)_. The rule of _Larsen_ is not grounded simply on foreseeability, but rests also upon the _unreasonable_ risk of injury in the event of collision. _Dreisonstok, supra_; _Turner v_. General Motors Corp_, supra._

A second and related reason given by those supporting the *Evans* approach is that the imposition of design standards is a legislative rather than a judicial function. *See, e.g.*, *Yetter v*. Rajeski*, 364 F. Supp. at 108*. Courts which previously adopted this view concluded that automobile design safety standard must await action by the state legislatures because the judiciary has **no** guidelines from which to fashion a standard of care and **no** machinery with which to require compliance. *See* Henderson, *Judicial Review of Manufacturers Conscious Desion Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531, 1539-41 (1973).

As the *Larsen* courts convincingly point out, however, this argument simply does not survive close analysis. *See e.g.*, *Knippen, 546 F.2d at 999*. *Evans* was decided in April 1966 as the Congress was considering but had not yet passed the National Traffic and Motor Vehicle **[\*29]** Safety Act of 1966, *15 U.S.C. § 1391 et seq*. A court's reluctance to break new ground in an area potentially subject to impending comprehensive legislation is understandable. The legislation which passed after *Evans*, however, explicitly provides that the Act is not intended to ″exempt any person from any liability under common law.″ *15 U.S.C. § 1397(c)*. Although a legislative approach to establishing reasonable desion standards would clearly be welcome, the historical development of tort and products liability law casts considerable doubt on the *Evans* notion of the appropriate sphere of judicial action. *Knippen, 546 F.2d at 1000*.

Furthermore, the ″intended use″ rule of *Evans*, although reducing the number of potential plaintiffs who could bring a negligent desion action against a manufacturer, by **no** means frees the courts from the task of deciding issues of negligent or defective desion or construction. *Id*. All courts, state and federal, continue to hear suits alleging. that a manufacturer's negligence caused an accident. Such cases present the same questions of what standard of care defendants must meet and how courts can police compliance with that standard. **[\*30]** [10] *Id*., *McMullen v*. Volkswagen of *America, 274 Or. 83, 545 P.2d 117, 120 (1976)*; *See also*, James and Sigerson, *Particularizing Standard of Conduct in Negligence Trials*, 5 Vand.L.Rev. 697, 698-703 (1952). If this view of narrow judicial competence was carried to its logical conclusion, it would mandate a finding of **no** judicially imposed duty in automobile or products design cases whatsoever. Such a rule would render much of tort and products liability law meaningless. In addition, the judicial incompetence view is completely and logically unrelated to the ″intended use″ predicate in *Evans*, which merely limits the number and type of plaintiffs who claim the benefit of a heretofore judicially imposed duty. *Id. Knippen, supra.*

**[\*31]** The logic of *Larsen*, in combination with the substantial attacks on *Evans*, has been overwhelmingly persuasive. As of this date, thirty-eight of the thirty-nine jurisdictions that have considered this question have adopted the doctrine of crashworthiness announced in *Larsen*:

| *Jurisdiction* | *Case* |
| --- | --- |
| Alabama | *General Motors Coro. v*. Edwards, 482 So.2d 1176 (Ala. 1985) |
| Arizona | *Cota v*. Harley Davidson, 684 P.2d 888 (Ariz.Ct.App. 1984) |
| California | *Horn v*. General Motors Corp., 17 Cal.3d 359, 131 Cal.Rptr. 78, 551 P.2d 398 (1976) |
| Colorado | *Roberts v*. May, 41 Colo. App. 82, 583 P.2d 305 (1978) |
| District of Columbia | *Knippen v*. Ford Motor Co., 546 F.2d 993 (D.C.Cir. (1976) |
| Florida | *Ford Motor Co. v*. Evancho, 327 So.2d 201 (Fla. 1976) |
| Georgia | *Friend v*. General Motors Corp., |

---

[10]   The court is cognizant of the fact that crashworthiness cases often present complicated questions of causation and apportionment. The trier of fact must separate which injury or how much of any given injury is attributable to the negligence which caused the collision from how much the plaintiff s injury was enhanced. However, at least since Palsgraf *v*. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928), courts routinely have had to deal with complex causal patterns. *Knippen, 546 F.2d at 1000 n.9*. *See also* discussion *infra* at 53-57 and 86-89.

| Jurisdiction | Case |
|---|---|
| | 118 Ga. App. 763, 165 S.E.2d 735 (1968) |
| Idaho | *Farmer v*. International *Harvester*, 97 Idaho 742, 553 P.2d 1306 (1976) |
| Illinois | *Buehler v*. Whalen, 70 Ill.2d 51, 15 111. Dec. 852, 374 N.E.2d 460 (1978) |

| Jurisdiction | Case |
|---|---|
| Indiana | *Huff v*. White Motor Corp., 565 F.2d 104 (7th Cir. 1977), *overruling Evans v*. General *Motors Corp*., 359 F.2d 822 (7th Cir. 1966) |
| Iowa | *Passwaters v*. General Motors *Corp*., 454 F.2d 1270 (8th Cir., 1972) |
| Kansas | *Garst v*. General Motors Corp., 207 Kan. 2, 484 P.2d 47 (1971) |
| Kentucky | *Wooten v*. White Trucks, 514 F.2d 634 (5th Cir. 1975) |
| Louisiana | *Perez v*. Fort Motor Co., 497 F.2d 82 (5th Cir. 1974) |
| Maryland | *Volkswagen of **America**, **Inc***. $ H*v*. Young, 272 Md. 201, 321 A.2d 737 (1974) |
| Massachusetts | *Smith v*. Ariens Co., 375 Mass. 620, 377 N.E.2d 954 (1978) |
| Michigan | *Rutherford v*. Chrysler Motors *Corp*., 60 Mich. App. 392, 231 N.W.2d 413 (1975) |
| Mississippi | *Toliver v*. General Motors *Corp*., 482 So.2d 213 (Miss. 1985), *overruling Watson v*. Chrysler Motor Corp. 229 So.2d 568 (Miss. 1969) |
| Missouri | *Cryts v*. Fort Motor Co., 571 S.W.2d 683 (Mo.Ct.App. 1978) |
| Montana | *Brandenburger v*. Toyota *Motor Sales*, 162 Mont. 506, 513 P.2d 238 (1973) |
| Nebraska | *Friedrich v*. Anderson, 191 Neb. 724, 217 N.W.2d 831 (1974) |
| New Jersey | *Huddell v*. Levin, 395 F.Supp. 64 (D.N.J. 1975), *judgment vacated and remanded on other grounds*, 537 F.2d 726 (3d Cir. 1976). |
| New Mexico | *Duran v*. General Motors Corp., 688 P.2d 779 (N.M.Ct.App. 1983). |

| *Jurisdiction* | *Case* |
|---|---|
| New York | *Bolm* ***v***. Triumph Corp., 33 N.Y.2d 151, 305 N.E.2d 769 (1973), 350 N.Y.S.2d 644. |
| North Dakota | *Johnson* ***v***. American Motors Corp., 225 N.W.2d 57 (N.D. 1974) |
| Ohio | *Leichtamer* ***v***. American Motors *Corp*., 424 N.E.2d 568 (Ohio 1981). *See also Anton* ***v***. Ford Motor Co., 400 F.Supp. 1270 (S.D.Ohio 1975). |
| Oklahoma | *Lee* ***v***. Volkswagen of ***America***, ***Inc***., 688 P.2d 1283 (Okla. 1984) |
| Oregon | *McMullen* ***v***. Volkswagen of ***America***, ***Inc***., 274 Or. 83, 545 P.2d 117 (1976) |
| Pennsylvania | *Dyson* ***v***. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa. 1969). *See also Placek* ***v***. Winnebago *Industries,* ***Inc***., 427 F.Supp. 359 (W.D.Pa. 1977) and *Jeno* |
| $ H***v***. Witters., 452 F.Supp. 1349 | (M.D.Pa. 1978). |
| Rhode Island | *Turcotte* ***v***. Ford Motor Co., 494 F.2d 173 (1st Cir. 1974) |
| South Carolina $ H202, 166 S.E.2d 173 (1969) | *Mickle* ***v***. Blackmon, 252 S.C. |
| South Dakota | *Enberg* ***v***. Ford Motor Co., 205 N.W.2d 104 (S.D. 1973) |
| Tennessee | *Ellithorpe* ***v***. Ford Motor Co., 503 S.W.2d 516 (Tenn. 1973) |
| Texas | *Turner* ***v***. General Motors Corp., 514 S.W.2d 49 (Tex.Civ.App. 1974) |

| *Jurisdiction* | *Case* |
|---|---|
| Virginia | *Dreisonstok* ***v***. Volkswagenwerk, 489 F.2d 1066 (4th Cir. 1974) |
| Washington | *Baumgardner* ***v***. American Motors *Corp*., 83 Wash 2d 751, 522 P.2d 829 (1974) |
| Wisconsin $ H551, 225 N.W.2d 431 (1975) | *Arbet* ***v***. Gussarson, 66 Wis. 2d |
| Wyoming | *Chrysler Corp.* ***v***. Todorvich, 580 P.2d 1123 (Wyo. 1978). *See also O'Donnell* ***v***. City of *Casper*, 696 P.2d 1278 (Wyo. 1985) [11] |

[*32]

Apparently, the only jurisdiction which has considered the doctrine of crashworthiness and has failed to adopt it is West Virginia. *McClung v*. Ford Motor Co*., 333 F.Supp. 17, (S.D.W.Va. 1971)*, *aff'd*., *472 F.2d 240 (4th Cir.)*, *cert. denied*, *412 U.S. 940 (1973)*. However, there is considerable doubt about whether the West Virginia courts would decline to adopt

---

[11]  All of the above cases following *Larsen* and their progeny are predicated upon either negligence, strict liability or breach of warranty. The court has made ***no*** comprehensive attempt to categorize the cases by theory of liability since *Larsen* itself was founded on pure negligence principles, this court's discussion is premised on the application of negligence concepts, and the holding today is limited to plaintiff's negligence cause of action. *See* discussion *infra* at 49-50 and 77-89.

*Larsen* if presented with the issue today. *See Van Tine v. Nisson Motor Co., Ltd., 463 F.Supp. at 1276-77* (the continued validity of *McClung* as a predictor of West Virginia law appears doubtful since several of the primary cases relied upon in *McClung* have subsequently been overruled).

In addition, [*33] seven jurisdictions which originally followed *Evans* have now rejected it in favor of the *Larsen* doctrine: Maryland, Mississippi, Montana, New Jersey, New York, Ohio and Texas. *See* cases listed supra at 24-27. Even *Evans* itself has been articulately and forcefully overruled in *Huff v. White Motors, supra.*

Accordingly, based on the aforesaid, if this court were deciding the issue on a clean slate and without reference to North Carolina law, it would have **no** trouble adopting the *Larsen* doctrine of crashworthiness. The rule is not unfair to manufacturers for they are liable only for unreasonable actions. Moreover, the manufacturer is the only party who is in a position to see that unreasonably dangerous features and parts are not incorporated into an automobile's design and construction. *Knippen, 546 F.2d at 1001*. As the Seventh Circuit stated in *Huff v. White Motors, supra*:

> There is **no** rational basis for limiting the manufacturer's liability where a structural defect has caused the collision and resulting injury. This is so because even if a collision is not caused by a structural defect, a collision may precipitate the malfunction of a defective [*34] part and cause injury. In that circumstance the collision, the defect, and the injury are interdependent and should be viewed as a combined event. Such an event is the foreseeable risk that a manufacturer should assume. Since collisions for whatever cause are foreseeable events, the scope of liability should be commensurate with the scope of the foreseeable risks. . . .

*HN13* [A] manufacturer of motor vehicles owes a duty to design and construct its product to be reasonably fit for its intended use and to be reasonably free from hidden defects which would render it unsafe for that use. The intended use of a vehicle encompasses the normal incidents of its being driven on the streets and highways, including the potentiality of collisions. The rule does not make manufacturers insurers of their products. The duty owed requires merely precautions to be taken against an unreasonable risk of injury. Plaintiff will still have the burden of proving that there is a defect presenting an unreasonable risk of harm and that such defect was the proximate cause of the injury.

*565 F.2d at 109-110*.

That being said, this court's view of what the law should be is really of **no** consequence, for the question [*35] at bar is whether the North Carolina courts would adopt the doctrine of crashworthiness, not whether this court would do so. Nonetheless, the preceding discussion is important for it provides an essential understanding of the history of the doctrine, its rationale, and the extent of its widespread, indeed overwhelming, acceptance within the judicial community. For additional guidance, the court now turns to

II. *PRIOR FEDERAL COURT DECISIONS ON THE DOCTRINE OF CRASHWORTHINESS UNDER NORTH CAROLINA LAW*

The issue of whether North Carolina would follow the *Larsen* rule has been addressed in nine previous federal court decisions, all attempting to predict what road the North Carolina courts would choose if presented with this issue. To suggest that those decisions are in conflict would be an understatement. [12]

[*36] The first case discussing the issue was *Bulliner v. General Motors Corp., 54 F.R.D. 479 (E.D.N.C. 1971)*, in which Judge Dupree of this court stated, in clear *dictum*, that North Carolina had not, as of that date, adopted *Larsen* because North Carolina law required a "causal relationship between the alleged negligence and the accident." *Id. at 482*. In *Bulliner*, the front wheel of plaintiff's van fell off and caused the vehicle to swerve into a ditch. The wheel failure was allegedly caused by the negligent design of the wheel retention mechanism. The court granted summary judgment finding there was **no** evidence that the manufacturer's negligence proximately caused the plaintiff's injuries.

---

[12] For an excellent analysis of all nine opinions, *See* Note, *Martin v. Volkswagen of **America**, **Inc**: Crashworthiness in North Carolina*, *62 N.C.L.Rev. 1423 (1984)*. The article is extremely well-reasoned and persuasively concludes that North Carolina would adopt the crashworthiness theory. This article is substantially relied upon throughout this opinion. *See Also* Comment, *The Crashworthy Vehicle: Heading For a Collision in the North Carolina Courts*, 18 Wake Forest L.Rev. 711 (1982).

As both Judges Britt and Larkins of this District subsequently have pointed out, *Bulliner* provides little guidance on the issue at bar. First, the question of crashworthiness was not before the court and reference to *Larsen* was not necessary for disposition of the case, since the alleged negligence, if proven, would have been the proximate cause of the accident, not of any enhanced injury. *See Isaacson v*. Toyota Motor Sales*, 438 F.Supp. 1 (E.D.N.C. 1976)*; *Sealey v*. [*37] *Ford Motor Co., 499 F.Supp. 475 (E.D.N.C. 1980)*.

Second, the North Carolina case cited by the court for its view that North Carolina would not adopt the doctrine of crashworthiness is ″unpersuasive.″ *Isaacson, 438 F.Supp. at 5*. The cited case, *Coakley v*. Ford Motor Co*., 11 N.C.App. 636, 182 S.E.2d 260 (1971)*, *cert denied*, *279 N.C. 393, 183 S.E.2d 244 (1971)*, did not address the question of liability for enhanced damages. Plaintiff, in *Coakley*, alleged that his injuries resulted from the initial collision. Although the North Carolina Court of Appeals did discuss the required casual relationship between the defect in the vehicle and the plaintiff's harm, ″it requires an unduly expansive reading of that decision to conclude that the North Carolina court would reject *Larsen*,″ *438 F.Supp. at 5-6*. Finally, *Bulliner* was decided in 1971, only three years after *Larsen* was decided, and prior to the avalanche of federal and state decisions interpreting, discussing, and adopting *Larsen*.

After *Bulliner* came *Alexander v*. Seaboard Air Line R.R*., 346 F.Supp. 320 (W.D.N.C. 1971)*, a decision by Judge Jones of the Western District of this state. The plaintiff [*38] in that case sought to recover from the manufacturer of his automobile (Volkswagen) for injuries sustained in a collision with a freight train. Plaintiff had driven his car into the side of the locomotive as it sped through a railroad crossing. The car traveled a considerable distance under the wheels of the train, crushing the gas tank in the front of the car. Plaintiff conceded there were *no* defects in the car which caused it to hit the train; however, he alleged that that the defendant manufacturer failed to desion a reasonably safe fuel storage system, and as a result his injuries were enhanced.

Judge Jones read *Larsen* as requiring a manufacturer to design a vehicle to be absolutely safe in any collision, including one with a speeding locomotive. *Id. at 327*. [13] Since North Carolina had not addressed the crashworthiness issue, the court reviewed general North Carolina products liability law and found that while a manufacturer has a duty to anticipate the probable results of normal uses of its product, there was *no* similar duty for the results of abnormal, reasonably unforeseeable or criminal uses. *Id*. The court considered plaintiff's conduct to be ″patently careless [*39] and improvident″ and, thus, clearly abnormal and reasonably unforeseeable. *Id*. In sum, Judge Jones reasonably found that an ″intended use″ of the plaintiff's car (or a clearly foreseeable danger arising from its intended use) did not include its collision with a speeding train. Fearing that acceptance of *Larsen* in this case would open the floodgates to absurd claims, the court rejected the crashworthiness doctrine. *Id*. [14]

The Fourth Circuit subsequently affirmed the entry of summary judgment for the defendant, but held it ″unnecessary [*40] to discern and apply a nonexistent North Carolina rule of law″ because damage from impact with the train was so great that the alleged defect could not have been a proximate cause of any additional injury. *Alexander v*. Seaboard Air Line R.R., *No*. 71-1915 (4th Cir., April 25, 1972).

The next case addressing the issue of crashworthiness was *Simpson v*. Hurst Performance, *Inc., 437 F.2d 445 (M.D.N.C. 1977)*, *aff'd*., *588 F.2d 1351 (1981)*, wherein plaintiff was a passenger seated in the middle of the car's bench-type front seat. The car originally had a gearshift mounted on the steering column, but a previous owner had replaced it with a floor-mounted gearshift made bv defendant. The vehicle was involved in a head-on collision and plaintiff was thrown forward and impaled on the gearshift. Plaintiff alleged that the gearshift manufacturer was negligent in failing to warn purchasers and users that the unit was dangerous when installed in an automobile with a bench-type front seat. Judge Ward determined first that the gearshift was a patent danger and under North Carolina law, a ″manufacturer is not liable for injury to the user by reason of a condition which is plainly obvious.″ [*41] *Id. at 446-47* citing *Douglas v*. W.C. Mallison & Son*, 265 N.C. 362, 144 S.E.2d 138 (1965)*. Therefore, the court held the manufacturer was not negligent in failing to warn of the danger of a passenger being impaled on it in a head-on collision. *Id*.

---

[13]   *Alexander* seemingly disregards *Larsen's* reasonableness limitation when it rhetorically asks ″Must [the manufacturer] foresee and design a vehicle to withstand a collision with a 114-ton locomotive engine pulling a freight train traveling at 45 miles per hour?″ *346 F.Supp. at 327*. Obviously, plaintiff stood little chance of prevailing in this case regardless of the theory he pursued.

[14]   The court notes that every one of the out-of-state cases relied on by Judge Jones to support his argument - cases from Ohio, Indiana, New York, New Jersey, Texas and Mississippi - have since been overruled in their respective jurisdictions.

Furthermore, the court determined, on the strength of *Bulliner* and *Alexander*, that even if negligence had been found, North Carolina would not impose liability under the *Larsen* theory. *Id. at 447*. This finding, as in *Bulliner*. was not necessary for the decision, and it was made simply bv citation to *Bulliner* and *Alexander* without any discussion of those cases, the doctrine of crashworthiness, or of *Evans* and *Larsen*.

*Larsen* was first adopted in North Carolina by Judge Larkins of this District in *Isaacson v*. Toyota Motor Sales*, supra.* [15] In *Isaacson*, a car that had stopped for a raised drawbridge was struck in the rear by another automobile, burst into flames, and all in the car burned to death. The complaint alleged that the gas tank ruptured upon impact due to negligent design.

 [*42] Judge Larkins, in a detailed opinion, rejected *Bulliner* and *Alexander* and held that North Carolina, while ″not presently in the vanguard of jurisdictions [expanding] the rights of consumers to recover in products liability cases,″ would nonetheless be responsive to the rationale of *Larsen* and the near unanimity of its acceptance in other jurisdictions. *Id. at 7*. The court rejected the 1971 *Bulliner* conclusion on crashworthiness as *dictum* and felt that *Alexander*, although correctly decided on the basis of the severity of the collision, was incorrect in its assessment on the crashworthiness issue. *Id. at 5-6*.

*Isaacson* believed that two arguments from *Larsen* would be ″compelling″ to the North Carolina courts. First, the court felt it would be irrational to differentiate, as *Evans* had, between defects that caused accidents and defects that merely enhanced injuries received in accidents. *Id. at 7-8*. ″As long as some other event, **no** matter how trivial, actually began the causal chain, a court following *Evans* would insulate manufacturers from liability, **no** matter how gross the negligence or how catastrophic its consequences.″ Note, [*43] *Martin v*. Volkswagen of **America**, **Inc**.: Crashworthiness in North Carolina, *62 N.C.L.Rev. 1423, 1426 (1984)*.

Second, despite contentions that *Larsen* mandates a floating ″Sherman tank,″ under the crashworthiness theory, the manufacturer must only eliminate unreasonable dangers in accordance with general negligence principles which contemplate a balancing of the burden of protection against the possible harm to be avoided. *Id. at 8*.

In addition, Judge Larkins found that ″[a]lthough the North Carolina Supreme Court has moved slowly into the products liability area, it has demonstrated an awareness of decisions from other jurisdictions, evolving standards of technology, and modern marketing conditions.″ *Id. at 7* referring to *Corpew v*. Geigy Chemical Corp*., 271 N.C. 485, 157 S.E.2d 98 (1967)* (citing to other jurisdictions and overruling prior law supporting the rule of *Winterbottom v*. Wright, 10 M. & W. 109, 152 Eng. Rep. 402 (Ex. 1842), which required privity of contract in manufacturer negligence cases) and *Tedder v*. Pepsi Cola Bottling Co*., 270 N.C. 301, 154 S.E.2d 337 (1967)* (citing modern marketing conditions as reason to abrogate necessity for privity [*44] of contract in breach of warranty cases against manufacturers of food products in sealed containers). As *Isaacson* concluded, ″[The North Carolina Supreme Court] is acutely cognizant of case law as developed in other states and has attempted to tailor its decisions to meet the realities of modern production and merchandising.″ *Id*.

The next case to examine crashworthiness was *Sealey v*. Ford Motor Co*., 449 F.Supp. 475 (E.D.N.C. 1980)*. In *Sealey*, the passengers burned to death after a ruptured gas tank leaked fumes into the passenger compartment of their automobile. Plaintiffs claimed that negligent design of the fuel tank had allowed it to leak when the car rolled over after a collision. The parties agreed the facts of this case presented a ″classic example″ of the ″'Second-Impact' doctrine of negligence.″ *Id. at 477*. Judge Britt proceeded to review the *Evans-Larsen* dispute, as well as the prior federal cases in North Carolina, and determined that *Evans'* reasoning was ″unrealistic.″ *Id. at 479*. The court was further persuaded by the nearly unanimous acceptance of the *Larsen* doctrine in other jurisdictions. *Id. at 478-79*.

Following *Isaacson* [*45] and *Sealey* came the procedurally important case of *Seese v*. Volkswagenwerk, A.G*., 648 F.2d 833 (3d Cir. 1981)*, *cert*. *denied*, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981). This case involved a single car ″roll-over″ accident of a Volkswagen van. Plaintiffs were forced off a North Carolina highway by another vehicle and when

---

[15] *Isaacson* was decided fourteen months prior to *Simpson*, but was not published until after *Simpson*.

they attempted to steer the van back onto the road, it overturned. Plaintiffs claimed their injuries were enhanced due to a negligently designed window retention system. [16]

*Seese* was tried in the United States District Court for the District of New Jersey. The parties stipulated at the outset of the case that North Carolina substantive law controlled. The jury awarded damages to the plaintiffs on both their crashworthiness (negligence) and strict liability counts.

The Third Circuit affirmed the jury's verdict as to the crashworthiness cause of action, holding that even though North Carolina had not adopted strict liability, North Carolina **[*46]** courts would recognize the doctrine of crashworthiness, predicated on negligence principles. After extensive discussion of the issue, the court stated:

In the absence of any expression by North Carolina and a split of authority by federal courts in that state, a prediction as to the law North Carolina would adopt can only be based on the greater persuasiveness of one of the conflicting theories, with an eve to the nationwide trend in judicial and legislative law-making. Having had the benefit of what we regard as unimpeachable logic in our own circuit's recent case of *Huddell v*. Levin*, supra*, which stated: "*We take it as beyond peradventure that an automobile manufacturer today has some legal obligation to design and produce a reasonably crashworthy vehicle.*" *537 F.2d at 735*, we are not disposed to base our prediction of North Carolina law on an outdated and repudiated doctrine. Like the district court here, we too are convinced that North Carolina is more likely to follow the enlightened rule of *Larsen* rather than the rule of *Evans*. Thus, we find **_no_** error in the district court's ruling that the plaintiffs could proceed on a crashworthiness theory. (emphasis added). **[*47]** [17]

Four months later, despite recent cases such as *Seese*, *Isaacson* and *Sealey*, the Fourth Circuit held in *Wilson v*. Ford Motor Co*., 656 F.2d 960 (4th Cir. 1981)*, that Judge Jones of the Western District of North Carolina had not committed reversible error bv ruling that "the North Carolina Supreme Court would not hold a manufacturer liable for injuries arising from defects which neither caused nor contributed to the accident." *Id*. The district court, in an unpublished opinion, had relied on *Bulliner* and *Alexander* to dismiss plaintiff's complaint, without reviewing recent North Carolina case law or re-evaluating the development in products liability law which had taken place in the ten years since *Alexander* and *Bulliner* were decided.

The Fourth Circuit's decision in *Wilson* consisted of a three-paragraph *per curiam* opinion which gave **_no_** specific reasons for its conclusions; [18] a footnote, however, stated that the North **[*48]** Carolina Supreme Court's recent rejection of strict liability in *Smith v*. Fiber Control Corp*., 300 N.C. 669, 268 S.E.2d 504 (1980)*, "fortifies our belief that if called upon the Supreme Court of North Carolina would also reject the second crash theory." *656 F.2d at 960 n.1*. However, since *Larsen* itself and many cases following *Larsen* have adopted the crashworthiness theory *solely* on the basis of negligence, this reasoning, without any explanation, is tenuous at best. Moreover, given the Supreme Court of North Carolina's reasons for declining to accept strict liabililty, the analogy between crashworthiness and strict liability becomes even more suspect. [19] 62 N.C.L.Rev. at 1427-28.

---

[16]   Plaintiffs further contended that the vehicle's "ball cage" was defective and sued on the basis of strict liability as well to recover damages for injuries resulting directly from this defect.

[17]   *Seese* was a 2-1 opinion. However, the dissenter, Judge Adams, accepted that North Carolina would adopt the tort of crashworthiness, but found remand was required for reassessment of damages. 648 F.2d at 849-50.

[18]   The entire substantive portion of the opinion reads as follows:

The district court, after a careful review of related State cases and of the several and divergent federal court determinations of the issue, ruled that the North Carolina Supreme Court would not hold a manufacturer liable for injuries arising from defects which neither caused nor contributed to the accident.

We find **_no_** reversible error in this conclusion.

[19]   The *Smith* court did not address the merits of the doctrine of strict liability, but rather based its rejection of the theory on its incompatibility with the requirements of N.C.GEN.STAT. § 99B-4 (1979), which provides for the availability of the defenses of

[*49] Following *Wilson*, the defendants in *Seese*, having already had their initial petition for rehearing denied, moved for a stay of mandate and for leave to file a second petition for rehearing predicated upon *Wilson*. Defendant's motion was denied and following the United States Supreme Court's refusal to grant certiorari, the Third Circuit issued its mandate affirming the judgment of the District Court of New Jersey.

Still not reconciled to the verdict, the defendants in *Seese* then moved for relief from judgment, pursuant to Fed.R.Civ 60(b)(6), again relying on *Wilson*. The district court denied the motion, holding that it was without jurisdiction to alter the final mandate of the Third Circuit. On appeal, the Third Circuit affirmed, *Seese v*. Volkswagenwerk, A.G. *(Seese II), 679 F.2d 336 (1982)*, holding that the Supreme Court's denial of certiorari ended the litigation and the case was not *sub judice* when defendants moved under Rule 60(b)(6). *Id. at 337*.

It is important to note that, although the Third Circuit recognized the existence of the Fourth Circuit's opinion in *Wilson*, it nevertheless gave absolutely __no__ indication as to whether it found that [*50] opinion persuasive or in any manner controlling, presumably because it simply was not called upon to consider that substantive issue at that time. [20] Thus, in the Third Circuit, *Seese* clearly remains the law. This conclusion is bolstered by the fact that when it had the opportunity to substantively decide whether it was bound by or persuaded by _W*ilson*, i.e., when defendants moved for leave to file a second petition for rehearing relying on *Wilson*, the Third Circuit denied the motion, thereby maintaining as good law the decision in *Seese*.

[*51] The court now comes to the final two decisions in the chronology of federal cases discussing the issue of crashworthiness in North Carolina. In 1982, less than one year after *Wilson*, Judge McMillan of the Western District of North Carolina held that North Carolina would adopt the doctrine of crashworthiness in *Martin v*. Smith*, 534 F.Supp. 804 (W.D.N.C. 1982)*. Plaintiffs in *Martin* alleged that the wrongful deaths of their decedents were caused by the negligent design and manufacture of the fuel tank system, which caused the vehicle to burst into flames upon collision with another car. In discussing the crashworthiness issue, Judge McMillan rejected *Wilson* as controlling, finding that it was "not in harmony with accepted principles of North Carolina tort law." *Id, at 806*. The court found that North Carolina tort law encompassed the following basic principles:

(1) There may be more than one proximate cause of an injury;

(2) If the negligence of an actor is a proximate cause of any part of the injuries, he is liable for that part;

(3) A defendant's negligence, in order to be actionable, need not be the sole proximate cause of the injury, nor the last [*52] act of negligence; and

(4) If the intervening act of a third person is reasonably foreseeable, it does not insulate a previously negligent party from liability for injuries caused by or contributed to by that previous negligence;

*Id. at 806-07*.

Given this framework and the fact that collisions involving the 150,000,000 motor vehicles in this country are clearly foreseeable, the court held that under North Carolina law, a manufacturer may be held liable for a defect in design which causes enhanced injury, even if the defect did not cause the initial collision. *Id*.

Judge McMillan's decision in *Martin* did not stand for long because on appeal, the Fourth Circuit reversed the denial of summary judgment, in a four-paragraph *per curiam* opinion, stating "we are bound by our decision in *Wilson* and [] we find

contributory negligence and assumption of the risk in products liability cases. 300 N.C. at 678, 268 S.E.2d at 509-10. Crashworthiness, however, as a negligence theory, is completely compatible with both of those defenses. *See* Seese v. Volkswagenwerk, A.G., 648 F.2d at 845; *Larsen, 391 F.2d at 503*; General Motors Corp. *v*. Edwards, 482 So.24 at 1182.

[20]    In this regard, this court respectfully disagrees with Judge Phillips' conclusion in footnote 3 of his specially concurring opinion in Martin v. Volkswagen of *America*, *Inc*., 707 F.2d 823 (4th Cir. 1983). *See* substantive discussion of this opinion *infra*. In his footnote, Judge Phillips states, "[the Third Circuit] has now recognized the primacy in that circuit of the Wilson 'finding.' of North Carolina law as applied to cases arising after *Wilson*. See Seese v. Volkswagenwerk, A.G., 679 F.2d 336 (3d Cir. 1982). . ." Contrary to Judge Phillips view, this court finds nothing in *Seese II* which would indicate the Third Circuit's view of the "primacy" of the Fourth Circuit's holding in *Wilson*. *Seese II* merely acknowledges the existence of the *Wilson* opinion in one sentence.

the two cases indistinguishable. . . ." *Martin v*. Volkswagen of *America*, *Inc., 707 F.2d 823, 824 (4th Cir. 1983)*. Since it is the practice of the Fourth Circuit to consider a panel decision as binding precedent until overruled *en banc*, *see Doe v*. Charleston Area Medical Center, *Inc., 529 F.2d 638, 642 (4th Cir. 1975)*, the subsequent denial of [*53] a rehearing *en banc* amounted to a decision to adopt *Wilson* as definitive. In an unusual procedure, Judge Murnaghan dissented from the denial of rehearing *en banc* to criticize *Wilson*'s validity. This, in turn, prompted Judge Phillips to concur specially in the *per curiam* opinion. [21]

Judge Murnaghan argued that *Wilson*'s prediction that North Carolina would not follow *Larsen* was "simply wrong." First, he stated that the rule in *Wilson* was one of proximate cause:

> The case holds that, however foreseeable in fact the likelihood of injury might be, an automobile manufacturer, as a matter of law, is free to ignore the inevitable consequences of his negligence when the chain of events triggering a plaintiff's injury (including injury due to the negligent construction of the vehicle) originates with the negligence of a third party.

> *707 F.2d at 827*.

Since North Carolina tort law recognizes **no** such bright line test, however, the issue of proximate cause in negligence cases goes to the jury in virtually all cases. *Id. citing Williams v*. Carolina Power & Light Co*., 296 N.C. 400,* [*54] *403, 250 S.E.2d 255, 258 (1979)*. *See also Dupree v*. Batts*, 276 N.C. 68, 170 S.E.2d 918 (1969)*; 62 N.C.L.Rev. at 1428.

Second, Judge Murnaghan discussed and cited with approval the holding and rationale of the Third Circuit in *Seese*. He stated, "all members of the *Seese* court agree that North Carolina courts would permit recovery, upon an adequate showing of the car manufacturer's contribution to the injuries suffered as a consequence of uncrashworthiness." *707 F.2d at 828*.

Finally, the dissent argued that because it was unlikely that a state court would have the opportunity to consider this issue, [22] it was the duty of the circuit judges to rehear the case and not "shrug off an erroneous decision on grounds that, if incorrect, it will all in due course be set straight by a North Carolina court." *Id*. The possible and, in Judge Murnaghan's

---

[21] Judge Phillips served on the panel that decided *Wilson*.

[22] Judge Murnaghan stated:

> The absence of a significant producer of motor vehicles in the state suggests that diversity jurisdiction will almost surely exist, or that the suit will be brought in some other state, whose capacity to deal with North Carolina law should be **no** greater than ours. . . . North Carolina has not adopted a referral statute permitting certification of a controlling question of state law to the North Carolina Supreme Court. . . . A case is not likely to generate damage claims of $10,000 or less, and **no** car manufacturer is apt to fail to remove when sued in a North Carolina court so long as *Wilson* and the panel opinion in the instant case remain dispositive. 707 F.2d at 828 n.1.

> [*55] As Judge Phillips states, however, a plaintiff wishing to go to state court could defeat diversity simply by joining the manufacturer's local distributor and, with *Wilson*, there certainly is **no** incentive for plaintiff's attorneys to file in federal court. *Id*. at 826; 62 N.C.L.Rev. at 1429 n.63.

> Judge Phillips, in his specially concurring opinion, defended *Wilson*. He warned against the use of "gentle pressure tactics of 'assuming' that the state courts will necessarily follow a view proclaimed by the federal court to be 'enlightened.'" 707 F.2d at 825. "'Enlightenment' is quite likely, in this as in other matters, to be in the eye of the beholder." *Id*. The concurrence further suggested that looking at what state courts have recently said as well as the "basic doctrinal premises they have seemed most consistently to hold" are the primary legal indicators for diversity courts forecasting state law. *Id*. Thus, Judge Phillips found that the only valid criticism of *Wilson* would be one that challenged the rationality of the assumptions upon which *Wilson* was predicated. Of course, as the University of North Carolina law review note relied on in this opinion [*56] acutely points out, *see* fn. 12, *supra*, this view places the critic at a severe disadvantage since neither *Wilson* nor *Martin* reveal any basis for the respective decisions. The only discernible "indicator" in *Wilson* was the footnote reference to North Carolina's failure to adopt strict liability and the only "indicator" in *Martin* was its reliance on *Wilson*. 62 N.C.L.Rev. at 1430.

opinion, unnecessary alternative to overruling *Wilson en banc* would be the gradual application of various North Carolina authorities to limit *Wilson* to its facts. *Id.*

However, Judge Phillips did cite three "indicators" in his concurring opinion in *Martin*, which in his view (and apparently the Fourth Circuit's) support the assumption that North Carolina, as of June 3, 1983, would continue to follow *Evans*. "First and foremost is the fact that North Carolina has at this late date not yet joined the crashworthiness 'trend.'" *707 F.2d at 826*. The lack of any case to consider the issue was considered of **no** consequence, since "[c]ourts minded to join 'enlightened trends' in decisional law have **no** difficulty reaching out in 'near' cases to join up." *Id.*

With all due respect, this court finds this argument to be unpersuasive. First, one would search in vain through the decisions of the North Carolina appellate courts to find a true crashworthiness [*57] case. The issue simply has never been presented to the state courts and until very recently **no** opinion that this court's research has uncovered even indirectly indicated the availability or non-availability of crashworthiness as a cause of action in North Carolina. [23]

This court does not agree that *Miller v*. Miller*, 273 N.C. 228, 160 S.E.2d 65 (1968)*, the case cited by Judge Phillips, is a good example of a case in which the "join-up" could easily have been accomplished. In *Miller*, the North Carolina Supreme Court held that, as a matter of law, the failure to wear a seat belt, absent special circumstances, was not contributory negligence. *Miller* was decided *only nine days* after *Larsen*. As such, it is extraordinarily unlikely the North Carolina Supreme Court even considered the issue of crashworthiness, assuming it had even read *Larsen*. In reality, the dispute over the doctrine [*58] of crashworthiness had yet to begin when *Miller* was decided. Thus, this court is of the opinion that although *Miller* did not address the crashworthiness issue, such cannot be taken as an "indicator" that North Carolina would not now adopt the doctrine.

Moreover, *Miller* was not a products liability case. It dealt with contributory negligence in an action against the driver of an automobile for personal injuries suffered by a passenger. *See* discussion *infra* at 51-52. To have "reach[ed] out" and imposed a duty on manufacturers to use reasonable care not to expose consumers to an unreasonable risk of injury in a collision, the *Miller* court would have had to impose an analogous duty on the public to fasten their seat belts when riding in an automobile. 62 N.C.L.Rev. at 1431. This would have denied plaintiff recovery by imposing a standard of care almost universally disregarded, a result the court was seemingly anxious to avoid. *Id., Miller. 273 N.C. at 237-38, 160 S.E.2d at 67*. [24] Thus, the failure of the "reasonable man" to recognize a duty to wear seat belts constitutes the clear basis of the court's refusal to impose such a duty.; that the omission [*59] actually did not cause the injury was purely "icing on the cake." 62 N.C.L.Rev. at 1431.

Second, accepting as true Judge Phillips' statement that a court seeking a way to join an "enlightened" trend can always reach out and find a case to "join up," this court notes that the converse is true as well. A court set on rejecting a doctrine likewise can find a way to do it, even if only in *dictum*. [*60] *Id*. If the North Carolina courts wanted to line up with *Evans*, under the above theory, it should have been **no** problem to do so - particularly in the first few years of the *Evans/Larsen* dispute, when judicial acceptance of *Larsen* was at its ebb. This did not occur.

---

[23] On December 3, 1985, the North Carolina Court of Appeals issued an opinion in Davidson *v*. Volkswagenwerk, A.G., 78 N.C.App. 193, 336 S.E.2d 714 (1985), which, at least indirectly, indicated the availability of the doctrine of crashworthiness. *See* discussion *infra* at 74-75

[24] The court notes that in *Miller*, the Supreme Court reviewed the law of a number of jurisdictions and after thoughtful consideration, followed the view of the apparently unanimous decisions from those jurisdictions which had decided the issue. As Justice Sharp stated:

> **No** reported case has come to our attention in which a plaintiff's failure to use an available seat belt has barred him from recovering damages for personal injuries sustained in an automobile accident for a defendant's negligence. . . . It would be a harsh and unsound rule which would deny all recovery to the plaintiff, whose mere failure to buckle his belt in **no** way contributed to the accident, and exonerate the active tortfeasor but for whose negligence the plaintiff's omission would have been harmless.

Judge Phillips' second "indicator" was North Carolina's reluctance to adopt such "liberal" tort theories as strict liability and comparative negligence. This court also questions this factor, however, because as previously stated, the crashworthiness theory originated in *Larsen* with pure negligence concepts and seems clearly to fit within a traditional negligence framework. *See* discussion *infra* at 53-57 and 86-89. *See also* *Toliver v*. General Motors Corp*., 482 So.2d at 215*; *Cota v*. Harley Davidson *, 684 P.2d at 894*. Thus, crashworthiness does not dispense with negligence nor does it seek to apportion fault between the plaintiff and defendant. The doctrine simply seeks to focus on the proximate cause of plaintiff's injuries, recognizing two distinct proximate causes and imposing familiar liability on joint tortfeasors. "[T]he measure of recovery is not changed; it is only spread more equitably [*61] among the blameworthy." 62 N.C.L.Rev. at 1431.

Furthermore, as this court's opinion discloses *infra* at 69-74, the North Carolina courts have increasingly recognized new causes of action sounding in tort to remedy what they perceive to be substantial wrongs, particularly when the elements of the new cause of action fit within an established framework for a particular category of torts, such as negligence. *See*, *e.g*., *Pangburn v*. Saad*, 73 N.C.App. 338, 326 S.E.2d 365 (1985)* (recognizing a cause of action for injuries resulting from the wrongful release of a mental patient).

The last "indicator" discussed by Judge Phillips consisted of "the guidance to be had from recent doctrinal expressions by North Carolina's highest court." *707 F.2d at 826*. Judge Phillips acknowledges that Judge Murnaghan is correct when he says that crashworthiness is in large measure a question of proximate cause and that North Carolina generally considers proximate cause a question for the jury. *Id*. However, he argues "there is a strong indication that the North Carolina Supreme Court presently identifies the 'first impact' as the critical and sole one for proximate causation - hence tort liability-analysis." [*62] *Id. at 827*. Such a view, if unequivocally held, would preclude application of the doctrine of crashworthiness. Cited as a predicate for this argument is *Miller v*. Miller*, supra.*

Again, with all due respect, this court does not agree with this argument and citation to *Miller* for a number of reasons. First, as Judge Phillips acknowledges, "*Miller* was not a pure 'crashworthiness'-doctrine case." *707 F.2d at 827*. The North Carolina Supreme Court never addressed the issue of whether the "first-impact" or "second collision" is the accident-occurrence upon which the proximate causation inquiry should be focused in crashworthiness cases. *Miller* simply stands for the proposition that the failure to wear a seat belt does not constitute negligence *per se* nor can it be used to mitigate damages under an "avoidable consequences" theory. *Page v*. Tao*, 56 N.C.App. 488, 289 S.E.2d 910 (1982)*. *See also* *Pritts v*. Walter Lowery Trucking Co*., 400 F.Supp. 867, 868-69 (W.D.Pa. 1975)*.

Second, every court in this nation which has, as of this date, addressed the issue of crashworthiness (with the possible exception of West Virginia) has adopted the *Larsen* doctrine. Some [*63] of those states previously adhered to "first impact" analysis and some had never addressed the issue. Nonetheless, each and every one of them has now adopted the "second collision" theory of crashworthiness. This court is not persuaded by sheer numbers, but it is of the belief that the North Carolina Supreme Court would be persuaded by the combined and nearly unanimous judicial decisions of the hundreds of state and federal judges who have heretofore considered the issue.

Third, *Miller* followed what it determined to be the majority, indeed the unanimous rule that a plaintiff's failure to use an available seat belt does not bar his recovery for personal injuries sustained in an automobile accident by a defendant's negligence. In primary support of its holding, the court cited all the reported judicial pronouncements to date on the identical issue of "seat belt negligence." *273 N.C. at 237, 160 S.E.2d at 73*. Those cases emanated from the following jurisdictions: California, Delaware, Florida, Indiana, Maryland, Missouri, South Carolina, Texas, and Wisconsin. With the exception of Delaware, which has not yet addressed the issue of crashworthiness, every one of those jurisdictions [*64] has adopted the *Larsen* doctrine. Thus, those eight jurisdictions either did not consider their seat-belt negligence cases as dispositive of or relevant to the issue of crashworthiness or, persuaded by *Larsen* and its progeny, they overturned any previously relied on "first impact" analysis. *See* *Ellithorpe v*. Ford Motor Co*., 503 S.W.2d at 520-21*.

Finally, a brief review of the doctrine of proximate cause leads to the conclusion that, consistent with North Carolina law, *HN14* a crashworthiness defect would be considered a proximate cause of any enhanced damages suffered by the plaintiff.

*HN15* Negligence is "conduct which falls below the standard established by law for the protection of others against unreasonably great risk of harm." Prosser, *Law of Torts*, *supra,* § 31 at 145. An essential element in proving a negligence

cause of action is a reasonably close causal connection between the conduct of an actor and the resulting injury to another. *Id*. § 30 at 143. Once it is established that defendant's conduct has in fact been one of the causes of plaintiff's injury, the question remains whether the defendant should be considered legally responsible for what he has caused. **[*65]** *Id*. § 42 at 244. Essentially, this issue is a "problem of law" - it is the question of "proximate cause," the gravamen of which is whether the defendant was "under a duty to protect the plaintiff against the event which did in fact occur." *Id*.

In North Carolina, **HN16** proximate cause is specifically defined as a "cause that produced the result in continuous sequence and without which it should not have occurred, and one from which a man of ordinary prudence could have foreseen that such result was probable. . . ." *McNair v*. Boyette*, 282 N.C. 230, 236, 192 S.E.2d 457 (1972)*; *Hester v*. Miller*, 41 N.C.App. 509, 255 S.E.2d 318, 320 (1979)*. Foreseeability of injury is an essential element of proximate cause. *Hairston v*. Alexander Tank & Equipment Co*., 310 N.C. 227, 233-35, 311 S.E.2d 559, 565 (1984)*; *Luther v*. Asheville Contracting Co*., 268 N.C. 636, 157 S.E.2d 649 (1966)*. If a defendant could not reasonably foresee any injury as the result of his act, or if his conduct was reasonable in light of what he could anticipate, there is **_no_** negligence. In sum, "[t]he test of proximate cause is whether the risk of injury, *not necessarily is the precise form in which it actually* **[*66]** *occurs*, is within the reasonable foresight of the defendant." *Williams v*. Power & Light Co *., 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1978)* emphasis added); *McNair v*. Boyette*, 282 N.C. at 236, 192 S.E.2d at 461*.

Furthermore, as Judge McMillan stated in *Martin, supra*, **HN17** there may be more than one proximate cause of an injury. *534 F.Supp. at 806* citing *Hester v*. Miller*, supra. See also Batts v*. Faggart*, 260 N.C. 641, 133 S.E. 504 (1963)*. "It is not required that defendant's negligence be the sole proximate cause of injury [*nor that it be] the last act of negligence*." *Hester v*. Miller*, 41 N.C. App. at 509, 255 S.E.2d at 320* (emphasis added). It is sufficient if defendant's negligence is one of proximate causes. *Id*.

Thus, under negligence principles in general and North Carolina law specifically, **HN18** a crashworthiness defect must be established as a proximate cause of plaintiff's injuries. As a starting point, it is accurate to state that the first impact is the sole proximate cause for plaintiff's injuries which would have been suffered in the collision absent the crashworthiness defect. Moreover, the initial impact is also a proximate cause of **[*67]** enhanced injuries suffered as a result of the crashworthiness defect, since there would have been **_no_** injuries at all absent the collision. By the same token, however, the crashworthiness defect is also a proximate cause of the enhanced injuries, for without the defect, these injuries would not have occurred. 62 N.C.L.Rev. at 1434. As to the enhanced injuries, then, the cause of the collision and the crashworthiness defect are concurrent proximate causes, given that automobile accidents occur with sufficient frequency so as to be reasonably foreseeable to manufacturers. *Id., Toliver v*. General Motors Corp*., 482 So. 2d at 214* and cases cited therein. It simply cannot be advanced as a pragmatic argument that the sole proximate cause of the enhanced injury is the "first impact" because it alone would not have caused the enhancement. *Id*. As a unanimous Supreme Court of Mississippi recently stated in overruling their past reliance on *Evans*:

We have previously held that **_no_** liability attaches to an automobile manufacturer in a "second impact" type case because the alleged defect in the automobile's design or manufacture did not proximately cause or proximately contribute **[*68]** to the collision. However, after careful consideration of the authorities cited by appellant in his brief, we are convinced that the question of causation more properly is addressed to the *instrumentality causing the enhanced injury, not that which caused the collision*. "That the design defect does not cause the initial collision should make **_no_** difference if it is a cause of the ultimate injury." *Id*. (emphasis in original) (citations omitted).

In addition, to deny that the crashworthiness defect is a proximate cause of plaintiff's enhanced injuries is to unfairly impose complete liability on the person responsible for the initial collision, regardless of how harmless that accident would have been in the absence of the defendant manufacturer's negligence. 62 N.C.L.Rev. at 1434. In an extreme example, it might well be that a plaintiff wearing her seat belt would have escaped injury-free from a collision absent a crashworthiness defect, but with that defect (i.e. the rearward displacement of the steering mechanism), plaintiff suffers permanent and severe bodily injury or even death.

This court does not believe *Miller* requires such a harsh and unreasonable result, a conclusion **[*69]** reinforced by the North Carolina Supreme Court's decision in 1980 in *City of Thomasville v*. Lease-Afex, **_Inc., 300 N.C. 651, 268 S.E.2d 190 (1980)_**. In *Thomasville*, plaintiff owed an Allis-Chalmers bulldozer which it used in its landfill operations. The bulldozer

was fitted with a fire suppression system supplied by the defendant. [25] The bulldozer, for unknown reasons, caught fire and was badly damaged when defendant's fire suppressant system failed to operate.

Thus, on its facts, *Thomasville* represents a products liability case actually considering the enhancement of damages allegedly caused by negligent design. The Supreme Court [*70] reversed the trial court's grant of summary judgment for defendant on the negligent desion and warranty claims, holding that if the system failed to function properly, it must have "caused at least some of the damage to plaintiff's bulldozer." [26] *300 N.C. at 657, 268 S.E.2d at 195*. Although this case is not a pure crashworthiness doctrine case, for purposes of predicting North Carolina law on the "first-impact" versus "second collision" causation issue, *Thomasville* represents an equally important, if not better, "indicator" of how the North Carolina courts would decide.

Having thoroughly reviewed the prior federal court decisions on the issue of crashworthiness in North Carolina, the court is persuaded that the more well-reasoned [*71] and compelling opinions are those in *Isaacson*, *Sealey, Seese* and the district court opinion in *Martin*. However, in determining the issue at bar, this court cannot simply ignore the clear holdings of the Fourth Circuit in both *Wilson* and *Martin*. The question is whether this court is bound by those decisions and, contrary to the Magistrate's view, for the reasons that follow the court finds that it is not.

III. *THIS COURT IS NOT BOUND BY WILSON AND MARTIN*

The court finds its hands are not tied on the issue *sub judice* by the prior Fourth Circuit holdings for two reasons. First, the procedural posture of this case eliminates any mandate that the court follow *Wilson* and *Martin*. This case initiated in the state courts of Pennsylvania and was transferred from the federal district court in Pennsvlvania to this district at defendant's request pursuant to *28 U.S.C. § 1404(a)*. It is beyond cavil that **HN19** when an action has been transferred under *§ 1404(a)*, pursuant to a defendant's motion, the transferee court must apply the same law as the original federal court would have applied. *VanDusen v. Barrack, 378 U.S. at 639, 84 S.Ct. at 821* ("[T]he transferee [*72] district must be obligated to apply the state law that would have been applied if there had been __no__ change of venue.") If it were otherwise, the defendant could attempt to forum shop for favorable law and the policy established in *Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020 (1941)*, of applying the law of the forum state would be undermined. [27] Thus, **HN20** "[a] change in venue under *§ 1404(a)* generally should be, with respect to state law, but a change of courtrooms." *VanDusen, supra.*

Accordingly, in order to effect the foregoing .principles this court "must sit as though it were [*73] a federal district court sitting in the [Eastern District of Pennsylvania]." *Schrieber v. Allis-Chalmers Corp., 611 F.2d 790, 792 (10th Cir. 1979)*. Under the circumstances at bar, a federal district court in Pennsvlvania would have applied Pennsvlvania choice of law rules to determine that North Carolina substantive law applies. This the court has done. However, faced with a determination of predicting what the North Carolina courts would decide on the issue of crashworthiness, the Pennsylvania district court would, if anything, have been bound by its own circuit's decision in *Seese, supra*, not by the Fourth Circuit's holdings in *Wilson* and *Martin*. Since *Seese* remains good law in the Third Circuit, *see* discussion *supra at 40-41*, it is quite

---

[25] The Afex fire suppressant system was desioned to be triggered by heat sensors mounted in several places in the bulldozer. When the temperature rose to 300 degrees Fahrenheit, certain switches were to close and set off a small $CO_2$ cartridge, which in turn was to cause a large pressurized cylinder of $CO_2$ to rupture, releasing pressurized $CO_2$. The gas was then to sweep into a cannister of chemical powder and blow the powder through various nozzles and tubes out over the bulldozer, blanketing any fire. 300 N.C. at 651-53, 268 S.E.2d at 197.

[26] The Supreme Court reasonably assumed that the fire would have caused at least some damage prior to being blanketed by the suppression system, even had the system properly functioned. *Cf.* Miller *v.* Miller, *supra* ("Furthermore it is safe to assume that, if an unbelted plaintiff sustained an injury in an automobile accident, he would also have suffered some injury - albeit minor - from buffeting even had he been wearing his seat belt.")

[27] In *Klaxon*, the Supreme Court held that the *Erie* doctrine requires a federal court to apply the same substantive law that a state court in the same jurisdiction would apply, including the forum state's choice of law rules. *Klaxon* was designed to eliminate forum shopping between state and federal courts in the same jurisdiction by preventing a federal court from applying its own choice of law rules, which could result in the application of the law of a state other than the one that would be applied if the action were initiated in a state court.

likely that a Pennsylvania court would continue to find that North Carolina would adopt the doctrine of crashworthiness. [28] To hold otherwise, would be to encourage the type of forum shopping by defendants which the rule in *VanDusen* seeks to prevent. [29]

Based on the aforesaid, the court holds that if it is bound bv any decision, it is bound by *Seese*. Nevertheless, because principles of inter-circuit comity do exist and because the Third Circuit has never expressly considered the effect of the Fourth Circuit's position in *Wilson* and *Martin*, the court finds it is bound by neither circuit's authority and, therefore, is free to decide the issue as it predicts the North Carolina courts would hold.

Second, assuming *arguendo*, that this court is procedurally bound bv the prior Fourth Circuit decisions in this area, the court finds that circumstances have changed so significantly since the Fourth Circuit ruled in *Martin* in June 1983, that the Court of Appeals if faced with the same issue today would [*75] rule differently. [30]

As a preface to the discussion of changed circumstances, it is important to set forth, at least briefly, (1) those factors which a federal court must review in order to ascertain the applicable state law in the absence of any ruling by the highest state court on the issue and (2) those factors which North Carolina appellate courts generally look to when deciding cases of first-impression in their state.

*HN21* In undertaking the hazardous occupation, and often thankless task, of predicting the predispositions of state law not yet determined, a federa. . . have regard for any persuasive data that is available, such as compelling inferences or logical implications from other related adjudications and considered pronouncements. The responsibility of the federal courts, in matters of local law, is not to formulate the legal mind of the state, but merely to ascertain [*76]

*Polk v*. Ford Motor Co*., 529 F.2d 259, 264 (8th Cir.)*, cert. denied, *426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976)* quoting *Yoder v*. Nu-Enamel Corp*., 117 F.2d 488, 489 (8th Cir. 1941)*. *See also* *Michelin Tires (Canada) Ltd. v*. First National Bank of Boston*, 666 F.2d 673, 682 (1st Cir. 1981)*. [31] In further discussing this function of the federal court, Professor Wright has summarized as follows:

*HN22* In vicariously creating law for a state, the federal court may look to such sources as the Restatements of Law, treatises, and law review commentary, and "the majority rule." The federal court must keep in mind, however, that its function is not to choose the rule that it would adopt for itself, if free to do so, [*77] but to choose the rule that it believes the state court, from all that is known about its methods of reaching decisions, is likely in the future to adopt.

Wright, *Law of Federal Courts* § 58 at 375 (4th ed. 1983). *See also* *City of Aurora, Colorado v*. Bechtel Corp*., 599 F.2d 382, 386 (10th Cir. 1979)* ("we may look to all resources, including decisions of other states, as well as [North Carolina] and federal decisions, and to the general weight and trend of authority."); *Takahashi v*. Loomis Armored Car Service*, 625 F.2d 214 (9th Cir. 1980)* (same); and cases cited in 19 Wright, Miller & Cooper, *Federal Practice & Procedure*: Jurisdiction § 4507 nn. 49-54 (1982).

A review of North Carolina appellate court decisions reveals that the state courts utilize similar methods when reaching decisions of first-impression or re-evaluating older decisions under current criticism. *See*, *e.g.*, *Corprew v*. Geigy Chemical

---

[28]   This court finds this to be particularly true given the fact that the Fourth Circuit's opinion in *Martin* simply relied on *Wilson* and, previously, the Third Circuit in *Seese* chose not to reconsider their holding in that case even after *Wilson* was decided.

[29]   [*74] Given the conflict between the Third and Fourth Circuits on the issue at bar, one could, from the face of this case, reasonably advance the argument that defense counsel recognized this conflict and accordingly moved for transfer to this district from Pennsylvania precisely to avoid the binding effect of *Seese*. The court does not suggest this occurred; it simply points out one reasonable motivation for transfer.

[30]   Unless a federal judoe is permitted some flexibility in reasonably anticipating changes in state jurisprudence, lawyers would, *no* doubt, forum shop based on whether an old or questionable state precedent, or federal prediction of state law, was favorable to his client's position.

[31]   This court is aware of Judge Phillips' admonition in *Martin* that the first step in predicting the future law in a jurisdiction is to look to the present status of the general state law. 707 F.2d at 827.

Corp*., supra*; *Rabon v*. Rowan Memorial Hospital, ***Inc*., 269 N.C. 1, 152 S.E.2d 485 (1967)**; *Watts v*. Cumberland County Hospital System*, 75 N.C.App. 1, 330 S.E.2d 242*, *cert. denied*, *314 N.C. 548, 335 S.E.2d 27 (1985)*; *Sides v*. Duke **[\*78]** *Hospital, 74 N.C.App. 331, 378 S.E.2d 818*, *cert. denied*, *314 N.C. 331, 333 S.E.2d 490 (1985)*. The cited cases are particularly instructive for their extensive reliance on cases from other jurisdictions, scholarly commentary and the rationale behind "the majority rule." *Id*. Moreover, North Carolina courts have not hesitated to depart from the common law or clear precedent when they find the rule at issue to be "unsupported by either law or logic" or when "public policy. and the interests of justice" so require. *Sides v*. Duke Hospital*, 74 N.C.App. at 343, 328 S.E.2d at 827* (recognizing a cause of action for retaliatory discharge of an employee at will due to the employee's refusal to withhold testimony or testify untruthfully in a lawsuit against the defendants); *Corprew v*. Chemical Corp*., 271 N.C. at 497, 157 S.E.2d at 106*. [32] As Judge Phillips of the North Carolina Court of Appeals recently stated in *Sides*:

While it is the function of courts to **[\*79]** interpret rather than make law, it must nevertheless be borne in mind that the common law is not a collection of archaic, abstract legal principles . . . it is a living system of law that, like the skin of a child, grows and develops as the customs, practices and necessities of the people it was adopted for change. The common law had its genesis in the customs and practices of the people, and its genius, as many of the country's greatest jurists and legal scholars have pointed out, is not only its age and continuity, but is vitality and adaptability.

*74 N.C.App. at 344, 328 S.E.2d at 827*. [33] *See also Rothberg v*. Olenik*, 128 Vt. 295, 305, 262 A.2d 461, 467 (1970)* cited in *Padula v*. J. J. Deb-Cin Homes, ***Inc*., 298 A.2d 529, 531 (R.I. 1973)** ("The law should be based upon current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast with the times.")

Applying the above principles to the case at bar, the court finds the following constitute sionificant developments or changes since June of 1983 in the law relevant to the doctrine of crashworthiness and its adaptability under general negligence principles of North Carolina tort law.

As previously stated, thirty-eight of the thirty-nine jurisdictions that have considered the issue of crashworthiness have adopted the doctrine. All of North Carolina's adjacent sister states have done so. Some of these decisions were rendered very recently, specifically in Alabama (1985), Arizona (1984), Mississippi (1985), and New Mexico (1983). *See* list *supra* at 24-27. n34 The decisions in Mississippi and Alabama are extremely notable, for like North Carolina, neither state has traditionally been considered a forerunner in products liability **[\*81]** "reform." Indeed, Mississippi was an initial and ardent follower of the *Evans* rule. *Walton v*. Chrysler Corp*, supra.* Nevertheless, in *Toliver v*. General Motors Corp *., supra*, the Supreme Court of Mississippi, in an 8-0 opinion, overruled *Walton* , adopted the *Larsen* doctrine of crashworthiness, and specifically held plaintiff could prove his cause of action on the basis of general negligence principles. *482 So.2d at 215*. [35] *See also Duran v*. General Motors Corp*. 688 P.2d at 781-82* and 784.

n34 In addition, the Oklahoma Supreme Court acted within this same period of time to embrace the doctrine, following the lead of its federal court predictor. *See Lee v*. Volkswagen of ***America*, *Inc*., *supra.**

---

[32] "There is ***no*** virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right." Spitzer *v*. Commissioners, 188 N.C. 30, 32, 123 S.E. 636, 638 (1924).

[33] Judge Phillips' eloquent statement is particularly applicable to the case at bar, for perhaps far more than in any other area of law, the common law of tort liability has remained the most flexible and conducive to the emerging and developing needs of society. *Larsen, 391 F.2d at 506*. As Professor Prosser has stated:

**[\*80]** The law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.

*Law of Torts*, *supra*, § 1 at 3-4.

[35] The court went on to hold that plaintiff could, *in the alternative*, prove his cause of action under the doctrine of strict liability. 482 So. 2d at 219.

In Alabama's case, neither *Evans* nor *Larsen* had ever been cited in Alabama and **no** Alabama court had ever dealt with the issue of crashworthiness. *General Motors Corp. v*. Edwards*, 482 So.2d at 1181*. However, in *Edwards*, the Supreme Court of Alabama in a 7-0 opinion, adopted the **[\*82]** doctrine of crashworthiness, again on the basis of general negligence law, holding:

> Having studied both opinions and the cases following them, we find that the rule stated in *Larsen* is more in keeping with the purpose of [Alabama products liability law], which is to protect consumers against injuries caused by defective products. . . . A cause of action [now explicitly] exists against an automobile manufacturer when a defect in its product causes it to fail during a collision, producing injury.

*Id*. at 1181-82. [36]

Perhaps the most impressive statistic in all these numbers is not the unanimity among jurisdictions, but that which exists within each jurisdiction itself. *E.g*., Alabama (7-0); **[\*83]** Arizona in *Cota, supra* (3-0); Mississippi (8-0); Nebraska in *Friedrich, supra* (4-0); Tennessee in *Ellithorpe*, *supra* (5-0); Wyoming in *Todorovich*, *supra* (5-0). Even *Evans* was cogently and unanimously overruled in *Huff, supra.* Essentially, the same policy arguments advanced by defendants in this case were advanced in those cases and many of the other states, resulting in defendants' contentions being. rejected each and every time, save the possible exception of West Virginia.

*Wilson* and *Martin* relied on the district court's opinion in *Wilson*, which in turn was predicated upon that same district court's opinion in *Alexander*. After the Supreme Court of Mississippi's decision in *Toliver*, every case cited in *Alexander* has now, without exception, been overturned. This court finds that the Fourth Circuit or the North Carolina Supreme Court would today hold as the Supreme Courts of Alabama and Mississippi did last year. Paraphrasing former Chief Justice Parker's opinion in another context in *Corprew v*. Geigy Chemical Corp*, supra*:

> "[T]he time has come for us to recognize that the *[Evans]* rule for all practical **[\*84]** purposes has ceased to exist. Its principle was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We have [now] abandoned it in this jurisdiction."

> *271 N.C. at 497, 157 S.E.2d at 106*.

As for scholarly commentary, *Evans* has been under overwhelming criticism since the day it was decided. *See*, *e.g*., Nader & Page, *Automobile Design & the Judicial Process*, 55 Cal. L.Rev. 645 (1967); Comment, *Manufacturer's Liability for an "Uncrashworthy" Automobile*, 52 Cornell L.Rev. 444 (1967); Comment, *Automobile Desion Liability:* Larsen *v*. General Motors & Its Aftermath, 118 U.Pa.L.Rev. 299 (1969); Recent Cases, 80 Harv.L.Rev. 688 (1966); Recent Decisions, 42 Notre Dame Lawyer 111 (1966); *See also* Notes, 4 Houston L.Rev. 311 (1966); 52 Iowa L.Rev. 953 (1967); 21 S.Car.L.Rev. 451 (1969); 1966 Utah L.Rev. 698; 24 Vand.L.Rev. 862 (1971). That criticism has continued unabated to the present. *See e.g*., Golden, *Automobile Crashworthiness & The Judiciary Responds When Manufacturers Improper Design Their Cars*, 46 Ins. Counsel J. 335 (1979); Horgan & Norman, *Crashworthiness: The Enhanced Injury Case* **[\*85]** , 20 Trial 84 (1984); Coben, *Building a Crashworthy Car* , 21 Trial 28 (1985); Note, Products Liability - *Automobile Manufacturer Must Design and Build a Crashworthy Automobile*, 5 Fla. St.U.L.Rev. 219 (1977); *Comment*, 18 Wake Forest Law Review 711, *supra*; *Note*, 21 Vill.L.Rev 72, *supra*; *Note*, *62 N.C.L.Rev. 1423*, *supra*; *Note*, 11 Tex. Tech L.Rev. 953 (1980).

Included within the crashworthiness doctrine's adherents is Professor Prosser, perhaps this nation's foremost authority in the field of torts. *Law of Torts*, *supra*, § 96 at 646. Citations to Professor Prosser's work abound in the decisions of the North Carolina appellate courts as they do in most states, thereby suggesting that his view would carry some weight in this jurisdiction. *E.g*., *Williams v*. Power & Light Co*, 296 N.C. at 403*; *250 S.E.2d at 258*; *City of Thomasville v*. Lease- *Afex, Inc., 300 N.C. at 656, 268 S.E.2d at 193*; *Corprew v*. Geigy Chemical Corp*., 271 N.C. at 490-91, 157 S.E.2d at 102*. *See*

[36] The Supreme Court of Alabama held that liability could be predicated upon either: (1) common law negligence, (2) breach of implied warranty or (3) the Alabama Extended Manufacturer's Liability Doctrine (A.E.M.L.D.), 482 So.2d at 1182. If a plaintiff chooses to pursue his crashworthiness cause of action on either negligence or A.E.M.L.D. grounds, the defendant has available the following affirmative defenses: assumption of risk and *contributory* negligence. *Id*.

*also Wooten v*. White Trucks*, 514 F.2d at 639*, (″. . . if there is an author in this common-law ambit who attains to the stature of civil juris consults it is [Professor **[*86]** Prosser]. We may therefore assume he [has not been] lightly invoked.″)

Finally, with regard to law review commentary, it is sionificant that support for the doctrine of crashworthiness and criticism of the *Wilson* and *Martin* decisions can now be found within this state in both the University of North Carolina Law Review and Wake Forest University Law Review. As indicated at footnote 12 , *supra*, in parts of this opinion the court has extensively relied upon the persuasive and well-reasoned analysis of the issue at bar found in Note: *Martin v*. Volkswagen of *America*, *Inc*: Crashworthiness in North Carolina, 62 N.C.L.Rev. at 1423 (1984). As that commentary concluded:

> It appears that because of the compatibility of the crashworthiness doctrine with North Carolina products liability law, North Carolina would accept the crashworthiness theory. Moreover, it is unlikely that North Carolina courts will have the opportunity to rule on the issue. Thus, it is critical that the divided federal courts in North Carolina have a clear and well-reasoned precedent to follow. *Martin v*. Volkswagen of *America*, *Inc*. is particularly disappointing in this respect. Thorough analysis **[*87]** of relevant North Carolina law reveals that the arguments advanced by those courts predicting the rejection of crashworthiness are not well-grounded, while the arguments for its acceptance are compelling.

> 62 N.C.L.Rev. at 1436. *See also* 18 Wake Forest L.Rev. at 733.

Turning next to the general state of North Carolina tort law, it has become increasingly clear, since 1983, that the North Carolina courts are willing to recognize new causes of action when either ″logic,″ ″public policy″ or ″the interests of justice″ so require, particularly as this court stated earlier, when the elements of the new cause of action can be found to fit within some aspect of traditional tort principles. In *Jackson v*. Bumgardner, the North Carolina Court of Appeals expressly recognized an action for wrongful conception or wrongful pregnancy, essentially alleging medical malpractice, finding it sounded in negligence and breach of contract. *71 N.C.App. 107, 109, 321 S.E.2d 541, 543 (1984)*, *cert. granted*, *312 N.C. 797, 325 S.E.2d 486 (1985)*. *See also Pierce v*. Piver*, 45 N.C.App. 111, 262* S.E.2d (1980). The court found that the cause of action was not dependent upon whether the method **[*88]** of birth control was permanent or temporary and, citing cases from Delaware, Georgia and Michigan, the court found the cause of action failed to present any problems incapable of resolution ″in the course of traditional tort litigation.″ *71 N.C.App. at 111, 321 S.E.2d at 544*.

*Jackson* was followed in March of 1985 by the Court of Appeals decision in *Pangburn v*. Saad*, supra*, in which the court recognized an action for injuries suffered by a third party resulting from the wrongful release of a mental patient. Reviewing similar holdings by the Supreme Court of Georgia and the Fourth Circuit Court of Appeals, applying Virginia law, the court stated:

> We likewise apply North Carolina tort principles, and find that plaintiff states a claim for actionable negligence, namely, that defendant breached a duty that he owed to plaintiff, and that she was injured as a proximate cause of that breach, it being *reasonably foreseeable that her injuries would result from the breach*. (emphasis added) (citations omitted).

> *73 N.C.App. at 338-39, 326 S.E.2d at 367*.

Two months later, the Court of Appeals decided *Sides v*. Duke Hospital*, supra*, wherein the court held that ″*no* **[*89]** employer in this State, notwithstanding that an employment is at will, has the right to discharge an employee and deprive him of his livelihood without civil liability because he refuses to testify untruthfully or incompletely in a court case. . . .″ *74 N.C.App. at 342, 328 S.E.2d at 826*. As suggested earlier, this forceful and articulate opinion by Judge Phillips is particularly useful in discerning the appellate court's methodology for deciding cases of first-impression and re-evaluating prior precedent. The court reviewed the origin and basis of the common law and North Carolina rule that an employee at will has *no* enforceable claim against his employer for retaliatory discharge. The court then analyzed the continuing validity of that *per se* rule in light of its increasing criticism by scholars, abrogation and modification in many jurisdictions, and suitability to the socio-economic climate of today. *74 N.C.App. at 337-44, 328 S.E.2d at 824-27*. Finding all of the above factors favored a limitation or modification of the doctrine, the court, for reasons of ″public policy,″ recognized the fact-specific doctrine of wrongful discharge.

Quickly on the heels of *Sides* came [*90] *Watts v*. Cumberland County Hospital System*, supra*, wherein the Court of Appeals recognized a cause of action against a health care provider for the unauthorized disclosure of confidential information. *75 N.C.App. at 9, 330 S.E.2d at 249-50*. Once again, the court primarily relied on decisions from other jurisdictions, *e.g*., Oregon, New York and Alabama, in rendering its determination. *Id*. The Court of Appeals found the cause of action really could be "characterized as one for medical malpractice," *id*., thus, fitting within some traditional tort framework.

These cases, along with others, [37] indicate that, in light of the nearly unanimous recognition of the doctrine of crashworthiness in other states and the contemporary record of the North Carolina appellate courts, manifesting a cleavage to the basic theorem that tort liability should follow harm which results from any intentional or negligent act, if the North Carolina Supreme Court were seized of the present case it would join the modern trend and allow a remedy to plaintiff premised on basic negligence principles. This court believes the North Carolina appellate courts would carefully examine the precedent before [*91] it in the issue *sub judice* and would conscientiously reason that the doctrine of crashworthiness is just and prudent.

One final factor [*94] serves as an indicator, at least in an implicit manner, that North Carolina would now adopt the doctrine of crashworthiness and that is the Court of Appeals recent decision in *Davidson v*. Volkswagenwerk*, A.G., 78 N.C.App. at 193, 336 S.E.2d 714 (1985)*. In *Davidson*, the plaintiff was involved in a head-on collision with another vehicle.

---

[37] *See also* Henry *v*. Deen, 310 N.C. 75, 310 S.E.2d 326 (1984) (recognizing a cause of action premised upon a civil conspiracy to falsify medical records); Dailey *v*. Integon Insurance Corp., 75 N.C.App. 387, 331 S.E.2d 148 (1985) (holding that under some circumstances, insurers may now be held liable for punitive damages, if they act in bad faith); and Raritan River Steel Co. *v*. Cherry, Bekaert & Holland, 79 N.C.App. 81, 87-91, 339 S.E.2d 62, 66-69 (1986) (relying on the "majority rule" and "judicial trend" to hold that lack of privity of contract is not a bar to actions by third parties against certified public accountants for negligent misrepresentation).

*But see* Azzolino *v*. Dinofelder, 71 N.C.App. 289, 322 S.E.2d 567 (1984), *reversed in part*, 315 N.C. 103, 337 S.E.2d 528 1985, where a sharply divided Supreme Court of North Carolina, 4-3, reversed a unanimous decision of the Court of Appeals which had recognized a cause of action for wrongful birth. The Supreme Court did so on the following grounds:

We again assume *arguendo* that the defendants owed the plaintiffs a duty and that they breached that duty. The issue of whether the breach of duty was the proximate cause of the "injury" to the plaintiff parents is more problematic, since even the plaintiffs acknowledge that the fetus which was to be Michael Azzolino was in existence and already genetically defective at the time the defendants first came into contact with the plaintiffs. We also assume *arguendo*, however, that the birth of Michael Azzolino was the proximate result of the defendants' negligence.

[*92] Courts which purport to analyze wrongful birth claims in terms of "traditional" tort analysis are able to proceed to this point but **no** further before their "traditional" analysis leaves all tradition behind or begins to break down. In order to allow recovery such courts must then take a step into *entirely untraditional analysis* by holding that the existence of a human life can constitute an injury cognizable at law. Far from being "traditional" tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury.

It should be emphasized here that the plaintiffs only allege that the defendants negligently caused or permitted an already conceived and defective fetus not to be aborted. The plaintiffs do not allege that the defendants in any way directly caused the genetic defect. Therefore, the only damages the plaintiffs allege they have suffered arise, if at all, from the failure of the defendants to take steps which would have led to abortion of the already existing and defective fetus.

[*93] 315 N.C. at 110-111, 337 S.E.2d at 533-34 (emphasis in original). However, *Azzolino* has **no** effect on this case because the ruling clearly focuses on the "entirely untraditional" concern of holding that the existence of a human life, with severe defects, constitutes a cognizable legal injury. The case at bar presents **no** such social, moral, theological or philosophical problems. Furthermore, as the Supreme Court stated, the plaintiffs in *Azzolino* did not allege that the defendants in any way directly caused the genetic defect. In this case, plaintiffs unambiguously allege that defendants' negligence was a direct and proximate cause of their injuries.

Finally, the court notes that the three panel members of the Court of Appeals and the three dissenters on the Supreme Court all found the *Azzolino* cause of action fit within a traditional negligence or malpractice framework. Under these circumstances, this court finds that *Azzolino* in **no** way precludes a finding that crashworthiness fits within traditional negligence parameters and, in fact, relevant language can easily be garnered from all of the opinions in *Azzolino* to support such a holding.

Plaintiff claimed that the impact of the accident caused the forward wall of his vehicle to collapse into the driving compartment, crushing his legs and body. As the Court of Appeals stated:

> The complaint alleged that the force of the impact of the vehicle was not great and that *plaintiff's injuries were proximately caused by the defective design and lack of crashworthiness of the vehicle*. (emphasis added).

> *78 N.C.App. at 194, 336 S.E.2d at 714*.

The trial court granted summary judgment in *Davidson* on grounds that plaintiff's claims were barred by the North Carolina statute of repose, *N.C.GEN.STAT. § 1-50(6)*, and *on this basis only*, the Court of Appeals affirmed.

*Davidson* is important, not so much for what it states, but for what it doesn't state. If **_no_** cause of action for crashworthiness exists in North Carolina, [*95] both the trial court and the Court of Appeals could clearly have so held in this case - simply by citing to *Martin* or *Wilson* or *Alexander* or *Bulliner*. Neither court did. Rather, the case was dismissed on the basis of the statute of repose. Implicit in the decision that plaintiff's claim was not timely, is the fact that he presented a cognizable claim in the first place. A court will not ordinarily reach the question of whether a claim is timely, unless there is a recognizable cause of action. In the decision-making process, affirmative defenses to claims are not generally analyzed unless there initially is determined to be a cognizable cause of action to defend.

The court acknowledges that *Davidson* does not expressly address the issue of crashworthiness in any manner. Nonetheless, given Judge Phillips' opinion in *Martin* that "courts minded to join 'enlightened trends' in decisional law have **_no_** difficulty reaching out in 'near' cases to join up," and this court's belief that the converse is equally as true, *supra at 46-49*, this court finds that the procedural scenario of *Davidson* more reasonably supports the converse deduction.

In conclusion, as suggested [*96] by Judge Phillips in *Martin*, this court has conducted an "honest reappraisal" of the doctrine of crashworthiness and the Fourth Circuit's decisions in *Martin* and *Wilson*. 707 F.2d at 827. The court has carefully weighed the rationale and policies which underlie both the *Evans* and *Larsen* rules and the implications which flow from them. It is the court's sincere belief that were the North Carolina courts presented with this issue today, they would adopt the doctrine of crashworthiness.

The doctrine of *stare decisis* was never meant to preclude a change in the law. Nor was it designed to "preserve and perpetuate error." *State v*. Ballance*, 229 N.C. 764, 767, 51 S.E.2d 731 (1948)*. Although North Carolina has not been in the vanguard of products liability reform, neither has it sat in the backwaters. To hold that North Carolina would, at this late date, adopt the *Evans* rule, nine years after *Evans* itself was overturned, would require this court to disregard (1) the overwhelming, perhaps unanimous, weight of authority from other state and federal jurisdictions; (2) the compelling logic of the *Larsen* doctrine and its societal implications; (3) the exhaustive [*97] scholarly commentary on the subject which forcefully and articulately urges adoption of the doctrine of crashworthiness; and (4) the unequivocal trend in this state's tort law to recognize the availability of a remedy when it is clear that the public's interests are entitled to legal protection. This the court is unwilling to do and its prediction is otherwise. Further, this court believes the Fourth Circuit, if presented once again with this question, would agree and would overrule *Martin* and *Wilson*. [38]

[*98] The court's decision is further justified by a brief review of

IV. *NORTH CAROLINA'S NEGLIGENCE FRAMEWORK AS IT RELATES TO THE DOCTRINE OF CRASHWORTHINESS*

In North Carolina, **HN23** a products liability claim sounding in tort, must include the same elements as any negligence claim: (1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of

---

[38] Although it is this court's firm opinion that the Fourth Circuit's decisions in *Wilson* and *Martin* were erroneous, absent the procedural posture of this case and changed circumstances since 1983, the court would not be at liberty to simply disregard the pronouncements of the Court of Appeals which sits in this circuit. The court is very aware of its special and limited role in applying the law as established by Congress, the Supreme Court and the Court of Appeals. Its duty and obligation is to attempt to clearly perceive what the law is at any particular moment on a specific issue, and once clearly perceived, to honestly, fairly and forthrightly apply that law irrespective of its own view of whether the law is correct or incorrect. *See* Spell *v*. McDaniel, 591 F.Supp. 1090, 1098-99 (E.D.N.C. 1984).

that standard of care; (3) injury caused directly or proximately by the breach; and (4) loss because of the injury. *City of Thomasville v*. Lease-Afex, *Inc., 300 N.C. at 656, 268 S.E.2d at 194* citing Prosser, *Law of Torts*, *supra* at § 30. Thus, for the crashworthiness theory to be compatible with North Carolina law, each of these essential elements must be established.

Under North Carolina law, **HN24** a manufacturer has a duty to the ultimate consumer, irrespective of contract, to use reasonable care in its manufacturing and to make reasonable inspections of the construction process in its plants where vehicles are manufactured. *Gwyn v*. Lucky City Motors, *Inc., 252 N.C. 123, 113 S.E.2d 302 (1960)*. In *Gwyn*, the North Carolina Supreme Court adopted the reasoning set forth in the **[\*99]** landmark case of *MacPherson v*. Buick Motor Co*., supra*, supported by ″overwhelming authority,″ which allowed an action by a consumer directly against the manufacturer of the product. *252 N.C. at 126, 113 S.E.2d at 304*.

The plaintiff in *Gwyn* alleged that a defect in the brakes of a Ford truck caused them to fail. The court held that the negligence, if any, of the dealership which sold the vehicle to plaintiff, either in its failure to discover or remedy the defect in the brake system, did not intervene and supercede the original negligence of Ford, because there was **no** break in the chain of causation set in motion by Ford's original negligence. *Id. at 131, 113 S.E.2d at 308*. Further, the court refused to hold, as a matter of law, that Ford could not reasonably have anticipated that a mechanic undertaking to repair the brakes would fail, leaving the brakes in their original defective condition. Citing Harper on Torts, ch. 7, sec. 106, the court stated:

> **HN25** A negligent defendant cannot escape liability because of the failure on the part of some third person to perform an affirmative duty which, if properly performed, would have enabled the plaintiff to avoid the risk **[\*100]** created by the defendant's negligence. The failure of the other to inspect adequately may make him liable to the party harmed, but it will not relieve the defendant whose negligence was responsible for the hazard in the first place.

> *Id. at 132, 113 S.E.2d at 309*.

The North Carolina Supreme Court further elaborated on the duty of a manufacturer in *Corprew v*. Geigy Chemical Corp*., supra. Corprew* involved damage to plaintiff's crops as a result of using the defendant's chemical weed killer. The court noted that plaintiff had alleged a cognizable cause of action in negligence and cited Professor Prosser, *Law of Torts*, § 665 (3d ed. 1964), as setting forth the manufacturer's duty:

> **HN26** Since the liability is to be based on negligence, the defendant is required to exercise the care of a reasonable man under the circumstances. His negligence may be found over an area quite as broad as his whole activity in preparing and selling the product. He may be negligent first of all in designing it, so that it becomes unsafe for the intended use. He may be negligent in failing to inspect or test his materials, or the work itself, to discover possible defects, or dangerous **[\*101]** propensities. He may fail to use proper care to give adequate warning to the user, not only as to dangers arising from unsafe design, or other negligence, but also as to dangers inseparable from a properly made product. The warning must be sufficient to protect third persons who may reasonably be expected to come in contact with the product and be harmed by it; and the duty continues even after sale, when the seller first discovers that the product is dangerous. He is also required to give adequate directions for use, when reasonable care calls for them.

> *271 N.C. at 491, 157 S.E.2d at 102-103*. [39] Thus, *Corprew* followed the basic principle that **HN27** ″the manufacturer is liable for an injury to a third person resulting from a failure to perform [the duty to use reasonable

---

[39]   In so holding, the Supreme Court noted that:

[T]oday the ordinary tests of duty, negligence and liability are applied widely to the man who supplies a chattel for the use of another. This trend was *responsive to the ever-growing pressure for protection of the consumer, coupled with a realization that liability would not unduly inhibit the enterprise of manufacturers and that they were well placed both to profit from its lessons and to distribute its burdens*. (emphasis added).

 **[\*102]** *271 N.C. at 492, 157 S.E.2d at 103*, *citing* 2 Harper & James *The Law of Torts*, § 28.1 at 1535.

care] provided that such injuries could reasonably be anticipated." *Id. at 489, 157 S.E.2d at 101*. *See also Swaney v*. Peden Steel Co*., 259 N.C. 531, 543-45, 131 S.E.2d 601, 607 (1963)*; [40] *McCollum v*. Grove Manufacturing Co*., 58 N.C.App. 283, 286-87, 293 S.E.2d 632, 635 (1982)*.

[*103] The reasoning of *Corprew* was followed in *Dupree v*. Batts*, 276 N.C. 68, 170 S.E.2d 918 (1968)*, where plaintiff alleged that defendant Chrysler was negligent in the design and manufacture of the wheels of his car. One of the wheels broke loose while plaintiff was driving and plaintiff lost control of the car. Plaintiff's evidence showed that Chrysler had manufactured the wheels out of the weakest and softest commercially available grade of steel and that a better grade of steel might not have failed. The Supreme Court held that this evidence was sufficient for plaintiff's case to go to the jury, since *HN28* a manufacturer's negligence may arise from the selection of materials for use in the manufacturing process, *Wilson v*. Hardware Co*., 259 N.C. 660, 131 S.E.2d 501 (1963)*, or in failing to make reasonable inspection for hidden defects in the product. *Gwyn, supra*; *See also Tyson v*. Manufacturing Co*., 249 N.C. 557, 107 S.E.2d 170 (1979)* (holding that a manufacturer owes a duty to the ultimate consumer not to construct a product with hidden defects which might result in injury and to give notice to the consumer of any concealed danger).

The logic of the above cases is [*104] clearly applicable to plaintiffs' crashworthiness cause of action. The duty to eliminate any unreasonable risk to the passengers of a car in the event of collision is not dissimilar in any manner to the basic obligation to inspect and test all work and materials to discover possible defects or dangerous propensities. 62 N.C.L.Rev. at 1433; 18 Wake Forest L.Rev. at 719-20.

As a general proposition, then, North Carolina has adopted the principle that the scope of the duty is coterminus with the foreseeability of unreasonable risk. [41] A manufacturer is under a basic duty to use reasonable care in the manufacture and design of a vehicle and if the construction or design creates an unreasonable risk of harm during its intended, normal or forseeable use, the manufacturer is liable for the injuries proximately caused by the defect. *Id. at 713*. As *Section 395 of the Restatement (Second) of Torts* (1965) states:

[*105] *HN30* A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.

Similarly, Section 398, with respect to design negligence, provides that:

*HN31* A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design. [42]

[*106] *See generally Davis v*. Silo, *Inc., 47 N.C.App. 237, 267 S.E.2d 354 (1980)*.

---

[40]   In *Swaney*, the North Carolina Supreme Court held that a manufacturer may be liable for its negligence in the design of a product which is unfit for its anticipated uses, even if such use is negligent. The plaintiff in *Swaney* was injured while "riding the load" in erecting a steel truss fabricated by defendant, when the truss collapsed at its apex because of a defect in design. The defendant alleged plaintiff's "riding the load" was negligent and, therefore, not an anticipated use of the truss. The court held that the evidence showed that "riding the load" was customary in plaintiff's trade. Thus, even if the procedure was negligent, the defendant should have anticipated such use.

Given that *Swaney* indicates a manufacturer is liable to someone who acts without reasonable care, though in a customary manner, in their use of defendant's product, it would seem reasonable to assume that the court would find a manufacturer liable to a plaintiff who was using the product in a normal manner, when another party's foreseeable negligence combined with the manufacturer's negligence to produce injuries to the plaintiff.

[41]   "It is fundamental that *HN29* the standard of conduct which is the basis of the law of negligence is determined by balancing the risk, in light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect and the expedience of the course pursued." Prosser, *Law of Torts*, *supra* at 149.

[42]   Comment K to section 395 states, in pertinent part:

Lisa Ranaldo

Even if there is _**no**_ explicit duty in North Carolina to eliminate unreasonable risks of injury to passengers in the event of a collision, there is such a duty under federal law. The National Traffic & Motor Vehicle Safety Act, *supra*, was passed in 1966, shortly after *Evans* was decided, and declared the necessity of establishing motor vehicle safety standards. *See 49 C.F.R. §§ 571.101-571.302 (1985)*. Under the Act, **HN32** ″Motor vehicle safety″ is defined as″:

> the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against *unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles.*

*15 U.S.C. § 1391(1)*. The intent of the Act was not only to protect individuals from risks associated with defective vehicles after serious injuries occurred, but also to reduce motor vehicle accidents, injuries and property damage and to prevent [*107] serious injuries stemming from established defects before they occur. *See*, *e.g*., *United States v*. General Motors Corp*., 565 F.2d 754 (D.C.Cir. 1977)*; *United States v*. Ford Motor Co*., 574 F.2d 534 (D.C.Cir. 1978)*. *See also Truck Safety Equipment Institute v*. Kane*, 466 F.Supp. 1242 (M.D.Pa. 1979)*.

The standards created are binding on the states, *15 U.S.C. § 1392(d)*, and specify the testing and degree of protection required of automobile manufacturers. For example, the standards regulate, among other things, occupant impact with the interior of the passenger compartment, [43] protection of the driver from injury caused by the steering column, [44] and retention of passengers within the vehicle in a collision. [45] Moreover, North Carolina has indicated its ongoing support of this effort by enacting the Vehicle Equipment Safety Compact, *N.C.GEN.STAT. § 20-183.13* (1983).

[*108] Accordingly, based on the aforesaid, the court finds that there is ample evidence that it is reasonable to require automobile manufacturers to eliminate foreseeable and unreasonable risks of injury in the event of a collision, and that this duty is entirely compatible with the basic North Carolina products liability standard of care. [46] 62 N.C.L.Rev. at 1434; 18 Wake Forest L.Rev. at 718-19 and 724-28. *See also Toliver v*. General Motors Corp*., 482 So.2d at 215*; *Passwaters v*. General Motors Corp., 454 F.2d 1274-76; *Larsen, 391 F.2d at 503-505*.

The second essential element in a products liability tort action is a breach of the duty owed. This can be found in any failure of the manufacturer to eliminate unreasonable risk of injury. *See*, *e.g.*, *City of Thomasville v*. Lease-Afex, *Inc., 300 N.C. at 657, 268 S.E.2d at 195*.

The third essential element is that the injury be proximately caused by the breach. The court previously discussed this element at length at pp. 53-57, *supra*, and that analysis does not bear repeating here.

---

> The manufacturer may, however, reasonably anticipate other uses than the one for which the chattel is primarily intended. The maker of a chair, for example, may reasonably expect that someone will stand on it.

[43] E.g., 49 C.F.R. § 571.201 (occupancy protection in interior impacts); § 571.208 (occupant crash protection) (1985).

[44] *Id*. § 571.203 (protection for driver from impact with steering mechanism); § 571.204 (steering control rearward displacement).

[45] Id. § 571.206 (door locks and door retention systems) § 571.210 (seat belt assembly anchorages).

[46] One argument traditionally raised by manufacturers in crashworthiness cases is that they should not be held liable because the intervening negligence of the other driver insulates the original negligence of the manufacturer. However, under North Carolina law, **HN33** if the negligence of an actor is a proximate cause of any part of the plaintiff's injuries, he is liable. Wise *v*. Vincent, 265 N.C. 647, 144 S.E.2d 877 (1965). If the intervening negligence of a third party is reasonably foreseeable, it does not insulate a previously negligent party from liability for injuries caused by that party's original negligence. Hairston *v*. Alexander Tank & Equipment Co., 310 N.C. at 235-38, 311 S.E.2d at 566-68; McNair *v*. Boyette, 282 N.C. at 237-38, 192 S.E.2d at 461-62. A jury is instructed that an intervening act will break the chain of causation and relieve a wrongdoer from liability only if the intervening act is the sole proximate cause of the injuries. Thomas *v*. Deloath, 45 N.C.App. 322, 263 S.E.2d 615, *cert*. denied, **300 N.C. 379, 267 S.E.2d 685 (1980)**.

[*109] Thus, **HN34** in a crashworthiness case, when a vehicle is being driven in a normal manner, a manufacturer's negligence in design or construction is not automatically insulated by a foreseeable intervening collision. 18 Wake Forest L.Rev. at 725. *See generally* Fietzer *v*. Ford Motor Co., 590 F.2d 215 (7th Cir. 1978); Passwaters *v*. General Motors Corp., 454 F.2d at 1270, 1273-74.

Lisa Ranaldo

*HN35* The final element in a negligence cause of action is that there be actual loss or damage because of the injury. *Unlike Azzolino*, *supra* at n. 38, the question in crashworthiness cases is not whether there was any cognizable damage, but how to determine what part of the damage is attributable to each cause - i.e., **[*110]** the rule of apportionment. Obviously, in a number of cases it may be difficult to differentiate between damage due solely to the original impact and damage due to the enhancement of injuries caused by the crashworthiness defect. 62 N.C.L.Rev. at 1435. *See generally* Note, *Apportionment of Damages in the "Second Collision" Case*, 63 Va.L.Rev. 475 (1977). Since, under the doctrine of crashworthiness, the manufacturer is only liable for the collision-enhanced injuries, the manufacturers have sought to impose the burden of apportioning the damages on the plaintiff. Decisions are split concerning this burden, with the substantial majority of jurisdictions placing this burden on the defendants, generally finding it more just that defendants bear the entire loss for which they are each theoretically only liable in part, than that the innocent victims of their combined wrongs forfeit all recovery for their inability to directly trace their injuries to each cooperating cause. *Compare Caiazzo v*. Volkswagenwerk, A.G*., 647 F.2d 241, 249-50 (2d Cir. 1981)* (holding plaintiff has the burden of proving the extent of his enhanced injuries attributable to the defective design) and *Huddell* **[*111]** *v*. Levin*, 537 F.2d 726 (3d Cir. 1976)* (same) with *McLeod v*. American Motors Corp*., 723 F.2d 830 (11th Cir. 1984)* (burden on the defendant); *Mitchell v*. Volkswagenwerk, A.G*., 669 F.2d 1199 (8th Cir. 1982)* (holding that under Minnesota law, burden as to divisibility of damages is on the defendant); *Fox v*. Ford Motor Co*., 575 F.2d 774 (10th Cir. 1978)*; *General Motors Corp v*. Edwards, *supra* (same); *Toliver v*. General Motors Corp*., supra* (same); *Chrysler Corp. v*. Todorovich, *supra* (on defendant, indivisible result).

Despite the difficulties in apportioning damages, not one jurisdiction has refused to recognize the tort of crashworthiness because of the apportionment concern. Resort can generally be had to analogous state law principles regarding the divisibility of damages. *See*, *e.g*., *Mitchell v*. Volkswagenwerk, A.G*., supra*; *Lee v*. Volkswagen of ***America***, ***Inc.***, *688 P.2d at 1286-1289*.

In North Carolina, state courts have repeatedly addressed the difficult task of apportioning damages, albeit in a different context, through application of the doctrine of "avoidable consequences." *See*, *e.g*., *Johnson v*. R.R*., 184 N.C. 101,* **[*112]** *113 S.E. 606 (1922)*. This doctrine imposes the duty on a plaintiff to minimize the injuries caused by another; the plaintiff's failure to do so will defeat his recovery to the extent of the resulting aggravation of injuries. *See Miller v*. Miller*, 273 N.C. at 238-40, 160 S.E.2d at 73-74*. This aggravation of damages often cannot be calculated with certainty, and in a close case a court may fairly refuse to allocate damages between the plaintiff and defendant. *Id. at 240, 160 S.E.2d at 74* citing Prosser, *Law of Torts* § 64 at 134 (1964).

However, the court notes, without deciding the issue today, that when the allocation is between the *two defendants*, North Carolina generally appears to hold the tortfeasors jointly and severally liable for all damages, thereby indicating that in the crashworthiness context, the burden might more appropriately be placed on each defendant to prove what part of the damages is not allocable to his negligence. 62 N.C.L.Rev. at 1436. This treatment of damages is certainly consistent with the concern for the plight of the worthy plaintiff voiced in *Miller, supra.* Similarly, the Supreme Court in *City of Thomasville v*. Lease-Afex, ***Inc*** **[*113]** *., supra*, displayed **_no_** reluctance to allow damages when it would be difficult to apportion them between the causes of the injuries. *300 N.C. at 657, 268 S.E.2d at 195*. 62 N.C.L.Rev. at 1436.

That being said, the issue of the burden of proof on apportionment of damages is one that needs further consideration and discussion, there being merit to both sides of the issue. *See* 18 Wake Forest L.Rev. at 729 (indicating burden, under North Carolina law, more appropriately rests on the plaintiff It is sufficient for purposes of this order that, regardless of which party ultimately possesses the burden, damages in a crashworthiness case are theoretically ascertainable under North Carolina law. It may be that if the court were to adopt the *Huddell v*. Levin and *Caiazzo* test, placing the burden on the plaintiff, that a particular plaintiff would be unable to prove with specificity those injuries which were caused by the specific crashworthiness defects, thereby mandating dismissal of his case against the manufacturer. Nonetheless, that determination is fact and case-specific. The above scenario certainly provides **_no_** reason to deny the existence of the tort in the first instance. **[*114]** *Id. at 730-733*.

Accordingly, the court concludes that an action based on the *Larsen* doctrine of crashworthiness sufficiently conforms to the traditional North Carolina tort framework and contains the requisite elements for a general negligence action.

*V*. CONCLUSION

In conclusion, it is hereby ORDERED that:

1. Defendants' motion to dismiss plaintiffs' "crashworthiness" cause of action, predicated on general negligence principles, is DENIED as this court holds that the appellate courts of North Carolina, if faced today with the issue *sub judice*, would adopt the *Larsen* doctrine of crashworthiness:

2. Defendant's motion to dismiss plaintiffs' "crashworthiness" cause of action, predicated upon strict liability principles, is GRANTED as North Carolina has clearly rejected the doctrine of strict liability, *Smith v*. Fiber Control Corp*., supra*;

3. Defendants' motion to dismiss plaintiffs' "crashworthiness" cause of action, predicated upon breach of warranty, is GRANTED for the reasons set forth in 21 Vill.L.Rev. at 91-93, *supra*. *See also Sealey v*. Ford Motor Co*., 499 F.Supp. at 477*; 18 Wake Forest L.Rev. at 721-22 n.93; *Cf. Dyson v*. General Motors [*115] *Corp., 298 F.Supp. at 1066*;

4. Defendants' motion for summary judgment is DENIED, without prejudice to defendants right to renew said motion after the completion of substantial discovery. *See Tarleton v*. Meharry Medical College*, 717 F.2d 1523, 1535 (6th Cir. 1983)*; and

5. Plaintiffs and defendants shall file their respective briefs on the apportionment of damages burden of proof issue within thirty (30) days of the date of service of this order.

VI. *COMMENT*

The issue of whether North Carolina would adopt the doctrine of crashworthiness has now been addressed by federal district courts in each district of this state and in Pennsylvania, as well as by the Third and Fourth Circuit Courts of Appeal. In the aggregate, hundreds of judicial hours have been expended addressing this issue; an issue that could long ago have been dispositively decided by the state courts of North Carolina. Although the question *sub judice* has not directly been raised in a state case, if North Carolina had enacted a statute providing for certification of substantial issues of state law from a federal court, the Supreme Court of North Carolina could have decided the issue as early as 1971 in [*116] *Alexander*. However, such is not the case as *no* mechanism for certification exists under state law. This is most unfortunate for the question at bar is obviously one best left to the state courts to authoritatively decide. Federal courts can act only as predictors of state law and prediction is a hazardous occupation at best. Certification "of course, in the long run, save[s] time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Brothers v*. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed. 25 215 (1974)*. It is only hoped that this opinion, when published, will provide some impetus towards renewed efforts to enact a procedure for certification of important issues of state law raised in the federal courts of North Carolina. .n this time and place, the expense of litigating questions such as the one at bar over prolonged periods of time cannot be justified to the taxpayers; the costs are simply unfair to the judicial system, the individual litigants, and the public.

SO ORDERED.

This *4th* day of *June,* 1986.

*JAMES C. FOX,* United States District Judge